1      UNITED STATES DISTRICT COURT

2      MIDDLE DISTRICT OF LOUISIANA

3

4  THOMAS FRAMPTON        : CIVIL ACTION

5  VERSUS                 : NO. 21-362-JWD-SDJ

6  CITY OF BATON ROUGE,
   ET AL                  : AUGUST 6, 2021
7
   =========================================================
8          MOTION FOR PRELIMINARY INJUNCTION HEARING
                HELD VIA ZOOM VIDEOCONFERENCE
9          BEFORE THE HONORABLE JOHN W. DEGRAVELLES
                UNITED STATES DISTRICT JUDGE
10
                    A P P E A R A N C E S
11

12  FOR THE PLAINTIFF:

13      LAW OFFICE OF WILLIAM MOST
        BY: WILLIAM BROCK MOST, ESQ.
14      201 ST. CHARLES AVENUE
        SUITE 114 #101
15      NEW ORLEANS, LOUISIANA 70170

16      BY: KATHARINE MURPHY SCHWARTZMANN, ESQ.
        TULANE UNIVERSITY SCHOOL OF LAW
17      FIRST AMENDMENT LAW CLINIC
        6329 FRERET STREET
18      SUITE 130C
        NEW ORLEANS, LOUISIANA 70118

19

20  FOR THE DEFENDANTS:

21      JOSEPH K. SCOTT, III, ATTORNEY AT LAW, L.L.C.
        BY: JOSEPH K. SCOTT, III, ESQ.
22      9448 BROOKLINE AVENUE
        BATON ROUGE, LOUISIANA 70809
23
        DOTSON FIRM, LLC
24      BY: ANDERSON O. DOTSON, III, ESQ.
        POST OFFICE BOX 4123
25      BATON ROUGE, LOUISIANA 70821

1    OFFICE OF THE PARISH ATTORNEY
     BY: DEELEE MORRIS, ESQ.
2    POST OFFICE BOX 1471
     BATON ROUGE, LOUISIANA 70821
3

4         REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
                 UNITED STATES COURTHOUSE
5                  777 FLORIDA STREET
             BATON ROUGE, LOUISIANA 70801
6                   (225) 389-3565

7    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
          COMPUTER-AIDED TRANSCRIPTION SOFTWARE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              I N D E X

2  PLAINTIFF WITNESS:                                PAGE

3   THOMAS FRAMPTON

4       DIRECT EXAMINATION BY MR. MOST .............18

5       CROSS-EXAMINATION BY MR. SCOTT .............58

6  PLAINTIFF/DEFENSE WITNESS:

7   DEELEE MORRIS

8       CROSS-EXAMINATION BY MR. MOST ..............62

9       DIRECT EXAMINATION BY MR. DOTSON ...........80

10      RECROSS-EXAMINATION BY MR. MOST ............93

11      QUESTIONS BY THE COURT .....................97

12      FOLLOW-UP EXAMINATION BY MR. MOST .........107

13      FOLLOW-UP EXAMINATION BY MR. DOTSON .......109

14 DEFENSE WITNESS:

15  VALERIE SINGLETON

16      DIRECT EXAMINATION BY MR. SCOTT ...........114

17      CROSS-EXAMINATION BY MR. MOST .............120

18 DEFENSE WITNESS:

19  COURTNEY MYERS-MINOR

20      DIRECT EXAMINATION BY MR. SCOTT ...........121

21      CROSS-EXAMINATION BY MR. MOST .............125

22      REDIRECT EXAMINATION BY MR. SCOTT .........125

23

24

25

1    **(21-CV-362 FRAMPTON V CITY OF BATON ROUGE)**

2                          **(AUGUST 6, 2021)**

3                              **PROCEEDINGS**

4           **THE COURT:**  GOOD MORNING, EVERYONE.  WE'RE HERE

5    IN THOMAS FRAMPTON VERSUS CITY OF BATON ROUGE AND OTHERS.

6    IT'S NO. 21-362.

7           WILL COUNSEL ENTER AN APPEARANCE FOR THE

8    RECORD.

9           **MR. MOST:**  GOOD MORNING, YOUR HONOR.

10   WILLIAM MOST AND KATIE SCHWARTZMANN ON BEHALF OF

11   PLAINTIFF, PROFESSOR THOMAS FRAMPTON.

12          **THE COURT:**  ALL RIGHT.

13          **MR. SCOTT:**  GOOD MORNING, YOUR HONOR.

14   JOSEPH SCOTT AND ANDY DOTSON ON BEHALF OF THE CITY OF

15   BATON ROUGE, CHIEF MURPHY PAUL AND MAYOR BROOME.

16          **THE COURT:**  ALL RIGHT.  AND, MR. SCOTT, I'M

17   TELLING YOU -- AND OUR COURT REPORTER JUST DID

18   THIS -- THAT THERE IS NO MISTAKING WHAT THAT SIGNAL

19   MEANS.  I WAS HAVING TROUBLE HEARING YOU AS WELL.  IT

20   SOUNDS LIKE YOU'RE IN A WELL.  I DON'T KNOW WHETHER

21   YOU CAN GET CLOSER TO THE MIKE OR WHAT WE NEED TO DO

22   TO SOLVE THAT ISSUE, BUT LET'S SEE IF WE CAN SOLVE

23   IT.

24          **MR. SCOTT:**  SEE HOW THAT GOES?

25          **THE COURT:**  REALLY NOT MUCH BETTER.  IT

1   STILL HAS THIS KIND OF RING TO IT AS THOUGH YOU'RE IN

2   A CAVERN.  IS IT POSSIBLE THAT YOU COULD GET HOOKED

3   UP TO A HEADSET?

4           **MR. SCOTT:**  I DON'T OWN ONE, YOUR HONOR.

5           **THE COURT:**  WELL, LET'S JUST -- WE'LL GO

6   ALONG FOR A MINUTE AND LET'S SEE IF IT WORKS.  THAT

7   LAST SENTENCE WAS CLEARER THAN YOUR PREVIOUS

8   SENTENCES, SO MAYBE WE CAN DO IT.  I JUST NEED TO

9   MAKE SURE WE GET A GOOD RECORD HERE.  SO IF WE NEED

10  TO STOP AND DO SOMETHING TO SOLVE THIS ISSUE, WE

11  WILL, BUT LET'S JUST PROCEED FOR A MOMENT.

12          LET ME SAY A COUPLE OF THINGS PRELIMINARILY.

13  ONE, WE'RE DOING THIS BY ZOOM, OF COURSE, AND WE'RE

14  IN THE MIDDLE OF A REAL SERIOUS SPIKE IN COVID CASES

15  IN LOUISIANA AND IN BATON ROUGE.  ORDINARILY I WOULD

16  HAVE LIKED TO HAVE DONE THIS IN COURT, BUT IT'S

17  SIMPLY NOT POSSIBLE.  WE HAVE OUR COURTHOUSE ACTUALLY

18  CLOSED AT LEAST UNTIL AUGUST 16TH.  EVERYONE IN THE

19  COURTHOUSE IS TELEWORKING, BY COURT ORDER, AND SO

20  WE'RE HAVING TO DO THIS BY ZOOM.

21          BUT NONETHELESS, ALTHOUGH I DON'T THINK I'M

22  REQUIRED TO GET CONSENT, I WOULD ASK THE PARTIES

23  WHETHER THEY ARE WILLING TO CONSENT TO DOING THIS BY

24  ZOOM.

25          AND I ASK THE PLAINTIFF FIRST.

1          **MR. MOST:**  YES, YOUR HONOR.  IN FACT, WE
2   WERE GOING TO REQUEST IT, BUT THE CLERK BEAT US TO
3   IT.
4          **THE COURT:**  ALL RIGHT.
5          AND FROM THE DEFENSE, DO WE HAVE YOUR
6   CONSENT?
7          **MR. SCOTT:**  WE WILL CONSENT FOR PURPOSES OF
8   THIS HEARING, YOUR HONOR.
9          **THE COURT:**  OKAY.  AND THEN THE SECOND ISSUE
10  I WANTED TO RAISE IS:  I SAW THERE WERE EXHIBITS
11  WHICH WERE INTRODUCED YESTERDAY.  I SAY *INTRODUCED*.
12  THEY WERE INTRODUCED INTO THE RECORD.  THEY HAVEN'T
13  BEEN INTRODUCED IN THE HEARING YET.  MAYBE WE CAN DO
14  THAT AS A PRELIMINARY MATTER.
15         BUT I JUST WANT TO LET THE PARTIES KNOW, OF
16  COURSE, I HAVEN'T HAD A CHANCE TO REALLY LOOK AT
17  THOSE.  AND I'M ASKING THE PARTIES:  DO THEY
18  ANTICIPATE NEEDING TIME AFTER THE HEARING FOR POST-
19  TRIAL BRIEFING?  WE WILL, OF COURSE, HAVE A
20  TRANSCRIPT, SO I'LL ASK THE PLAINTIFF FIRST AND THEN
21  THE DEFENDANT -- DEFENDANTS.
22         **MR. MOST:**  YOUR HONOR, I THINK IF IT WOULD
23  AID THE COURT, WE'D BE HAPPY TO DO SO.  I THINK THE
24  PREHEARING BRIEFING LAYS OUT THE ISSUES PRETTY
25  EFFECTIVELY ON BOTH SIDES, SO I DON'T ANTICIPATE A

1  STRONG NEED FOR IT.  BUT IF IT WOULD AID THE COURT,

2  WE'D BE HAPPY TO DO IT.

3          **THE COURT:**  ALL RIGHT.

4          WHAT ABOUT FROM THE DEFENDANTS?

5          **MR. SCOTT:**  WE -- SURPRISINGLY, WE PRETTY

6  MUCH AGREE WITH MR. MOST ON THIS ISSUE.  IF THERE ARE

7  NEW ISSUES RAISED OR NEW ARGUMENTS THAT NEED TO BE

8  ADDRESSED, BY ALL MEANS, WE'LL PREPARE A BRIEF FOR

9  THE CONVENIENCE OF THE COURT.  BUT OTHERWISE, I THINK

10  WE'LL TAKE THE TESTIMONY AND SEE HOW IT GOES.

11          **THE COURT:**  WHEN IS THE HEARING IN JUVENILE

12  COURT SET, OR IS IT SET?

13          **MR. MOST:**  IT IS SET, YOUR HONOR, FOR

14  SEPTEMBER -- JUST PULLING IT UP.  SEPTEMBER 30TH,

15  YOUR HONOR.

16          **THE COURT:**  SEPTEMBER 30TH.  OKAY.  WELL,

17  I'M GOING TO TAKE THIS ISSUE UP AT THE END OF THE

18  HEARING, BECAUSE THEN HOPEFULLY WE'LL KNOW WHAT NEW

19  ISSUES, IF ANY, HAVE BEEN INTRODUCED, AND I'LL GIVE

20  YOU MY FEELING AS TO WHETHER I THINK IT WOULD HELP ME

21  TO GET SOME POST-TRIAL BRIEFING.

22          OKAY.  SO WE'RE BACK TO THE ISSUE OF THE

23  EXHIBITS.  ARE -- THE EXHIBITS WHICH WERE FILED IN

24  THE RECORD YESTERDAY, ARE THOSE GOING TO BE

25  INTRODUCED WITHOUT OBJECTION?  IF SO, AT LEAST TO THE

1  EXTENT THAT THEY ARE GOING TO BE INTRODUCED WITHOUT

2  OBJECTION, I THINK IT WOULD BE A GOOD IDEA TO GO

3  AHEAD AND DO THAT NOW SO THAT WE DON'T HAVE TO WORRY

4  ABOUT DOING IT THROUGH INDIVIDUAL WITNESSES AND THAT

5  KIND OF THING.

6          **MR. MOST:**  PLAINTIFF HAS NO OBJECTION TO THE

7  INTRODUCTION OF ANY OF DEFENDANTS' EXHIBITS.

8          **THE COURT:**  ALL RIGHT.  AND FROM THE

9  PLAINTIFFS -- I'M SORRY -- DEFENDANTS AS TO THE

10 PLAINTIFF'S EXHIBITS?

11         **MR. SCOTT:**  WE DON'T ANTICIPATE ANY

12 OBJECTIONS, YOUR HONOR.

13         **THE COURT:**  DOES THAT MEAN YOU HAVE NO

14 OBJECTIONS?

15         **MR. SCOTT:**  I DON'T KNOW WHAT THEY FILED.

16         **THE COURT:**  YOU HAVEN'T LOOKED AT THE

17 EXHIBITS?

18         **MR. DOTSON:**  YOUR HONOR, WE'RE LOOKING AT IT

19 RIGHT NOW.  AND WE DON'T HAVE ANY OBJECTIONS, YOUR

20 HONOR.

21         **THE COURT:**  OKAY, GOOD.

22         ALL RIGHT.  WELL, THEN WE'RE GOING TO

23 RECEIVE ALL THE EXHIBITS INTO EVIDENCE AS THEY ARE

24 MARKED ON THE FILING WITH THE COURT.  AND SO THE

25 PARTIES CAN REFER TO THESE EXHIBITS IN THEIR

QUESTIONING OR THEIR ARGUMENT WITHOUT ANY FURTHER
NEED FOR INTRODUCTION.

FINALLY I WANT TO SAY, BEFORE WE GET STARTED
WITH THE HEARING, THAT THIS, OF COURSE, IS BEING DONE
BY ZOOM.  I WANT TO REMIND -- AND I KNOW WE HAVE
SOME -- I THINK WE HAVE SOME LAW STUDENTS WHO ARE
PARTICIPATING, JUST LISTENING.  AND THAT WAS WITH THE
PERMISSION OF THE COURT.

BUT I WANT TO REMIND ALL OF THE PARTIES AND
ANYONE WHO IS LISTENING THAT IT IS BOTH IMPROPER AND
ILLEGAL TO RECORD THIS.  SO I WANT TO GET
ACKNOWLEDGMENT OF THE PARTIES THAT THEY UNDERSTAND
THAT.

MR. MOST, FOR THE PLAINTIFF?

**MR. MOST:**  YES, FOR PLAINTIFF, WE
ACKNOWLEDGE AND UNDERSTAND THAT.

**THE COURT:**  ALL RIGHT.  FROM THE DEFENDANTS?

**MR. SCOTT:**  UNDERSTOOD, YOUR HONOR.  WE'RE
NOT RECORDING ANYTHING.

**THE COURT:**  OKAY.  AND I'M REALLY STILL
HAVING TROUBLE HEARING YOU CLEARLY.  LET'S SEE IF WE
CAN DO SOMETHING.  IS THERE SOMEBODY IN YOUR TECH
DEPARTMENT THAT CAN MAYBE HELP MAKE THE AUDIO A
LITTLE CLEARER?

**MR. SCOTT:**  MR. DOTSON IS GOING TO LOOK FOR

1  SOMEBODY TO FIND ASSISTANCE HERE.

2      MR. MOST:  DURING DEPOSITIONS THE CITY

3  PARISH HAS ON SOME OCCASIONS BEEN CALLING IN BY

4  TELEPHONE, AND IT SOUNDS BETTER THAN WHAT WE'RE

5  HEARING NOW.  I WONDER IF THAT'S AN OPTION.

6      THE COURT:  YES, WITH THE ZOOM.  YES, WE'VE

7  DONE THAT BEFORE AND IT SEEMS TO WORK WELL.

8      KRISTIE, ANY ADVICE HERE?

9      THE COURTROOM DEPUTY:  JUST TELL ME WHO YOU

10 WOULD LIKE ME TO EMAIL THE TELEPHONE INSTRUCTIONS TO.

11     THE COURT:  ALL RIGHT.  LET'S EMAIL THEM TO

12 MR. SCOTT.

13     THE COURTROOM DEPUTY:  IS THAT DEELEE?  I

14 CAN'T REALLY TELL WITH THE MASK.

15     MS. MORRIS:  YES.  I'M SORRY.

16     THE COURT:  SO THAT'S MS. MORRIS.  AND I

17 DIDN'T HEAR HER EITHER.  I COULDN'T UNDERSTAND

18 ANYTHING.

19     THE COURTROOM DEPUTY:  THAT WAS MS. MORRIS,

20 JUDGE.  I'M GOING TO EMAIL THE INSTRUCTIONS TO HER.

21     THE COURT:  OKAY, GOOD.

22     THE COURTROOM DEPUTY:  THAT'S DEELEE MORRIS.

23     THE COURT:  ALL RIGHT.

24     MR. MOST:  YOUR HONOR, I BELIEVE THERE IS

25 ONE OTHER PERSON IN THE EAST BATON ROUGE PARISH

1 ATTORNEY'S ROOM.  AND I DON'T KNOW IF THEY'VE BEEN

2 INTRODUCED.  THEY MAY BE A WITNESS.  WE'RE LIKELY TO

3 MOVE THE COURT TO SEQUESTER WITNESSES, SO WE MIGHT AT

4 SOME POINT WANT TO IDENTIFY WHO THAT IS.

5       **THE COURT:**  OKAY.  WE'LL DO THAT RIGHT NOW.

6       MR. SCOTT, CAN YOU TELL US WHO THAT IS?  I

7 CAN'T SEE -- I SAW A PART OF A BODY BUT NO FACE.  SO

8 WHO ELSE IS IN THERE WITH YOU?

9       **MR. SCOTT:**  YOUR HONOR, WE HAVE THREE

10 WITNESSES.  IT WOULD BE -- (INAUDIBLE DUE TO

11 VIDEOCONFERENCE TECHNICAL DIFFICULTIES) --

12       **THE COURT:**  WAIT, WAIT.  LET'S STOP, MR.

13 SCOTT, BECAUSE THE COURT REPORTER CAN'T HEAR YOU AND

14 I CAN'T HEAR YOU.  SO LET'S WAIT UNTIL WE GET THE

15 PHONE SITUATION SITUATED AND HOPEFULLY WE CAN GET ALL

16 OF THAT CLEARLY ON THE RECORD.

17       BUT THERE HAS BEEN A MOTION TO SEQUESTER THE

18 WITNESSES, AND I'M GOING TO GRANT THAT MOTION.

19       AND FOR THE WITNESSES WHO ARE PRESENT AND

20 CAN HEAR MY VOICE, WHAT THAT MEANS IS THAT YOU'LL

21 NEED TO STAND OUTSIDE OF THE ROOM WHERE YOU ARE NOW.

22 YOU CAN SPEAK TO THE ATTORNEYS ABOUT THE CASE, BUT

23 YOU CAN'T SPEAK WITH ONE ANOTHER OR ANYONE WHO IS NOT

24 AN ATTORNEY ABOUT THE CASE, ANYTHING TO DO WITH THE

25 CASE, UNTIL YOU HAVE BEEN SWORN AND TESTIFIED AND

1  THEN RELEASED FROM THE SEQUESTRATION ORDER.

2         SO TO THE EXTENT THAT THERE MAY BE A WITNESS

3  THAT'S NOT IN THE ROOM HEARING THIS, I WOULD ASK THAT

4  EITHER THE PLAINTIFF'S LAWYER OR THE DEFENSE LAWYER

5  TO MAKE SURE THAT THAT WITNESS IS ADVISED OF THE

6  SEQUESTRATION ORDER.

7         **MR. MOST:**  YOUR HONOR, PROFESSOR FRAMPTON IS

8  A WITNESS ON BOTH PARTIES' LIST.  AND HE'S A PARTY TO

9  THE CASE, SO I PRESUME THAT THIS DOES NOT APPLY TO

10 HIM.  BUT PLEASE LET ME KNOW IF I'M WRONG.

11        **THE COURT:**  YOU ARE CORRECT.

12        **MR. SCOTT:**  THAT'S MY UNDERSTANDING OF THE

13 SEQUESTRATION RULE AS WELL.

14        **THE COURT:**  ALL RIGHT.  THANK YOU, MR.

15 SCOTT.

16        **THE COURTROOM DEPUTY:**  THE INSTRUCTIONS HAVE

17 BEEN SENT, JUDGE.

18        **THE COURT:**  WHAT'S THAT, KRISTIE?

19        **THE COURTROOM DEPUTY:**  I SENT THE

20 INSTRUCTIONS TO MS. DEELEE MORRIS.

21        **THE COURT:**  OKAY.  SO MS. MORRIS HAS THE

22 INSTRUCTIONS AND WE'RE WAITING TO SEE IF SHE CAN GET

23 THE PHONE HOOKED UP.

24        **(WHEREUPON, THERE WAS A PAUSE IN THE**

25 **PROCEEDINGS DUE TO VIDEOCONFERENCE TECHNICAL**

1 DIFFICULTIES.)

2       **THE COURT:** SO THERE IS NO ONE Y'ALL CAN

3 CALL THAT'S AN I.T. PERSON THAT CAN GIVE YOU EXPERT

4 ADVICE?

5       **MR. DOTSON:** YES, SIR. WHAT WE'RE GOING TO

6 DO IS WE'RE GOING TO GO TO MY OFFICE -- I THINK IT'S

7 GETTING BETTER, BUT WE'RE GOING TO GO IN MY OFFICE

8 AND DO THIS, AND THEN WE'LL TRY AND GET SOMEBODY HERE

9 TO FIX IT IN HERE IF WE CAN.

10       **THE COURT:** THAT SOUNDS LIKE A PLAN. WE'LL

11 STAND AT RECESS UNTIL THEN.

12       **(WHEREUPON, A RECESS WAS TAKEN DUE TO**

13 **VIDEOCONFERENCE TECHNICAL DIFFICULTIES.)**

14       **THE COURT:** SO WE ARE READY TO PROCEED.

15 WE'RE BACK ON THE RECORD.

16       AND, MR. MOST, YOU MAY PROCEED.

17       **MR. MOST:** YES, YOUR HONOR. I'D LIKE TO

18 MAKE A VERY BRIEF OPENING STATEMENT AND THEN WILL

19 MOVE INTO THE DIRECT EXAMINATION OF PROFESSOR THOMAS

20 FRAMPTON, IF I MAY.

21       **THE COURT:** YOU MAY.

22       **MR. MOST:** YOUR HONOR, THE PLAINTIFF HERE IS

23 PROFESSOR THOMAS FRAMPTON. HE SHARED HIS CLIENT

24 CLARENCE GREEN'S COPY OF A VIDEO. THAT VIDEO

25 DEPICTED WHAT THIS COURT CALLED A "SERIOUS AND WANTON

1 DISREGARD" OF CONSTITUTIONAL RIGHTS BY THE BATON

2 ROUGE POLICE DEPARTMENT.  THAT VIDEO WAS ALREADY IN

3 THE PUBLIC RECORD.  SPECIFICALLY IT WAS IN THE -- IT

4 WAS PUBLICLY AVAILABLE TO ANYONE WHO REQUESTED IT

5 THROUGH THE CLERK OF THIS COURT, THE MIDDLE DISTRICT

6 OF LOUISIANA.  AND THE VIDEO, IN FACT, HAD BEEN

7 REPORTED ON BY THE ADVOCATE NEWSPAPER BEFORE

8 PROFESSOR FRAMPTON SHARED IT.

9        BUT LITERALLY ONE DAY AFTER PROFESSOR

10 FRAMPTON'S SHARING OF HIS CLIENT'S COPY OF THE VIDEO

11 CAUSED IT TO BECOME A NATIONAL NEWS STORY, THE CITY

12 PARISH MOVED TO HOLD PROFESSOR FRAMPTON IN CONTEMPT

13 OF COURT, ARGUING THAT THE VIDEO WAS A CONFIDENTIAL

14 RECORD OF THE JUVENILE COURT, EVEN THOUGH THERE NEVER

15 HAD BEEN A JUVENILE COURT PROCEEDING REGARDING THIS

16 JUVENILE AND THIS ARREST.

17        NOW, THE CITY HAS ARGUED IN BRIEFING THAT IT

18 DIDN'T KNOW THE VIDEO WAS ALREADY A PUBLIC RECORD

19 WHEN THEY MOVED FOR CONTEMPT AGAINST PROFESSOR THOMAS

20 FRAMPTON.  BUT THIS IS A PRELIMINARY INJUNCTION

21 HEARING.  AND AS OF TODAY, THE CITY IS WELL AWARE

22 THAT THE VIDEO WAS IN THE PUBLIC RECORD FOR MORE THAN

23 HALF A YEAR BEFORE PROFESSOR THOMAS FRAMPTON SHARED

24 IT.  AND AS OF TODAY, THE CITY IS CONTINUING IN ITS

25 EFFORT TO HOLD PROFESSOR FRAMPTON IN CONTEMPT,

SOMETHING THAT COMES WITH UP TO SIX MONTHS OF JAIL TIME.

SO THIS COURT IN THIS HEARING IS GOING TO LEARN A COUPLE OF THINGS.  WE EXPECT THAT IT WILL LEARN THAT THE CITY PARISH'S INTERPRETATION OF THE LAW WOULD MEAN THAT MANY, MANY OTHER PERSONS WOULD BE SIMILARLY IN CONTEMPT OF JUVENILE COURT UNDER THE CITY PARISH'S THEORY.  BUT THE CITY ONLY MOVED FOR SANCTIONS AGAINST THE ONE PERSON WHO MADE THEIR MISCONDUCT A NATIONAL NEWS STORY.

INDEED, THIS COURT WILL LEARN THAT PROFESSOR FRAMPTON IS THE ONLY PERSON THE CITY PARISH HAS EVER MOVED FOR SUCH SANCTIONS AGAINST.  YOU'RE GOING TO LEARN THAT THE CITY PARISH DOES NOT EVEN FOLLOW ITS OWN INTERPRETATION OF THE LAW, AND YOU'RE GOING TO LEARN THAT PROFESSOR FRAMPTON'S SPEECH HAS BEEN ACTUALLY CHILLED BY THE CITY'S THREATS.

AND SO FOR THESE REASONS, BY THE END OF THIS HEARING, WE BELIEVE THAT PLAINTIFF WILL HAVE ESTABLISHED SOME LIKELIHOOD OF SUCCESS ON THE MERITS, WHICH IS WHAT THIS COURT NEEDS TO ISSUE THE PRELIMINARY INJUNCTION.  THANK YOU, YOUR HONOR.

**THE COURT:**  ALL RIGHT.  DOES THE DEFENSE WISH TO MAKE AN OPENING STATEMENT?

**MR. SCOTT:**  YES, YOUR HONOR.  JOSEPH SCOTT

1  ON BEHALF OF THE CITY PARISH.

2        I UNDERSTAND THE PLAINTIFF'S POSITION, BUT I

3  THINK THAT THIS COURT SHOULD ABSTAIN FROM INTERFERING

4  IN A STATE COURT CONTEMPT PROCEEDING, AS I'VE SET

5  FORTH.  THE CITY PARISH HAS NOT ASKED FOR ANY

6  PARTICULAR SANCTION AGAINST PROFESSOR FRAMPTON.  WE

7  THINK THIS IS THE CORRECT METHOD TO TEST WHETHER THIS

8  WAS A GOOD RELEASE OR NOT.

9        AND IF THE JUVENILE COURT SAYS *IT WAS*

10  *ALREADY OUT THERE.  MR. FRAMPTON DID NO WRONG*, THE

11  MATTER IS COMPLETE.  BUT WE BELIEVE THAT THE JUVENILE

12  COURT IS THE COURT OF PROPER JURISDICTION TO MAKE

13  THAT DETERMINATION.

14        SO I'D ASK THIS COURT TO ABSTAIN, LET THE

15  JUVENILE COURT MAKE ITS FINDINGS.  AND IF THERE IS

16  SOME RESIDUAL CAUSE OF ACTION AFTER THE JUVENILE

17  COURT MAKES ITS DETERMINATION, THEN BY ALL MEANS THE

18  PLAINTIFF CAN PROCEED.  BUT I THINK THAT THE PROPER

19  WAY TO DO IT IS TO LET THE JUVENILE COURT INTERPRET

20  THE LOUISIANA CHILDREN'S CODE AND THEN ASK THE

21  FEDERAL COURT FOR WHATEVER REVIEW MAY BE AVAILABLE.

22  THANK YOU.

23        **THE COURT:**  ALL RIGHT.  THANK YOU, MR.

24  SCOTT.

25        ALL RIGHT.  MR. MOST, YOU MAY PROCEED.

1        MR. MOST:  WE'LL CALL OUR FIRST WITNESS TO

2  THE STAND, PROFESSOR THOMAS FRAMPTON, THE PLAINTIFF

3  IN THIS MATTER.

4        MR. DOTSON:  YOUR HONOR, IF I MAY, JUST AS A

5  HOUSEKEEPING MATTER -- AND I JUST WANTED TO ASK THIS

6  REAL QUICK, YOUR HONOR.  WE DID -- AND WHAT MR. SCOTT

7  WAS REFERENCING WAS OUR 12(B)(6) MOTION.  AND I

8  WASN'T SURE IF YOUR HONOR WAS JUST GOING TO DEFER

9  TILL THE END ONCE YOU HEAR ALL THE TESTIMONY OR IF WE

10 WERE GOING TO ADDRESS THAT IN THE BEGINNING.  THAT'S

11 KIND OF WHAT MR. SCOTT WAS ALLUDING TO, YOUR HONOR,

12 JUST FOR HOUSEKEEPING PURPOSES.

13       THE COURT:  WE'RE GOING TO WAIT TILL THE

14 END.  I'M GOING TO ROLL BOTH OF THESE INTO THE SAME

15 DECISION, SO I'M CONSIDERING ALL THE EVIDENCE IN

16 CONNECTION WITH BOTH THE MOTION TO DISMISS -- WELL,

17 ACTUALLY, TO THE EXTENT THAT I'M ABLE TO CONSIDER

18 EVIDENCE IN CONNECTION WITH THE MOTION TO DISMISS I

19 WILL.  BUT I'M CONSIDERING THE MOTION TO DISMISS AND

20 THE MOTION FOR PRELIMINARY INJUNCTION AT THE SAME

21 TIME.

22       MR. DOTSON:  THANK YOU, YOUR HONOR.  I

23 APPRECIATE IT.

24       THE COURT:  ALL RIGHT.

25       MR. MOST:  MS. CAUSEY, WOULD YOU SWEAR IN

1  THE WITNESS, PLEASE.

2          **(WHEREUPON, THOMAS FRAMPTON, BEING DULY**

3  **SWORN, TESTIFIED AS FOLLOWS.)**

4                  **DIRECT EXAMINATION**

5  **BY MR. MOST:**

6      **Q**   ALL RIGHT.  GOOD MORNING, PROFESSOR

7  FRAMPTON.

8      **A**   GOOD MORNING.

9      **Q**   WOULD YOU PLEASE INTRODUCE YOURSELF AND YOUR

10  CURRENT POSITION.

11      **A**   MY NAME IS THOMAS FRAMPTON.  I'M AN

12  ASSOCIATE PROFESSOR OF LAW AT THE UNIVERSITY OF

13  VIRGINIA SCHOOL OF LAW.

14      **Q**   AND WHAT DO YOU TEACH THERE?

15      **A**   I TEACH CRIMINAL PROCEDURE, CRIMINAL LAW AND

16  CIVIL RIGHTS LITIGATION.

17      **Q**   DO YOU PUBLISH SCHOLARSHIP IN THOSE FIELDS?

18      **A**   YES.  I HAVE PUBLISHED OR HAVE WORKS

19  FORTHCOMING FOR *HARVARD LAW REVIEW*, *MICHIGAN LAW*

20  *REVIEW*, *CALIFORNIA LAW REVIEW*, *STANFORD LAW REVIEW*

21  ONLINE, *VANDERBILT LAW REVIEW*, *THE JOURNAL OF*

22  *CRIMINAL LAW & CRIMINOLOGY*, *THE FEDERAL SENTENCING*

23  *REPORTER* AND SEVERAL OTHERS.

24      **Q**   WHAT DID YOU DO BEFORE YOU WERE A PROFESSOR

25  AT UNIVERSITY OF VIRGINIA?

1     **A**    IMMEDIATELY BEFORE I WAS THE LECTURER ON LAW

2   AND CLIMENKO FELLOW AT HARVARD LAW SCHOOL.  AND

3   BEFORE THAT I PRACTICED CRIMINAL DEFENSE IN

4   LOUISIANA.

5     **Q**    DO YOU STILL PRACTICE LAW?

6     **A**    A LITTLE BIT.  I HAVE A HANDFUL OF CIVIL

7   RIGHTS, HABEAS AND DIRECT APPEALS CASES THAT I DO

8   STRICTLY ON A PRO BONO BASIS, ALONGSIDE MY ACADEMIC

9   RESPONSIBILITIES HERE.

10    **Q**    WAS THERE A PETITION FILED AGAINST YOU IN

11  JUVENILE COURT THIS YEAR?

12    **A**    YES.

13    **Q**    BEFORE THAT PETITION WAS FILED AGAINST YOU,

14  HAD YOU EVER APPEARED IN BATON ROUGE JUVENILE COURT?

15    **A**    NO.  NEVER.

16    **Q**    ALL RIGHT.  SO I WANT TO TALK A LITTLE BIT

17  ABOUT THE STORY OF WHAT LED US HERE TODAY.  AND WE'LL

18  START ON JANUARY 1, 2020.

19        CAN YOU TELL ME WHAT HAPPENED ON JANUARY 1,

20  2020?

21    **A**    SURE.  CLARENCE GREEN AND HIS 16-YEAR-OLD

22  BROTHER, WHO IS NOW AN ADULT -- BUT I'LL REFER TO HIM

23  AS FB -- WERE RIDING AS PASSENGERS IN A VEHICLE THAT

24  WAS STOPPED BY A TEAM OF BATON ROUGE POLICE

25  DEPARTMENT OFFICERS.  THEY WERE BOTH ILLEGALLY

1  FRISKED SEVERAL TIMES BEFORE THEY WERE BOTH ILLEGALLY

2  STRIP-SEARCHED.

3       AFTER THEY WERE ARRESTED, THEY WERE TAKEN TO

4  THEIR MOTHER'S HOUSE WHERE TWO BRPD OFFICERS

5  ILLEGALLY ENTERED WITHOUT A WARRANT AND GUNS DRAWN.

6  THE APARTMENT WAS SEARCHED.  AND AT THE CONCLUSION OF

7  THE ENCOUNTER, ONE OF THE OFFICERS RETURNED TO THE

8  HANDCUFFED CLARENCE GREEN AND REPEATEDLY AND

9  PROFANELY THREATENED TO BEAT HIM WHILE HE SAT IN THE

10 BACK OF A POLICE CAR.

11    Q   SO TWO PEOPLE WERE ARRESTED THAT DAY:

12 CLARENCE GREEN AND FB?  DO I HAVE THAT RIGHT?

13    A   THAT'S RIGHT.  FB WAS THEN HELD FOR ABOUT 30

14 MINUTES TOTAL BEFORE HE WAS DROPPED OFF AT HIS

15 MOTHER'S APARTMENT.

16    Q   OKAY.  SO WHAT RESULTED FROM THE ARREST OF

17 CLARENCE GREEN?  WHAT WAS THE NEXT STEP IN HIS

18 CRIMINAL MATTER?

19    A   HE WAS EVENTUALLY INDICTED FEDERALLY IN THE

20 MIDDLE DISTRICT OF LOUISIANA.  AND THAT CASE -- FOR

21 POSSESSION OF A FIREARM.  THAT CASE WAS -- THERE WAS

22 A SUPPRESSION HEARING.  AND THEN BEFORE JUDGE JACKSON

23 RULED ON IT, THE GOVERNMENT FILED A RULE 48 MOTION TO

24 DISMISS, WHICH THE COURT GRANTED.

25    Q   ALL RIGHT.  I'D LIKE TO PULL UP THAT ORDER

1    AND SEE IF I'M LOOKING AT THE SAME ONE YOU'RE

2    DESCRIBING.

3           PROFESSOR FRAMPTON, IS THIS THE ORDER THAT

4    YOU'RE DESCRIBING GRANTING THE RULE 48 MOTION?

5      A    YES.  THAT'S JUDGE JACKSON'S ORDER.

6      Q    OKAY.  AND DO YOU SEE THIS FOOTNOTE HERE?

7      A    YEAH.  IN ADDITION TO GRANTING THE MOTION,

8    HE INCLUDED A LENGTHY FOOTNOTE EXPRESSING HIS

9    CONCERNS ABOUT THE GOVERNMENT CONDUCT IN THE CASE.

10     Q    OKAY.  WOULD YOU READ TO ME THIS THIRD

11   SENTENCE IN THE FOOTNOTE THAT BEGINS *AS REFLECTED IN*

12   *THE VIDEO EVIDENCE*?

13     A    *AS* --

14          THE COURT:  MR. MOST, LET ME INTERRUPT FOR

15   JUST ONE SECOND.  I KNOW IT'S BEEN INTRODUCED INTO

16   EVIDENCE, BUT THERE IS NO REFERENCE YET TO ITS

17   EXHIBIT NUMBER.  SO THAT THE RECORD IS CLEAR, IF YOU

18   COULD JUST TELL US WHAT EXHIBIT NUMBER THIS IS.

19          MR. MOST:  THANK YOU, YOUR HONOR.  OF

20   COURSE.  THIS IS PLAINTIFF'S EXHIBIT 3.

21          THE COURT:  ALL RIGHT.

22          MR. SCOTT:  AND, YOUR HONOR, I'M GOING TO

23   OBJECT TO READING THE DOCUMENT.  I WOULD SAY THAT THE

24   DOCUMENT IS THE BEST EVIDENCE OF ITS CONTENTS AND

25   REQUIRES NO FURTHER INTERPRETATION FROM THE PARTIES.

1    **THE COURT:**  WELL, I MEAN, LOOK, I'VE READ

2    IT.  OKAY?  SO IF YOU'RE READING IT FOR MY BENEFIT,

3    YOU DON'T NEED TO WASTE THE TIME.  IF THERE IS

4    SOMETHING YOU WANT SPECIFICALLY TO BRING TO MY

5    ATTENTION, I'M HAPPY TO HEAR IT.

6         BUT IN TERMS OF READING THE WHOLE THING, I'M

7    NOT GOING TO SUSTAIN THE OBJECTION, I'M NOT GOING TO

8    PREVENT YOU FROM DOING IT.  I'M JUST TELLING YOU IT'S

9    NOT NECESSARY.

10        **MR. MOST:**  OKAY.  THEN I'LL JUST ASK.

11   BY MR. MOST:

12   **Q**   PROFESSOR FRAMPTON, IS THIS THE FOOTNOTE

13   FROM WHICH WE GET THE *SERIOUS AND WANTON DISREGARD*

14   *FOR CONSTITUTIONAL RIGHTS* LANGUAGE THAT'S BEEN

15   DESCRIBED?

16   **A**   YES.

17   **Q**   THANK YOU.

18        ALL RIGHT.  SO THAT'S WHAT HAPPENED WITH

19   CLARENCE GREEN'S ARREST.  HE WAS INDICTED AND THEN

20   THE CHARGES WERE COMPLETELY DROPPED AGAINST HIM?  IS

21   THAT THE END OF WHAT HAPPENED TO CLARENCE GREEN'S

22   CRIMINAL CHARGES?

23   **A**   CORRECT.  HIS CRIMINAL CASE CONCLUDED IN

24   DECEMBER OF 2020.

25   **Q**   AND FB, THE YOUNGER BROTHER, WAS -- WHAT

1 HAPPENED AFTER HE WAS ARRESTED?  WAS HE BOOKED OR

2 TAKEN TO PRISON OR ANYTHING LIKE THAT?

3    A    NO.  HE WAS DROPPED OFF AT HIS MOM'S

4 APARTMENT.

5    Q    OKAY.  AND WAS THERE ANY SORT OF DOCUMENT

6 THAT ALLOWED THE POLICE TO -- OR THAT THE POLICE USED

7 TO RELEASE HIM TO HIS MOTHER?

8    A    AT THE TIME THEY DROPPED FB OFF WITH HIS

9 MOTHER, THEY HAD HER SIGN SOMETHING THAT BRPD CALLS A

10 CUSTODIAL AGREEMENT.  THEY DID NOT GIVE HER A COPY OF

11 IT.  BUT YOU CAN SEE ON THE VIDEO VERY BRIEFLY, FOR

12 ABOUT A SECOND, SHE PUTS HER SIGNATURE ON A PIECE OF

13 PAPER.  SO I THINK THAT'S THE DOCUMENT YOU'RE

14 REFERRING TO.

15    Q    YEAH.  I'LL PULL THIS UP AND SEE IF WE'RE

16 LOOKING AT THE SAME DOCUMENT.  THIS IS PLAINTIFF'S

17 EXHIBIT 2.

18       IS THIS THE DOCUMENT YOU'RE DESCRIBING,

19 PROFESSOR FRAMPTON?

20    A    THAT'S RIGHT.  YES.

21    Q    OKAY.  AND PRIOR TO THE FILING OF THIS CIVIL

22 CASE THAT WE'RE HERE FOR TODAY, HAD YOU EVER SEEN

23 THIS DOCUMENT BEFORE?

24    A    I HAD NEVER SEEN -- I ONLY SAW IT FOR THE

25 FIRST TIME I THINK WHEN IT WAS TENDERED ABOUT TWO

1   WEEKS AGO, WAS THE FIRST TIME I HAD ACTUALLY SEEN IT.

2   AND I WAS NOT PREVIOUSLY AWARE OF IT PRIOR TO --

3   SORRY -- DURING THE CIVIL LAWSUIT OR REALLY SEEING OR

4   PROMOTING THE VIDEO; CLARENCE GREEN'S COPY OF THE

5   VIDEO.

6       Q    AND THIS DOCUMENT -- I WANT TO LOOK AT THE

7   LANGUAGE OF IT TO TRY AND SEE WHAT IT IS.  IS THERE

8   ANY LANGUAGE IN HERE THAT REFLECTS TO YOU WHAT THIS

9   DOCUMENT IS OR WHAT IT DOES?

10      A    SURE.  IT SAYS THAT IF THERE IS A TIME FIXED

11  BY THE COURT, THE PARENT AGREES TO BRING THE CHILD

12  THERE.  OR IF THERE IS NOT EVER ANY KIND OF COURT

13  DATE BUT BRPD SIMPLY WANTS TO HAVE INTERVIEWS WITH

14  THE CHILD, THE PARENT ALSO AGREES TO THAT AS WELL.

15  AND SPECIFICALLY I'M LOOKING AT THE LANGUAGE *FOR*

16  *INTERVIEWS AND/OR HEARINGS UPON NOTIFICATION.*

17      Q    THAT'S IN THAT SECOND PARAGRAPH SORT OF

18  ABOUT A THIRD OF THE WAY DOWN THE PAGE?

19      A    THE PART THAT TONYA GREEN SIGNS.

20      Q    DO YOU SEE ANY FILE STAMP ON THIS THAT THIS

21  WAS FILED WITH THE JUVENILE COURT?

22      A    NO.

23      Q    TO YOUR UNDERSTANDING, DOES THIS INITIATE A

24  MATTER OR PROCEEDING IN THE JUVENILE COURT?

25          **MR. DOTSON:**  OBJECTION, YOUR HONOR.  I DON'T

1  THINK HE -- THERE HAS BEEN A FOUNDATION LAID THAT HE

2  CAN PROVIDE THAT TYPE OF INFORMATION OR THAT HE'S

3  AWARE OF THE POLICIES AND PROCEDURES REGARDING THE

4  FILING OF MATTERS IN THE JUVENILE COURT.

5       **THE COURT:**  OKAY.  I'M GOING TO SUSTAIN THAT

6  OBJECTION.

7       BUT I AM GOING TO ASK THAT YOU GUYS

8  CHOOSE -- IN THE DEFENSE SIDE -- CHOOSE A LAWYER TO

9  REPRESENT YOUR CLIENT FOR THIS WITNESS, BECAUSE THE

10 RULE IN THIS COURT IS, IS THAT ONE LAWYER PER ONE

11 WITNESS.  I KNOW MR. SCOTT PREVIOUSLY OBJECTED.  NOW

12 YOU'RE OBJECTING, MR. DOTSON.  SO WHY DON'T YOU PICK

13 A HORSE AND THEN RIDE IT.

14       **MR. DOTSON:**  I APOLOGIZE, YOUR HONOR.  THE

15 HORSE TODAY IS GOING TO BE MR. SCOTT ON THIS WITNESS.

16 I APOLOGIZE.

17       **THE COURT:**  ALL RIGHT.  NO PROBLEM.

18       YOU MAY PROCEED.

19       **MR. MOST:**  THANK YOU, YOUR HONOR.

20 BY MR. MOST:

21    **Q**   PROFESSOR FRAMPTON, DO YOU KNOW WHAT

22 HAPPENED WITH THIS DOCUMENT AFTER MS. GREEN SIGNED

23 IT?

24    **A**   YES.  SO SHE WASN'T GIVEN A COPY.  AND THEN

25 ACTUALLY IT APPEARS THAT SERGEANT CAMALLO LOST IT FOR

1  SEVEN MONTHS BEFORE REDISCOVERING IT AFTER HE HAD

2  MISPLACED IT SOMETIME IN LATE JULY OR EARLY AUGUST OF

3  2020.

4      Q    THANK YOU.

5           SO THIS -- FB WAS NOT TAKEN TO ANY SORT OF

6  PRISON OR JAIL?  IS THAT MY UNDERSTANDING BASED ON

7  THIS AGREEMENT?

8      A    THAT'S RIGHT.

9      Q    OKAY.  WAS FB SUBSEQUENTLY CHARGED?

10     A    NO.  NEVER.

11     Q    EVEN AS OF TODAY?

12     A    AS OF AT LEAST 48 HOURS AGO, NO.

13     Q    SO DID YOU AT ANY POINT REPRESENT ANY MEMBER

14 OF THE GREEN FAMILY?

15     A    YES.  SO I REPRESENTED CLARENCE AND TONYA

16 GREEN IN A SECTION 1983 LAWSUIT BROUGHT AGAINST

17 THE -- SEVERAL MEMBERS OF THE BATON ROUGE POLICE

18 DEPARTMENT AND OTHERS, AND REPRESENTED FB.

19     Q    OKAY.  AND HOW DID YOU COME TO REPRESENT

20 THEM?

21     A    I INITIALLY CAME TO REPRESENT THEM BECAUSE I

22 READ JUDGE JACKSON'S OPINION AND I DECIDED TO LOOK

23 INTO THE UNDERLYING FACTS.  AND I REALIZED THAT AT

24 THE TIME THAT HE ISSUED HIS OPINION, THERE WAS STILL

25 A COUPLE DAYS LEFT BEFORE THE ONE-YEAR PROSCRIPTION

1  PERIOD RAN.

2      **Q**    AND DID YOU -- WHAT WAS THE TERMS OF YOUR

3  REPRESENTATION IF YOU REACHED OUT TO THEM?  WAS IT

4  FOR MONEY, PRO BONO?

5      **A**    NO.  I CONTACTED CLARENCE GREEN AND HIS

6  MOTHER, TONYA GREEN, AND I VOLUNTEERED TO REPRESENT

7  THEM.  IN LOUISIANA IF YOU HAVE A PECUNIARY MOTIVE,

8  YOU ACTUALLY CAN'T DO WHAT I DID, THE DIRECT

9  SOLICITATION.  BUT MY AGREEMENT WITH THEM WAS

10  EXPRESS; THAT I WAS NOT GOING TO MAKE ANY MONEY

11  WHATSOEVER BY REPRESENTING THEM AND WOULD NOT ACCEPT

12  ANY ATTORNEY'S FEES OR OTHERWISE PROFIT IN ANY WAY

13  FROM THEIR REPRESENTATION.

14      **Q**    ALL RIGHT.  AND DID YOU WIND UP FILING ANY

15  LITIGATION ON THEIR BEHALF?

16      **A**    I DID.  ON JANUARY 2ND OF 2021 I FILED *GREEN*

17  *V CAMALLO* IN THE MIDDLE DISTRICT OF LOUISIANA,

18  ALLEGING MULTIPLE CONSTITUTIONAL VIOLATIONS,

19  TRESPASS, FALSE IMPRISONMENT AND, I BELIEVE, THE

20  MANUFACTURING OF FALSE EVIDENCE, BASED ON SERGEANT

21  CAMALLO'S TESTIMONY.

22          **MR. MOST:**  I'LL NOTE THAT THE COMPLAINT IS

23  IDENTIFIED AS PLAINTIFF'S EXHIBIT 4, JUST FOR THE

24  RECORD.

25  **BY MR. MOST:**

1    Q    SO, PROFESSOR FRAMPTON, WERE YOU COUNSEL OF

2   RECORD IN THAT CASE?

3    A    YES, I WAS.

4    Q    DID YOU OBTAIN ANY EVIDENCE RELATED TO THAT

5   CIVIL SUIT?

6    A    I DID, YES.

7    Q    WHAT KIND OF EVIDENCE DID YOU OBTAIN?

8    A    REPORTS AND VIDEOS PRINCIPALLY, AND

9   TRANSCRIPTS.

10    Q    THOSE VIDEOS, WHAT KIND OF VIDEOS WERE THEY?

11    A    SO THE FIRST THING I DID WAS CONTACT

12   CLARENCE GREEN'S FEDERAL PUBLIC DEFENDER.  AND I

13   EXPLAINED THAT I NOW REPRESENTED CLARENCE GREEN IN A

14   CIVIL CAPACITY, AND I REQUESTED A COPY OF ALL OF HIS

15   FILES FROM *UNITED STATES V GREEN*.  AND HE OBLIGED.

16    Q    HAD THE FEDERAL PUBLIC DEFENDER USED THESE

17   VIDEOS IN THE CRIMINAL PROCEEDING?

18    A    YES.  SO HE HAD ABOUT TEN HOURS WORTH OF

19   FOOTAGE.  I THINK IT WAS ABOUT TWO GIGABYTES IN

20   TOTAL.  BUT ABOUT AN HOUR WORTH OF CLIPS WERE

21   ADMITTED BY BOTH CLARENCE GREEN AND BY THE UNITED

22   STATES GOVERNMENT AS EXHIBITS IN THE NOVEMBER 20TH

23   SUPPRESSION HEARING IN CLARENCE GREEN'S CRIMINAL

24   CASE.

25    Q    WERE THEY ADMITTED UNDER SEAL OR OTHERWISE

1  PROTECTED?

2      A    NO.

3      Q    OKAY.  SO AS OF NOVEMBER 2020, THESE -- THE

4  VIDEO YOU'RE DESCRIBING WAS IN THE PUBLIC RECORD OF

5  THIS COURT?  IS THAT A FAIR STATEMENT?

6      A    THAT'S RIGHT.  THE 63 MINUTES OF FOOTAGE

7  WERE IN THE PUBLIC RECORD, AND THE TEN HOURS WERE THE

8  PROPERTY OF CLARENCE GREEN AS THEY HAD BEEN TURNED

9  OVER TO HIM.

10     Q    AND DID THE VIDEO THAT WAS PLACED INTO THE

11 PUBLIC RECORD -- DID THAT INCLUDE FOOTAGE OF BOTH

12 CLARENCE GREEN AND THE JUVENILE FB?

13     A    YES.  THE VIDEO THAT WAS IN THE COURT'S

14 RECORD SHOWS THE ILLEGAL SEARCHING OF FB.  IT SHOWS

15 HIS UNBLURRED FACE.  SO THAT WAS IN THE EXHIBITS THAT

16 I THINK BOTH SIDES HAD INTRODUCED.

17     Q    THANK YOU.

18          AND DO YOU KNOW IF THAT FOOTAGE WAS EVER

19 ACCESSED BY ANYBODY BESIDES THE PARTIES AND YOURSELF?

20     A    YES.  LEA SKENE, A JOURNALIST WHO COVERED

21 THE MATTER FOR THE BATON ROUGE ADVOCATE, OBTAINED THE

22 FOOTAGE IN JANUARY OF 2021.

23          **MR. SCOTT:**  YOUR HONOR, I'M GOING TO OBJECT

24 TO THE HEARSAY.

25          **THE COURT:**  ALL RIGHT.  I DIDN'T HEAR ANY

1  HEARSAY YET, BUT I THINK A FOUNDATION WOULD BE PROPER

2  TO SAY WHAT IS THE BASIS FOR HIS UNDERSTANDING.

3      Q    PROFESSOR FRAMPTON, HOW DO YOU KNOW THAT

4  SOMEONE ELSE ACCESSED THEM?

5      A    FROM -- TWO REASONS.  ONE IS FROM READING

6  HER DESCRIPTION OF THE VIDEOS THAT APPEARED IN THE

7  ADVOCATE.  AND THE SECOND WAS FROM DIRECTLY

8  CONFIRMING WITH HER IN WRITING THAT SHE HAD OBTAINED

9  THE FOOTAGE.

10     Q    I'M GOING TO PULL UP PLAINTIFF'S EXHIBIT 5

11 TO SEE IF WE CAN SEE WHAT YOU'RE DESCRIBING.

12          IS THIS THE ARTICLE THAT YOU'RE DESCRIBING,

13 PROFESSOR FRAMPTON?

14     A    YES.

15     Q    OKAY.  AND THIS IS DATED JANUARY 12, 2021?

16     A    THAT'S WHEN IT WAS PUBLISHED, YES.

17     Q    I'M GOING TO TURN TO PAGE 5 OF PLAINTIFF'S

18 EXHIBIT 5.  DOES THIS PAGE REFLECT WHAT YOU'RE

19 DESCRIBING; THAT -- IT INDICATED TO YOU SOMEHOW THAT

20 THEY HAD ACCESSED THE VIDEO?

21     A    YES, IT DOES.  AND I CAN EXPLAIN, IF YOU'D

22 LIKE.

23     Q    PLEASE.

24     A    SURE.  SO IN THE MIDDLE PARAGRAPH THERE IT

25 SAYS "CAMALLO'S BODYCAM VIDEO SHOWS HIM PUSHING OPEN

1  THE APARTMENT DOOR AND WALKING INSIDE WITH ANOTHER

2  OFFICER."  SO THAT'S INFORMATION THAT ACTUALLY WAS

3  NOT IN JUDGE JACKSON'S OPINION OR OTHERWISE EASILY

4  ACCESSIBLE.  IT REFLECTS HAVING ACTUALLY WATCHED THE

5  VIDEO.  AND THAT'S, OF COURSE, WHAT MS. SKENE TOLD ME

6  AS WELL.

7      Q    ALL RIGHT.  THANK YOU.

8           SO BY JANUARY OF 2021, THIS VIDEO WAS

9  ALREADY IN THE PUBLIC RECORD, AND YOU CONCLUDED THAT

10 THE PRESS HAD IT AND WAS REPORTING ON IT.  IS THAT A

11 FAIR SUMMARY?

12     A    SURE.  AND JUST TO BE TOTALLY CLEAR, THE

13 DETAIL THAT YOU'D ONLY GET FROM THE BODYCAM VIDEO IS

14 THAT THERE WAS A SECOND OFFICER WALKING BEHIND

15 CAMALLO.  THAT WAS TROY LAWRENCE, JR.  JUDGE

16 JACKSON'S OPINION REFERENCES THE ILLEGAL SEARCH OF

17 THE APARTMENT BUT NOT THAT DETAIL.

18     Q    THANK YOU.

19          AND IN THE COURSE OF REPRESENTING THE GREEN

20 FAMILY IN THIS CASE, DID YOU SEND ANY PUBLIC RECORDS

21 ACT REQUEST?

22     A    I DID.  I -- A COUPLE WEEKS AFTER I FILED

23 THE LAWSUIT, I FILED A WIDE-RANGING PUBLIC RECORDS

24 ACT REQUEST FOR DOCUMENTS, RECORDS, WHATSAPP

25 CONVERSATIONS BETWEEN THE OFFICERS, DISCIPLINARY

1  RECORDS FOR THE OFFICERS INVOLVED AND SO FORTH.

2      **Q**    DID THE CITY TURN OVER ANY RESPONSIVE

3  DOCUMENTS?

4      **A**    NOT FOR MONTHS AND MONTHS.  AND ONLY THEN,

5  IT WAS ONLY AFTER I AGREED TO ABANDON EVERYTHING IN

6  MY INITIAL REQUEST EXCEPT FOR THE INTERNAL AFFAIRS

7  FILES FOR TWO OF THE OFFICERS AND ONLY THEN AFTER I

8  THREATENED TO SUE UNDER THE PUBLIC RECORDS ACT TO

9  OBTAIN THOSE DOCUMENTS.

10         MY EXPERIENCE IS THAT THEY ARE LOATHE TO

11 TURN OVER, VIA THE PUBLIC RECORDS ACT MECHANISM,

12 ANYTHING THEY CAN POSSIBLY AVOID TURNING OVER THROUGH

13 A PRA REQUEST.

14     **Q**    DID YOU PARTICULARLY DISCUSS ANYTHING ABOUT

15 VIDEO WITH MS. MORRIS?

16     **A**    YES, I DID.  MS. MORRIS MADE IT CLEAR THAT

17 THEY DIDN'T WANT TO TURN THAT OVER; THOUGH SHE DID

18 NOT ACTUALLY DENY THE REQUEST FOR THE VIDEO.  TO THE

19 CONTRARY.  SHE SAID SHE WOULD REVIEW THE VIDEOS, SEE

20 ABOUT EDITING THEM AND RELEASE WHAT SHE COULD.  BUT

21 THEN SHE ALSO SAID SHE WAS VERY BUSY, AND SHE

22 PROMISED TO LOOK AT THE VIDEO AND GET BACK TO ME.

23     **Q**    DID SHE?

24     **A**    NO.

25     **Q**    OKAY.  DID SHE TELL YOU SHE THOUGHT SHE

1  COULDN'T RELEASE ANY PORTIONS OF THE VIDEO TO YOU?

2      A    SHE SAID THAT SHE BELIEVED THAT THEY WERE

3  NOT SUBJECT TO THE LOUISIANA PUBLIC RECORDS ACT BY

4  WAY OF ITS INCORPORATION OF A PORTION OF THE

5  LOUISIANA CHILDREN'S CODE.

6      Q    DID YOU AGREE WITH HER ASSESSMENT?

7      A    NO, I DID NOT.  FOR WHAT IT'S WORTH, I MEAN,

8  I DID THINK THAT THERE WERE OTHER PORTIONS OF THE

9  LOUISIANA PUBLIC RECORDS ACT THAT SHE MIGHT HAVE

10 INVOKED OTHER EXCEPTIONS THAT WERE MUCH BETTER FITS

11 IF SHE DIDN'T WANT TO DISCLOSE THOSE VIDEOS UNDER A

12 PRA REQUEST.  AND THAT WAS PART OF THE REASON WHY,

13 FOR EXAMPLE, I WOULDN'T SUE UNDER THE PRA FOR THOSE

14 PORTIONS OF THE VIDEO.

15      BUT I DID NOT AGREE WITH HER ASSESSMENT WITH

16 RESPECT TO OUR CONVERSATIONS AND HER UNDERSTANDING OF

17 THE LAW.

18     Q    DID SHE PROVIDE YOU WITH ANY CASE CITATIONS,

19 ATTORNEY GENERAL OPINIONS, OR ANYTHING LIKE THAT TO

20 SUPPORT HER POSITION?

21     A    NO.  SHE JUST CITED ARTICLE 412.

22     Q    OKAY.  SO THERE IS A LAWSUIT -- A CIVIL

23 LAWSUIT AGAINST THE CITY.  WHO DEFENDED THAT LAWSUIT?

24     A    JOE SCOTT WAS THE PRINCIPAL ATTORNEY FROM

25 THE PARISH ATTORNEY'S OFFICE WHO I WAS DEALING WITH.

1  THOUGH SARAH MONSOUR ALSO PARTICIPATED ALONGSIDE JOE

2  SCOTT IN ONE FACE-TO-FACE SETTLEMENT NEGOTIATION WE

3  HAD.

4      Q    IS MS. MONSOUR OUTSIDE COUNSEL, OR WAS SHE

5  ALSO PART OF THE PARISH ATTORNEY'S OFFICE?

6      A    MY UNDERSTANDING WAS THAT SHE WAS ALSO PART

7  OF THE PARISH ATTORNEY'S OFFICE.

8      Q    AT ANY POINT DID YOU MEET WITH

9  REPRESENTATIVES OF THE PARISH ATTORNEY'S OFFICE

10 RELATED TO THAT CIVIL SUIT?

11     A    YES; IN MARCH OF 2021.

12     Q    WHAT WAS THE CONTEXT OF THAT MEETING?

13     A    WE SAT DOWN IN PERSON IN THEIR OFFICES IN

14 BATON ROUGE.  AND WE WERE THERE TO DISCUSS WHETHER OR

15 NOT A SETTLEMENT AGREEMENT COULD BE REACHED TO

16 RESOLVE THE CASE EXPEDITIOUSLY.

17     Q    AND DURING THAT SETTLEMENT CONFERENCE, DID

18 YOU TALK TO THEM ABOUT YOUR POSSESSION OF THE

19 BODY-WORN CAMERA FOOTAGE?

20     A    YES.  WHEN I FILED THE LAWSUIT WE INITIALLY

21 NAMED KEN CAMALLO AS A DEFENDANT, AND THE REMAINING

22 OFFICERS WERE JOHN DOES BECAUSE THEY WEREN'T AS

23 READILY IDENTIFIABLE FROM THE COURT RECORD.  AND

24 THERE WAS A VERY, VERY SHORT PERIOD OF TIME BEFORE

25 THE STATUTE OF LIMITATIONS RAN.

1    BUT I SPECIFICALLY REMEMBER DISCUSSING WITH

2  MR. SCOTT THAT I HAD BEEN ABLE TO IDENTIFY TROY

3  LAWRENCE, JR., AS ONE OF THE OTHER OFFICERS FROM

4  REVIEWING THE BODY-WORN CAMERA AND THAT HE ALONGSIDE

5  CAMALLO HAD DONE ALL OF THE SAME THINGS IN TERMS OF

6  PARTICIPATING IN THE ILLEGAL SEARCH OF THE PERSONS

7  AND ENTERING BEHIND CAMALLO WHEN THEY WENT INTO TONYA

8  GREEN'S APARTMENT.  SO I REMEMBER ACTUALLY TALKING

9  ABOUT WHAT COULD BE SHOWN ON THE VIDEO.  AND THAT WAS

10 PART OF OUR MARCH 2021 CONVERSATION.

11    Q    SO BY MARCH 2021, THE CITY PARISH ATTORNEY'S

12 OFFICE KNEW THAT SOMEONE HAD SHARED THE VIDEO BECAUSE

13 IT HAD BEEN SHARED WITH YOU.  CORRECT?

14    A    YES.

15    Q    OKAY.  AND THIS -- IN MARCH 2021, THIS --

16 I'M SKIPPING AHEAD A LITTLE BIT.  BUT THIS IS BEFORE

17 THE CBS NEWS STORY.  IS THAT CORRECT?

18    A    YES.  WELL BEFORE.

19    Q    DURING THAT MEETING DID ANY MEMBERS OF THE

20 PARISH ATTORNEY'S OFFICE INDICATE THAT SOMEONE HAD

21 VIOLATED THE CHILDREN'S CODE BY SHARING THAT VIDEO

22 WITH YOU?

23    A    NO, NOT AT ALL.

24    Q    DID ANYONE INDICATE TO YOU THAT YOU

25 SHOULDN'T SHARE IT WITH ANYONE ELSE?

1    **A**    NO, NOT AT ALL.

2    **Q**    DID ANYONE SUGGEST IT MIGHT BE A CRIME OR A

3  VIOLATION OF LAW FOR YOU TO SHARE IT WITH ANYONE

4  ELSE?

5    **A**    NO, NOT AT ALL.

6    **Q**    AND THE VIDEO ITSELF, WAS IT STAMPED

7  *CONFIDENTIAL* OR IN ANY WAY WAS THERE ANY OTHER

8  INDICATION ON THE VIDEO INDICATING THAT IT SHOULD NOT

9  BE SHARED?

10    **A**    THERE WAS NOT.

11    **Q**    SO WAS THAT -- HOW WAS THAT CIVIL LAWSUIT

12  RESOLVED?

13    **A**    MY CLIENTS AGREED TO ACCEPT A $35,000

14  SETTLEMENT IN EXCHANGE FOR DROPPING THEIR CIVIL

15  RIGHTS AND STATE -- ATTACHED STATE LAW CLAIMS AGAINST

16  THE DEFENDANTS.

17    **Q**    DID THAT AGREEMENT COME WITH ANY SORT OF

18  CONFIDENTIALITY OR NONDISPARAGEMENT AGREEMENT?

19    **A**    NO.  AND THE SETTLEMENT WAS PUBLICLY

20  RATIFIED BY THE BATON ROUGE CITY COUNCIL -- EXCUSE

21  ME -- BY THE METROPOLITAN COUNCIL.

22    **Q**    THANK YOU.

23        OKAY.  SO THE CASE WAS SETTLED.  WHAT

24  HAPPENED NEXT?

25    **A**    WELL, I TALKED WITH MY CLIENTS, AND THEY

1  WERE OBVIOUSLY HAPPY TO HAVE THE MONETARY SETTLEMENT.

2  THE FACT WAS, THOUGH, THAT NOTHING WAS HAPPENING WITH

3  THESE OFFICERS, AND THAT WAS TROUBLING.  TRYING TO

4  ENSURE SOME ACCOUNTABILITY WAS ONE OF THE REASONS

5  THAT WE FILED SUIT IN THE FIRST PLACE.  SO THAT WAS

6  CERTAINLY UNSETTLING.

7     Q    WHEN YOU SAY *NOTHING WAS HAPPENING TO THE*

8  *OFFICERS*, DO YOU MEAN LIKE LITERALLY NOTHING, OR WAS

9  THERE A PENDING INVESTIGATION?

10    A    SO THIS HAPPENED -- INCIDENT HAPPENED IN

11 JANUARY OF 2020.  JUDGE JACKSON ISSUED HIS RULING IN

12 DECEMBER OF 2020.  WE FILED SUIT IN JANUARY OF 2021.

13        BUT AS OF MARCH OF 2021, THE ONLY ONE OF

14 THESE OFFICERS WHO WAS EVEN FACING ANY KIND OF

15 INTERNAL INVESTIGATION OF WRONGDOING WAS KEN CAMALLO.

16 AND HE WAS STILL ON THE STREET.  SO BRPD AS OF MARCH

17 2021 STILL HADN'T EVEN OPENED THE DISCIPLINARY

18 INVESTIGATION INTO TROY LAWRENCE, JR. --

19        **MR. SCOTT:**  YOUR HONOR, I'M GOING TO

20 QUESTION THE RELEVANCE OF THIS.

21        **THE COURT:**  OVERRULED.

22    A    SO I KNEW FROM THE DOCUMENTS THAT HAD BEEN

23 TURNED OVER BY MS. MORRIS THAT BRPD HADN'T EVEN

24 OPENED THE DISCIPLINARY INVESTIGATION TO TROY

25 LAWRENCE, JR., WHO WAS THE OFFICER WHO'S SEEN

1  REPEATEDLY THREATENING TO BEAT CLARENCE WHILE HE'S

2  SITTING IN HANDCUFFS, WHO PARTICIPATED IN THE

3  UNWARRANTED HOME SEARCH AND WHO PARTICIPATED IN THE

4  FRISKS.  NOR HAD THEY DONE ANY -- OPENED ANY SORT OF

5  DISCIPLINARY INVESTIGATION INTO THE OTHER OFFICERS

6  INVOLVED, DESPITE A FEDERAL JUDGE SUGGESTING THAT

7  WHAT, YOU KNOW, HAD OCCURRED WAS POTENTIALLY CRIMINAL

8  CONDUCT.

9      Q    AND SO WHAT DID YOU AND THE FAMILY DECIDE TO

10  DO, GIVEN THOSE FACTS?

11     A    WELL, I TALKED WITH THE FAMILY, AND WE ALL

12  AGREED THAT THE BEST POSSIBILITY OF SECURING SOME

13  FORM OF ACCOUNTABILITY WAS TO DRAW ATTENTION TO THE

14  CASE.  SO WE CHOPPED DOWN THAT TEN HOURS OF FOOTAGE

15  INTO SOMETHING MUCH SHORTER, PERHAPS ABOUT TWO OR

16  THREE MINUTES.

17          AND THEN AT THEIR REQUEST AND WITH THEIR

18  EXPRESS BLESSING, THEY HAD ME SEND OUT A PRESS

19  RELEASE ON THEIR BEHALF AS THE BEST WAY TO TRY TO

20  ACTUALLY GET SOME ACCOUNTABILITY WITH RESPECT TO WHAT

21  HAD HAPPENED ON JANUARY 1ST.

22     Q    OKAY.  BEFORE WE MOVE ON TO WHAT HAPPENED

23  NEXT, I WANT TO ASK:  PRIOR TO SENDING OUT THIS PRESS

24  RELEASE, HAD YOU TALKED TO ANY OTHER INSTITUTIONAL

25  ACTORS ABOUT THIS VIDEO OTHER THAN THE BATON ROUGE

1  PARISH ATTORNEY'S OFFICE?

2     A   YES.  PRIOR TO SENDING OUT THE PRESS

3  RELEASE, I PERSONALLY SPOKE WITH THE DISTRICT

4  ATTORNEY, HILLAR MOORE, VIA TELEPHONE.  I DISCUSSED

5  THE VIDEO WITH HIM, SO HILLAR MOORE AS WELL KNEW THAT

6  I HAD THE VIDEO.  AND WE HAD A PHONE CONVERSATION

7  ABOUT THAT SHORTLY BEFORE WE DECIDED TO ULTIMATELY GO

8  AHEAD AND TRY TO BRING MORE ATTENTION TO IT.

9     Q   DID HILLAR MOORE TELL YOU YOU SHOULDN'T HAVE

10  A COPY OF THAT VIDEO OR EXPRESS SURPRISE THAT YOU HAD

11  IT?

12     A   NO --

13        MR. SCOTT:  OBJECTION; HEARSAY, YOUR HONOR.

14        MR. MOST:  YOUR HONOR, I'M NOT OFFERING IT

15  FOR THE TRUTH OF THE MATTER ASSERTED.  IT'S JUST FOR

16  NOTICE TO PROFESSOR FRAMPTON.

17        THE COURT:  ALL RIGHT.  OVERRULED.

18     A   NO, NOT AT ALL.  AND HE INDICATED NOTHING AS

19  TO -- WITH RESPECT TO CONCERN ABOUT THE VIDEO.  HE

20  OFFERED NOTHING TO SUGGEST THAT THERE WAS A PENDING

21  OR CONTEMPLATED PROCEEDING AGAINST FB OR THAT

22  ANYTHING FROM HIS OFFICE OF THAT SORT WAS

23  CONTEMPLATED.

24     Q   DID HE TELL YOU YOU SHOULDN'T SHARE IT OR

25  THAT WOULD BE A CRIME TO SHARE IT?

1      **A**    NO, DEFINITELY NOT.

2      **Q**    SO I THINK -- I THINK YOU TOLD US THAT YOU

3    DISCUSSED THE IDEA OF SHARING THE VIDEO WITH THE

4    GREEN FAMILY BEFORE YOU SENT OUT THE PRESS RELEASE.

5    WHY DID YOU DO THAT IF -- IF THE VIDEO WAS ALREADY A

6    PUBLIC RECORD, WHY DID YOU EVEN NEED TO TALK TO THE

7    FAMILY ABOUT IT BEFORE DOING THAT?

8      **A**    I MEAN, TWO REASONS REALLY.  FIRST, I WAS

9    CONCERNED ABOUT BRPD RETALIATION, ABOUT THEIR

10   PHYSICAL SAFETY.  I WAS WORRIED AND, FRANKLY, AM

11   STILL DEEPLY WORRIED THAT BRPD WILL SEEK TO RETALIATE

12   AGAINST THEM FOR SHARING THE VIDEO.

13         SO I TALKED WITH TONYA ABOUT THAT

14   POSSIBILITY, I TALKED WITH CLARENCE ABOUT THAT

15   POSSIBILITY, I TALKED WITH FB ABOUT THAT.  AND WE

16   WENT OVER THE RISKS.  AND THEY ALL AGREED THAT WHILE

17   THAT WAS A REAL CONCERN, IT WAS IMPORTANT FOR THE

18   PUBLIC TO KNOW ABOUT WHAT HAD HAPPENED TO THEM.  IT

19   WAS REALLY COURAGEOUS AND I ADMIRE THEM FOR IT.

20         SECOND, APART FROM THE RISKS OF RETALIATION,

21   I DO THINK THAT THERE IS A BASIC PRIVACY

22   CONSIDERATION.  I DON'T THINK IT'S HYPERBOLE TO

23   DESCRIBE WHAT TALKS, WHAT'S DEPICTED IN THE

24   UNCENSORED VIDEOS AS A SPECIES OF SEXUAL ASSAULT.

25         SO I WANTED TO MAKE ABSOLUTELY SURE THAT

1  CLARENCE AND FB WERE BOTH COMFORTABLE WITH THEIR

2  FRIENDS, WITH THEIR NEIGHBORS AND PEOPLE ACROSS THE

3  WORLD SEEING THEM IN THAT SORT OF SITUATION BEFORE I

4  SHARED IT ON THEIR BEHALF, BEFORE I DID SO.

5      Q   SO ONCE YOU SHARED THE VIDEO PUBLICLY -- AND

6  THIS WAS -- YOU WERE SHARING CLARENCE GREEN'S COPY OF

7  THE VIDEO?  IS THAT THE COPY THAT YOU WERE SHARING?

8      A   TO BE CLEAR, THE VIDEO THAT I HAD, WAS

9  WORKING WITH, WAS THE COPY OF THE VIDEO THAT WAS

10  PROVIDED VIA THE U.S. GOVERNMENT TO CLARENCE GREEN'S

11  FEDERAL PUBLIC DEFENDER TO ME.

12      Q   OKAY.  WHAT HAPPENED AFTER YOU SHARED IT?

13      A   IT STARTED TO GARNER ATTENTION.  I UPLOADED

14  A SHORT -- THE THREE-MINUTE VERSION TO YOUTUBE.  AND

15  I THINK A RELATIVELY SMALL NUMBER -- THAT IS TO SAY

16  LIKE TEN OR FIFTEEN THOUSAND PEOPLE VIEWED IT ON

17  YOUTUBE.  I SAY *RELATIVE* ONLY BECAUSE IT WAS PICKED

18  UP BY NEWS ORGANIZATIONS AND OTHER PUBLIC FIGURES

19  WITH MUCH, MUCH BIGGER AUDIENCES THAN ME.  AND SO

20  WHEN THOSE INDIVIDUALS AND ORGANIZATIONS SHARED IT,

21  LOTS OF PEOPLE SAW THE VIDEO.

22      Q   AND WAS CBS EVENING NEWS ONE OF THESE

23  ORGANIZATIONS THAT SHARED IT?

24      A   YES.  SO SEVERAL NATIONAL NEWS OUTLETS

25  SHARED IT OR WROTE ABOUT IT.  CBS EVENING NEWS

1   BROADCAST PORTIONS OF THE VIDEO ON THEIR EVENING NEWS

2   CAST AND ALSO PUT IT ON THEIR WEBSITE.

3       Q    I'D LIKE TO PULL UP PLAINTIFF'S EXHIBIT 8

4   AND SEE IF THIS IS WHAT YOU'RE DESCRIBING.

5            IS THIS WHAT YOU'RE DESCRIBING, PROFESSOR

6   FRAMPTON?

7       A    SURE.  SO THAT'S AN ONLINE INTERNET VERSION

8   OF THE STORY.  BUT IF YOU SEE THE -- YOUR COMPUTER

9   PRINTOUT HAS A VIDEO.  AND I'M ALMOST CERTAIN THAT IF

10  YOU WOULD CLICK ON THE REAL VERSION OF THAT ON THE

11  WEBSITE, IT'S THE SEGMENT THAT AIRED THAT EVENING ON

12  THE EVENING NEWS.

13      Q    OKAY.  AND THAT WAS THE EVENING OF MAY 27?

14  WELL, LET ME JUST ASK YOU.  IS THERE A DATE ON THIS?

15      A    YES.  MAY 27TH.

16      Q    AND THAT'S 2021?

17      A    2021.

18      Q    OKAY.

19           OKAY.  SO THAT WAS MAY 27, 2021.  TO YOUR

20  KNOWLEDGE, WAS -- AFTER YOU SHARED THE VIDEO, WAS

21  THIS THE FIRST THAT THIS STORY ABOUT WHAT HAPPENED TO

22  THE GREEN FAMILY HAD BEEN A NATIONAL NEWS STORY?

23      A    I -- I THINK ACTUALLY IN THE HOURS BEFORE

24  THAT A FEW OTHER NATIONAL NEWS WEBSITES HAD PICKED IT

25  UP.  BUT IT WAS THE FIRST TIME THAT IT WAS BROADCAST

1   TO MILLIONS OF PEOPLE OVER NETWORK TELEVISION, YES.

2       Q    SO THAT WAS MAY 27TH.  WHAT HAPPENED THE

3   NEXT DAY, MAY 28TH?

4       A    BRPD CALLED A PRESS CONFERENCE.

5       Q    DID YOU WATCH THE PRESS CONFERENCE?

6       A    YES.  IT WAS BROADCASTING LIVE ON SEVERAL

7   NEWS OUTLETS, INTERNET FEEDS, AND I BELIEVE BRPD ALSO

8   STREAMED IT AS WELL.

9       Q    AND DID ANYTHING HAPPEN SIGNIFICANT THAT YOU

10  RECALL DURING THE PRESS CONFERENCE?

11      A    WELL, IMMEDIATELY BEFORE -- I THINK RIGHT AS

12  CHIEF PAUL WAS WALKING UP TO THE PODIUM -- I RECEIVED

13  AN EMAIL FROM MS. DEELEE MORRIS AT THE PARISH

14  ATTORNEY'S OFFICES INDICATING FIRST THAT SHE AND JOE

15  SCOTT HAD APPARENTLY APPEARED BEFORE A JUVENILE COURT

16  JUDGE, I ASSUME IN AN EX PARTE PROCEEDING, WITHOUT ME

17  OR FB RECEIVING ANY KIND OF NOTICE, AND PURPORTED TO

18  OBTAIN AN ORDER "RELEASING" VIDEO THAT WAS IN THEIR

19  OWN POSSESSION; AND TWO, THAT THEY HAD ALSO PERSUADED

20  THE SAME JUDGE TO ORDER MY PRESENCE FOR A HEARING

21  ON -- AT WHICH I WOULD BE EXPECTED TO SHOW WHY I

22  SHOULD NOT BE HELD IN CONTEMPT OF COURT.

23      Q    I'M GOING TO PULL UP PLAINTIFF'S EXHIBIT 7.

24  IS THIS THE DOCUMENT THAT YOU'RE DESCRIBING?

25      A    YES.

1    Q   WAS THERE ANY INDICATION, ANY EXPLANATION

2  WITHIN THIS DOCUMENT FOR WHY -- THAT INDICATED TO YOU

3  WHY THE CITY PARISH WAS DOING THIS?

4    A   YES.  I MEAN, THE DOCUMENT LARGELY SPEAKS

5  FOR ITSELF.  THOUGH YOU CAN ALSO SEE THERE IS AN

6  INSTAGRAM LINK THERE SHOWING A POLITICAL FIGURE, GARY

7  CHAMBERS -- WHO IS ALSO A CRITIC OF BRPD

8  FREQUENTLY -- HAD RESHARED ANOTHER COPY OF THE COPY

9  OF THE VIDEO THAT I HAD SHARED.  SO THAT WAS LISTED

10  AS PART OF THE REASON THE INSTAGRAM LINK REFERS TO

11  GARY CHAMBERS'.

12        AND THE PRESS RELEASE -- OR EXCUSE ME -- THE

13  FILING GOES ON TO EXPLAIN THAT THE CITY OF BATON

14  ROUGE HAD RECEIVED A SUBSTANTIAL AMOUNT OF NEGATIVE

15  CORRESPONDENCE FROM THE PUBLIC AS A RESULT OF MY

16  ACTIONS IN ATTRACTING PRESS ATTENTION TO THE ISSUE.

17    Q   OKAY.  AND DID THIS DOCUMENT REFLECT UNDER

18  WHAT STATUTE THEY WERE SEEKING CONTEMPT SANCTIONS

19  AGAINST YOU?

20    A   ARTICLE 1509 OF THE LOUISIANA CHILDREN'S

21  CODE.

22    Q   AND DO YOU KNOW WHAT THE CONSEQUENCES FOR

23  CONTEMPT UNDER THAT STATUTE ARE?

24    A   YES.  IMPRISONMENT UP TO SIX MONTHS IN THE

25  PARISH JAIL.

1    **Q**   OKAY.  AND BEFORE WE LEAVE THIS DOCUMENT, I

2    NOTICE -- DOES THIS DOCUMENT HAVE SORT OF A STANDARD

3    CAPTION ON IT?

4    **A**   NO, IT'S NOT A STANDARD CAPTION.  THERE IS

5    NOT A CASE NAME, IT'S NOT *IN RE:* INITIALS, AS YOU

6    WOULD TYPICALLY SEE IN A JUVENILE COURT PETITION.

7    THERE IS NO SUIT NUMBER, THERE IS NO SECTION NUMBER

8    OR ANYTHING THAT YOU WOULD TYPICALLY SEE IN A

9    JUVENILE COURT FILING.

10   **Q**   AND, PROFESSOR FRAMPTON, WHAT DID YOU THINK

11   WHEN YOU RECEIVED THIS?

12   **A**   I MEAN, I WAS IN DISBELIEF, I WAS SCARED, I

13   WAS ANGRY.  YOU KNOW, I WAS ANGRY ON BEHALF OF MY

14   CLIENTS AND I WAS SCARED ON BEHALF OF MYSELF AND MY

15   FAMILY.

16   **Q**   WHAT WERE YOU SCARED OF?

17   **A**   I -- YOU KNOW, I LEFT FULL-TIME PRACTICE IN

18   LOUISIANA FOR SEVERAL REASONS.  WELL, ONE OF THE

19   REASONS -- AND I FEEL KIND OF COWARDLY ADMITTING

20   THIS -- WAS THAT I WAS SICK AND TIRED OF THREATS AND

21   INTIMIDATION FROM LOCAL OFFICIALS THAT I WOULD DEAL

22   WITH IN DOING MY WORK AS A PUBLIC DEFENDER OR PAST

23   POLICE ACCOUNTABILITY WORK.  I FACED THREATS FROM

24   PROSECUTORS OR OTHER LAW ENFORCEMENT OFFICIALS FOR

25   DOING MY JOB.

1       AND MY DECISION TO GO AND TAG AN EMAIL WAS

2   IN PART BECAUSE I DIDN'T WANT TO RAISE MY FAMILY IN

3   LOUISIANA WORRYING ABOUT THAT CONSTANTLY.  SO WHEN I

4   HAD TO TELL MY WIFE THAT THE PARISH ATTORNEY IN BATON

5   ROUGE WAS SEEKING TO HAVE ME JAILED, IT FELT LIKE A

6   VERY UNWELCOME REMINDER THAT IF YOU CHALLENGE

7   POWERFUL PEOPLE HERE IN LOUISIANA, STATE OFFICIALS

8   ARE GOING TO HAVE NO QUALMS ABOUT THREATENING YOUR

9   FREEDOM AND YOUR LIVELIHOOD.

10      Q    YOU ALSO MENTIONED BEING ANGRY ON BEHALF OF

11  YOUR CLIENTS.  WHAT MADE YOU ANGRY ON BEHALF OF YOUR

12  CLIENTS?

13      A    I HAD -- THE NOTION THAT THIS HAD ANYTHING

14  TO DO WITH FB'S PRIVACY JUST STRUCK ME AS REQUIRING A

15  CERTAIN DEGREE OF CHUTZPAH.  THEY SHOWED NO REGARD

16  FOR FB'S PRIVACY WHEN BRPD STRIP-SEARCHED HIM IN

17  PUBLIC.  THEY SHOWED NO REGARD FOR HIS PRIVACY WHEN

18  THEY HELD A PRESS CONFERENCE AND CHIEF PAUL ANNOUNCED

19  THAT HE HAD PERSONALLY LOOKED AT THIS AND SAW

20  ABSOLUTELY NOTHING WRONG WITH THE SEARCHES OF

21  CLARENCE GREEN AND FB.  AND THEY SHOWED NO REGARD FOR

22  HIS PRIVACY WHEN THE VIDEO THAT THEY SCREENED

23  ACTUALLY SHOWED A MUCH BLURRIER VERSION, MUCH

24  LENGTHIER VERSION OF SHOWING A 16-YEAR-OLD'S PENIS TO

25  A ROOMFUL OF ASSEMBLED JOURNALISTS.

1        IF THEY TRULY BELIEVED THAT ARTICLE 412

2   REQUIRED THIS, THE FACT THAT THEY DIDN'T GIVE FB OR

3   ME NOTICE THAT THEY WERE GOING TO DO THIS IS JUST --

4   WAS DEEPLY UPSETTING.

5        SO, YOU KNOW, WHEN I WAS ANGRY ON THEIR

6   BEHALF, I GUESS I WAS SAYING THAT IT REINFORCED THE

7   SORT OF FOUL BLOWS THAT JUDGE JACKSON WROTE ABOUT IN

8   HIS OPINION, AND THEY WERE CONTINUING TO DO IT.

9    Q    AND HAVE YOU LEARNED HOW COMMON IT IS FOR

10  THE CITY PARISH TO SEEK THESE KIND OF SANCTIONS?

11   A    YES.

12   Q    AND WHAT DID YOU LEARN?

13   A    THEY HAVE NEVER DONE IT BEFORE.

14   Q    OKAY.  AND HOW DID YOU COME TO LEARN THAT?

15   A    THROUGH THE REQUEST FOR ADMISSIONS AND

16  INTERROGATORIES PROPOUNDED IN THIS CASE.

17   Q    I'M GOING TO PULL UP PLAINTIFF'S EXHIBIT 12.

18  I'M GOING TO GO DOWN TO PAGE 5.

19       DO YOU SEE THE RESPONSE TO INTERROGATORY NO.

20  6 HERE, PROFESSOR FRAMPTON?

21   A    YES.

22   Q    IS THIS WHAT CAUSED YOU TO LEARN THAT THEY

23  HAD NEVER SOUGHT THESE KIND OF SANCTIONS BEFORE?

24   A    YES.

25   Q    WHAT SPECIFICALLY ABOUT IT SAYS THAT TO YOU?

1      A     WHERE THEY ACKNOWLEDGE *THIS IS THE FIRST*

2   *TIME THE PARISH ATTORNEY'S OFFICE HAS FILED A RULE*

3   *FOR CONTEMPT IN JUVENILE COURT TO PUT THE QUESTION TO*

4   *THE TEST.*

5      Q     AND IN THE -- PRIOR TO THE SECTION YOU READ,

6   IT SAYS -- WELL, WHAT'S THE SECTION PRIOR TO WHAT YOU

7   JUST READ?  THE FIRST PART OF THAT SENTENCE.

8      A     IT SAYS, "THIS IS THE FIRST TIME THAT THE

9   BATON ROUGE PARISH ATTORNEY'S OFFICE HAS ENCOUNTERED

10  WHAT APPEARS TO BE AN UNAUTHORIZED RELEASE OF

11  JUVENILE INVESTIGATION MATERIALS, ACCORDINGLY" AND

12  THEN THE REST OF THE SENTENCE.

13     Q     IS THAT TRUE; THAT YOU'RE THE ONLY PERSON TO

14  HAVE SHARED THIS VIDEO?

15     A     NO.  SURE, SO I AM PERSONALLY AWARE THAT,

16  JUST WITH RESPECT TO FB, MEMBERS OF THE PARISH

17  ATTORNEY -- EXCUSE ME -- MEMBERS OF THE DEFENDANT,

18  BATON ROUGE POLICE DEPARTMENT, SHARED IT WITH THE

19  U.S. ATTORNEY'S OFFICE.  THE U.S. ATTORNEY'S OFFICE

20  SHARED IT WITH CLARENCE GREEN.  BOTH THE U.S.

21  ATTORNEY AND THE FEDERAL PUBLIC DEFENDER SHARED IT

22  PUBLICLY IN COURT FILINGS.  THE FEDERAL PUBLIC

23  DEFENDER SHARED IT WITH ME.

24          AND AGAIN, THESE ARE COPIES OF THE RECORDS

25  WE'RE TALKING ABOUT.  CBS EVENING NEWS SHARED IT WITH

1  MANY MORE PEOPLE THAN I DID.  MANY POLITICAL FIGURES

2  AND OTHER PEOPLE SHARED IT WITH HUNDREDS OF THOUSANDS

3  OF PEOPLE ONLINE.  SO THERE ARE LOTS OF PEOPLE WHO

4  HAVE SHARED THE VIDEO IN QUESTION.  OR A COPY OF THE

5  VIDEO IN QUESTION, I SHOULD SAY.

6      Q    TO YOUR KNOWLEDGE, HAVE ANY OF THEM BEEN --

7  HAD CONTEMPT SANCTIONS LEVIED AGAINST THEM?

8      A    NO.

9      Q    DID YOU SEND SOMEONE TO CHECK AND, LIKE,

10 DOUBLE-CHECK THAT THIS ACTUALLY COULD BE OBTAINED

11 FROM THE CLERK OF THIS COURT?

12     A    YES.  WE IN THE COURSE OF THIS LITIGATION

13 DID THAT AS WELL.

14     Q    I'M GOING TO PULL UP PLAINTIFF'S EXHIBIT 13.

15          TO YOUR KNOWLEDGE, IS THIS THE RECEIPT FROM

16 WHEN YOU SENT SOMEONE TO ACTUALLY GET A COPY OF THE

17 VIDEO FROM THE CLERK OF THIS COURT?

18     A    YES.  AND AS THEY DO AND HAVE TO.

19          MR. SCOTT:  YOUR HONOR, IMPROPER FOUNDATION

20 LAID HERE.  I DIDN'T HEAR ANYTHING ABOUT PERSONAL

21 KNOWLEDGE OR HIS CONTACT --

22          THE COURT:  YEAH, I THINK -- I SUSTAIN THE

23 OBJECTION.  WHY DON'T YOU GET SOME EXPLANATION AS TO

24 HOW THE --

25          MR. MOST:  SURE.  FAIR ENOUGH.

1  BY MR. MOST:

2      Q    PROFESSOR FRAMPTON, DID YOU ASK SOMEONE

3  TO -- OR DID YOU ASK THE CLERK OF COURT TO PROVIDE A

4  COPY OF THE VIDEO SO YOU COULD SEE IF IT WAS PUBLICLY

5  AVAILABLE?

6      A    YES; ON THE DATE JUNE 16, 2021.  AND THEY

7  PROVIDED THE VIDEO IN EXCHANGE FOR $32.

8      Q    OKAY.  AND THIS IS THE RECEIPT OF THAT

9  EXCHANGE?

10     A    THAT'S RIGHT.  FOR THE -- A COPY OF ALL THE

11 VIDEOS THAT WERE ADMITTED INTO THE RECORD IN *USA V*

12 *CLARENCE GREEN*.

13     Q    AND THERE WAS NO INDICATION THEY GAVE IT TO

14 YOU BECAUSE YOU WERE A LITIGANT OR SOMETHING.  IT WAS

15 JUST PART OF A STANDARD SOMEONE ASKING FOR IT FROM

16 THE CLERK OF COURT?

17     A    CORRECT.

18     Q    SO THE CLERK OF THIS COURT WOULD BE AMONG

19 THE LIST OF PEOPLE YOU LISTED WHO SHARED A COPY OF

20 THIS VIDEO?

21     A    SURE.  SO WE CAN ADD TO BRPD THE U.S.

22 ATTORNEY, THE FEDERAL PUBLIC DEFENDER, CBS EVENING

23 NEWS, MANY NEWS OUTLETS AND THE MEDIA, THE CLERK OF

24 COURT -- I GUESS UNDER THE THEORY THAT'S BEING

25 ADVANCED TO HOLD ME IN CONTEMPT -- HAVE ENGAGED IN

1  THE SAME DISTRIBUTION OF THE VIDEO WITHOUT PRIOR

2  EXPRESS AUTHORIZATION FROM A JUVENILE COURT JUDGE

3  BEFORE WHOM NO JUVENILE PROCEEDING IS PENDING.

4     Q    TO YOUR KNOWLEDGE, HAS THE CITY PARISH

5  SOUGHT CONTEMPT SANCTIONS AGAINST THE CLERK OF THIS

6  COURT?

7     A    NO.

8     Q    OKAY.

9        SO I WANT TO ASK A LITTLE BIT ABOUT THE CITY

10  PARISH'S COMPLIANCE WITH THEIR OWN THEORY OF ARTICLE

11  412.

12        DOES ARTICLE -- ARTICLE 412 IS THE ARTICLE

13  OF THE CHILDREN'S CODE THAT DESIGNATES CERTAIN THINGS

14  AS CONFIDENTIAL.  IS THAT RIGHT?

15     A    THAT'S RIGHT.  IF THERE IS A RECORD OF A

16  JUVENILE PROCEEDING OR MATTER BEFORE THE JUVENILE

17  COURT, THAT IS CONFIDENTIAL.  AND ARTICLE 412(E)

18  OUTLINES SOME STEPS IF YOU HAVE A RECORD FROM A

19  JUVENILE COURT PROCEEDING THAT YOU NEED TO FOLLOW

20  BEFORE DISSEMINATING IT.

21     Q    WHAT ARE SOME OF THOSE STEPS?

22     A    ACCORDING TO THE 412(E) PROCESS, THE

23  INFORMATION HAS TO BE MATERIAL AND NECESSARY TO A

24  SPECIFIC INVESTIGATION OR PROCEEDING.  YOU FILE A

25  PETITION, THAT HAS TO BE SERVED ON BOTH THE JUVENILE

1  AND THE JUVENILE'S ATTORNEY.  SO IT CONTEMPLATES THAT

2  THIS IS SOMEBODY OTHER THAN THE JUVENILE DOING THIS,

3  OF COURSE.

4       IT MUST STATE THE NAMES OF ALL THE PERSONS

5  THAT WILL HAVE ACCESS TO THAT INFORMATION.  AND

6  PURSUANT TO 412(E), THE PARTY SEEKING DISCLOSURE HAS

7  TO GIVE THE JUVENILE AND HIS ATTORNEY NOTICE

8  BEFOREHAND SO THEY HAVE AN OPPORTUNITY TO BE HEARD.

9     Q   SO WITH REGARD TO THE MAY 28TH PETITION THAT

10  WE LOOKED AT THAT'S PLAINTIFF'S EXHIBIT 7, DID THE

11  CITY PARISH FOLLOW THOSE STEPS?

12    A   SO THAT'S THE PETITION FOR WHEN THEY WANTED

13  TO -- RIGHT BEFORE THE PRESS CONFERENCE.  NO.

14    Q   OKAY.  WHICH STEPS DID THEY NOT FOLLOW?

15    A   THEY DID NOT PROVIDE THE JUVENILE ANY

16  OPPORTUNITY TO OBJECT OR BE HEARD.  THERE WAS NO

17  CONTRADICTORY HEARING.  BEYOND THAT, I DON'T KNOW

18  BECAUSE I BELIEVE IT WAS AN EX PARTE HEARING, SO I

19  DON'T KNOW ACTUALLY WHAT OTHER REPRESENTATIONS WERE

20  MADE TO THE JUVENILE COURT.

21    Q   OKAY.  DID ANYTHING HAPPEN IN THE COURSE OF

22  THIS LITIGATION THAT ALSO SUGGESTED THE CITY PARISH

23  DIDN'T COMPLY WITH ITS OWN READING OF 412?

24    A   YES.  SO SOMEONE UNBELIEVABLY, GIVEN ALL OF

25  THIS BACK-AND-FORTH -- JOE SCOTT, COUNSEL FOR THE

1   DEFENDANTS, HIMSELF SHARED MORE OF THESE DOCUMENTS

2   THAT PURPORT TO BE JUVENILE RECORDS WITHOUT SEEKING

3   ADVANCE PERMISSION; AND THEN -- ABOUT A WEEK AFTER

4   HAVING MADE THOSE DOCUMENTS PUBLIC, THEN WENT BACK

5   INTO JUVENILE COURT TO ASK TO GO THROUGH ONE OF THESE

6   412 PROCEDURES FOR PERMISSION TO SHARE ABOUT 12 PAGES

7   OF POLICE REPORTS THAT HE HAD ALREADY DISCLOSED

8   PUBLICLY IN THIS LITIGATION WITHOUT AUTHORIZATION.

9       Q    OKAY.  SO LET'S GET A LITTLE MORE SPECIFIC.

10  I'M GOING TO PULL UP PLAINTIFF'S EXHIBIT 15.

11          IS THIS THE DOCUMENT THAT YOU'RE DESCRIBING,

12  MR. FRAMPTON?

13      A    YES.  SO THIS IS THE JULY 20TH EMAIL FROM

14  JOE SCOTT TO MANY PEOPLE, INCLUDING MY ATTORNEYS.  IT

15  INCLUDES, AMONG OTHER THINGS, A SET OF -- A 72-PAGE

16  PDF CALLED *REDACTED INITIAL REPORT*.

17      Q    AND THAT INCLUDED -- WHAT WAS IN THAT?

18      A    SEVENTY-TWO PAGES OF POLICE REPORTS,

19  INCLUDING POLICE REPORTS RELATED TO FB'S ARREST.

20  THEY ACTUALLY WERE NOT REDACTED VERY WELL.  YOU COULD

21  SEE FB'S FULL NAME IN THOSE DOCUMENTS.  THERE WAS

22  OTHER IDENTIFYING INFORMATION.  BUT IT'S ESSENTIALLY

23  THE FULL SET OF SERGEANT CAMALLO'S POLICE REPORTS

24  FROM THE JANUARY 1, 2020 INCIDENT.

25      Q    AND THEN I'M GOING TO PULL UP PLAINTIFF'S

1   EXHIBIT 17.  DO YOU KNOW WHAT THIS IS?

2       A    YES.  SO THIS IS A PLEADING THAT I WAS

3   SERVED WITH PURSUANT TO ARTICLE 412(E), BECAUSE I

4   REPRESENT FB, WHEREIN MS. MORRIS GOES AND SEEKS

5   PERMISSION FROM THE JUVENILE COURT TO RELEASE THOSE

6   VERY SAME POLICE REPORTS THAT MR. SCOTT HAD ALREADY

7   SHARED.

8       Q    AND DO YOU SEE THE DATE THAT THIS WAS

9   SIGNED?

10      A    YES.  21ST OF JULY.

11          THE COURT:  WHAT IS THE PLAINTIFF'S EXHIBIT

12  NUMBER ON THIS ONE?

13          MR. MOST:  THIS IS 17.

14          THE COURT:  AND WHAT WAS THE ONE WITH THE

15  TRANSMITTAL EMAIL FROM MR. SCOTT?

16          MR. MOST:  THE TRANSMITTAL WAS PLAINTIFF'S

17  15.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19          MR. MOST:  AND I'LL JUST REPRESENT, FOR THE

20  SAKE OF EXPEDIENCY, THAT PLAINTIFF'S 16 IS THE -- IS

21  FROM THE ATTACHMENT TO PLAINTIFF'S 15.

22  BY MR. MOST:

23      Q    SO, PROFESSOR FRAMPTON, THEY PRODUCED A

24  JUVENILE REPORT AND THEN ASKED FOR PERMISSION TO

25  PRODUCE IT AFTER THEY ALREADY PRODUCED IT?

1    **A**    EXACTLY.

2    **Q**    OKAY.  DID -- TO YOUR KNOWLEDGE, HAS MR.

3   SCOTT -- HAS THERE BEEN ANY SEEKING OF CONTEMPT

4   SANCTIONS AGAINST MR. SCOTT FOR RELEASING THESE

5   REPORTS PRIOR TO GETTING JUVENILE COURT PERMISSION?

6    **A**    NO.  UNLIKE ME, MR. SCOTT HAS NOT HAD A

7   CONTEMPT PROCEEDING INITIATED AGAINST HIM FOR HIS

8   DISCLOSURE OF WHAT, I UNDERSTAND TO BE THE PARISH

9   ATTORNEY'S POSITION, ARE JUVENILE COURT RECORDS.

10    **Q**    OKAY.  AND JUST TO BE CLEAR, THAT'S THE

11   JUVENILE COURT'S POSITION.  RIGHT?  WHAT DOES THE

12   CHILDREN CODE ACTUALLY SAY IS A CONFIDENTIAL RECORD

13   OF A JUVENILE COURT?

14    **A**    THE JUVENILE CODE MAKES CONFIDENTIAL ANY

15   RECORD OR REPORT --

16         **MR. SCOTT:**  YOUR HONOR, I'M GOING TO OBJECT.

17   I THINK THAT THE INTERPRETATION OF THE CHILDREN'S

18   CODE IS BEST LEFT TO A COURT.  I THINK THAT SHOULD BE

19   THE JUVENILE COURT, BUT THIS COURT IS EXERCISING

20   JURISDICTION AT THE MOMENT.

21         **THE COURT:**  AND THIS COURT WILL EXERCISE

22   JURISDICTION TO DETERMINE WHETHER IT'S GOING TO

23   PROCEED IN THIS CASE, AND THAT INCLUDES AN

24   INTERPRETATION OF THAT STATUTE.  SO I SUSTAIN YOUR

25   OBJECTION, MR. SCOTT.

1    THAT'S THE -- I CAN READ AND I CAN

2    UNDERSTAND AND I CAN READ THE CASES, SO YOU DON'T

3    NEED TO TELL ME WHAT THE CODE SAYS.

4    **MR. MOST:** YES, YOUR HONOR. THANK YOU.

5    **BY MR. MOST:**

6    **Q** SO, PROFESSOR FRAMPTON, I JUST WANT TO CLOSE

7    BY ASKING YOU ABOUT HOW THIS HAS IMPACTED YOU. AND

8    SPECIFICALLY HAS THIS THREAT OF CONTEMPT ALTERED YOUR

9    BEHAVIOR, YOUR SPEECH, ANYTHING ELSE IN ANY WAY?

10   **A** ABSOLUTELY. IN AT LEAST THREE WAYS. FIRST

11   AND MOST IMMEDIATELY, I HAD SEVERAL MEDIA INTERVIEWS

12   LINED UP IMMEDIATELY AFTER THE MAY 28TH PRESS

13   CONFERENCE TO RESPOND TO CHIEF PAUL'S REMARKS. I

14   VERY MUCH WANTED TO, INSOFAR AS THERE WERE MANY

15   MATERIALLY FALSE STATEMENTS MADE BY CHIEF PAUL DURING

16   THOSE -- DURING THAT PRESS CONFERENCE. I IMMEDIATELY

17   CANCELLED ALL OF THEM AS SOON AS I GOT THE NOTICE

18   THAT I WAS FACING CONTEMPT, BECAUSE I WAS FRANTICALLY

19   TRYING TO GET CRIMINAL DEFENSE LAWYERS TO REPRESENT

20   ME. SO I DIDN'T SPEAK TO THE PRESS WHEN I WOULD HAVE

21   LIKED TO AND WHEN IT WAS IN THE NEWS.

22   SECOND, CHIEF PAUL MADE MANY REMARKS DURING

23   THE PRESS CONFERENCE THAT IF YOU ACTUALLY LOOK AT THE

24   FULL VIDEO -- SO FROM THE MOMENT THAT CLARENCE AND FB

25   ARE STOPPED TO THE MOMENT THAT THEY'RE

1  STRIP-SEARCHED -- THEY'RE DEMONSTRATIVELY FALSE, BUT

2  YOU NEED TO SEE THE WHOLE VIDEO IN ORDER TO REALIZE

3  THAT.

4          SO, FOR EXAMPLE, CHIEF PAUL SAID THAT

5  SERGEANT CAMALLO ONLY WENT IN TO START GROPING

6  CLARENCE'S GENITALS AFTER HE HAD --

7          **MR. SCOTT:**  OBJECT TO THE HEARSAY HERE.

8          **THE COURT:**  OVERRULED.

9      **A**   SO, FOR EXAMPLE, CHIEF PAUL INDICATED THAT

10 SERGEANT CAMALLO ONLY SEARCHED CLARENCE GREEN'S

11 GENITALS AFTER HIS HAND BRUSHED BY WHAT HE KNEW TO BE

12 A HARD METAL OBJECT.  IF YOU LOOK AT THE WHOLE VIDEO,

13 THOUGH, A COUPLE MINUTES INTO THE ENCOUNTER SERGEANT

14 CAMALLO IS THREATENING TO SEARCH CLARENCE GREEN'S

15 UNDERWEAR.  THAT WASN'T INCLUDED IN THE VIDEO THAT I

16 HAD DISSEMINATED.

17         I WOULD VERY MUCH HAVE LIKED TO SHARE MORE

18 OF THE VIDEO THAT WAS STILL IN MY POSSESSION, THE

19 CLARENCE GREEN'S COPY OF THE VIDEO.  BUT OBVIOUSLY

20 UNDER THE THREAT OF A CONTEMPT SANCTION, WE HAVE NOT

21 SHARED ANY MORE OF THE VIDEO THAT WOULD REBUT THE

22 PUBLIC REMARKS OF CHIEF PAUL.  SO I HAVEN'T TALKED TO

23 -- CANCELLED THE PRESS INTERVIEWS.  I HAVEN'T SHARED

24 ADDITIONAL VIDEOS.

25         AND THEN FINALLY, IT'S JUST BEEN LIKE A HUGE

1  PERSONAL STRESS.  I'M RELATIVELY NEW ON THE FACULTY

2  AT UVA LAW SCHOOL.  I HAD TO EXPLAIN TO MY DEAN WHAT

3  WAS GOING ON AND THAT I HOPED IT WOULDN'T AFFECT MY

4  TEACHING IN THE FALL.  UVA IS A PRETTY CONSERVATIVE

5  PLACE RELATIVE TO OTHER TOP LAW SCHOOLS, AND I'D MUCH

6  RATHER BE GETTING ATTENTION FOR MY SCHOLARSHIP OR MY

7  TEACHING RATHER THAN ALLEGATIONS THAT I VIOLATED A

8  JUVENILE'S PRIVACY RIGHTS.

9         SO IT'S TAKEN A HUGE AMOUNT OF TIME AND IT'S

10 DISTRACTED ME FROM MY WRITING AND IT KEEPS ME UP AT

11 NIGHT DEALING WITH THIS.

12    Q    KEEPS YOU UP AT NIGHT.  DO YOU MEAN THAT

13 LITERALLY?

14    A    YES, LITERALLY.  LIKE I'M LITERALLY LOSING

15 SLEEP AND WILL CONTINUE TO DO SO DURING THE PENDENCY

16 OF THESE MATTERS.

17        MR. MOST:  THAT'S ALL I HAVE; ALTHOUGH I'LL

18 RESERVE THE RIGHT FOR REDIRECT IF THERE IS CROSS.

19        THE COURT:  ALL RIGHT.  CROSS-EXAMINATION?

20               CROSS-EXAMINATION

21 BY MR. SCOTT:

22    Q    GOOD MORNING, PROFESSOR FRAMPTON.

23    A    GOOD MORNING.

24    Q    PROFESSOR FRAMPTON, ARE YOU FAMILIAR WITH

25 THE TRANSCRIPT OF THE HEARING ON THE MOTION TO

1   SUPPRESS?

2       A    I AM AWARE THAT THERE -- YES, I'VE READ I

3   BELIEVE THE ENTIRE TRANSCRIPT.  CERTAINLY PORTIONS OF

4   IT.

5       Q    AND TROY LAWRENCE IS IDENTIFIED AS THE OTHER

6   OFFICER WHO ENTERED THE HOME IN THAT TRANSCRIPT?

7       A    I -- I CAN'T RECALL OFFHAND.  I DON'T THINK

8   THAT I RECOGNIZED THAT IT WAS TROY LAWRENCE UNTIL

9   LATER.  IT'S POSSIBLE THAT HE WAS LISTED IN THERE.  I

10  THINK HE'S LISTED AS POSSIBLY -- I DON'T KNOW THE

11  ANSWER TO THAT.

12          I KNOW THAT I WAS NOT AWARE THAT TROY

13  LAWRENCE WAS THE OTHER OFFICER UNTIL AFTER FILING THE

14  LAWSUIT AGAINST CAMALLO AND JOHN DOES.

15      Q    TO YOUR KNOWLEDGE, DID LEA SKENE, THE BATON

16  ROUGE ADVOCATE REPORTER, RELEASE ANY PORTION OF THESE

17  VIDEOS THROUGH HER MEDIA OUTLET?

18      A    THE ADVOCATE DESCRIBED BUT DID NOT PUT A

19  COPY OF THE VIDEO OF HER REPORT ON THEIR WEBSITE, TO

20  MY KNOWLEDGE.

21      Q    YOU MENTIONED HAVING TO EXPLAIN TO YOUR WIFE

22  THAT YOU WERE FACING A CONTEMPT RULE.  DOES YOUR WIFE

23  RESIDE WITH YOU IN VIRGINIA?

24      A    AT THE TIME SHE WAS STILL LIVING IN

25  LOUISIANA.  I'VE MOVED HER TO VIRGINIA NOW.

1    **Q**   WHEN WE LOOKED AT PLAINTIFF'S EXHIBIT 13,

2    THE RECEIPT FOR THE VIDEO THAT YOU GOT FROM THE CLERK

3    OF THE MIDDLE DISTRICT, DID YOU HAVE TO GO IN PERSON

4    TO PICK THAT UP?

5    **A**   I DIDN'T GO IN PERSON.  I HAD SOMEBODY PICK

6    IT UP FOR ME.

7    **Q**   BUT COULD YOU HAVE, FOR INSTANCE, DOWNLOADED

8    THE VIDEO FROM PACER?

9    **A**   NO.  BUT ANYONE COULD HAVE HAD IT MAILED TO

10   THEM.  I SENT SOMEBODY TO GO PHYSICALLY PICK IT UP

11   BECAUSE IT WAS QUICKER.

12   **Q**   NOW, CHILDREN'S CODE, ARTICLE 412, I NOTICE

13   YOU FOCUS ON SUBSECTION E, AS IN ECHO?  THAT'S YOUR

14   FOCUS?

15   **A**   I AM FOCUSED ON ALL PORTIONS OF THE RELEVANT

16   LAW.

17   **Q**   DOES 412(E) PROVIDE THE EXCLUSIVE METHOD FOR

18   RELEASE OF JUVENILE RECORDS?

19        **MR. MOST:**  OBJECTION, YOUR HONOR.

20        **THE COURT:**  YEAH, I MEAN, MR. SCOTT, YOU

21   JUST OBJECTED TO HIM OPINING ON THE LAW.  NOW YOU'RE

22   ASKING HIM TO GO OPINE ON THE LAW, SO YOU CAN'T HAVE

23   IT BOTH WAYS.  SORRY.

24        **MR. SCOTT:**  I WITHDRAW THE QUESTION, YOUR

25   HONOR.  I'LL SAVE THAT FOR ARGUMENT LATER.

1          THE COURT:  ALL RIGHT.

2          MR. SCOTT:  ONE MOMENT, JUDGE?

3          THE COURT:  ALL RIGHT.

4          MR. SCOTT:  YOUR HONOR, NO FURTHER QUESTIONS

5    OF THIS WITNESS.

6          THE COURT:  REDIRECT?

7          MR. MOST:  NO, YOUR HONOR.

8          WE'LL CALL OUR SECOND WITNESS, WHO WILL BE

9    DEELEE MORRIS.

10         THE COURT:  ALL RIGHT.  WELL, LET'S TAKE A

11   TEN-MINUTE BREAK BEFORE WE DO THAT.  WE'RE GOING TO

12   STAND AT RECESS FOR TEN MINUTES.

13         **(WHEREUPON, A RECESS WAS TAKEN.)**

14         THE COURT:  LET'S GO AHEAD AND BEGIN YOUR

15   EXAMINATION.

16         MR. MOST:  THANK YOU.  I WOULD LIKE TO CALL

17   DEELEE MORRIS TO THE STAND.

18         THE COURT:  ALL RIGHT.  MS. CAUSEY, SWEAR

19   MS. MORRIS IN.  WE DON'T HAVE MS. CAUSEY, SO WE'RE

20   NOT GOING TO PROCEED WITHOUT HER.  DID I CUT THE TEN

21   MINUTES SHORT?

22         MR. MOST:  BY A FEW MOMENTS, YOUR HONOR.

23         THE COURT:  THAT'S JUST MY TIME

24   COMPULSIVITY.

25         MR. MOST:  AND I THINK AS A FEDERAL JUDGE

1    YOU CAN JUST ORDER TIME TO MOVE FASTER OR SLOWER

2    DEPENDING ON THE NEEDS OF THE COURT.

3           THE COURT:  WELL, WE'RE ACCUSED OF THAT,

4    THAT'S FOR SURE.

5           ALL RIGHT.  MS. CAUSEY, IF YOU WILL SWEAR IN

6    MS. MORRIS.

7           (WHEREUPON, DEELEE MORRIS, BEING DULY SWORN,

8    TESTIFIED AS FOLLOWS.)

9                    CROSS-EXAMINATION

10   BY MR. MOST:

11      Q    GOOD MORNING, MS. MORRIS.

12      A    GOOD MORNING.

13      Q    MS. MORRIS, COULD YOU GIVE US YOUR NAME AND

14   TITLE.

15      A    DEELEE MORRIS.  SPECIAL ASSISTANT PARISH

16   ATTORNEY WITH THE -- PARISH ATTORNEY WITH THE EAST

17   BATON ROUGE PARISH ATTORNEY'S OFFICE.

18      Q    AND ARE YOU THE ATTORNEY IN THAT OFFICE

19   SPECIFICALLY ASSIGNED TO THE BATON ROUGE POLICE

20   DEPARTMENT?

21      A    YES.

22      Q    AND DO YOU WORK OUT OF POLICE DEPARTMENT

23   HEADQUARTERS OR THE PARISH ATTORNEY'S OFFICE?

24      A    I WORK MAINLY OUT OF THE POLICE DEPARTMENT

25   HEADQUARTERS.

1    **Q**    DID YOU SUBMIT A DECLARATION IN THIS CASE AS

2    A WITNESS TO CERTAIN EVENTS?

3    **A**    YES.

4        **MR. MOST:**  FOR NOTE KEEPING, THAT'S

5    PLAINTIFF'S EXHIBIT 1.

6        YOUR HONOR, AS MS. MORRIS IS A WITNESS

7    IDENTIFIED WITH AN ADVERSE PARTY, I'D LIKE TO REQUEST

8    PERMISSION TO USE LEADING QUESTIONS WITH HER PURSUANT

9    TO FEDERAL RULE OF EVIDENCE 611.

10        **THE COURT:**  ANY OBJECTION?

11        **MR. DOTSON:**  NO, YOUR HONOR.

12        **THE COURT:**  ALL RIGHT.  PROCEED.

13        **MR. DOTSON:**  AND I WILL BE TAKING THE LEAD,

14   YOUR HONOR, ON SIMPLY MS. MORRIS.  I'M TAKING THE

15   LEAD ON THIS ONE.  THANK YOU.

16        **THE COURT:**  THANK YOU, MR. DOTSON.

17   BY MR. MOST:

18    **Q**    MS. MORRIS, JUST TO GO OVER VERY BRIEFLY

19   WHAT HAPPENED, MY UNDERSTANDING IS THAT ON JANUARY 1,

20   2020, BATON ROUGE POLICE DEPARTMENT ARRESTED CLARENCE

21   GREEN AND HIS JUVENILE BROTHER FB.  IS THAT CORRECT?

22    **A**    YES.

23    **Q**    CLARENCE GREEN WAS FEDERALLY INDICTED, BUT

24   FB WAS RELEASED TO HIS MOTHER PURSUANT TO A CUSTODIAL

25   AGREEMENT.  IS THAT RIGHT?

1    **A**   YES.

2    **Q**   AND IN CLARENCE GREEN'S FEDERAL CRIMINAL

3  CASE, THERE WAS A MOTION TO SUPPRESS HEARING.

4  CORRECT?

5    **A**   I CAN'T REALLY CONFIRM THAT.  I BELIEVE THAT

6  IS THE CASE.  BUT I DIDN'T HAVE ANY PARTICIPATION IN

7  THAT MATTER, SO I REALLY DON'T WANT TO COMMENT ON

8  ANYTHING THAT I'M FULLY AWARE OF.

9    **Q**   ARE YOU AWARE THAT VIDEO FOOTAGE OF CLARENCE

10  GREEN AND THE JUVENILE FB WAS ENTERED INTO THE RECORD

11  OF THIS COURT AT THAT HEARING?

12    **A**   I HAVE BEEN TOLD THAT, BUT I HAVE NOT

13  REQUESTED ANY RECORD AND I'VE NOT SEEN ANY RECORD, SO

14  I CAN'T SAY FOR CERTAIN THAT IT'S IN THE RECORD OR

15  HAVE --

16    **Q**   SO YOUR -- I'M SORRY.

17    **A**   OR HAVE THE RECORD.

18    **Q**   SO YOUR OFFICE HASN'T GONE TO CHECK?

19    **A**   NO.

20    **Q**   THE U.S. DEPARTMENT OF JUSTICE DISMISSED ALL

21  CHARGES AGAINST CLARENCE GREEN.  CORRECT?

22    **A**   I AM NOT A PARTY TO THAT CASE.  I BELIEVE

23  THAT HAPPENED, BUT I CAN'T TELL YOU FOR CERTAIN.

24    **Q**   OKAY.  AND THEN THERE WAS A CIVIL SUIT FILED

25  BY THE GREEN FAMILY AGAINST BATON ROUGE POLICE

1  DEPARTMENT, THE CITY OF BATON ROUGE.  CORRECT?

2      A    AGAIN, I'M NOT -- I WASN'T THE ATTORNEY IN

3  THAT MATTER EITHER, BUT I BELIEVE THAT IS CORRECT.

4      Q    AND PROFESSOR FRAMPTON WAS COUNSEL OF RECORD

5  FOR PLAINTIFFS IN THAT CASE?

6      A    AGAIN, NOT BEING AN ASSIGNED ATTORNEY TO

7  THAT MATTER, I CAN'T PROMISE ANYTHING, BUT I BELIEVE

8  THAT IS CORRECT.

9      Q    I'M SORRY.  YOU DON'T KNOW WHETHER PROFESSOR

10 FRAMPTON WAS COUNSEL OF RECORD IN THAT CASE?

11     A    I BELIEVE THAT IS CORRECT, YES.

12     Q    PROFESSOR FRAMPTON, AFTER THAT CASE WAS

13 RESOLVED, ISSUED A PRESS RELEASE.  CORRECT?

14         MR. DOTSON:  OBJECTION, YOUR HONOR.  I DON'T

15 THINK HE'S LAID A FOUNDATION AS TO WHICH CASE HE'S

16 TALKING ABOUT OR WHICH CASE HE'S REFERRING TO, YOUR

17 HONOR.

18         THE COURT:  REPHRASE IT.

19         MR. MOST:  I'LL REPHRASE.

20 BY MR. MOST:

21     Q    AFTER THE CONCLUSION OF THE GREEN FAMILY

22 VERSUS THE CITY'S CIVIL RIGHTS CASE, PROFESSOR

23 FRAMPTON ISSUED A PRESS RELEASE.  CORRECT?

24     A    I BELIEVE HE DID, YES.

25     Q    AND AFTER PROFESSOR FRAMPTON ISSUED A PRESS

1  RELEASE, THE CBS EVENING NEWS RAN A STORY ABOUT THE

2  ARREST OF THE GREENS.  CORRECT?

3     A    I HAVE NO KNOWLEDGE OF THAT.

4     Q    YOU HAVE NO KNOWLEDGE OF A CBS NEWS STORY?

5     A    NOPE.

6        THE COURT:  EVEN TODAY?

7     A    I HAVEN'T SEEN ANY CBS NEWS STORY.  I THINK

8  Y'ALL REFERENCED IT.  BUT IN ALL FAIRNESS, I DON'T

9  WATCH THE NEWS, SO I DON'T -- I'M NOT -- I DIDN'T GO

10 LOOK AT IT.  I HAVEN'T SEEN IT.

11    Q    I'LL PULL UP PLAINTIFF'S EXHIBIT 8.  DO YOU

12 SEE THAT THIS IS A CBS NEWS STORY ENTITLED *BATON*

13 *ROUGE REACHES $35,000 SETTLEMENT WITH FAMILY AFTER*

14 *POLICE STRIP-SEARCHED TEEN AND ENTERED HOME WITHOUT*

15 *WARRANT*?

16    A    YES, I SEE THAT.

17    Q    YOU'VE NEVER SEEN THIS BEFORE?

18    A    NO.

19    Q    YOU'RE THE PARISH ATTORNEY ASSIGNED TO THE

20 BATON ROUGE POLICE DEPARTMENT, AND YOU'VE NEVER SEEN

21 THIS VIDEO ABOUT A SETTLEMENT WITH THE BATON ROUGE

22 POLICE DEPARTMENT AFTER THEY STRIP-SEARCHED A TEEN?

23    A    THE CBS VIDEO THAT YOU'RE REFERENCING HERE

24 OR JUST THE VIDEO THAT'S -- WELL, I MEAN, WHAT I'M

25 LOOKING AT ON THE SCREEN I HAVE NOT LOOKED AT BEFORE.

1      Q    OKAY.  BUT DID YOU UNDERSTAND THAT THE GREEN

2  FAMILY'S SITUATION BECAME A NATIONAL NEWS STORY IN

3  LATE MAY OF 2021?

4      A    AGAIN, I DIDN'T SEE ANY OF THE NATIONAL NEWS

5  STORIES ON IT, TO BE HONEST WITH YOU.

6          THE COURT:  THAT'S NOT THE QUESTION HE

7  ASKED, MS. MORRIS.  THAT'S NOT THE QUESTION THAT HE

8  ASKED.  PLEASE ANSWER HIS QUESTION.

9      A    CAN YOU ASK THE QUESTION AGAIN?

10     Q    YES.  DID YOU UNDERSTAND THAT THE -- WHAT

11 HAPPENED TO THE GREEN FAMILY WITH BATON ROUGE POLICE

12 DEPARTMENT BECAME A NATIONAL NEWS STORY IN LATE MAY

13 OF 2021?

14     A    YES.

15     Q    OKAY.  AND AFTER THE INCIDENT BECAME A

16 NATIONAL NEWS STORY, THE CHIEF OF BATON ROUGE POLICE

17 DEPARTMENT ASKED TO HOLD A PRESS CONFERENCE.

18 CORRECT?

19     A    YES.

20     Q    IT WAS SCHEDULED FOR 3 P.M. ON MAY 28, 2021?

21     A    YES.

22     Q    AND THE CITY PARISH WANTED TO SHARE SOME

23 VIDEO OF THE ARREST AT THAT PRESS CONFERENCE?

24     A    CORRECT.

25     Q    AND FOR WHATEVER REASON -- I'M NOT GOING TO

1  GET INTO WHY -- THE CITY PARISH THOUGHT IT NEEDED THE

2  JUVENILE COURT'S PERMISSION TO DO SO?

3      A    YES.

4      Q    I'M PULLING UP PLAINTIFF'S EXHIBIT 7.  DO

5  YOU SEE THIS?

6      A    YES.

7      Q    IS THIS THE PETITION IN WHICH THE CITY

8  PARISH SOUGHT THAT PERMISSION TO RELEASE MORE VIDEO?

9      A    I BELIEVE SO.

10     Q    WE CAN LOOK AT THE BOTTOM OF PAGE 2.  IS

11 THIS YOUR SIGNATURE ON IT?

12     A    YES.

13     Q    AND IT'S DATED MAY 28, 2021?

14     A    YES.

15     Q    AND AT THE TOP OF PAGE 1 I SEE THAT THE SUIT

16 NUMBER IS LEFT BLANK IN THE UPPER RIGHT-HAND CORNER?

17     A    YES.

18     Q    BECAUSE AT THAT TIME, AT THE TIME OF THE

19 FILING OF THIS PETITION, THERE WAS NO SUIT NUMBER

20 ASSOCIATED WITH THIS JUVENILE.  CORRECT?

21     A    NO.

22         THE COURT:  WAIT.  *NO*, YES, OR *NO,* THAT'S

23 NOT CORRECT?

24         THE WITNESS:  NO, THAT'S NOT CORRECT.

25     Q    SO THERE WAS A SUIT NUMBER ASSOCIATED WITH

1  THIS JUVENILE?

2      A    NO.  THIS IS AN IN RE: PETITION, SO IT'S MY

3  OWN PETITION.  I -- WHEN I FILE THESE TYPES OF

4  PETITIONS I DO NOT INTERVENE IN ANY SUIT, ANY

5  CRIMINAL PROSECUTION.  IT IS KIND OF A STAND-ALONE

6  FILING THAT WILL GET ASSIGNED A SEPARATE DOCKET

7  NUMBER.

8      Q    OKAY.  SO DID YOU -- IS THERE A SUIT NUMBER

9  IN JUVENILE COURT ASSOCIATED WITH THIS JUVENILE?

10     A    I DON'T KNOW.

11     Q    DID YOU DO ANYTHING TO CHECK AND SEE IF

12  THERE WAS A PENDING PROCEEDING AGAINST THIS JUVENILE?

13     A    BECAUSE THE RECORD -- OR BECAUSE ALL

14  JUVENILE PROCEEDINGS ARE CLOSED, YOU CAN'T -- AND

15  CONFIDENTIAL -- YOU CAN'T ASK THAT KIND OF QUESTION

16  TO JUVENILE COURT.  THAT'S MY UNDERSTANDING.

17     Q    SO YOU MADE NO EFFORT TO DETERMINE IF THIS

18  JUVENILE HAD A PROCEEDING AGAINST HIM.  CORRECT?

19     A    I BELIEVE HE HAS A PROCEEDING IN JUVENILE --

20  I BELIEVE THAT THERE IS A MATTER BEFORE THE COURT IN

21  JUVENILE COURT.

22     Q    WHAT MATTER IS THAT?

23     A    THE PENDING ARREST CHARGES AGAINST THIS

24  JUVENILE.

25     Q    DID YOU DO ANYTHING TO CHECK AND SEE IF,

1  OTHER THAN THE ARREST, ANYTHING HAD BEEN FILED IN

2  JUVENILE COURT WITH REGARD TO THIS JUVENILE?

3      **A**    CAN YOU REPEAT THE QUESTION?  I APOLOGIZE.

4      **Q**    SURE.  SETTING ASIDE THE ARREST, DID YOU

5  TAKE ANY STEPS TO DETERMINE IF ANYTHING HAD BEEN

6  FILED IN JUVENILE COURT WITH REGARD TO THIS JUVENILE?

7          **MR. DOTSON:**  YOUR HONOR, I'M GOING TO OBJECT

8  TO THIS AS BEING ASKED AND ANSWERED.  I THINK HE

9  ASKED ABOUT --

10         **THE COURT:**  OVERRULED.

11         ANSWER THE QUESTION, PLEASE.

12         **MR. DOTSON:**  THANK YOU, YOUR HONOR.

13     **A**    I BELIEVE THAT THE CHARGES -- THE ARREST

14 CHARGES ARE THE MATTER IN THE JUVENILE COURT.  I

15 GUESS I'M KIND OF CONFUSED.

16     **Q**    OKAY.  ASIDE FROM WHATEVER YOU'RE DESCRIBING

17 AS ARREST CHARGES, DID YOU CHECK TO SEE IF ANYTHING

18 ELSE HAD BEEN FILED -- A PETITION, INDICTMENT,

19 ANYTHING ELSE FILED -- IN JUVENILE COURT REGARDING

20 THIS JUVENILE PRIOR TO THIS?

21     **A**    I -- THE ONLY RECORDS THAT I COULD CHECK ARE

22 THE RECORDS OF, YOU KNOW -- OF BATON ROUGE POLICE

23 DEPARTMENT.  AND I KNEW THAT THERE WAS A CUSTODIAL

24 AGREEMENT ISSUED -- I TAKE THAT BACK.  NO, LET ME NOT

25 SAY THAT.

1         I DID NOT -- I DID NOT GO CHECK WITH

2    JUVENILE COURT TO SEE IF ANYTHING HAD BEEN DONE IN

3    THIS MATTER, NO.  DOES THAT ANSWER YOUR QUESTION

4    ENOUGH?

5         Q    IT DOES.  THANK YOU, MS. MORRIS.

6         SO THIS PETITION THAT WE'RE LOOKING AT,

7    PLAINTIFF'S EXHIBIT 7, PART OF IT SEEKS THE RELEASE

8    OF VIDEO.  RIGHT?

9         A    YES.

10        Q    AND PART OF IT ASKS THAT -- THAT THE CITY

11   PARISH SEEKS A RULE TO SHOW CAUSE WHY ATTORNEY THOMAS

12   FRAMPTON SHOULD NOT BE HELD IN CONTEMPT PURSUANT TO

13   LOUISIANA CHILDREN'S CODE, ARTICLE 1509.  CORRECT?

14        A    YES.

15        Q    AND ARTICLE 1509, THAT'S A CODE ARTICLE THAT

16   ALLOWS FOR IMPRISONMENT OF UP TO SIX MONTHS.

17   CORRECT?

18        A    IT HAS OTHER PENALTIES AS WELL.  BUT THAT IS

19   ONE OF THE PENALTIES, YES.

20        Q    ALL RIGHT.  I'M GOING TO PULL UP WHAT IS

21   DESIGNATED PLAINTIFF'S EXHIBIT NO. 9.  DO YOU SEE

22   THIS -- PLAINTIFF'S EXHIBIT 9, THIS LETTER, MS.

23   MORRIS?

24        A    YES, I CAN SEE IT.

25        Q    DO YOU SEE THAT THIS IS A LETTER DATED JUNE

1  2, 2021, FROM THE ACLU OF LOUISIANA?

2     A    YES.

3     Q    HAVE YOU SEEN THIS DOCUMENT BEFORE TODAY?

4     A    I BELIEVE I HAVE.

5     Q    DO YOU SEE THE LAST SENTENCE OF PARAGRAPH 2

6  WHERE IT SAYS, "THE UNITED STATES MADE THE RELEVANT

7  FOOTAGE PUBLIC IN NOVEMBER 2020"?

8     A    YES, I DO.

9     Q    AND YOU SEE THERE IS A FOOTNOTE THERE THAT

10 SAYS, "SEE REC. DOC. 26, *UNITED STATES V GREEN,* CASE

11 NO. 20-CR-00049."  CORRECT?

12    A    YES.

13    Q    SO THIS LETTER IS INDICATING THAT THE VIDEO

14 FOOTAGE WAS MADE PUBLIC IN NOVEMBER OF 2020 AND

15 PROVIDING A CITATION -- SPECIFIC CITATION TO A RECORD

16 DOCUMENT THAT SHOWS THAT.  CORRECT?

17    A    THIS DOCUMENT PURPORTS THAT THE VIDEO WAS

18 MADE PUBLIC, YES.

19    Q    DID THE CITY PARISH CHECK TO SEE IF THAT WAS

20 TRUE?

21    A    I DID NOT, NO.

22    Q    DO YOU KNOW IF ANYONE ELSE AT THE CITY

23 PARISH CHECKED TO SEE IF THAT WAS TRUE?

24    A    I CAN'T SPEAK ON BEHALF OF OTHER PEOPLE OF

25 THE CITY PARISH.

**1**     Q    I'M ASKING DO YOU KNOW IF ANYONE ELSE AT THE

**2**  CITY PARISH DID ANYTHING TO CHECK AND SEE IF THIS WAS

**3**  TRUE.

**4**     A    NO, I DON'T.

**5**     Q    ANY REASON -- DID YOU HAVE ANY REASON AT THE

**6**  TIME OF THE RECEIPT OF THIS LETTER TO DOUBT THAT THAT

**7**  WAS TRUE?

**8**     A    NO.

**9**        MR. DOTSON:  YOUR HONOR, I WOULD JUST

**10**  INTERPOSE AN OBJECTION.  DOUBT AS TO WHAT?  DOUBT

**11**  THAT IT WAS A PUBLIC RECORD OR DOUBT THAT IT WAS A

**12**  PART OF THE RECORD DOCUMENTS IN FEDERAL COURT?  I

**13**  DON'T THINK THE QUESTION WAS CLEAR.

**14**        MR. MOST:  I CAN CLARIFY MY QUESTION.

**15**  BY MR. MOST:

**16**     Q    MS. MORRIS, AT THE TIME OF THE RECEIPT OF

**17**  THIS LETTER, DID YOU HAVE REASON TO DOUBT EITHER OF

**18**  THE THINGS MR. ANDERSON JUST DESCRIBED?

**19**     A    I -- I DON'T DOUBT THAT IT IS IN THE COURT

**20**  RECORD.  I DO DISAGREE WITH THE FACT THAT IT'S NOW A

**21**  PUBLIC RECORD.

**22**     Q    OKAY.  THE LAST CLAUSE OF THAT SENTENCE AT

**23**  THE END OF THE SECOND PARAGRAPH SAYS, "AND THE

**24**  REGION'S LARGEST NEWSPAPER INDEPENDENTLY OBTAINED AND

**25**  DESCRIBED" -- *IT* MEANING THE VIDEO -- "IN JANUARY OF

1   2021." DO YOU SEE THAT?

2       A    YES.

3       Q    AND IT PROVIDED A CITATION TO A SPECIFIC

4   ARTICLE ON FOOTNOTE 2?

5       A    YES.

6       Q    WHEN YOU RECEIVED THIS LETTER, DID YOU HAVE

7   ANY REASON TO DOUBT THAT PART OF THE LETTER WAS

8   UNTRUE?

9       A    NO.

10      Q    SO AS OF THE TIME OF THE RECEIPT OF THE JUNE

11  2, 2021 LETTER FROM THE ACLU OF LOUISIANA, THE CITY

12  PARISH HAD BEEN INFORMED THAT THE VIDEO WAS ALREADY

13  IN THE RECORD OF THIS COURT AND HAD BEEN OBTAINED AND

14  DESCRIBED BY A NEWSPAPER, AND THE CITY PARISH HAD NO

15  REASON TO THINK ANY OF THAT WAS UNTRUE.  CORRECT?

16      A    CORRECT.

17      Q    OKAY.  DID THE CITY PARISH WITHDRAW ITS

18  REQUEST FOR CONTEMPT AGAINST PROFESSOR FRAMPTON AT

19  THAT TIME?

20           MR. DOTSON:  AT WHICH TIME?  OBJECTION, YOUR

21  HONOR.  AT WHICH TIME?

22      Q    AFTER THE RECEIPT OF THIS LETTER, DID THE

23  CITY PARISH WITHDRAW ITS CONTEMPT REQUEST AGAINST

24  PROFESSOR FRAMPTON?

25      A    NO.

1    Q   IN FACT, AFTER THE RECEIPT OF THIS LETTER,

2  PROFESSOR FRAMPTON'S LAWYERS ASKED FOR AN EXTENSION

3  OF THE HEARING ON CONTEMPT, AND THE CITY PARISH

4  REFUSED TO GIVE THAT CONSENT.  CORRECT?

5        MR. DOTSON:  I'M GOING TO OBJECT TO THIS

6  QUESTION AS TO THE RELEVANCE OF THAT QUESTION, YOUR

7  HONOR.

8        THE COURT:  OVERRULED.

9    Q   I'LL PULL UP --

10       THE COURT:  I DIDN'T HEAR THE ANSWER, FIRST

11  OF ALL.

12       DO YOU KNOW THE ANSWER, MS. MORRIS?

13   A   DID WE CONSENT TO AN EXTENSION, NO.

14  INITIALLY, NO.

15   Q   WE'RE LOOKING AT PLAINTIFF'S EXHIBIT 10.

16  THIS IS A JUNE 15, 2021 EMAIL FROM YOURSELF TO

17  PLAINTIFF'S COUNSEL, INDICATING THAT THE CITY PARISH

18  WOULD NOT CONSENT TO AN EXTENSION OF TIME.  CORRECT?

19   A   THAT'S CORRECT.

20   Q   PROFESSOR FRAMPTON IS NOT THE ONLY PERSON

21  WHO HAS SHARED THIS VIDEO.  CORRECT?

22       MR. DOTSON:  OBJECTION; I THINK THAT CALLS

23  FOR SPECULATION.  THERE IS NO WAY THAT SHE CAN --

24       THE COURT:  OVERRULED.

25       MR. DOTSON:  -- (INAUDIBLE DUE TO

1   VIDEOCONFERENCE TECHNICAL DIFFICULTIES).

2           **THE COURT:**  OVERRULED.

3       **A**    CAN YOU ASK THE QUESTION AGAIN, PLEASE?

4       **Q**    SURE.  PROFESSOR FRAMPTON IS NOT THE ONLY

5   PERSON WHO HAS SHARED THIS VIDEO.  CORRECT?

6       **A**    I THINK YOU'RE CORRECT.  YES.

7       **Q**    BATON ROUGE POLICE DEPARTMENT SHARED IT WITH

8   THE U.S. ATTORNEY'S OFFICE.  RIGHT?

9       **A**    I BELIEVE -- I BELIEVE THAT'S CORRECT, YES.

10      **Q**    THE U.S. ATTORNEY'S OFFICE SHARED IT WITH

11  THE FEDERAL PUBLIC DEFENDER.  CORRECT?

12      **A**    AS PART OF THE PROSECUTION FOR CLARENCE

13  GREEN, I BELIEVE THAT IS -- WELL, LET ME REPHRASE

14  THAT.  HOLD ON.

15          I DON'T KNOW IF THE U.S. ATTORNEY'S OFFICE

16  SHARED IT WITH THE FEDERAL PUBLIC DEFENDER'S OFFICE.

17  I'M SORRY.

18      **Q**    ANY REASON TO THINK THE U.S. ATTORNEY'S

19  OFFICE DIDN'T SHARE IT WITH THE PUBLIC DEFENDER'S

20  OFFICE?

21      **A**    NO.

22      **Q**    THE FEDERAL PUBLIC DEFENDER'S OFFICE THEN

23  SHARED IT WITH PROFESSOR FRAMPTON.  ANY REASON TO

24  THINK THAT'S NOT TRUE?

25      **A**    I BELIEVE HE -- MR. FRAMPTON DID SAY THAT

1  THAT'S HOW HE RECEIVED THE VIDEO, SO I DON'T HAVE ANY

2  REASON TO BELIEVE THAT THAT'S NOT TRUE, BASED ON

3  THAT.

4      Q    THE CLERK OF THIS COURT SHARED A COPY OF THE

5  VIDEO.  CORRECT?

6      A    THAT, I MEAN -- TO WHO OR WITH WHO?  I

7  MEAN --

8      Q    DO YOU HAVE ANY REASON TO THINK THAT THE

9  CLERK OF THIS COURT DIDN'T SHARE A COPY OF THE VIDEO

10  WITH PROFESSOR FRAMPTON THROUGH A THIRD PARTY?

11      A    I DON'T KNOW THAT.  I DON'T KNOW.

12      Q    BUT NO REASON TO THINK THAT DIDN'T HAPPEN.

13  CORRECT?

14      A    THE ONLY THING THAT I HAVE HEARD WAS THAT

15  THE FEDERAL PUBLIC DEFENDER SHARED IT WITH MR.

16  FRAMPTON.  SO I DON'T REALLY HAVE ANY REASON TO

17  BELIEVE THAT HE GOT IT FROM THE CLERK OF COURT'S

18  OFFICE.

19      Q    THE CITY PARISH HASN'T SOUGHT CONTEMPT

20  SANCTIONS AGAINST ANY OF THOSE PEOPLE WE JUST

21  DISCUSSED, EXCEPT FOR PROFESSOR THOMAS FRAMPTON.

22  CORRECT?

23      A    THAT'S CORRECT.

24      Q    MS. MORRIS, I WANT TO ASK A FEW QUESTIONS

25  SORT OF ABOUT THE BALANCE OF EQUITIES HERE.

1          SO THE CITY PARISH HAS MOVED FOR CONTEMPT

2    AGAINST PROFESSOR FRAMPTON UNDER CHILDREN'S CODE,

3    ARTICLE 1509.  CORRECT?

4        A    YES.

5        Q    AND THAT IS -- AS YOU POINTED OUT, HAS --

6    CARRIES A RANGE OF POTENTIAL SANCTIONS UP TO AND

7    INCLUDING UP TO SIX MONTHS IN THE EAST BATON ROUGE

8    PARISH PRISON?

9        A    YES.

10       Q    AND THAT'S A THREAT OF POTENTIAL SIGNIFICANT

11   HARM.  CORRECT?

12          MR. DOTSON:  OBJECTION, YOUR HONOR.  I THINK

13   WE WENT OVER THIS EARLIER WHEN WE DISCUSSED WHAT THE

14   PENALTIES WERE, AND COUNSEL LAID OUT WHAT THE

15   PENALTIES WERE --

16          THE COURT:  MR. DOTSON, LET ME EXPLAIN TO

17   YOU THE RULES OF THIS COURT.  YOU MAKE AN OBJECTION,

18   YOU TELL ME THE BASIS FOR THE OBJECTION, BUT YOU DO

19   NOT MAKE A RUNNING OBJECTION.  SO WHAT IS THE BASIS

20   FOR YOUR OBJECTION?

21          MR. DOTSON:  ASKED AND ANSWERED, YOUR HONOR.

22          THE COURT:  OVERRULED.

23       Q    MS. MORRIS, MY QUESTION WAS:  THAT'S A

24   THREAT OF AT LEAST POTENTIAL SIGNIFICANT HARM.

25   CORRECT?

1      **A**    MY THREAT, LIKE I'M THREATENING HIM, OR IS

2   -- I DON'T THINK I CAN ANSWER THAT QUESTION

3   APPROPRIATELY.

4      **Q**    WOULD YOU AGREE THAT SOMEONE FACING UP TO

5   SIX MONTHS IN JAIL POTENTIALLY IS UNDER A THREAT OF

6   POTENTIAL HARM?

7           **MR. DOTSON:**  SAME OBJECTION, YOUR HONOR.

8           **THE COURT:**  OVERRULED.

9      **A**    IN MY PERSONAL OPINION OR UNDER A LEGAL

10  STANDARD?  I GUESS THAT'S WHERE I'M KIND OF HUNG UP.

11     **Q**    YOU KNOW WHAT?  I'LL WITHDRAW THE QUESTION.

12          MS. MORRIS, IF THE CITY PARISH WERE ORDERED

13  TO WITHDRAW ITS REQUEST FOR CONTEMPT AGAINST

14  PROFESSOR FRAMPTON, IT WOULD BE ABLE TO DO IT WITH

15  PROBABLY A ONE-PAGE FILING TO THE JUVENILE COURT.

16  WOULD YOU AGREE?

17     **A**    I THINK SO.  I'VE NEVER FILED IT, SO -- BUT

18  I MEAN, I DON'T HAVE ANY REASON TO DOUBT THAT IT

19  WOULDN'T BE A DIFFICULT TASK.

20     **Q**    RIGHT.  AND IT WOULD BE WITHOUT COST BECAUSE

21  THE CITY PARISH AS A PUBLIC ENTITY WOULDN'T HAVE TO

22  PAY ANY FILING FEE FOR A ONE-PAGE FILING LIKE THAT.

23  CORRECT?

24     **A**    YOU KNOW, HONESTLY I DON'T KNOW.  I DON'T

25  PAY FOR THE FILING FEES.  I KNOW THAT THERE IS FILING

1  FEES THAT THE CITY PARISH DOES ENCOUNTER, BUT I DON'T

2  KNOW IF THERE ARE IN THIS SITUATION.  I

3  UNFORTUNATELY -- OR LUCKILY DON'T HANDLE ANY OF THE

4  BILLING IN THESE KINDS OF CASES.

5      Q    BUT IT'S AT LEAST SAFE TO SAY THAT IT WOULD

6  BE A SIMPLE TASK WITHOUT GREAT EXPENSE FOR THE CITY

7  PARISH, IF IT WERE ORDERED TO DO SO, TO WITHDRAW ITS

8  PETITION FOR CONTEMPT AGAINST PROFESSOR FRAMPTON.

9  WOULD YOU AGREE?

10     A    YES.

11         MR. MOST:  OKAY.  THAT CONCLUDES MY

12  QUESTIONING OF MS. MORRIS; ALTHOUGH I RESERVE THE

13  RIGHT FOR RE -- I GUESS RECROSS IF THERE IS

14  QUESTIONING BY THE OTHER SIDE.

15         THE COURT:  ALL RIGHT.  MR. DOTSON, DO YOU

16  WANT TO QUESTION MS. MORRIS AT THIS TIME?

17         MR. DOTSON:  I DO HAVE A FEW QUESTIONS, YOUR

18  HONOR, IF YOU'LL INDULGE ME, PLEASE.

19         THE COURT:  OF COURSE.

20                   DIRECT EXAMINATION

21  BY MR. DOTSON:

22     Q    LET'S GO BACK TO SOMETHING THAT MR. MOST

23  TALKED ABOUT EARLIER IN TERMS OF THE PLEADING AND THE

24  FACT THAT THERE WAS NO SUIT NUMBER THERE.  IS THERE

25  ANY REQUIREMENT THAT -- LET ME BACK UP.

1       HAVE YOU FILED THESE KIND OF PROCEEDINGS

2  BEFORE WHERE YOU'RE ASKING FOR THE RELEASE OF CERTAIN

3  INFORMATION PERTAINING TO A JUVENILE, MS. MORRIS?

4     A    YES.

5     Q    AND IN THE PREVIOUS TIMES YOU FILED IT, WAS

6  THERE A REQUIREMENT THAT YOU PUT A SUIT NUMBER AT THE

7  TOP OF THE DOCUMENT?

8     A    NO.

9     Q    HAS A COURT EVER TOLD YOU THAT IT WAS

10  IMPROPERLY FILED BECAUSE IT DIDN'T CONTAIN A SUIT

11  NUMBER?

12     A    NO.

13     Q    DID A COURT EVER TELL YOU IT SHOULD HAVE

14  BEEN FILED WITHIN THE JUVENILE PROCEEDING?

15     A    NO.

16     Q    HAVE THOSE BEEN GRANTED PREVIOUSLY TO THIS

17  INCIDENT HERE THAT WE'RE HERE FOR TODAY?

18     A    YES.  I'VE HAD ONE GRANTED LAST YEAR.

19     Q    BECAUSE THERE WAS NO PENDING SUIT NUMBER,

20  DOES THAT MEAN TO YOU THAT THERE WAS NOT A CRIMINAL

21  PROCEEDING?

22     A    NO.

23     Q    DO YOU UNDERSTAND WHAT I MEAN WHEN I'M

24  ASKING YOU THAT?

25     A    YES.

1    Q    WHAT IS YOUR UNDERSTANDING OF THE STATUS OF

2    THIS MATTER AT THE TIME THAT YOU FILED YOUR REQUEST

3    TO RELEASE THE INFORMATION FROM THE JUVENILE COURT?

4    A    I BELIEVE THAT THERE WAS A PENDING CRIMINAL

5    CHARGE THAT WAS BEFORE THE COURT.

6    Q    OKAY.  AND WHAT'S YOUR BASIS FOR THAT

7    UNDERSTANDING, MS. MORRIS?

8    A    THAT THERE WAS AN ARREST REPORT AND A

9    CUSTODIAL AGREEMENT THAT WAS SENT TO THE DA'S OFFICE.

10   Q    AND YOU WORK FOR THE BATON ROUGE POLICE

11   DEPARTMENT.  IS THAT CORRECT?

12   A    YES.

13   Q    AS PART OF YOUR DUTIES FOR THE BATON ROUGE

14   POLICE DEPARTMENT, YOU DEAL WITH RECORDS AND

15   DOCUMENTS THAT COME IN, INCLUDING CUSTODIAL

16   AGREEMENTS.  IS THAT CORRECT?

17   A    YES.

18   Q    HOW ARE CUSTODIAL AGREEMENTS HANDLED WHEN

19   THEY COME IN, TO YOUR KNOWLEDGE?

20   A    TO MY KNOWLEDGE, THEY ARE TRANSMITTED TO THE

21   RECORDS DIVISION.  AND THE RECORDS DIVISION PROCESSES

22   THAT, THEY REVIEW THE CUSTODIAL AGREEMENT ESSENTIALLY

23   LIKE A SUMMONS, AND THEY REVIEW THE CRIMINAL REPORT

24   TO MAKE SURE THAT THE CHARGES ARE MATCHED AND THAT

25   ALL THE INFORMATION IS IN LINE WITH THE CUSTODIAL

1  AGREEMENT.  AND THEN THEY TRANSMIT THAT TO THE COURT

2  THROUGH THE -- LIKE THE DA SCAN PAPER -- PAPER --

3      Q    ELECTRONIC?

4      A    YEAH, IT'S ELECTRONICALLY SENT TO THE DA --

5  JUVENILE COURT DA'S DIVISION.

6      Q    AND LET ME ASK YOU TO BE CLEAR, BECAUSE YOU

7  MENTIONED COURT AND DA.  TO YOUR UNDERSTANDING, THE

8  CUSTODIAL AGREEMENT, ONCE APPROVED BY THE BATON ROUGE

9  POLICE DEPARTMENT, IS TRANSMITTED TO WHO?

10     A    TO THE -- WELL, IT'S SENT ELECTRONICALLY TO

11  THE JUVENILE COURT DIVISION OF THE DA'S OFFICE.

12     Q    AND IT'S SENT THERE BECAUSE IT'S A CRIMINAL

13  PROCEEDING.  IS THAT ACCURATE?

14     A    I BELIEVE SO.

15     Q    MR. MOST ALSO REFERENCED THE FACT THAT WHY

16  YOU DIDN'T CONTACT THE JUVENILE COURT REGARDING

17  WHETHER THERE WAS ANY PENDING MATTER.  ARE YOU

18  FAMILIAR WITH JUVENILE COURT PROCEEDINGS GENERALLY?

19     A    GENERALLY.

20     Q    FROM YOUR UNDERSTANDING, DO YOU HAVE THE

21  ABILITY TO CALL THE JUVENILE COURT AND ASK THEM ABOUT

22  ANY SPECIFIC MATTER THAT'S PENDING AT THAT TIME

23  BEFORE THE JUVENILE COURT?

24     A    NO.  I DON'T BELIEVE THAT THEY WOULD GIVE ME

25  A RESPONSE TO THAT QUESTION.

1       **Q**    AND WHY IS THAT, MS. MORRIS?

2       **A**    BECAUSE ALL MATTERS AND PROCEEDINGS BEFORE

3    JUVENILE COURT ARE CONFIDENTIAL.

4       **Q**    THERE HAS BEEN SOME DISCUSSION EARLIER ABOUT

5    412(A) AND 412(E) OF THE CHILDREN'S CODE.  IS THERE A

6    DIFFERENCE BETWEEN THOSE TWO ARTICLES?

7       **A**    I BELIEVE SO.

8            **MR. MOST:**  OBJECTION.

9            **THE COURT:**  MR. DOTSON, YOU MAY NOT AGREE

10   WITH YOUR CO-COUNSEL AND YOU MAY NOT AGREE WITH THIS

11   COURT'S PREVIOUS RULING, BUT I'VE ALREADY RULED THAT

12   I'M NOT GOING TO LET THE LAWYERS OR THE PARTIES TALK

13   ABOUT WHAT THE LAW MEANS.  THAT'S MY PROVINCE.  OKAY?

14           **MR. DOTSON:**  I UNDERSTAND, YOUR HONOR.  AND

15   TO THE EXTENT I WAS DOING THAT, I WAS VERY MINDFUL IN

16   MY QUESTIONING NOT TO WANT TO HAVE HER DO THAT.

17   MAYBE I DIDN'T QUALIFY MY QUESTION PROPERLY.  BUT

18   YOUR HONOR WILL LET ME KNOW IF I HAVE THE ABILITY TO

19   ASK HER THIS.

20           AS A LAWYER WHO MADE THE DECISION TO FILE

21   UNDER THAT STATUTE, SHE SHOULD BE ABLE TO

22   ARTICULATE -- I WOULD ASK THAT SHE BE ABLE TO

23   ARTICULATE WHY SHE UTILIZED THAT STATUTE.

24           **THE COURT:**  YES, SHE CAN ANSWER THAT

25   QUESTION.

1        **MR. DOTSON:**  THANK YOU, YOUR HONOR.

2   **BY MR. DOTSON:**

3      **Q**    WHY DID YOU UTILIZE ARTICLE 412(A) IN THIS

4   PROCEEDING WE'RE HERE WITH TODAY AS OPPOSED TO

5   412(E)?

6      **A**    BECAUSE UNDER 412(E) YOU NEED -- IT'S A

7   DIFFERENT SET OF CIRCUMSTANCES.  YOU ARE KIND OF

8   SEEKING TO RELEASE DOCUMENTS FOR A PURPOSE OF A

9   PROCEEDING OR AN INVESTIGATION.  I DIDN'T HAVE THAT

10  IN THIS MATTER.  I WAS SEEKING TO RELEASE IT

11  PUBLICLY, NOT FOR A PROCEEDING OR AN INVESTIGATION.

12  SO, YOU KNOW, YOU KIND OF FALL UNDER THE GENERAL

13  CONFINES OF 412(A).

14     **Q**    IS THERE A CONTRADICTORY HEARING REQUIREMENT

15  UNDER 412(A)?

16     **A**    NO.

17     **Q**    DID YOU UTILIZE ARTICLE 412(E) IN THIS

18  GENERAL PROCEEDING -- RELATED TO THIS GENERAL

19  PROCEEDING AT ANY TIME?

20     **A**    I USED IT TO OBTAIN DOCUMENTS TO PRODUCE TO

21  THIS COURT IN THIS PROCEEDING.

22     **Q**    UNDER 412(E), THOUGH.

23     **A**    YES.

24     **Q**    IS THAT CORRECT?

25     **A**    UH-HUH.

1    **Q**   THERE ARE SOME ALLEGATIONS IN THE BRIEFS

2   THAT HAVE BEEN FILED HERE, AS WELL AS THE COMPLAINT,

3   THAT THE SOLE REASON WHY THE CITY PARISH FILED THIS

4   MATTER WAS RELATED -- IN JUVENILE COURT -- WAS

5   BECAUSE NEGATIVE PRESS WAS BEING RECEIVED.

6        WITHOUT GOING INTO WORK PRODUCT OR ATTORNEY-

7   CLIENT PRIVILEGE -- AND IF YOU CAN'T PROVIDE THE

8   ANSWER WITHOUT DOING THAT, THEN DON'T PROVIDE THE

9   ANSWER -- WAS THAT THE BASIS FOR FILING THIS MATTER;

10   NEGATIVE PRESS?

11    **A**   IT WAS NOT THE BASIS FOR FILING THE RULE TO

12   SHOW CAUSE.  IT WAS ONLY THE BASIS TO TRY TO GET THE

13   RECORDS RELEASED UNDER 412.

14    **Q**   AND CAN YOU EXPLAIN THAT?  WHAT DO YOU MEAN?

15    **A**   I MEAN --

16    **Q**   WHY GETTING THEM RELEASED.

17    **A**   BECAUSE WE NEEDED TO HAVE THE DOCUMENTS

18   PROPERLY RELEASED FOR THE PRESS CONFERENCE SO THAT WE

19   COULD USE THEM FOR PUBLIC RELEASE.

20    **Q**   BUT NOT IN REACTION TO ANYTHING THAT WAS

21   HAPPENING REGARDING PROFESSOR FRAMPTON?

22    **A**   NOT AT ALL.  THIS IS A PETITION THAT I HAD

23   FILED BEFORE IN A SIMILAR MATTER LAST YEAR.  AND IT

24   IS -- IT'S THE SAME THING TO -- AND I DIDN'T -- THERE

25   WAS NO RULE TO SHOW CAUSE OR ANYTHING ATTACHED TO

1   THAT PETITION.  THIS IS JUST SIMPLY PROVIDING THE

2   JUDGE WITH REASONS AND GROUNDS AS TO GET A PUBLIC

3   RELEASE OF SUCH RECORD.

4       Q    CAN YOU EXPLAIN TO THE COURT -- BECAUSE

5   THERE HAS BEEN SOME ALLEGATIONS TO THAT AS WELL,

6   REGARDING THE TIMING OF THIS MATTER.  THERE WERE SOME

7   ALLEGATIONS THAT IT WAS FILED RIGHT WHEN THE CBS NEWS

8   BROADCAST WAS BEING MADE.  WAS THERE INTENT TO FILE

9   IT AT THAT TIME IN THAT MANNER, MS. MORRIS?

10      A    NO.

11      Q    CAN YOU EXPLAIN THAT?

12      A    WELL, I DIDN'T KNOW THAT THERE -- SO THE

13  ALLEGATION IS THAT I RELEASE -- OKAY.  I DON'T KNOW

14  WHEN THAT CBS BROADCAST OCCURRED, SO I --

15      Q    LET ME ASK YOU THIS, IF YOU HAVE -- WHAT

16  HAPPENED THAT DAY IN TERMS OF YOUR TRYING TO FILE

17  THIS PROCEEDING IN JUVENILE COURT?

18      A    OKAY.  I HAD TO GO DOWN TO JUVENILE COURT TO

19  FILE -- AND THIS WAS A HOLIDAY AGAIN, ALSO, SO IT

20  WILL HELP PUT THINGS IN REFERENCE.  I WAS INSTRUCTED

21  TO GET AN ORDER FROM THE JUVENILE COURT JUDGE TO TRY

22  TO GET THE DOCUMENT -- OR THE VIDEOS RELEASED FOR

23  THIS PRESS CONFERENCE THAT WAS BEING HELD THAT DAY.

24  I THINK WE HAD TALKED ABOUT IT BRIEFLY THE DAY

25  BEFORE.

1    AND BECAUSE THE COURT WAS CLOSING, I WASN'T

2    ABLE TO GO DOWN THE DAY BEFORE.  SO I HAD TO GO THAT

3    MORNING TO THE COURT AND DRAFT THAT PETITION AND GET

4    IT ALL SITUATED.  AND THE JUDGE WAS ACTUALLY LEAVING

5    AT NOON THAT DAY.

6          SO I HURRIED DOWN TO THE COURT RIGHT BEFORE

7    NOON TO TRY TO GET HER TO SIGN THE ORDER.  AND

8    (INAUDIBLE DUE TO VIDEOCONFERENCE TECHNICAL

9    DIFFICULTIES) -- THAT ORDER, I CAME BACK TO MY OFFICE

10   AND OUR INTERNET SERVER WAS DOWN BECAUSE -- I MEAN, I

11   DON'T KNOW.  BUT I WAS TRYING TO GET THIS OUT TO MR.

12   FRAMPTON AS FAST AS POSSIBLE BECAUSE, IN ALL HONESTY,

13   WE GOT OFF AT TWO O'CLOCK THAT DAY AND I HAD PLANS

14   AND I WAS TRYING TO GET OUT OF THERE AND GET MY

15   CHILD.

16          SO I KEPT TRYING AND TRYING TO SCAN THE

17   COPIES TO DO CERTIFICATE OF SERVICE; ALTHOUGH, YOU

18   KNOW, I ALSO REQUESTED PROPER LONG-ARM SERVICE FOR

19   THAT RULE TO SHOW CAUSE.  BUT FOR THE CERTIFICATE OF

20   SERVICE, I WAS JUST TRYING TO GET IT SCANNED.  AND

21   THE SCANNER WOULDN'T SEND TO IT MY EMAIL, BECAUSE

22   THAT'S THE WAY OUR SYSTEM WORKS.  YOU SCAN IT, SEND

23   IT TO YOUR EMAIL.  BUT BECAUSE THE SERVERS WERE DOWN,

24   IT WOULDN'T GO THROUGH.

25          SO I TRIED A COUPLE OF TIMES, AND THEN

1   FINALLY I WOUND UP LEAVING.  I THINK I EVEN CALLED

2   AROUND TRYING TO FIGURE OUT HOW TO GET THIS

3   FACILITATED AND ACCOMPLISHED BEFORE THE DAY WAS UP,

4   BECAUSE I WAS CONCERNED ABOUT THE CERTIFICATE OF

5   SERVICE AND NOT GETTING IT DONE IN TIME.

6           AND SO I ACTUALLY WENT SO FAR AS TO -- I WAS

7   ABOUT TO GO TO MY NEIGHBOR'S HOUSE TO USE HER SCANNER

8   TO SEND IT TO MY PERSONAL EMAIL ADDRESS SO THAT I

9   COULD SEND IT TO MR. FRAMPTON.  BUT RIGHT ABOUT THAT

10  TIME, I NOTICED THAT IT FINALLY CAME -- ON MY PHONE I

11  NOTICED THAT IT HAD COME THROUGH, THE SCANNED

12  VERSION, AND I WAS ABLE TO THEN SEND IT TO MR.

13  FRAMPTON.

14     Q   SO THAT'S THE REASON WHY IT CAME OUT AROUND

15  THE SAME TIME AS THE CBS NEWS PROGRAM CAME ON.  IS

16  THAT ACCURATE?

17     A   AGAIN, I DON'T KNOW WHEN THE CBS -- BUT,

18  YEAH, IT CAME OUT WHATEVER TIME IT CAME OUT.  YES.

19     Q   DO YOU -- AS PART OF YOUR JOB AS THE BATON

20  ROUGE POLICE DEPARTMENT LEGAL LIAISON, DO YOU HAVE

21  OCCASION TO REVIEW PUBLIC RECORD REQUESTS?

22     A   YES.

23     Q   IS THAT PART OF YOUR JOB FUNCTION?

24     A   YES.

25     Q   AND SO YOU'RE FAMILIAR WITH THE RULES ON

1    PUBLIC RECORDS AND WHAT CAN AND CANNOT BE PROVIDED TO

2    INDIVIDUALS SEEKING DOCUMENTS, VIDEOS, THINGS OF THAT

3    NATURE.  CORRECT?

4        A    YES.

5        Q    DID YOU HAVE OCCASION TO RECEIVE A PUBLIC

6    RECORDS REQUEST FROM PROFESSOR FRAMPTON PRIOR TO

7    FILING ANY KIND OF JUVENILE PROCEEDING OR ANYTHING

8    LIKE THAT EARLY ON IN THESE CHAIN OF EVENTS?

9        A    YES.

10       Q    DO YOU REMEMBER THAT PUBLIC RECORDS REQUEST

11   FROM PROFESSOR FRAMPTON?

12       A    YES.

13       Q    WHAT WAS YOUR RESPONSE TO THAT PUBLIC

14   RECORDS -- WELL, LET ME ASK YOU THIS.  I APOLOGIZE.

15            WHAT DID HE ASK FOR, IF YOU REMEMBER?

16       A    I THINK HE ASKED FOR SOME IA FILES.  HE

17   ASKED FOR THE -- I CAN'T REMEMBER IF HE ASKED FOR THE

18   CRIMINAL REPORT OR NOT.  I KNOW HE ASKED FOR THE BODY

19   CAMERA.  I THINK HE ASKED FOR THE REPORT AS WELL.

20            SO A LOT OF TIMES I LIKE TO REACH OUT TO THE

21   INDIVIDUAL REQUESTER VIA PHONE BECAUSE I FEEL LIKE IN

22   THESE TIMES IT'S A LOT EASIER.

23       Q    AND LET ME SAY THIS TO YOU.  I DON'T WANT TO

24   HAVE A NARRATIVE.  I KNOW IT'S BETTER FOR YOUR HONOR

25   AND EVERYBODY IF WE JUST HAVE A SEQUENCE.

1        SO YOU REMEMBER THE ITEMS THAT HE REQUESTED

2   WERE IA FILES, BODY CAMERA REPORT, AMONG MAYBE OTHER

3   THINGS?

4        A    YES.

5        Q    OKAY.  WHAT -- DID YOU HAVE AN OPPORTUNITY

6   TO REVIEW ALL THOSE MATTERS TO SEE IF YOU COULD

7   PROVIDE IT PURSUANT TO THE PUBLIC RECORDS LAW?

8        A    YES.

9        Q    WHAT WERE YOUR FINDINGS AS TO WHETHER YOU

10  COULD PROVIDE THE IA FILES, THE BODY CAMERA OR THE

11  REPORT OR ANY OTHER INFORMATION TO PROFESSOR

12  FRAMPTON?

13       A    THE IA FILES THAT WERE CLOSED I COULD

14  PROVIDE TO HIM WITH CERTAIN REDACTIONS AND, OF

15  COURSE, LOUISIANA LAW.  THE BODY CAMERA FOOTAGE WAS

16  DIFFICULT -- AND I ALSO THINK HE ASKED FOR THE BODY

17  CAMERA FOOTAGE OF CLARENCE GREEN.  AND I KNEW THAT IT

18  WAS TIED IN WITH A JUVENILE ARREST, AND SO I TOLD HIM

19  THAT THAT'S PROBLEMATIC BECAUSE IT'S A RECORD

20  PERTAINING TO A JUVENILE ARREST.

21       ALSO, THE SAME ISSUE WAS PRESENTED WITH THE

22  CRIMINAL REPORT, BECAUSE THE CRIMINAL REPORT IS ONE

23  REPORT WITH THOSE ARRESTS, BOTH THE ADULT AND THE

24  JUVENILE.  AND SO I TOLD HIM THAT THERE WERE PROBLEMS

25  UNDER 412 WITH RELEASING THAT WITHOUT A JUVENILE

1  COURT ORDER AND EXPLAINED TO HIM THAT THAT WOULD

2  PROBABLY BE THE EASIEST WAY TO FACILITATE HIS REQUEST

3  AND THAT WE COULD PROVIDE ALL THOSE DOCUMENTS TO HIM

4  UNREDACTED IF HE JUST GOT AN ORDER.

5      Q    AND WHAT WAS HIS RESPONSE TO THAT DIRECTION

6  PURSUANT TO 412?

7      A    I BELIEVE HE TOLD ME THAT HE LIVED IN

8  VIRGINIA AND THAT HE COULDN'T SEEK AN ORDER IN

9  JUVENILE COURT.

10     Q    BUT YOU MADE CLEAR THAT THE REASON FOR IT

11 WAS BECAUSE IT WAS INVOLVING A JUVENILE AND THE NEED

12 TO PROTECT THEIR INTERESTS?

13     A    YES.

14     Q    WERE YOU ABLE TO PROVIDE ANYTHING TO

15 PROFESSOR FRAMPTON WITH ALL OF THIS AS A BACKGROUND?

16     A    YES.  I PROVIDED -- I BELIEVE -- I CAN'T

17 REMEMBER EXACTLY WHAT WE PROVIDED.  BUT I BELIEVE WE

18 PROVIDED HIM WITH THE IA FILE.  HE INEVITABLY WOUND

19 UP DROPPING HIS (INAUDIBLE DUE TO VIDEOCONFERENCE

20 TECHNICAL DIFFICULTIES) -- FOR THE CRIMINAL -- I

21 THINK HE DROPPED HIS REQUEST FOR THE CRIMINAL REPORT.

22 AND THAT'S ONLY FOR THE BODY CAMERA FOOTAGE.

23     Q    SO YOU NEVER HAD TO GET TO A POINT TO WHERE

24 THERE WAS A NEED AT THAT TIME TO SEEK ANY KIND OF

25 INTERVENTION BEFORE YOU RELEASED IT?

1    **A**    NO.

2         **MR. DOTSON:**  YOUR HONOR, I BELIEVE THAT'S

3    ALL THE QUESTIONS AT THIS TIME.  I DO RESERVE MY

4    RIGHT FOR REDIRECT FROM YOUR HONOR.

5         **THE COURT:**  I DON'T THINK YOU HAVE A RIGHT

6    TO REDIRECT, MR. DOTSON.  YOU JUST TOOK YOUR FIELD.

7    YOU COULD DO IT NOW OR YOU COULD DO IT IN YOUR CASE,

8    BUT YOU CAN'T DO IT BOTH TIMES.

9         **MR. DOTSON:**  I APOLOGIZE.  I'LL CALL HER

10   BACK UP IN MY CASE IN CHIEF IF I NEED TO ADDRESS

11   ANYTHING ELSE.

12        **THE COURT:**  NO, NO, YOU MISUNDERSTOOD.  YOU

13   HAVE THE OPTION TO EITHER TAKE HER ON DIRECT

14   EXAMINATION RIGHT AFTER THE PLAINTIFF HAS CALLED ON

15   CROSS-EXAMINATION OR YOU CAN DO IT IN YOUR CASE, BUT

16   YOU CAN'T DO IT BOTH TIMES.

17        **MR. DOTSON:**  THAT'S THE DOWNFALL OF DOING IT

18   THIS WAY, YOUR HONOR.  YOU'RE CORRECT AND IT JUST

19   CLICKED IN MY MIND, BUT I'M FINE WITH THE WAY THE

20   TESTIMONY HAS GONE, YOUR HONOR.  THAT'S FINE.

21        **THE COURT:**  ALL RIGHT.  AND ANY RECROSS?

22        **MR. MOST:**  YES, YOUR HONOR, JUST A FEW BRIEF

23   POINTS.

24                   **RECROSS-EXAMINATION**

25   BY MR. MOST:

1    Q    MS. MORRIS, ABOUT THE CUSTODIAL AGREEMENT,

2  YOU TESTIFIED IT GOES FROM THE ARRESTING OFFICER TO

3  THE RECORDS DIVISION OF THE BATON ROUGE POLICE

4  DEPARTMENT.  CORRECT?  YOU'RE MUTED.

5    A    SORRY.  IT'S MY ROUGH UNDERSTANDING.  I

6  DON'T PROCESS THE PAPERWORK.  AND I BELIEVE THAT

7  SITUATIONS CAN BE DIFFERENT, BUT IT IS -- I KNOW FOR

8  A FACT THAT THE CUSTODIAL AGREEMENT GETS TO THE

9  RECORDS DIVISION FOR PROCESSING, YES.

10    Q    OKAY.  GETS TO THE RECORDS DIVISION OF THE

11  POLICE DEPARTMENT AND THEN GOES FROM THERE

12  ELECTRONICALLY TO THE DA'S OFFICE.  CORRECT?

13    A    THE JUVENILE COURT DA'S DIVISION, YES.

14    Q    CORRECT.  THE JUVENILE COURT DIVISION OF THE

15  DISTRICT ATTORNEY'S OFFICE.  RIGHT?

16    A    YES.

17    Q    NOT TO THE JUVENILE COURT ITSELF?

18    A    I BELIEVE THAT THAT IS ALL KIND OF -- ALL

19  THE RECORDS FOR JUVENILE ARRESTS ARE FUNNELED THE

20  SAME WAY.

21    Q    TO THE DISTRICT ATTORNEY'S OFFICE?

22    A    CORRECT.

23    Q    OKAY.  MS. MORRIS, WE WENT BACK AND FORTH ON

24  WHETHER YOU SAW THE CBS NEWS STORY.  MR. ANDERSON

25  ASKED YOU ABOUT THAT.  BUT REGARDLESS OF -- SETTING

1 ASIDE THE CBS NEWS STORY, THE MAY 28TH PETITION

2 EXPLICITLY REFERENCES DISSEMINATION OF THE VIDEO ON

3 MEDIA PLATFORMS.  RIGHT?

4     **A**   YES.

5         **THE COURT:**  SORRY.  I DIDN'T HEAR THE

6 ANSWER.

7         **THE WITNESS:**  OH, I'M SORRY.  YES.

8     **Q**   AND THEN I WANT TO SEE IF I CAN UNDERSTAND

9 WHAT YOU WERE SAYING ABOUT WHY YOU DIDN'T FEEL THE

10 NEED TO NOTIFY THE JUVENILE IN ADVANCE OF THAT MAY

11 28TH PETITION.

12         **MR. DOTSON:**  I DON'T THINK WE WENT INTO

13 THAT, YOUR HONOR.

14         **THE COURT:**  WELL, YOU DID.  YOU ASKED HER

15 WHY SHE DID WHAT SHE DID, AND SHE EXPLAINED IT, SO

16 THIS IS FAIR CROSS.

17         **MR. DOTSON:**  I UNDERSTAND, YOUR HONOR.  AND

18 CAN I JUST SAY ONE THING, IF YOU DON'T MIND, YOUR

19 HONOR?

20         **THE COURT:**  SURE.

21         **MR. DOTSON:**  I DID GO INTO A DISCUSSION

22 ABOUT 412(A) AND 412(E), BUT I DON'T THINK I WENT

23 INTO CERTAIN NOTICES.  BUT I RESPECT YOUR HONOR'S

24 DECISION AND I WILL BE QUIET NOW, YOUR HONOR.  THANK

25 YOU.

1        **THE COURT:**  OKAY.  YOU MAY -- I OVERRULE THE

2   OBJECTION.  YOU MAY ASK THE QUESTION.

3       **Q**    SO, MS. MORRIS, IF I WAS UNDERSTANDING YOU

4   RIGHT, ARTICLE 412, IF YOU WANT TO DISCLOSE SOME

5   JUVENILE RECORDS TO A FEW SPECIFIC PEOPLE FOR A

6   SPECIFIC PROCEEDING, YOU HAVE TO NOTIFY THE JUVENILE

7   IN ADVANCE AND HAVE A CONTRADICTORY HEARING WHERE

8   THEY CAN OBJECT.  IS THAT RIGHT?

9       **A**    YEAH.  WHATEVER THE REQUIREMENTS UNDER --

10  (INAUDIBLE DUE TO VIDEOCONFERENCE TECHNICAL

11  DIFFICULTIES) -- WAS THE REQUIREMENTS OF 412(E), YES.

12      **Q**    BUT DON'T YOU THINK --

13      **A**    OH, GO AHEAD.

14      **Q**    BUT DO YOU THINK THAT IF INSTEAD YOU'RE

15  ASKING THE COURT TO RELEASE IT FOR A PRESS CONFERENCE

16  TO THE WHOLE WORLD, YOU DON'T HAVE TO NOTIFY THE

17  JUVENILE IN ADVANCE OR GIVE THEM AN OPPORTUNITY TO

18  OBJECT?  IS THAT YOUR POSITION?

19      **A**    THAT THE -- IT'S ACTUALLY THE JUDGE'S

20  POSITION.  THE JUDGE CAN GRANT OR DENY THE ORDER AS

21  IT STANDS.

22      **Q**    OKAY.  SO IF YOU'RE DOING IT FOR A PRESS

23  CONFERENCE, YOU DON'T THINK YOU NEED TO TELL THE

24  JUVENILE IN ADVANCE?

25        **MR. DOTSON:**  AGAIN, THAT'S ASKED AND

1   ANSWERED, YOUR HONOR.

2          THE COURT:  OVERRULED.

3       A   I CAN'T -- DO I THINK THAT IT'S -- CAN YOU

4   REPEAT THE QUESTION?  I'M SORRY.

5       Q   SURE.  IF I'M UNDERSTANDING YOU RIGHT, WHEN

6   YOU'RE DOING THIS FOR A PRESS CONFERENCE, YOU DON'T

7   FEEL THE NEED TO NOTIFY THE JUVENILE IN ADVANCE OR

8   GIVE THEM AN OPPORTUNITY TO OBJECT.  CORRECT?

9          MR. DOTSON:  SAME OBJECTION.

10      A   I BELIEVE THERE ARE CERTAIN CIRCUMSTANCES

11  THAT REQUIRE AN URGENCY.  AND IN THIS CASE, NO, I DID

12  NOT -- I DID NOT HAVE THE TIME, HONESTLY, TO NOTIFY

13  ANY JUVENILE.  AND LIKE I SAID, I HAVE DONE THIS

14  BEFORE AND I DIDN'T SET IT FOR HEARING OR NOTIFY THE

15  JUVENILE BEFORE WHEN I DID THIS AGAIN -- WHEN I DID

16  THIS LAST YEAR AND IT WAS GRANTED.  SO BASED ON THAT

17  EXPERIENCE, I DID NOT BELIEVE THAT NOTIFICATION TO

18  THE JUVENILE WAS NECESSARY.

19      Q   OKAY.

20         MR. MOST:  NO FURTHER QUESTIONS, YOUR HONOR.

21         THE COURT:  I HAVE A FEW QUESTIONS.

22         MS. MORRIS, AS THE ATTORNEY FOR THE POLICE

23  DEPARTMENT, IF A REQUEST -- AND A REQUEST WAS MADE

24  PRESUMABLY BY THE UNITED STATES ATTORNEY TO THE BATON

25  ROUGE POLICE DEPARTMENT FOR THESE VIDEOS.  DID YOU

1  PARTICIPATE IN CLEARING THAT?

2              THE WITNESS:  NO.

3              THE COURT:  ALL RIGHT.  AND ORDINARILY IF

4  THE UNITED STATES ATTORNEY ASKS FOR VIDEOS -- BODYCAM

5  VIDEOS OF BATON ROUGE POLICE POLICEMEN, WOULD YOU

6  HAVE ANY ROLE IN REVIEWING THAT REQUEST AND APPROVING

7  THAT REQUEST BEFORE THE REQUEST IS HONORED?

8              THE WITNESS:  NO.

9              THE COURT:  TELL ME HOW IT WORKS.

10             THE WITNESS:  I BELIEVE -- BECAUSE THIS

11 IS -- I MEAN, IT'S TOTALLY SEPARATE FROM WHAT I DO AS

12 FAR AS A PUBLIC RECORDS STANDPOINT OR ANYTHING LIKE

13 THAT.  BUT I BELIEVE THAT THE U.S. ATTORNEY'S OFFICE

14 WOULD DIRECTLY CONTACT -- MAKE A REQUEST THROUGH

15 FOLIO, WHICH IS THE REQUEST SYSTEM FOR VIDEOS, AND

16 THEY JUST DIRECTLY REQUEST IT FROM THE MOBILE DATA

17 DIVISION.

18             AND I THINK THAT'S THE WAY IT HAPPENS IN ALL

19 PROSECUTIONS, NOT JUST THE U.S. ATTORNEY'S OFFICE.  I

20 DON'T HAVE ANY ROLE IN PRODUCING ANY VIDEOS FOR ANY

21 PROSECUTIONS WHATSOEVER.  THAT'S ALL DONE SEPARATE

22 AND APART FROM ME.

23             THE ONLY TIME -- I WOULD SAY THIS -- IS

24 THAT, YOU KNOW, OCCASIONALLY WE'LL GET SUBPOENAS --

25 IF WE GET A SUBPOENA FOR A SPECIFIC VIDEO --

1   SOMETIMES DEFENSE ATTORNEYS WILL SEND US SUBPOENAS IN

2   CRIMINAL LITIGATION.  AND THAT'S THE ONLY TIME THAT I

3   HAVE ANY ROLE IN IT, IS IF I RECEIVE A SUBPOENA THAT

4   WAS FILED IN A CRIMINAL PROSECUTION.  AND THEN WE

5   PRODUCE THOSE -- YOU KNOW, WE'LL MANAGE PRODUCTION OF

6   THOSE VIDEOS.

7           **THE COURT:**  SO IS THERE ANY MECHANISM IN

8   PLACE AT BATON ROUGE CITY POLICE DEPARTMENT OR WITHIN

9   THE CITY PARISH SUCH THAT IF A VIDEO THAT WOULD

10  INCLUDE VIDEO OF A JUVENILE WHO'S ALLEGEDLY COMMITTED

11  SOME OFFENSE, THAT REQUEST IS MADE, IS THERE ANY

12  MECHANISM WHEREBY SOMEBODY SAYS *WAIT A MINUTE.  CAN'T*

13  *DO THAT WITHOUT THE PERMISSION OF THE JUVENILE COURT*?

14          **THE WITNESS:**  NOT TO MY KNOWLEDGE.  BUT THAT

15  DOES NEED TO BE DONE.

16          **THE COURT:**  I'M SORRY?

17          **THE WITNESS:**  I SAID NOT TO MY -- I DON'T

18  KNOW EXACTLY -- AND THIS IS -- FOR ME, THIS IS AN

19  UNUSUAL CIRCUMSTANCE.  BUT I DON'T THINK THERE IS A

20  SPECIFIC PROCEDURE IN PLACE FOR THAT AND THAT I WOULD

21  SAY THAT THAT NEEDS TO BE DONE.

22          **THE COURT:**  I HEARD THE PART THAT SAID *THERE*

23  *IS NOT A SPECIFIC PROCEDURE IN PLACE*, BUT I DIDN'T

24  HEAR THE NEXT PART.

25          **THE WITNESS:**  AND I SAID I BELIEVE THAT

1    NEEDS TO BE DONE.

2         **THE COURT:**  OKAY.  SO IF THERE ISN'T SUCH A

3    MECHANISM, YOU BELIEVE THERE SHOULD BE SUCH A

4    MECHANISM?

5         **THE WITNESS:**  YES.

6         **THE COURT:**  ALL RIGHT.  AND THEN -- SO TO

7    YOUR KNOWLEDGE, WHEN THIS VIDEO WAS RELEASED, WHICH

8    YOU BELIEVE IS SUBJECT TO THIS REQUIREMENT THAT IT BE

9    BLESSED -- THAT THE RELEASE BE BLESSED BY THE

10   JUVENILE COURT.  WHEN IT WAS RELEASED, IT WAS

11   RELEASED WITHOUT SUCH BLESSING.  CORRECT?

12        **THE WITNESS:**  YES.

13        **THE COURT:**  AND THEN WHEN IT WENT TO THE

14   U.S. ATTORNEY'S OFFICE, THE U.S. ATTORNEY RELEASED IT

15   TO MARK UPTON, THE FEDERAL PUBLIC DEFENDER --

16   CORRECT? -- REPRESENTING MR. GREEN?

17        **THE WITNESS:**  I BELIEVE THAT HAPPENED, YES.

18        **THE COURT:**  WHEN YOU SAY YOU BELIEVE -- AND

19   I THINK MR. MOST ASKED IT 20 TIMES:  *DO YOU HAVE ANY*

20   *REASON TO DISBELIEVE.*  YOU'VE READ --

21        **THE WITNESS:**  NO.

22        **THE COURT:**  YOU'VE READ ALL THE BRIEFING ON

23   THIS.  RIGHT?

24        **THE WITNESS:**  YES.

25        **THE COURT:**  SO THE FEDERAL PUBLIC DEFENDER

1    RECEIVES IT FROM U.S. ATTORNEY.  WAS THE U.S.

2    ATTORNEY IN VIOLATION OF THE JUVENILE CODE WHEN HE

3    RELEASED IT WITHOUT GETTING PERMISSION OF THE

4    JUVENILE COURT?

5            THE WITNESS:  I MEAN, TECHNICALLY, YEAH, I

6    THINK SO.  I THINK THAT THERE -- THIS IS THE PROB- --

7    AND I DON'T KNOW IF I'M ALLOWED TO EXPLAIN --

8            THE COURT:  IF YOU WANT TO EXPLAIN YOUR

9    ANSWER, YOU'RE WELCOME TO EXPLAIN YOUR ANSWER.

10           THE WITNESS:  I DO SEE THIS ISSUE WITH THESE

11   COMMINGLED RECORDS.  AND, YOU KNOW, I DON'T WANT

12   TO -- I KNOW THAT THEY ARE GETTING IT FOR THE

13   PURPOSES OF PROSECUTION AND THERE IS A QUICK

14   TURNAROUND FOR A LOT OF THINGS.  THIS IS KIND OF

15   FOREIGN -- NOT FOREIGN -- NEW TERRITORY FOR THE

16   DEPARTMENT WITH THE BODY CAMERA FOOTAGE.

17           WITH THE REPORTS, I BELIEVE THAT WE NEED TO

18   START SEPARATING THEM OUT SOMEHOW SO THAT THIS

19   DOESN'T HAPPEN AGAIN.  WITH BODY CAMERA FOOTAGE, I'M

20   NOT QUITE SURE HOW WE CAN GO FORWARD UNDER THE

21   CURRENT LAW EFFICIENTLY.  SO THESE ARE THINGS THAT

22   ARE GOING ON IN MY HEAD IN TRYING TO NAVIGATE, YOU

23   KNOW, UNDER THESE CIRCUMSTANCES.

24           SO I KNOW THAT THERE ARE LAWS TO GET THE

25   VIDEOS -- YOU KNOW, UNDER 412 THERE IS DIFFERENT

1 REASONS TO GET THE VIDEOS. AND, YOU KNOW, WHETHER

2 IT'S BLACKING OUT THE JUVENILE PORTION OF IT, I'M

3 JUST NOT CERTAIN AS TO HOW YOU GO FORWARD. BUT

4 SOMETHING DOES NEED TO BE DONE SO THAT THEY DON'T GET

5 ENTERED INTO, YOU KNOW, A PROCEEDING WITHOUT THE

6 JUVENILE COURT KNOWING AND -- OR FILING IT UNDER

7 SEAL, AT A BARE MINIMUM. I THINK THAT THAT WOULD BE,

8 YOU KNOW, A START. BUT AGAIN --

9          **THE COURT:** I'M SORRY. GO AHEAD.

10          **THE WITNESS:** YOU'D HAVE TO GO THROUGH THE

11 WHOLE CONTACTING THE JUVENILE COURT AND GETTING THE

12 ORDER TO --

13          **THE COURT:** AND NOTIFYING THE JUVENILE?

14          **THE WITNESS:** YES. BECAUSE IN THAT

15 SITUATION IT IS A PROCEEDING. RIGHT? SO THEN IT

16 WOULD FALL UNDER 412(E) AND THEN YOU HAVE TO HAVE A

17 CONTRADICTORY HEARING. SO IT IS -- IT'S GETTING --

18 IT'S GETTING KIND OF PRECARIOUS. I'M NOT QUITE SURE

19 HOW YOU PROCEED UNDER THAT, YOU KNOW, TO BE IN

20 COMPLIANCE WITH THE LAW, WITHOUT DOING A LOT OF

21 LEGWORK.

22          **THE COURT:** OKAY. SO TO ANSWER THE

23 QUESTION -- I THINK YOU DID ANSWER IT, BUT I WANT TO

24 MAKE SURE I UNDERSTAND YOUR ANSWER. WHEN THE U.S.

25 ATTORNEY RELEASED THIS TO THE FEDERAL PUBLIC

1  DEFENDER, HE VIOLATED THE CHILDREN'S CODE.  CORRECT?

2           THE WITNESS:  I BELIEVE SO.

3           THE COURT:  ALL RIGHT.  AND WHEN -- THE FACT

4  OF THE MATTER IS WHEN THE BATON ROUGE POLICE

5  DEPARTMENT RELEASED THE VIDEO TO THE U.S. ATTORNEY'S

6  OFFICE WITHOUT GETTING JUVENILE COURT CONSENT, THE

7  BATON ROUGE POLICE DEPARTMENT VIOLATED THE JUVENILE

8  CHILDREN'S CODE.  CORRECT?

9           THE WITNESS:  I BELIEVE SO.

10           THE COURT:  AND WHEN THE FEDERAL PUBLIC

11  DEFENDER RELEASED IT TO HIS CLIENT, CLARENCE GREEN,

12  THE FEDERAL PUBLIC DEFENDER VIOLATED THE CHILDREN'S

13  CODE.  CORRECT?

14           THE WITNESS:  THAT'S MY UNDERSTANDING, YES.

15           THE COURT:  AND WHEN THE -- MR. GREEN

16  RELEASED IT TO HIS LAWYER, MR. FRAMPTON, MR. GREEN

17  VIOLATED THE CHILDREN'S CODE.  CORRECT?

18           THE WITNESS:  YES.

19           THE COURT:  AND WHOEVER RELEASED IT TO THE

20  ADVOCATE, THAT PERSON VIOLATED THE CHILDREN'S CODE.

21  CORRECT?

22           THE WITNESS:  YES.

23           THE COURT:  NOW, MS. MORRIS, WHY HASN'T THE

24  CITY PARISH PURSUED SANCTIONS AGAINST ANY OF THOSE

25  PEOPLE?  YOU JUST SAID THEY VIOLATED IT JUST LIKE MR.

1  FRAMPTON DID.  WHY DIDN'T THEY PURSUE THE

2  SANCTIONS -- THE SAME SANCTIONS THAT THEY ARE

3  PURSUING AGAINST MR. FRAMPTON?

4          THE WITNESS:  WELL, I DID REACH OUT TO THE

5  U.S. ATTORNEY'S OFFICE TO TRY TO START MITIGATING THE

6  ISSUE AND GETTING IT FILED UNDER SEAL --

7          THE COURT:  THAT'S NOT THE QUESTION I'M

8  ASKING.  I'M NOT ASKING ABOUT MITIGATION.  I'M ASKING

9  WHY YOU DIDN'T PURSUE SANCTIONS, LIKE YOU DID WITH

10  MR. FRAMPTON, AGAINST ALL OF THOSE PEOPLE WHO YOU

11  JUST TOLD ME, IN YOUR VIEW, VIOLATED THE CHILDREN'S

12  CODE.

13          THE WITNESS:  WELL, AT THE TIME THAT I FILED

14  THE RULE TO SHOW CAUSE, I DIDN'T KNOW --

15          THE COURT:  MA'AM, THAT'S NOT THE QUESTION.

16          YOU KNOW NOW, THOUGH, DO YOU NOT?

17          THE WITNESS:  YES.

18          THE COURT:  SO MY QUESTION STANDS.  WHY

19  HAVEN'T YOU PURSUED SANCTIONS AGAINST THE U.S.

20  ATTORNEY, THE FEDERAL PUBLIC DEFENDER, THE CLERK OF

21  COURT, AND MR. GREEN?

22          THE WITNESS:  I DON'T KNOW.  HONESTLY, I

23  MEAN, I THINK THAT WE'RE TRYING TO RESOLVE THIS

24  MATTER, AND THEN AFTER THAT I WILL RESOLVE ALL OF

25  THAT.  BUT I --

1     THE COURT:  ALL RIGHT.  I DON'T WANT TO KNOW

2  HOW THE DECISION WAS MADE, BUT I DO WANT TO KNOW:

3  WHO MADE THE DECISION TO BRING THESE SANCTIONS

4  AGAINST MR. FRAMPTON?  WHO PARTICIPATED IN THAT

5  DECISION-MAKING?

6     MR. DOTSON:  YOUR HONOR, I WOULD INTERPOSE

7  AN OBJECTION.  I THINK THAT IS PRIVILEGED UNDER --

8     THE COURT:  I WITHDRAW IT.

9     MY NEXT QUESTION IS:  WHEN WAS THAT DECISION

10  MADE?

11     THE WITNESS:  I GUESS AROUND THE SAME TIME

12  OF FILING THAT PETITION.

13     THE COURT:  I THINK I MAY HAVE SOME

14  ADDITIONAL QUESTIONS HERE.

15     MR. DOTSON:  THANK YOU, YOUR HONOR.

16     THE COURT:  NOW, MR. MOST ASKED SOME

17  QUESTIONS EARLIER -- OR HE MADE SOME COMMENTS EARLIER

18  ABOUT THE RECORDS -- OF MR. SCOTT RELEASING SOME

19  RECORDS THAT ARE SUPPOSEDLY SUBJECT TO THIS

20  REQUIREMENT THAT THE JUVENILE COURT GIVE PERMISSION

21  TO DO IT; HE RELEASED IT ONE WEEK BEFORE YOU ASKED

22  FOR PERMISSION.  DO YOU KNOW ANYTHING ABOUT THAT?

23     THE WITNESS:  I DON'T THINK SO, NO.

24     THE COURT:  SO THIS IS NEWS TO YOU?

25     THE WITNESS:  THEY REFERENCE -- HE

1  REFERENCED SOMETHING IN -- WE ALL HAD A --

2          MR. DOTSON:  SHE MAY NOT KNOW WHAT YOU'RE

3  REFERRING TO, YOUR HONOR, SHE NOT HAVING BEEN IN

4  EARLIER AND HEARD HOW MR. MOST LAID OUT THE

5  FOUNDATION.

6          THE COURT:  WELL, I'LL SAY I JUST SAW

7  INTRODUCED INTO THE RECORD AN EMAIL FROM MR. SCOTT IN

8  WHICH SHE RELEASED CERTAIN JUVENILE RECORDS OF THE --

9  WHAT ARE Y'ALL SAYING?  *F* AS IN FRANK, *B* AS IN BOY OR

10 *S* AS IN SAM, *B* AS IN BOY?  WHAT IS IT?

11         MR. MOST:  *F* AS IN FRANK, YOUR HONOR.

12         MR. DOTSON:  CAN WE PUT A DOCUMENT UP, YOUR

13 HONOR?  WOULD THAT BE OKAY?

14         THE COURT:  NO, IT'S NOT OKAY, MR. DOTSON.

15         NOW, MY QUESTION TO YOU -- AND IF YOU NEED

16 TO LOOK AT THE DOCUMENT, I'M HAPPY TO LET YOU LOOK AT

17 IT.  YOU MAY NOT NEED TO.

18         I SAW EARLIER AN EMAIL THAT SHOWED THAT

19 MISTER -- PURPORTED TO SHOW THAT MR. SCOTT RELEASED

20 RECORDS OF THIS JUVENILE -- ARREST RECORDS OF THIS

21 JUVENILE -- WAS SUPPOSEDLY REDACTED BUT APPARENTLY

22 NOT ENTIRELY REDACTED -- ABOUT ONE WEEK BEFORE YOU

23 SOUGHT PERMISSION TO RELEASE THOSE RECORDS FROM THE

24 JUVENILE COURT.  DO YOU KNOW ANYTHING ABOUT THAT?

25         THE WITNESS:  I DON'T.

1      THE COURT:  OKAY.  NOW, EARLY IN RESPONSE TO

2  MR. MOST'S QUESTIONS YOU SAID THAT YOU DISAGREE WITH

3  HIS POSITION THAT THE VIDEO, DOCUMENT 26, THAT WAS

4  PLACED INTO THE MIDDLE DISTRICT RECORD IN CONNECTION

5  WITH THE CRIMINAL CASE AND WAS THE SUBJECT OF A

6  MOTION TO SUPPRESS AND WAS PLAYED, AS I UNDERSTAND

7  IT, AT THE MOTION TO SUPPRESS, IS NOT A PUBLIC

8  DOCUMENT.  CAN YOU EXPLAIN TO ME YOUR POSITION ON

9  THAT?

10      THE WITNESS:  I THINK THAT THE LAW STATES --

11  I THINK THAT THE LAW STATES THAT ANYBODY THAT HAS

12  POSSESSION OF THE VIDEO RIGHTFULLY IS STILL MAIN- --

13  OR ANY RECORDS PERTAINING TO A JUVENILE, THAT THAT IS

14  STILL -- THE CONFIDENTIALITY IS STILL MAINTAINED AND

15  YOU'RE NOT -- EVEN IF YOU HAVE IT PROPERLY, YOU CAN'T

16  RELEASE IT WITHOUT, AGAIN, THE COURT ORDER.  AND --

17      THE COURT:  WERE YOU FINISHED WITH YOUR

18  ANSWER?

19      THE WITNESS:  I'M DONE.  I'M SORRY.

20      THE COURT:  OKAY.  NOW, DOES EITHER SIDE

21  WANT TO FOLLOW UP ON ANY QUESTIONS THAT I ASKED?

22      MR. MOST?

23      MR. MOST:  YES, YOUR HONOR.

24            FOLLOW-UP EXAMINATION

25  BY MR. MOST:

1      Q    I WOULD JUST LIKE TO PULL UP PLAINTIFF'S

2   EXHIBIT 15.  MS. MORRIS, DO YOU SEE THIS DOCUMENT,

3   PLAINTIFF'S EXHIBIT 15?

4      A    YES.

5      Q    AND I'LL REPRESENT TO YOU THAT THIS IS THE

6   EMAIL THAT WE DISCUSSED IN THE QUESTIONING OF

7   PROFESSOR FRAMPTON THAT INCLUDES A REDACTED INITIAL

8   REPORT OF FB.

9           DO YOU SEE WHERE THERE IS AN ATTACHMENT AT

10   THE BOTTOM?

11      A    YES.

12      Q    AND DO YOU SEE THAT YOU ARE CC'D ON THIS

13   EMAIL?

14      A    YES.

15      **MR. MOST:**  THAT WAS MY ONLY QUESTION, YOUR

16   HONOR.

17      **THE COURT:**  ALL RIGHT.  ANY QUESTIONS, MR.

18   DOTSON?

19      **MR. DOTSON:**  YES, YOUR HONOR.  IF I CAN

20   INDULGE MR. MOST TO PULL UP THOSE TWO DOCUMENTS

21   AGAIN.  WE SAW THE DOCUMENT ALREADY THAT WAS DATED

22   JULY 20TH.  CAN YOU PULL UP THE DOCUMENT THAT WAS

23   RIGHT AFTER THAT YOU SHOWED?

24      **THE COURT:**  I THINK IT WAS 15.  WAS THAT

25   P15?

1    MR. DOTSON:  THAT SHE FILED.

2    MR. MOST:  YES.  SO I'LL PULL UP --

3  PLAINTIFF'S EXHIBIT 15 IS THE JULY 20TH DISCOVERY

4  PRODUCTION.  AND THEN I THINK YOU'RE REFERRING TO

5  PLAINTIFF'S 17, WHICH I'LL PULL UP RIGHT NOW.

6    MR. DOTSON:  THAT'S CORRECT.

7    MR. MOST:  DATED JULY 1, 2020.

8    MR. DOTSON:  GO BACK.  DATED WHAT, SIR?

9    MR. MOST:  JULY 21, 2020 -- ONE.  2021.  I'M

10 SORRY.

11              FOLLOW-UP EXAMINATION

12 BY MR. DOTSON:

13   Q   SO MY QUESTION IS:  THE JUDGE ASKED YOU DID

14 YOU FILE THIS DOCUMENT.  DO YOU REMEMBER FILING THIS

15 DOCUMENT, MA'AM?

16   A   YES.

17   Q   OKAY.  AND WHAT'S THE DATE OF THE FILING OF

18 THIS DOCUMENT?

19   A   JULY 21ST.

20   Q   DO YOU REMEMBER THE DATE OF THE PREVIOUS

21 DOCUMENT WHERE MR. SCOTT RELEASED THE INFORMATION?

22 WHAT WAS THE DATE OF THAT, MA'AM?

23   A   OH.  JULY 20TH.

24   Q   SO HOW FAR APART WAS THAT, MA'AM?

25   A   ONE DAY.

1    **Q**   OKAY.  ONE DAY APART.  OKAY.

2        WHAT WAS YOUR REASONING FOR FILING THE

3    SECOND ITEM, P17, WHICH WAS THE DOCUMENT SEEKING

4    DISCLOSURE OF THE REPORT -- SEEKING TO BE ABLE TO

5    DISCLOSE THE REPORTS AND OTHER ITEMS?  WHAT WAS THE

6    REASONING FOR THAT?

7    **A**   TO PRESENT IT AT THIS HEARING.

8        **THE REPORTER:**  I'M SORRY?

9    **Q**   THE JUDGE ASKED YOU --

10       **MR. MOST:**  THE COURT REPORTER IS WAVING.

11       **THE COURT:**  HANG ON ONE SECOND, MR. DOTSON.

12       **THE REPORTER:**  I DIDN'T HEAR YOUR COMPLETE

13   ANSWER, MS. MORRIS.  COULD YOU REPEAT?

14       **THE WITNESS:**  TO PRESENT IT AT THIS HEARING.

15   TO GET APPROVAL TO PRESENT IT AT THIS MATTER.

16       **THE COURT:**  I'M SORRY.  PROCEED, MR. DOTSON.

17       **MR. DOTSON:**  THANK YOU, YOUR HONOR.  I THINK

18   I HAD JUST ONE OTHER QUESTION.  AND AGAIN, IT'S GOING

19   TO BE RELATED TO THE QUESTION YOU ASKED AND NOT

20   OUTSIDE OF THAT, YOUR HONOR, IF I MAY.

21       **THE COURT:**  ALL RIGHT.

22   BY MR. DOTSON:

23   **Q**   YOUR HONOR WENT THROUGH AND KIND OF DETAILED

24   SOME VARIOUS WAYS THAT THE DOCUMENTS OR THE VIDEOS

25   HAD BEEN RELEASED ALL THE WAY FROM THE U.S. ATTORNEY

1  ALL THE WAY TO THE ADVOCATE.  CORRECT?  DO YOU

2  REMEMBER THAT LINE THAT HE WENT THROUGH?

3      **A**    YES.

4      **Q**    AND YOUR HONOR ASKED YOU, YOU KNOW, WHY WE

5  HAD NOT -- OR WHY THE CITY PARISH OR WHY YOU HAD NOT

6  FILED ANYTHING AGAINST THESE INDIVIDUALS.  DO YOU

7  REMEMBER THAT QUESTION?

8      **A**    YES.

9      **Q**    ONE THING YOU SAID EARLIER AS WELL WAS --

10  WHAT WAS THE REASONING YOU GAVE EARLIER ABOUT SOMEONE

11  BEING IN POSSESSION OF SOMETHING AND THEN BEING ABLE

12  TO GIVE IT EVEN THOUGH THEY HAVEN'T RECEIVED APPROVAL

13  FROM THE JUVENILE COURT?  DO YOU REMEMBER THAT

14  ANSWER?  SO SOMEBODY HAVING SOMETHING, DOES THAT

15  NECESSARILY GIVE THEM THE ABILITY TO --

16      **THE COURT:**  WHOA, WHOA, WHOA, WHOA.  MR.

17  DOTSON, THIS IS YOUR WITNESS.  AND THIS IS NOT ONLY A

18  LEADING QUESTION, YOU'RE TELLING HER WHAT TO SAY.

19      **MR. DOTSON:**  I'LL REPHRASE THE QUESTION,

20  YOUR HONOR.

21      **THE COURT:**  ASK THE QUESTION IN A NONLEADING

22  WAY.

23      **MR. DOTSON:**  I CAN DO THAT, SIR.

24  BY MR. DOTSON:

25      **Q**    DOES AN INDIVIDUAL -- OKAY.  LET ME DO IT

1   THIS WAY SO IT DOESN'T APPEAR TO BE LEADING.

2           WHAT, IF ANY, RIGHT DOES AN INDIVIDUAL HAVE

3   TO PROVIDE A DOCUMENT OR VIDEO THAT THEY HAVE, THAT'S

4   IN VIOLATION OF A JUVENILE CODE, TO ANOTHER JUST

5   BECAUSE THEY HAVE IT?

6       A    THEY'RE PROHIBITED FROM RELEASING IT UNDER

7   412(A).  IT SPECIFICALLY SAYS THAT ANYBODY THAT'S IN

8   POSSESSION OF A VIDEO, RIGHTFULLY OR NOT, CANNOT

9   RELEASE IT WITHOUT A COURT ORDER.

10      Q    OKAY.  SO EVEN IF ALL THESE OTHER PLACES HAD

11  IT, IF PROFESSOR FRAMPTON HAD IT AND HE PROVIDED IT

12  WITHOUT GETTING RELEASE UNDER 412, WAS HE IN

13  VIOLATION OF ARTICLE 412?

14      A    YES.

15      Q    OKAY.

16          MR. DOTSON:  ALL RIGHT.  THAT'S ALL I HAVE,

17  YOUR HONOR.

18          THE COURT:  ALL RIGHT.  THANK YOU.

19          OKAY.  WHO IS YOUR NEXT WITNESS?

20          MR. MOST:  YOUR HONOR, THOSE ARE THE ONLY

21  WITNESSES THAT WE'LL CALL IN OUR CASE IN CHIEF.

22          THE COURT:  OKAY.  AND THEN I KNOW, MR.

23  DOTSON, Y'ALL HAVE HOW MANY WITNESSES?

24          MR. DOTSON:  TWO QUICK WITNESSES, YOUR

25  HONOR.

1    THE COURT:  OKAY, GOOD.  WELL, IT'S 11:38.

2  SO IF THEY'RE QUICK, WE'LL JUST KEEP ON GOING.

3    MR. DOTSON:  YES.  AND I CAN'T SPEAK FOR MR.

4  MOST.  I CAN ONLY SPEAK FOR MYSELF.

5    THE COURT:  I UNDERSTAND.  I UNDERSTAND.

6    MR. MOST:  I DON'T EXPECT MY CROSS WILL BE

7  VERY LONG, BUT WE'LL SEE.

8    THE COURT:  IF WE NEED TO BREAK FOR LUNCH

9  BECAUSE THE FIRST WITNESS GOES LONG, WE'LL BREAK FOR

10 LUNCH.  BUT MAYBE WE CAN GET THEM BOTH DONE BEFORE WE

11 BREAK FOR LUNCH.

12   MR. DOTSON:  THANK YOU, YOUR HONOR.  COULD

13 WE TAKE A FIVE-MINUTE BREAK BEFORE WE DO THAT?

14   THE COURT:  LET'S MAKE IT TEN MINUTES.

15 LET'S MAKE IT TEN MINUTES.  IT'S 11:38.  WE'LL COME

16 BACK AT 11:48.

17   MR. DOTSON:  THANK YOU, YOUR HONOR.

18   **(WHEREUPON, A RECESS WAS TAKEN.)**

19   THE COURT:  OKAY, FOLKS, WE'RE BACK.  AND

20 WHO IS YOUR WITNESS, MR. SCOTT?

21   MR. SCOTT:  YES, YOUR HONOR.  CITY PARISH

22 WOULD CALL MS. VALERIE SINGLETON.

23   THE COURT:  ALL RIGHT.  MS. SINGLETON, MS.

24 CAUSEY WILL SWEAR YOU IN, IF YOU'LL RAISE YOUR RIGHT

25 HAND.

1    (WHEREUPON, VALERIE SINGLETON, BEING DULY

2  SWORN, TESTIFIED AS FOLLOWS.)

3                    DIRECT EXAMINATION

4  BY MR. SCOTT:

5    Q   MS. SINGLETON, PLEASE GIVE YOUR NAME AND

6  PROFESSIONAL ADDRESS FOR THE RECORD.

7    A   IT'S VALERIE SINGLETON.  BATON ROUGE POLICE

8  DEPARTMENT, 9000 AIRLINE HIGHWAY, BATON ROUGE,

9  LOUISIANA.

10   Q   AND WHAT IS YOUR POSITION WITH THE BATON

11 ROUGE POLICE DEPARTMENT?

12   A   I AM AN ADMINISTRATIVE SPECIALIST ONE, WHICH

13 IS LIKE A SUPERVISOR, IN THE RECORDS DEPARTMENT.

14   Q   AND AS PART OF YOUR WORK, DO YOU ENCOUNTER

15 CUSTODIAL ORDERS FOR JUVENILES?

16   A   YES, SIR.

17       MR. SCOTT:  YOUR HONOR, I BELIEVE THAT WE

18 ADMITTED ALL OF THE EXHIBITS AT THE BEGINNING OF THE

19 HEARING?

20       THE COURT:  YES, SIR.

21       MR. SCOTT:  AND SO I'M GOING TO ATTEMPT TO

22 SCREEN SHARE WHAT I HAVE IDENTIFIED IN JERS AS

23 EXHIBIT 1, IF I CAN MAKE THIS WORK.

24       OKAY.  I DON'T KNOW WHAT Y'ALL ARE SEEING OR

25 NOT, SO --

1        THE COURT:  WE'RE SEEING THE CUSTODIAL

2   AGREEMENT.

3        MR. SCOTT:  OKAY.

4        MR. MOST:  COULD I MAKE A -- YOUR HONOR, IF

5   I MAY.  THERE IS 5.2 INFORMATION ON THIS DOCUMENT.

6        THE COURT:  OKAY.

7        MR. MOST:  COULD WE USE MY VERSION OF THIS

8   DOCUMENT?  I THINK IT'S THE SAME VERSION, AND 5.2

9   INFORMATION HAS BEEN REDACTED.

10       MR. SCOTT:  CERTAINLY.  LET ME FIGURE OUT

11  HOW TO STOP SCREEN SHARING.

12       THE COURT:  AND LET ME JUST SAY, ALSO, FOR

13  THE RECORD, MR. SCOTT, WHAT YOU'LL NEED TO DO IS TO

14  FILE A MOTION TO STRIKE THAT DOCUMENT AND REPLACE IT

15  WITH ONE THAT'S PROPERLY REDACTED.

16       MR. SCOTT:  YES, YOUR HONOR.

17       MR. MOST:  I'LL PULL UP PLAINTIFF'S EXHIBIT

18  2, WHICH I BELIEVE IS THE DOCUMENT YOU'RE LOOKING

19  FOR.  HERE.

20  BY MR. SCOTT:

21     Q    SO, MS. SINGLETON, ARE YOU FAMILIAR WITH

22  THIS DOCUMENT IN PARTICULAR?

23     A    YES.

24     Q    HOW SO?

25     A    I ACTUALLY PROCESSED THAT CUSTODIAL

1  AGREEMENT.

2      **Q**   IS THERE ANY NOTATION ON HERE OF, FOR

3  INSTANCE, WHEN YOU MIGHT HAVE DONE SO, OR --

4      **A**   IF YOU'LL SCROLL DOWN ON IT, LET ME SEE IF

5  THERE IS A STAMP.

6          **THE COURT:**  AND IF YOU CAN SPEAK UP A LITTLE

7  BIT, MS. SINGLETON.

8          **THE WITNESS:**  OKAY.  I WAS LOOKING TO SEE

9  WHAT DATE WE ACTUALLY RECEIVED IT OR HAD IMAGED IT IN

10 OUR IMAGING DEPARTMENT.

11         **THE COURT:**  ALL RIGHT.

12     **Q**   AND IS THAT A STAMP AND --

13     **A**   YES, IT IS.

14     **Q**   -- INDICATOR THAT YOU RECOGNIZE AS BEING

15 GENERATED BY YOUR OFFICE?

16     **A**   YES, IT IS.  UH-HUH.

17     **Q**   SO Y'ALL GOT IT SOME TIME AROUND AUGUST 4TH

18 OF 2020?

19     **A**   YES, THAT'S CORRECT.

20     **Q**   SO WHAT DO YOU DO WITH IT THEN?

21     **A**   ONCE I GET THE DOCUMENT IN, I GO TO OUR

22 REPORTING SYSTEM AND I PULL UP THE REPORT THAT

23 CORRESPONDS WITH THAT FILE NUMBER, AND I VERIFY

24 INFORMATION THAT'S ON THE CUSTODIAL AGAINST WHAT'S IN

25 THE ACTUAL REPORT.

1      **Q**    AND IF YOU RECALL, DID YOU DO THAT WITH THIS

2   DOCUMENT?

3      **A**    YES.  YES, SIR.

4         **MR. SCOTT:**  AND, JUDGE, I'M NO LONGER

5   CONFIDENT IN MY REDACTION SKILLS, SO I -- I WAS NEVER

6   VERY CONFIDENT WITH THEM TO BEGIN WITH, AND NOW I'M

7   JUST FEELING COMPLETELY INCOMPETENT FOR REDACTION.

8   SO I THINK I'D BETTER TAKE A CLOSER LOOK AT MY

9   EXHIBIT 2 ARREST REPORT BEFORE INTRODUCING IT AND --

10        **THE COURT:**  ALL RIGHT.  WHY DON'T YOU LOOK

11  AT IT WITHOUT SHARING IT AND JUST SATISFY YOURSELF

12  IT'S PROPERLY REDACTED.  AND THEN IF IT IS, WE CAN

13  PUT -- YOU CAN PUT IT ON THE SCREEN.

14        **MR. DOTSON:**  YOUR HONOR, WHILE MR. SCOTT IS

15  DOING THAT, CAN I ASK A HOUSEKEEPING MATTER, PLEASE?

16        **THE COURT:**  YES, SIR.

17        **MR. DOTSON:**  I'M NOT GOING TO BE CALLING MS.

18  MORRIS ANYMORE.  IF MR. MOST IS NOT GOING TO BE

19  CALLING HER, COULD SHE BE RELEASED?  JUST THAT SHE BE

20  RELEASED FROM THE SEQUESTRATION, YOUR HONOR?

21        **THE COURT:**  ANY OBJECTIONS, MR. MOST?

22        **MR. MOST:**  NO, YOUR HONOR.

23        **THE COURT:**  YES, SHE MAY.

24        **MR. DOTSON:**  THANK YOU, YOUR HONOR.

25        **THE COURT:**  YOU BET.

1          **MR. SCOTT:** OKAY. YES, SIR?

2          **MR. MOST:** IF THERE IS A PROBLEM, WE ALSO

3    HAVE PLAINTIFF'S EXHIBIT 16, WHICH IS THE JUVENILE'S

4    ARREST REPORT. SO IF THERE IS AN ISSUE WITH

5    REDACTION, WE COULD ALSO USE PLAINTIFF'S 16.

6          **MR. SCOTT:** I THINK I GOT THIS ONE RIGHT,

7    AFTER LOOKING AT IT. I'M SURE SOMEONE WILL CORRECT

8    ME IF I'M WRONG.

9    **BY MR. SCOTT:**

10        **Q** UNDERSTANDING THAT A WHOLE LOT OF THIS HAS

11   BEEN REDACTED OUT, DO YOU THINK THAT THIS IS THE

12   REPORT THAT YOU SAW?

13        **A** YES, SIR.

14        **Q** AND IN YOUR COMPARISON, WAS THE INFORMATION

15   CORRECT AS BETWEEN THE CUSTODIAL AND THE REPORT?

16        **A** YES, SIR.

17        **Q** AND SO HAVING CONFIRMED THAT, WHAT DO YOU DO

18   WITH IT?

19        **A** AFTER WE VERIFY NAME, SOCIAL, DATE OF BIRTH,

20   CHARGES, DATE OF ARREST, LOCATIONS, WE DO WHAT'S A

21   PAPERLESS SEND TO THE DA'S OFFICE.

22        **Q** DO YOU HAVE ANY FURTHER CONTACT WITH THE

23   CUSTODIAL ORDER AFTER THAT?

24        **A** NO. ONCE WE FINISH WITH THAT, WE DO WHAT WE

25   HAVE TO DO WITH IT. WHEN WE SEND IT PAPERLESS TO THE

1  DA'S OFFICE, WE'RE DONE WITH IT.  THE HARD COPY WAS

2  GOING TO A -- ANOTHER DEPARTMENT WITHIN OUR AGENCY

3  FOR WHATEVER THEY DO WITH IT.

4      Q    AND IS THERE A DIFFERENT PROCESS WHEN A

5  CHILD IS PUT INTO THE JUVENILE DETENTION CENTER?

6      A    ALL OF OUR ARRESTS ARE HANDLED THE SAME.

7  THERE IS CERTAIN -- YOU KNOW, CUSTODIAL AGREEMENTS

8  STAND BY THEMSELVES.  THERE IS USUALLY A RAP SHEET

9  AND A PC OR A RAP SHEET AND A VERIFIED COMPLAINT OR A

10  WARRANT.  BUT WE HANDLE ALL OF THE ARRESTS THE SAME.

11  WE PROCESS THEM ALL THE SAME WAY.  THEY JUST HAVE

12  DIFFERENT PAPERWORK ATTACHED TO THEM.

13      Q    YES, MA'AM.  HOW LONG HAVE YOU BEEN WITH

14  BRPD DOING THIS?

15      A    A LITTLE OVER 11 YEARS.

16      Q    AND WHAT'S YOUR UNDERSTANDING OF WHAT'S

17  GOING ON WITH THIS CHILD AS A RESULT OF THIS

18  CUSTODIAL AGREEMENT AND --

19      A    HE GOT ARRESTED AND HE GOT RELEASED TO HIS

20  PARENTS.  WE PROCESS SO MANY OF THEM, YOU REALLY

21  DON'T HAVE TIME TO SIT AND PICK THROUGH.

22      MR. SCOTT:  I BELIEVE THAT'S ALL THE

23  QUESTIONS THAT I HAVE FOR MS. SINGLETON, YOUR HONOR,

24  SUBJECT TO REDIRECT.

25      THE COURT:  ANY CROSS?

1     MR. MOST:  VERY BRIEFLY.

2                   CROSS-EXAMINATION

3  BY MR. MOST:

4     Q    GOOD AFTERNOON -- OR STILL GOOD MORNING, MS.

5  SINGLETON.

6     A    GOOD MORNING.

7     Q    I'M THE ATTORNEY FOR THE PLAINTIFF IN THIS

8  MATTER, PROFESSOR THOMAS FRAMPTON.

9          AND I JUST VERY BRIEFLY WANT TO ASK YOU:  SO

10  A CUSTODIAL AGREEMENT GETS DIGITIZED BY THE BATON

11  ROUGE POLICE DEPARTMENT AND SENT TO THE DA'S OFFICE.

12  CORRECT?

13     A    CORRECT.

14     Q    THE BATON ROUGE POLICE DEPARTMENT DOES NOT

15  SEND IT TO THE JUVENILE COURT.  CORRECT?

16     A    NO.  WE SEND IT TO THE DA'S OFFICE.

17     Q    OKAY.  THAT'S MY ONLY QUESTION.  THANK YOU,

18  MS. SINGLETON, FOR YOUR TIME.

19          THE COURT:  ALL RIGHT.  ANY REDIRECT?

20          MR. SCOTT:  NO, SIR.

21          THE COURT:  OKAY.  THANK YOU, MS. SINGLETON.

22          AND WHO IS THE NEXT WITNESS?

23          MR. SCOTT:  COURTNEY MYERS, YOUR HONOR.  I

24  HAVE HER SITTING OUT IN THE FOYER OVER HERE.

25          THE COURT:  LET'S GET MS. MYERS IN AND WE'LL

1  SWEAR HER IN.

2        **MR. SCOTT:**  YES, SIR.  JUST A MOMENT.

3        OH.  AND CAN WE RELEASE MS. SINGLETON SO SHE

4  CAN GO ABOUT THE REST OF HER DAY?

5        **MR. MOST:**  NO OBJECTION.

6        **THE COURT:**  ALL RIGHT.  SHE IS RELEASED.

7        **MR. SCOTT:**  THANK YOU, SIR.

8        IS MY MIKE WORKING?

9        **THE COURT:**  YES, IT IS.

10       **MR. SCOTT:**  I HAD HIT THE WRONG BUTTON ON

11 ANDY'S FANCY MICROPHONE AND ALMOST LOST IT.

12       **THE COURT:**  MS. MYERS, IF YOU WOULD RAISE

13 YOUR RIGHT HAND, MS. CAUSEY WILL SWEAR YOU IN.

14       **(WHEREUPON, COURTNEY MYERS-MINOR, BEING DULY**

15 **SWORN, TESTIFIED AS FOLLOWS.)**

16                  **DIRECT EXAMINATION**

17 BY MR. SCOTT:

18    **Q**   MS. MYERS, PLEASE GIVE YOUR FULL NAME AND

19 PROFESSIONAL ADDRESS FOR THE RECORD.

20    **A**   MY NAME IS COURTNEY MYERS-MINOR.  MY ADDRESS

21 IS 8 -- MY WORK ADDRESS IS 8333 VETERANS MEMORIAL

22 BOULEVARD.

23       **THE COURT:**  WAIT, WAIT.  HANG ON.  HOLD ON.

24 YOU'RE NOT SUPPOSED TO BE GIVING YOUR ADDRESS.  OKAY?

25 SO I WANT THAT PART OF THE RECORD STRICKEN.  AND JUST

1  GIVE YOUR PLACE -- YOUR CITY OF RESIDENCE.

2       **THE WITNESS:**  OKAY.  BATON ROUGE, LOUISIANA.

3       **THE COURT:**  THANK YOU.

4       **THE WITNESS:**  CAN I REMOVE MY MASK?

5       **MR. SCOTT:**  YES.

6       I WAS HAVING HER GIVE A WORK ADDRESS, YOUR

7  HONOR.

8       **THE COURT:**  OKAY.  I DIDN'T UNDERSTAND THAT,

9  SO WE'RE GOOD.  LET'S GO.

10 **BY MR. SCOTT:**

11    **Q**  OKAY.  HOW ARE YOU EMPLOYED?

12    **A**  I AM EMPLOYED BY THE EAST BATON ROUGE PARISH

13 DISTRICT ATTORNEY'S OFFICE.

14    **Q**  AND WHAT'S YOUR POSITION IN THE DA'S OFFICE?

15    **A**  I AM AN ASSISTANT DISTRICT ATTORNEY AND I'M

16 THE JUVENILE SECTION CHIEF.

17       **MR. SCOTT:**  MR. MOST, CAN I IMPOSE ON YOU TO

18 CALL PLAINTIFF'S 2 BACK UP?

19       **MR. MOST:**  OF COURSE.  PLAINTIFF'S EXHIBIT

20 2.

21       **MR. SCOTT:**  THANK YOU, SIR.

22 **BY MR. SCOTT:**

23    **Q**  MS. MYERS, ARE YOU FAMILIAR WITH THESE

24 DOCUMENTS IN GENERAL OR THIS ONE IN PARTICULAR?

25    **A**  YES, SIR.

1    **Q**    HOW WOULD YOU IDENTIFY THIS?

2    **A**    THAT IS A CUSTODIAL AGREEMENT FOR A JUVENILE

3    ISSUED BY THE BATON ROUGE CITY POLICE DEPARTMENT.

4    **Q**    MULTIPLE AGENCIES USE THE SAME FORM?

5    **A**    THEY USE -- THEY DO DO CUSTODIAL AGREEMENTS,

6    BUT EACH FORM LOOKS A LITTLE BIT DIFFERENT.  THEY

7    HAVE DIFFERENT TITLES.  BUT YES, EACH AGENCY USES A

8    CUSTODIAL AGREEMENT TO RELEASE JUVENILES TO PARENTS.

9    **Q**    AND WHAT'S YOUR UNDERSTANDING OF THE EFFECT

10   OF A CUSTODIAL AGREEMENT?

11   **A**    SO THAT IS AN ARREST.

12   **Q**    HOW DOES THIS GET FILED WITH THE JUVENILE

13   COURT, OR DOES IT?

14   **A**    IT DOES NOT.  SO THAT AGREEMENT AND REPORT

15   WOULD BE SENT TO THE DISTRICT ATTORNEY'S OFFICE,

16   FIRST DOWNTOWN AND THEN TO THE JUVENILE DIVISION.

17   ONCE IT'S RECEIVED BY THE JUVENILE DIVISION, ALL

18   CASES ARE REVIEWED.  AND THEN THE ONLY WAY THAT

19   ANYTHING WOULD GET FILED WITH THE JUVENILE COURT IS

20   IF THE DA'S OFFICE FILED A PETITION.

21   **Q**    HOW IS THAT DIFFERENT, IF IT'S DIFFERENT,

22   FROM WHEN A CHILD IS PLACED IN JUVENILE DETENTION?

23   **A**    SO -- IT'S NOT DIFFERENT.  SO THE -- WHEN A

24   CHILD IS BOOKED INTO JUVENILE DETENTION, THEY ARE

25   ADDED TO THE DOCKET FOR A DETENTION HEARING.  BUT

1  AGAIN, NOTHING IS FILED IN THE RECORD UNTIL A

2  PETITION IS FILED.

3     Q    AND THE PETITION YOU'RE TALKING ABOUT THERE,

4  THAT'S YOUR CHARGING INSTRUMENT IN JUVENILE COURT?

5     A    YES.  IT'S THE SAME AS A BILL OF

6  INFORMATION.  WE JUST CALL IT A PETITION.

7     Q    AND YOUR OFFICE HAS NOT, IN FACT, AT THIS

8  TIME FILED ANY CHARGES AGAINST THE CHILD IDENTIFIED

9  AS FB IN THIS CUSTODIAL?

10    A    SO I DO NOT BELIEVE THAT I CAN ANSWER THAT

11 QUESTION, BASED ON CONFIDENTIALITY.  WE DO NOT

12 RELEASE THAT INFORMATION, BECAUSE ALL MATTERS IN

13 JUVENILE COURT ARE CONFIDENTIAL UNLESS THERE IS A

14 COURT ORDER.

15    Q    WOULD THERE BE ANY MECHANISM FOR THE PARISH

16 ATTORNEY'S OFFICE, FOR INSTANCE, TO GO TO JUVENILE

17 COURT AND ASK IF A PARTICULAR CHILD HAD BEEN CHARGED,

18 IF YOU KNOW?

19    A    SO I BELIEVE THAT SOMETHING WOULD HAVE TO BE

20 FILED WITH THE COURT IN ORDER FOR THE COURT TO

21 RELEASE THAT INFORMATION WITH THE JUVENILE COURT.

22       MR. SCOTT:  I BELIEVE THAT'S ALL THE

23 QUESTIONS I HAVE, SUBJECT TO REDIRECT.

24       THE COURT:  ALL RIGHT.  CROSS-EXAMINATION.

25       MR. MOST:  YEAH.

1              **CROSS-EXAMINATION**

2    BY MR. MOST:

3        Q    THANK YOU, MISS -- WAS IT MS. MYERS-MINOR?

4    DO I HAVE THAT RIGHT?

5        A    YEAH, THAT'S CORRECT.  SO I GO BY COURTNEY

6    MYERS AT WORK, SO YOU CAN JUST USE MYERS.

7        Q    OKAY.  THANK YOU, MS. MYERS.

8             SO IF I UNDERSTAND YOU CORRECTLY, NOTHING IS

9    FILED WITH THE JUVENILE COURT UNTIL THE DA'S OFFICE

10   DECIDES TO FILE A PETITION INITIATING CRIMINAL

11   CHARGES AGAINST THAT MINOR.  IS THAT CORRECT?

12       A    THAT'S CORRECT.

13       Q    OKAY.  AND THAT INCLUDES A CUSTODIAL

14   AGREEMENT?

15       A    YES.  YEAH.  I MEAN, THE CUSTODIAL AGREEMENT

16   WOULD NOT BE FILED.  THE PETITION WOULD BE FILED.

17       Q    OKAY.  I THINK THAT'S ALL THE QUESTIONS I

18   HAVE.  THANK YOU, MS. MYERS, FOR YOUR TIME.

19            **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

20            **REDIRECT EXAMINATION**

21   BY MR. SCOTT:

22       Q    SO ON THE BASIS OF THAT CUSTODIAL AGREEMENT

23   AND THAT REPORT, DOES THAT CHILD HAVE A PENDING

24   CHARGE?

25       A    NO.  THE CHARGE DOES NOT -- I MEAN, THE

FORMAL CHARGE DOES NOT COME UNTIL THE DA'S OFFICE FILES THE PETITION. IT'S CONSIDERED AN ARREST. IT'S ESSENTIALLY AN ARREST.

**Q** IS THAT CHILD STILL SUBJECT TO THE JURISDICTION OF JUVENILE COURT?

**MR. MOST:** OBJECTION.

**THE COURT:** SUSTAINED.

**MR. SCOTT:** YES, SIR. GOT TO TRY.

**THE COURT:** GOOD TRY. GOOD TRY, MR. SCOTT.

**MR. SCOTT:** UNLESS YOU'VE GOT ANY QUESTIONS, JUDGE, THAT CONCLUDES --

**THE COURT:** NO QUESTIONS FROM THE COURT.

OKAY, FOLKS. ANY OTHER WITNESSES FOR THE DEFENSE?

**MR. SCOTT:** NO, SIR. DEFENSE RESTS.

AND MR. DOTSON AND I THINK WE MIGHT BENEFIT FROM SOME POST-HEARING BRIEFING.

**THE COURT:** I WAS FIXING TO SAY, I THINK I WOULD BENEFIT AS WELL BECAUSE THERE WERE ISSUES RAISED IN THE PROCEEDING WHICH HAD NOT BEEN PREVIOUSLY BRIEFED. THERE WAS ACTUALLY SOME DOCUMENTS WHICH WERE REFERRED TO AND INTRODUCED AND TALKED ABOUT THAT HAD NOT BEEN PREVIOUSLY BRIEFED. AND SO I WOULD VERY MUCH LIKE POST-HEARING BRIEFING.

NOW, THAT'S GOING TO REQUIRE -- TO DO THIS,

1  IT'S GOING TO REQUIRE THE CITY TO MOVE THE HEARING

2  DATE BECAUSE -- I ASSUME YOU WANT TRANSCRIPTS OF THE

3  HEARING IN ORDER TO DO THE POST-TRIAL BRIEFING.  AND

4  IT WOULD HELP THE COURT.  PROBABLY WOULD HELP YOU

5  TOO.

6  　　　　　MR. SCOTT:  AGREED, YOUR HONOR.

7  　　　　　THE COURT:  MR. MOST, DO YOU AGREE AS WELL?

8  　　　　　MR. MOST:  YEAH.  NO OBJECTION TO CONTINUING

9  THE JUVENILE COURT HEARING DATE.  AND I AGREE WITH

10  THE VALUE OF TRANSCRIPTS.

11  　　　　　THE COURT:  OKAY.  SO WHAT WE'LL DO -- HOW

12  MUCH TIME WOULD YOU NEED -- AND WHAT I WOULD LIKE

13  THIS IN THE FORM OF WOULD BE PROPOSED FINDINGS OF

14  FACT AND CONCLUSIONS OF LAW.  AND I WOULD LIKE -- I

15  JUST NEED TO KNOW HOW MUCH TIME FROM THE TIME THE

16  TRANSCRIPT IS FILED INTO THE RECORD THE PARTIES WOULD

17  WANT TO DO THEIR PROPOSED FINDINGS OF FACT AND

18  CONCLUSIONS OF LAW.

19  　　　　　MR. MOST:  I THINK LAST TIME WE DID THIS IT

20  WAS THREE WEEKS.  BUT GIVEN THE ABBREVIATED NATURE OF

21  THAT, I WOULD SUGGEST TWO WEEKS, YOUR HONOR.

22  　　　　　THE COURT:  DO YOU AGREE WITH THAT, MR.

23  SCOTT?

24  　　　　　MR. SCOTT:  I THINK I WOULD PREFER THREE

25  JUST BECAUSE I'M --

**1**      **MR. DOTSON:**  WE HAVE A DELUGE OF STUFF GOING

**2** ON HERE, YOUR HONOR.

**3**      **THE COURT:**  HERE'S THE ANSWER THEN.  IT'S

**4** GOING TO BE THREE WEEKS FROM THE TIME THE TRANSCRIPT

**5** IS FILED FOR THE PROPOSED FINDINGS OF FACT AND

**6** CONCLUSIONS OF LAW.  AND THEN EACH SIDE WILL HAVE ONE

**7** WEEK THEREAFTER -- SEVEN DAYS THEREAFTER TO RESPOND

**8** OR REPLY TO THE OTHER'S PROPOSED FINDINGS.

**9**      SO IN THE MEANTIME, I WOULD ASK JUST TO

**10** NOTIFY THE COURT AS TO WHAT -- I'M NOT SURE HOW

**11** YOU'LL DO THIS BECAUSE I'M NOT SURE HOW TO PREDICT

**12** WHEN THE TRANSCRIPT WILL BE FILED.  BUT I WOULD ASK,

**13** YOU KNOW, LET THE PARTIES KNOW THAT THE HEARING DATE

**14** IS OFF AT LEAST UNTIL, A, THE BRIEFING IS FILED AND

**15** THEN, B, GIVES THE COURT SOME TIME TO LOOK AT IT AND

**16** RULE.

**17**      SO I DON'T KNOW WHETHER IT'S POSSIBLE TO PUT

**18** IT OFF WITHOUT DATE, TO CONTINUE IT WITHOUT DATE.

**19** THAT MIGHT BE THE MOST PRACTICAL WAY.  BUT IF IT'S

**20** NOT -- IF THAT'S NOT POSSIBLE, I JUST LEAVE IT UP TO

**21** YOU GUYS.  I JUST NEED TO BE ABLE TO HAVE THE ABILITY

**22** TO REVIEW THE BRIEFING AND THE DOCUMENTS AND RULE

**23** BEFORE THE JUVENILE COURT RULES.  THAT'S THE WHOLE

**24** PURPOSE OF THIS EXERCISE WE'RE IN.

**25**      **MR. DOTSON:**  YOUR HONOR, I THINK -- WHAT

1  WE'LL DO, YOUR HONOR, IS SHOOT TO GET A DATE MAYBE IN

2  NOVEMBER OR DECEMBER, HOPING THAT'S ENOUGH TIME.  AND

3  IF NOT, THEN WE CAN ALWAYS GO BACK TO THE COURT TO

4  MAYBE SEEK SOME MORE TIME, LIKE NOVEMBER PROBABLY,

5  YOUR HONOR.  LATE NOVEMBER OR SOMETHING LIKE THAT.

6       **THE COURT:**  THAT MAKES SENSE TO ME.

7       **MR. DOTSON:**  YOUR HONOR, MAY I ASK ONE MORE

8  HOUSEKEEPING MATTER?  MS. MYERS IS SITTING OUTSIDE.

9  I'M THINKING WE CAN RELEASE HER AT THIS TIME.  IS

10  THAT CORRECT, YOUR HONOR?

11       **THE COURT:**  IS THAT CORRECT, MR. MOST?

12  ANYBODY HAVE ANY DESIRE TO KEEP HER?

13       **MR. MOST:**  NO.

14       **THE COURT:**  SHE IS RELEASED.

15       **MR. DOTSON:**  THANK YOU, YOUR HONOR.

16       **THE COURT:**  OKAY, FOLKS.

17       WELL, ANYTHING ELSE FROM THE PLAINTIFF?

18       **MR. MOST:**  IS THERE -- WE'LL PREPARE

19  CONCLUSIONS OF LAW, FINDINGS OF FACT.  ARE THERE ANY

20  TOPICS THAT THIS COURT WOULD LIKE PARTICULAR

21  ATTENTION PAID TO OR QUESTIONS THAT NEED TO --

22       **THE COURT:**  NO.  I JUST THINK IT WOULD BE

23  MORE PRODUCTIVE IF YOU JUST STARTED FROM SCRATCH AND

24  ENDED.  YOU KNOW, THERE WILL BE THINGS THAT YOU WILL

25  HAVE COVERED THAT I WILL HAVE REVIEWED AND ALL OF

1  THAT.  BUT I JUST -- RATHER THAN PARSE IT OUT, I

2  THINK THE SAFEST THING TO DO IS JUST GO FROM SCRATCH.

3       **MR. MOST:**  YES, YOUR HONOR.  THANK YOU.

4       **THE COURT:**  ANYTHING FROM THE DEFENDANT?

5       **MR. SCOTT:**  NO, YOUR HONOR.  YOU'RE GIVING

6  ME AN ASSIGNMENT TO DRAFT SOMETHING I'VE NEVER

7  DRAFTED BEFORE.  BUT, YOU KNOW --

8       **THE COURT:**  LET ME TELL YOU, TO MAKE IT

9  EASY, I HAVE POSTED ON MY WEB PAGE A FORM THAT I'D

10  ASK YOU TO LOOK AT IN TERMS OF THE FORMATTING OF THE

11  PROPOSING FINDINGS OF FACT AND CONCLUSIONS OF LAW.

12  AND YOU'LL SEE THE WAY I LIKE IT DONE, SO IT

13  HOPEFULLY WILL TAKE THE MYSTERY OUT OF IT.

14       **MR. SCOTT:**  YES, SIR.  THANK YOU.

15       **MR. MOST:**  ONE FINAL HOUSEKEEPING MATTER.

16  WILL THE PARTIES NEED TO SUBMIT A REQUEST FOR THE

17  TRANSCRIPT, OR IS THAT GOING TO BE SORT OF ORDERED BY

18  THE COURT NOW?

19       **THE COURT:**  ARE Y'ALL REQUESTING IT?

20       **MR. MOST:**  YES.

21       **MR. SCOTT:**  WE ARE.

22       **THE COURT:**  YOU'VE JUST REQUESTED IT.  IT'S

23  NOTED, AND IT WILL BE NOTED IN THE MINUTES.

24       **MR. MOST:**  THANK YOU, YOUR HONOR.

25       **MR. SCOTT:**  THANK YOU, SIR.

1          MR. DOTSON:  THANK YOU.

2          THE COURT:  OKAY, FOLKS.  THANK Y'ALL VERY

3  MUCH.  HAVE A GOOD DAY.

4          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5              C E R T I F I C A T E

6          I CERTIFY THAT THE FOREGOING IS A CORRECT

7  TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

8  ABOVE-ENTITLED NUMBERED MATTER.

9  S:/NATALIE W. BREAUX

10  NATALIE W. BREAUX, RPR, CRR

11  OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25