## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

THOMAS FRAMPTON

                              **CIVIL ACTION**

VERSUS

                              **NO. 21-CV-362-JWD-SDJ**

CITY OF BATON ROUGE/PARISH OF
EAST BATON ROUGE, ET AL.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Table of Contents

I.      INTRODUCTION ................................................................................................ 3

II.    PARTIES ............................................................................................................. 4

III.   BACKGROUND FACTS AND PROCEDURAL HISTORY ............................ 5

      A.    January 1, 2020 Stop Of Clarence Green Vehicle ................................ 5

      B.    Federal Proceedings Against Clarence Green And The Release Of BRPD Video. 7

      C.    Frampton Is Hired As Green Family Lawyer, Files Civil Suit And Settles Case With City/Parish .......................................................................................... 9

      D.    Frampton Releases Some BRPD Video ............................................... 12

      E.    Paul Holds Press Conference And City/Parish, On Behalf Of BRPD, Files Petition In Juvenile Court Seeking Release Of Video And Sanctions Against Frampton . 13

      F.    The Previous Public Release Of BRPD Video And Defendants' Awareness Of Same .................................................................................................... 14

      G.    Despite Knowledge Of Previous Public Release Of BRPD Video, Defendants Continue To Pursue The Contempt Motion Against Frampton And Do Not Pursue Contempt Actions Against Others Who Previously Released Video .................. 16

      H.    Frampton Files Petition For Injunctive Relief And Motion For Preliminary Injunction; Defendants File Motion To Dismiss; Preliminary Injunction Hearing Is Held ................................................................................................... 17

IV.   STANDARDS TO BE APPLIED ................................................................... 18

      A.    Motion To Dismiss ............................................................................. 18

      B.    Motion For Preliminary Injunction ..................................................... 19

      C.    *Younger* Abstention And Bad Faith Exception ................................... 20

      D.    Retaliation Against The Exercise Of The Constitutional Right Of Free Speech .. 22

V.     ISSUES .................................................................................................. 24

VI.     ARGUMENTS OF THE PARTIES ....................................................... 26

    A.     Should The Court Abstain From Deciding This Case? ......................... 26

        1.     Plaintiff's Position .................................................... 26

        2.     Defendants' Position.................................................. 42

    B.     Has Plaintiff Satisfied His Burden For The Issuance Of A Preliminary Injunction?
           .................................................................................................. 55

        1.     Has Plaintiff Shown A Probability Of Success On The Merits? ............. 55

        2.     Has Plaintiff Shown A Significant Threat Of Irreparable Injury?........... 56

        3.     Does The Threatened Injury Of The Injunction Outweigh The Harm That
               Will Result If The Injunction Is Granted? ................................. 58

        4.     Will The Grant Of The Injunction Disserve The Public Interest? ........... 60

VII.     DISCUSSION ....................................................................................... 61

    A.     Motion To Dismiss ............................................................... 61

        1.     Does *Younger* Apply To A State Contempt Proceeding?........................ 61

        2.     Test For Application Of Bad Faith Exception To *Younger* ..................... 62

        3.     Was Frampton Engaged In Exercising A Constitutionally Protected Right?
               .................................................................................................. 63

        4.     Has Plaintiff Proved That A Major Motivating Factor In Filing The
               Contempt Motion Was To Retaliate? ....................................... 63

        5.     Is Art. 412 Applicable To The Facts Of This Case?............................... 77

        6.     Have Defendants Met Their Burden To Show The City/Parish Would
               Have Brought The Contempt Motion In The Absence Of Frampton's
               Constitutionally Protected Right?............................................ 83

        7.     Conclusion ........................................................... 84

    B.     Has Plaintiff Satisfied His Burden For The Issuance Of The Preliminary
           Injunction? .................................................................................... 84

        1.     Test.................................................................................. 84

        2.     Has Plaintiff Shown A Probability Of Success On The Merits? ............. 85

        3.     Has Plaintiff Shown A Substantial Threat of Irreparable Harm? ............. 86

        4.     Does The Threatened Injury To Plaintiff Outweigh The Threatened Injury
               To Defendants? ....................................................... 88

        5.     Will The Granting Of The Preliminary Injunction Disserve The Public
               Interest?............................................................... 88

VIII.          CONCLUSION........................................................................... 90

## I.    INTRODUCTION

Before the Court is a *Motion for Preliminary Injunction* brought by plaintiff Thomas Frampton ("Plaintiff" or "Frampton") seeking to have this Court order the defendants City of Baton Rouge/Parish of East Baton Rouge ("City/Parish"), Sharon Weston Broome ("Broome") and Murphy J. Paul, Jr. ("Paul") (collectively, "Defendants") to withdraw a portion of a Juvenile Court Petition which seeks to hold Frampton in contempt of court.[1]    Defendants filed an opposition to the *Motion for Preliminary Injunction*.[2] Plaintiff filed a reply memorandum in support of his *Motion for Preliminary Injunction*.[3]

Also before the Court is Defendants' *Motion to Dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6)*.[4] Plaintiff filed an opposition,[5] and Defendants filed a reply.[6]

On August 6, 2021, an evidentiary hearing on Plaintiff's *Motion for Preliminary Injunction* was held by Zoom.[7]    Following the filing of the trial transcript of the preliminary injunction hearing into the record,[8] Proposed Findings of Fact and Conclusions of Law were filed by Plaintiff[9] and Defendants.[10] Each filed a response to the other's submission.[11]

The Court has carefully considered the law, facts in the record and arguments and submissions of counsel and is prepared to rule. For the following reasons, Plaintiff's *Motion for*

---

[1] Doc. 2.
[2] Doc. 20.
[3] Docs. 21, 24.
[4] Doc. 18-1. Defendants' supporting memorandum is Doc. 18-2, and their memorandum in opposition to the *Motion for Preliminary Injunction* is Doc. 18-5, which is also the same as Doc. 20.
[5] Docs. 21, 24. These pleadings also double as Plaintiff's reply memorandum in support of his *Motion for Preliminary Injunction*.
[6] Doc. 25.
[7] Doc. 32.
[8] Doc. 38, Trial Transcript of Hearing on Motion for Preliminary Injunction, August 6, 2021 ("Transcript").
[9] Doc. 42.
[10] Doc. 41.
[11] Docs. 43 and 44, respectively.

*Preliminary Injunction*[12] is granted and Defendants' *Motion to Dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6)*[13] is denied.

## II.    PARTIES

Plaintiff Frampton is an Associate Professor of Law at the University of Virginia School of Law.[14] Frampton teaches criminal procedure, criminal law, and civil rights litigation.[15] He is a resident of Virginia.[16] This Frampton is also a lawyer licensed in Louisiana.[17]

Plaintiff filed this action against Defendants City/Parish, Broome in her individual and official capacities as Mayor[18] of the City/Parish,[19] and Paul in his official capacity as Chief of the Baton Rouge Police Department ("BRPD").[20] Defendant City/Parish is a political subdivision of the State of Louisiana and is the party which filed the petition in Juvenile Court in Baton Rouge, Louisiana, which is at the center of this controversy ("Juvenile Court Petition" or "Petition"). The Petition includes a rule to show cause why Frampton should not be held in contempt of the Juvenile Court ("Contempt Motion") for releasing dash camera and body camera video footage taken by BRPD officers which allegedly documents misconduct by BRPD and captures the arrest and search of a juvenile ("BRPD Video" or "Video").[21]

Frampton alleges that Broome, as Mayor-President of the City/Parish, is the chief executive

---

[12] Doc. 2.
[13] Doc. 18-1.
[14] Doc. 38, Transcript at 18.
[15] *Id.* at 18.
[16] *Id.* at 59.
[17] *Thomas Frampton, LSBA Membership Directory,* https://www.lsba.org/public/MembershipDirectoryV3.aspx (last visited Jan. 7, 2022).
[18] The correct title for Broome's position is "Mayor-President". The Plan of Government of the Parish of East Baton Rouge and the City of Baton Rouge, Section 4.01 (as amended Nov. 18, 1995).
[19] Doc. 1 at 3, ¶ 15.
[20] Doc. 1 at 3–4, ¶ 16. It is not clear from the *Complaint* whether Paul is also being sued in his individual capacity.
[21] Plaintiff's Exhibit 7, Rule to Show Cause at ¶ 8 ("the City/Parish seeks a Rule to Show Cause why attorney Thomas Frampton . . . should not be held in contempt").

and final policymaker for the City/Parish and the BRPD.[22] According to Plaintiff, Broome finalizes policies and practices of the BRPD and is also the final policymaker regarding what legal actions the City/Parish Attorney's Office pursues on behalf of the City/Parish.[23] She also is alleged to be the final policymaker and has decision-making authority as to what actions the City/Parish and its subdivisions have taken against Frampton. Defendant Paul is Chief of the BRPD. He is alleged to be the final policymaker for the BRPD and a final policymaker as to what actions are taken by BRPD.[24]    BRPD was established through the City-Parish Plan of Government and is a part of the City/Parish.[25]

## III.   BACKGROUND FACTS AND PROCEDURAL HISTORY

### A.  January 1, 2020 Stop Of Clarence Green Vehicle

On January 1, 2020, Clarence Green ("Green") and his younger brother F.B. (a juvenile) were passengers in a car travelling in Baton Rouge, Louisiana.[26] The car was stopped by BRPD officers. As described by United States District Judge Brian Jackson of the Middle District of Louisiana, the officers "demonstrated a serious and wanton disregard for [Green's] constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading [Green's] home (weapons drawn) to conduct an unjustified, warrantless search."[27] Both Green and

---

[22] Doc. 1 at 3, ¶ 15; *see also* Plan of Government of the City of Baton Rouge and the Parish of East Baton Rouge, § 4.01.

[23] *Id.*; *see also* Plan of Government of the City of Baton Rouge and the Parish of East Baton Rouge, § 4.03.

[24] Code of Ordinances of the City of Baton Rouge and the Parish of East Baton Rouge 4:51.

[25] Plan of Government of the Parish of East Baton Rouge and the City of Baton Rouge, § 6.02 ("The Metropolitan Council shall have . . . all the powers and duties relating to the organization and activities of a Police Department . . . ."); *Huval v. La. State Univ. Police Dep't*, No. 16-553, 2018 WL 5879490 (M.D. La. July 20, 2018) (Jackson, J.); *Grimes v. City of Baton Rouge*, No. 07-145, 2007 WL 9706750 (M.D. La. July 11, 2007) (Brady, J.).

[26] Doc. 38, Transcript at 19.

[27] Plaintiff's Exhibit 3, Order from *United States v. Green*, No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 29, 2020), Doc. 35 at 1.

F.B. were arrested[28] although the significance of the arrest as it relates to the juvenile F.B. is disputed.

The vehicle stop and arrests as well as the home search were captured in the BRPD Video.[29] Those portions of the Video that deal with the arrest and search of the minor F.B. are at the center of this controversy. According to Plaintiff, after stopping the car, BRPD Officers Ken Camallo and Troy Lawrence placed Green and F.B. on the concrete and then frisked and strip-searched them.[30] Camallo and Lawrence then drove Green and his younger brother to their mother's home.[31] The officers then entered the home without a warrant, with guns drawn.[32]

Plaintiff contends that, at the conclusion of the encounter, one of the officers returned to the handcuffed Green and threatened to beat him while he sat in the back of a police car.[33] The juvenile F.B. was released without being booked[34] pursuant to a custodial agreement ("Custodial Agreement"),"[35] a BRPD document which allows a child to be released without booking if a parent promises to bring the child to the Juvenile Court Center for "interviews and/or hearings" if requested.[36] A Custodial Agreement is equivalent to an arrest.[37] The offense for which F.B. was issued the Custodial Agreement was Possession of Marijuana, La. R.S. § 40:966E.[38] As of the time of the hearing on the *Motion for Preliminary Injunction* on August 6, 2021, F.B. had not been charged with any crime.[39]

---

[28] Doc. 38, Transcript at 18–19.
[29] *Id.* at 28–29. According to Frampton, there was some 10 hours of video taken although only some 63 minutes of the Video was introduced by the Government and Green at Green's Motion to Suppress hearing. (*Id.*)
[30] *Id.* at 19–20.
[31] *Id.*, ¶ 17, citing Doc. 38, Transcript at 20.
[32] Doc. 42 at 6, ¶ 14, citing Doc. 38, Transcript at 20.
[33] *Id.*, ¶ 15, citing Doc. 38, Transcript at 20.
[34] *Id.*, citing Doc. 38, Transcript at 22–23.
[35] *Id.*, citing Doc. 38, Transcript at 23 and Plaintiff's Exhibit 2, Custodial Agreement.
[36] *Id.*
[37] Doc. 38, Transcript at 123.
[38] Plaintiff's Exhibit 2, Custodial Agreement.
[39] Doc. 38, Transcript at 26.

**B. Federal Proceedings Against Clarence Green And The Release Of BRPD Video**

Following his arrest, Green was indicted by a federal grand jury for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[40]  After the indictment, BRPD released the BRPD Video of the stop, arrests and home search (including the footage of F.B.) to the U.S. Attorney for the Middle District.[41] Even though the BRPD Video included the arrest and search of the juvenile F.B., no effort was made by the BRPD or the City/Parish to request permission from the Juvenile Court before releasing the Video[42] nor did BRPD mark the Video as confidential or place any restrictions on the use or dissemination of the Video.[43]

The U.S. Attorney, in turn, released the full ten hours of the BRPD Video to Green through his attorney, Assistant Federal Public Defender Mark Upton.[44] When the Video was released to Green's attorney, again, no restrictions of any kind were placed on the use and dissemination of the Video. Plaintiff maintains that when the BRPD Video was released to Green's attorney, it "thereby became Mr. Green's — with no restrictions on his use of that material."[45]

In Green's criminal case, his Federal Public Defender filed a Motion to Suppress evidence and statements.[46] In connection with Green's Motion to Suppress, both the Unites States[47] and

---

[40] *Id*. at 20; *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. July 16, 2020), Indictment, Doc. 1.
[41] *Id*. at 76, 100.
[42] *Id.* at 100.
[43] *Id.* at 28–29.
[44] *Id.*
[45] Doc. 42 at 7, ¶ 18, citing Doc. 38, Transcript at 29 ("The 63 minutes of footage were in the public record, and the ten hours were the property of Clarence Green as they had been turned over to him."); Plaintiff also cites Louisiana Rules of Professional Conduct, Rule 1.16(d) ("Upon written request by the client, the lawyer shall promptly release to the client or the client's new lawyer the entire file relating to the matter.").
[46] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La.), Motion to Suppress, Docs. 12, and Exhibit Log for Motion to Suppress Hearing, Doc. 26; Doc. 38, Transcript at 20.
[47] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Nov. 20, 2020), Exhibit Log for Motion to Suppress Hearing, Doc. 26 (Government Exhibits 1s through 1c and 2).

Green's attorney filed portions of the BRPD Video into the public record[48] as well as incident reports.[49] According to Frampton's uncontradicted testimony, the Video showed, among other things, an illegal search of F.B. and F.B.'s unblurred face.[50] It was not stamped "confidential" or in any way designated "not to be shared."[51] The Video was not admitted under seal or otherwise protected nor was its use restricted and it therefore became a public record of this Court.[52]

On November 20, 2020, an evidentiary hearing on Green's Motion to Suppress was conducted before Judge Jackson.[53] At the hearing, Officer Camallo testified and, according to Judge Jackson, gave "multiple conflicting accounts when describing the circumstances leading up to [Green's] traffic stop and failed to offer a satisfactory explanation for why the police reports in the investigation were revised nearly one *dozen* times in the months following the arrest."[54]

Following the hearing, on December 24, 2020, the United States "reevaluated" the evidence against Green and based on that "reevaluation", moved to dismiss the indictment against Green.[55] On December 29, 2020, the Court granted the Government's motion to dismiss and ordered Green's immediate release. Significantly, the Court wrote:

> As reflected in the video evidence submitted in support of Defendant's Motion to Suppress (Doc. 12), the state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the

---

[48] *Id*. (Defense Exhibits 6–8). According to Frampton, of the ten hours of video making up the entirety of the video taken by BRPD, only 63 minutes of it were introduced. (Doc. 38, Transcript at 29.) However, the entire ten hours of video had previously been released to Green's criminal defense lawyer. (*Id*.)

[49] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Nov. 20, 2020), Exhibit Log from Motion to Suppress Hearing, Doc. 26.

[50] Doc, 42 at 7, ¶ 19, citing Doc. 38, Transcript at 29.

[51] Doc. 38, Transcript at 36.

[52] Doc. 42 at 7, ¶ 20, citing Doc. 38, Transcript at 28–29, 36.

[53] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Nov. 20, 2020), Minute Entry from Motion to Suppress Hearing, Doc. 25.

[54] Plaintiff's Exhibit 3, Order from *United States v. Green*, No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 29, 2020), Doc. 35 at 1, n.1.

[55] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 24, 2020), Motion to Dismiss Indictment, Doc. 34.

United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63.[56]

### C. Frampton Is Hired As Green Family Lawyer, Files Civil Suit And Settles Case With City/Parish

Following the Court's December 29, 2020 ruling, and because there were only a few days left before the statute of limitations period expired, Frampton offered to represent the Green family *pro bono* in a § 1983 civil rights suit against the City/Parish.[57] He agreed that he was "not going to make any money whatsoever by representing them and would not accept any attorney's fees or otherwise profit in any way from [his] representation."[58]

On January 1, 2021, Frampton filed a civil suit on behalf of Clarence Green and Tanya Green, *Green v. Camallo*, 21-cv-00001-JWD-EWD (M.D. La.), alleging constitutional violations, trespass, false imprisonment, and the manufacturing of false evidence.[59] Tanya Green is the mother of the minor F.B.[60] Pursuant to his representation, Frampton requested and received Green's copy of the BRPD Video from the Federal Public Defender, who had received it from the U.S. Attorney's Office and who, in turn, had received it from BRPD.[61] The Federal Public Defender placed no restrictions on Frampton's use of the video.

Frampton also submitted a public records request to BRPD on January 21, 2021 seeking, among other records, "all body-worn camera footage and dash-camera footage from officers involved in the above incidents [BRPD file No. 2020-225]."[62] On or around February 4, 2021,

---

[56] Plaintiff's Exhibit 3, Order from *United States v. Green*, No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 29, 2020), Doc. 35 at 1, n.1.
[57] Doc. 38, Transcript at 26–27.
[58] *Id*. at 27.
[59] *Id*. at 27; Plaintiff's Exhibit 4, *Green v. Camallo* Complaint; *see also Green v. Camallo*, 21-cv-00001-JWD-EWD (M.D. La.), Complaint, Doc. 1.
[60] Plaintiff's Exhibit 2, Custodial Agreement; *Green v. Camallo*, No. 21-cv-00001-JWD-EWD (M.D. La.), Complaint, Doc. 1 at 4, ¶ 14.
[61] Doc. 38, Transcript, at 28, 41, 48.
[62] *Id.* at 31–32; *see also* Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 9.

Deelee Morris, City/Parish BRPD counsel,[63] contacted Frampton in response to that request and told him "there were problems under 412 with releasing that without a Juvenile Court Order…and that we could provide those documents to him unredacted if he just got an order."[64] However, having received the BRPD Video from Green's criminal defense lawyer, Frampton withdrew his request for videos and reports from BRPD file # 20-225 on March 25, 2021.[65]

On or before January 12, 2021, the Baton Rouge Advocate newspaper independently obtained the BRPD Video and published a story describing it.[66] A search of this Court's records reveals that on January 4, 2021, Lea Skene, one of the authors of the story, ordered from the Clerk of this Court a copy of the BRPD Video and paid $32.00 for it.[67] This is consistent with the testimony of Frampton that someone on his behalf successfully ordered a copy of the BRPD Video from the Clerk.[68] In addition, the court record in *U.S. v. Green* shows that on January 5, 2921, John Simerman, the other author of the Advocate article, ordered a copy of the transcript of the Motion to Suppress hearing.[69]

Frampton testified that during a March 2021 settlement conference in Green's civil suit, he discussed his possession of the BRPD Video with the City/Parish attorneys, in the context of

---

[63] *Id.* at 62 (Morris testified that she was "Special Assistant Parish Attorney…specifically assigned to the Baton Rouge Police Department… work[ing] mainly out of the Police Department Headquarters.").

[64] *Id.* at 91–92; Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 9. Frampton recounts a similar version of this conversation. Doc. 38, Transcript at 32–33.

[65] Defendants' Exhibit 3.

[66] Plaintiff's Exhibit 5 (John Simerman and Lea Skene, *Federal judge voids gun charges, calls bad BRPD bust a 'foul' against justice system*, BATON ROUGE ADVOCATE, Jan. 12, 2021 (the "Advocate article"); Doc. 38, Transcript at 30 (describing that Lea Skene confirmed in writing she had obtained the footage); Doc. 38, Transcript at 29–31 (describing details in article only available in footage and not Judge Jackson's opinion).

[67] The Court document showing Lea Skene ordered the recording is attached to this ruling as Appendix 1. The Court may take judicial notice of this document. *Fetty v. La. State Bd. of Priv. Sec. Exam'rs*, No. CV 18-517-JWD-EWD, 2020 WL 448231, at *8 (M.D. La. Jan. 28, 2020) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." (quoting *Norris v. Hearts Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)); *Duncan v. Heinrich*, 591 B.R. 652, 655 (M.D. La. 2018) ("Documents in judicial actions and cases' dockets are public records of which any court can take judicial notice." (internal citations omitted.)

[68] Doc. 38, Transcript at 49–50; Plaintiff's Exhibit 13, Receipt from Clerk of Court.

[69] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Jan 5, 2021), Transcript Request by John Simerman of the Advocate, Doc. 37.

identifying the officers who were visible in the footage.[70] This testimony is not disputed. Thus, by March 2021, the City Parish Attorney's Office knew that someone had shared the BRPD Video with Frampton[71] and by March 25, 2021 knew that it had not come as a result of his formal request (discussed with City/Parish Attorney Morris) since that request was withdrawn on that date.[72]

Frampton testified that at the settlement conference, no one with the City/Parish Attorney's Office raised a concern about his possession of the Video or suggested that he or the individual who provided it to him had violated the Children's Code.[73] City/Parish attorneys did not tell Frampton he should not share it with anyone else.[74] They did not say or suggest it might be a violation of the law to share it with anyone else.[75] No inquiry was made as to how Frampton came to possess the Video. This testimony is undisputed.

Frampton also personally spoke with East Baton Rouge Parish District Attorney Hillar Moore about his possession of the Video.[76] District Attorney Moore did not express surprise that Frampton had the video, or tell him that he should not share it, or that it would be a crime to share it.[77]

By May 14, 2021, the Green family settled its claims with the City/Parish and moved to dismiss the case.[78] The settlement agreement did not include any confidentiality or non-disparagement terms.[79] The civil claims were dismissed on May 17, 2021.[80]

---

[70] Doc. 38, Transcript at 34–35.
[71] Id.
[72] Defendants' Exhibit 3.
[73] Doc. 38, Transcript at 34–35.
[74] Id. at 35–36.
[75] Id. at 36.
[76] Id. at 39.
[77] Id. at 39–40.
[78] Green v. Camallo, 21-cv-00001-JWD-EWD (M.D. La.), Joint Motion to Dismiss, Doc. 10; Doc. 38, Transcript at 36.
[79] Doc. 38, Transcript at 36.
[80] Green v. Camallo, 21-cv-00001-JWD-EWD (M.D. La.), Judgment of Dismissal, Doc. 11.

### D.  Frampton Releases Some BRPD Video

Despite the settlement, the Green family was unsettled by the fact no officers had been disciplined despite the fact that a federal judge suggested potential criminal conduct on the part of BRPD officers.[81] By March 2021, they were concerned that, despite the stern words from Judge Jackson, BRPD had not even "opened the disciplinary investigation into Troy Lawrence, Jr.", who, according to Plaintiff, was the officer allegedly seen in the video repeatedly threatening to beat Clarence while he was sitting in handcuffs, and who participated in the unwarranted home search and who participated in the frisks."[82]

On or around May 27, 2021, at the Green family's "request and with their express blessing," Frampton issued a "press release on their behalf as the best way to try to actually get some accountability with respect to what had happened on January 1st."[83] The press release regarding the settlement contained a link to the public internet platform, YouTube, which hosted an edited version of the BRPD Video depicting Clarence Green and F.B. being searched and arrested.[84]

On May 27, 2021, BRPD's conduct in connection with stopping Green's vehicle and the events which followed became a national news story. The *CBS Evening News* ran a story entitled "Baton Rouge reaches $35,000 settlement with family after police strip-searched teen and entered

---

[81] Doc. 38, Transcript at 36–37; Plaintiff's Exhibit 2, Custodial Agreement at 1, n.1. ("Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution…may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63.").

[82] Doc. 38, Transcript at 37.

[83] *Id.* at 38; *see also* Doc. 38, Transcript at 40–41; Plaintiff's Exhibit 9, ACLU Letter (explaining that the press and Video release was done at the request and with the consent of the Green family).

[84] Plaintiff's Exhibit 8, CBS News Story, available online, https://www.cbsnews.com/news/baton-rouge-police-teen-strip-searched-settlement/; *see also* link referenced in Plaintiff's Exhibit 7, Rule to Show Cause at ¶ 2; Thomas Frampton, *BRPD – Illegal Strip Searches; Entering Home (Guns Drawn) w/out Warrant; Physical Threats*, YOUTUBE (May 27, 2021), https://www.youtube.com/watch?v=nBtmXaAxs-8.

home without warrant."[85] CBS broadcasted portions of the Video on the evening news and put it

on their website.[86] According to Frampton, "several national news outlets shared it or wrote about

it."[87] According to Defendants, the Video on YouTube, was also reproduced through various

media and social platforms.[88]

### E. Paul Holds Press Conference And City/Parish, On Behalf Of BRPD, Files Petition In Juvenile Court Seeking Release Of Video And Sanctions Against Frampton

On May 28, 2021, the day after Frampton released the BRPD Video and the CBS news

story aired, Paul scheduled a press conference to be held that afternoon at 3:00 p.m.[89] That

morning, before Paul's press conference, Defendant City/Parish, "on behalf of" BRPD, filed in

Juvenile Court a "Petition to Disclose Portion of Records Concerning [*sic*] a Matter Before Juvenile

Court Pursuant to La CH.C. [*sic*] Art [*sic*] 412 With Rule to Show Cause."[90] No effort was made

to contact or give notice to F.B.'s mother or the Green family's lawyer, Thomas Frampton, the

subject of the rule to show cause, before the Petition and order were presented by City/Parish

Attorney Deelee Morris *ex parte* to the Juvenile Court judge for signing.[91]

The Juvenile Court Petition alleged that since the Video had been made public, "the City

of Baton Rouge has received a substantial amount of negative correspondence from the public."[92]

"In an effort to reduce the potential for civil unrest," [93] it sought the Juvenile Court's permission

---

[85] Plaintiff's Exhibit 8, CBS News Story, available online at https://www.cbsnews.com/news/baton-rouge-police-teen-strip-searched-settlement/.
[86] Doc. 38, Transcript at 41–42.
[87] *Id.* at 41.
[88] Doc. 41 at 6, ¶ 26, citing Doc. 38, Transcript 48–49.
[89] Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 2.
[90] Plaintiff's Exhibit 7, Rule to Show Cause.
[91] Plaintiff's Exhibit 1, Declaration of Deelee Morris; Doc. 38, Transcript at 43.
[92] Plaintiff's Exhibit 7, Rule to Show Cause at ¶ 4. The Court notes that the Petition contains two paragraphs labeled as paragraph 4; this is the second one.
[93] *Id.* at ¶ 5.

to disclose portions of the BRPD Video to the public[94] "because the release of these videos will assist in accurately explaining the events that led up to and transpired during the arrest."[95]

The Juvenile Court Petition also included a "Rule to Show cause why attorney Thomas Frampton (La. Bar Roll 35775) should not be held in contempt pursuant to Louisiana Children's Code art. 1509 for the public release of the videos prior to seeking authorization with this Court under Louisiana Children's Code art 412"[96] ("Contempt Motion"). The Petition attached a copy of Frampton's press release.[97]

At about 12:00 p.m. that same day, the Juvenile Court Judge (1) granted the *ex parte* order seeking release of the requested limited footage and (2) set the hearing on the Contempt Motion for July 12, 2021.[98] After City/Parish lawyer Morris obtained the judge's signature on the Petition and show cause order, she served Frampton with the Contempt Motion.[99] Frampton was served as BRPD's Paul began the press conference.[100]

### F.  The Previous Public Release Of BRPD Video And Defendants' Awareness Of Same

Prior to Frampton's press release of May 27, 2021 and Defendants' May 28, 2021 Contempt Motion, the BRPD Video was released to at least five persons without anyone having sought or gained permission of the Juvenile Court: 1) BRPD released it to the U.S. Attorney; 2) the U.S. Attorney released it to Green and his lawyer, the Federal Public Defender; 3) U.S. Attorney and Federal Public Defender introduced portions of the Video into evidence in connection Green's Motion to Suppress and therefore it came into the possession of the Clerk of

---

[94] *Id.* at ¶ 1.
[95] *Id.* at ¶ 6.
[96] *Id.* at ¶ 8.
[97] *Id.* at pg. 5.
[98] Plaintiff's Exhibit 7, Rule to Show Cause; Defendants' Exhibit 5, Rule to Show Cause; Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 4.
[99] Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶¶ 4–6.
[100] Doc. 38, Transcript at 43.

Court; 4) the Federal Public Defender released it to Green's civil attorney Frampton; 5) the Middle District Clerk of Court released it to Lea Skene of the Baton Rouge Advocate.

In each case, the Video was released without restriction of any kind having been placed on the use of the Video. At the time the City/Parish filed the Juvenile Court Petition and Contempt Motion against Frampton, the BRPD Video had been a public record of the Middle District for nearly six months.[101]

On June 2, 2021, shortly after the Contempt Motion was served on Frampton, Frampton's lawyers wrote City/Parish Attorney Anderson Dotson informing him that the BRPD Video:

> was initially provided by the U.S. Attorney to Clarence Green as discovery in his (adult) criminal prosecution. The United States made the relevant footage public in November 2020 [referring by footnote to the introduction of the video in connection with the hearing on the Motion to Suppress, R. Doc. 26 *United States v. Green*, Case No. 20-CR-00049 (M.D. La. Nov. 20, 2020)] and the region's largest newspaper independently obtained and described it in January 2021.[102]

The letter also states that Frampton released the BRPD video "at the behest of and with the consent of all concerned members of the Green Family."[103] It asked Dotson to "let us know by June 7, 2021…whether you will withdraw the request for contempt."[104] Defendant Mayor-President Sharon Weston Broome was sent a copy of the letter.[105]

Despite Dotson's receipt of the June 2, 2021 letter and despite City/Parish Attorney Deelee Morris having requested a copy of the transcript of the hearing on January 6, 2020,[106] Morris claims

---

[101] *See United States v. Green*, No. 20-CR-46-BAJ-SDJ (M.D. La. Nov. 20, 2020), Exhibit Log from Motion to Suppress Hearing, Doc. 26, Government Exhibits 1-a, 1-b, 1-c, and 2 and Defendant's Exhibits 6 and 7.

[102] Plaintiff's Exhibit 9, ACLU Letter (referencing the January 12, 2020 Advocate article, introduced in this proceeding as Plaintiff's Exhibit 5).

[103] *Id.* at 1.

[104] *Id.* at 2.

[105] *Id.*

[106] Doc. 38, Transcript at 64 (Questioning of Deelee Morris). Morris' testimony that she could "not really confirm" that there had been a motion to suppress hearing in Green's federal criminal case, that she had "not requested any record" and she had "not seen any record" is directly contradicted by Doc. 38 of the record in *United States v. Green,*

15

she was unaware that the BRPD Video had been introduced into the public record at Green's November 20, 2020 motion to suppress hearing, some six months before the Contempt Motion.[107] The transcript reveals that the Video was shown to the Court and witnesses at the suppression hearing,[108] and the record shows the Video was introduced.[109]

In any event, Morris testified at the hearing that she did not "have any reason at the time of the receipt of this letter to doubt" that the Video was already a public record as of November, 2020.[110] Nor did she have any reason to doubt that it was "in the court record,"[111] nor did she have any reason to doubt that part of the letter indicating the Baton Rouge Advocate had received the BRPD Video in January of 2021 and published an article describing the video.[112]

### G.  Despite Knowledge Of Previous Public Release Of BRPD Video, Defendants Continue To Pursue The Contempt Motion Against Frampton And Do Not Pursue Contempt Actions Against Others Who Previously Released Video

After the receipt of the June 2, 2021 letter, the City/Parish did not withdraw the Contempt Motion against Frampton.[113] Furthermore, even though the City/Parish now takes the position that the others who released the BRPD Video without requesting permission of the Juvenile Court violated the same provision of the Children's Code it alleges was violated by Frampton, including 1) the BRPD, 2) the U.S. Attorney, 3) the Federal Public Defender, 4) the Middle District Clerk

---

No. 20-CR-46-BAJ-SDJ (M.D. La.), which shows that on January 6, 2021, Dellee Morris ordered the transcript for the Motion to Suppress hearing.

[107] Doc. 38, Transcript at 64 (Questioning of Deelee Morris)

[108] *See United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Nov. 20, 2020), Exhibit Log from Motion to Suppress Hearing, Doc. 26, and Transcript from Motion to Suppress Hearing, Doc. 31 at 23–42.

[109] *Id.*; Doc. 26.

[110] Doc. 38, Transcript at 73 ("Q. Any reason – did you have any reason at the time of the receipt of this letter to doubt that that was true? A. No.").

[111] *Id.* at 73.

[112] *Id*. at 74 ("Q. When you received this letter, did you have any reason to doubt that part of the letter was untrue? A. No.").

[113] *Id*. at 74 ("Q. After the receipt of this letter, did the City Parish withdraw its contempt request against Professor Frampton? A. No.").

of Court, and 5) Clarence Green,[114] it has not pursued a contempt motion against anyone other than Frampton.[115]

### H. Frampton Files Petition For Injunctive Relief And Motion For Preliminary Injunction; Defendants File Motion To Dismiss; Preliminary Injunction Hearing Is Held

On June 23, 2021, Frampton filed suit for injunctive relief in this Court.[116] His complaint makes three claims: First Amendment Retaliation, Abuse of Process, and Violation of the Louisiana Constitution.[117] His prayer for relief seeks a preliminary injunction directing Defendants to cease their retaliation against him.[118] On the same day suit was filed, Frampton filed a *Motion for Preliminary Injunction*, asking that "this Court issue a preliminary injunction against Defendants' course of retaliatory conduct towards Mr. Frampton."[119]

On July 7, 2021, Defendants filed a consolidated *Motion to Dismiss under Rules 12(b)(1) and 12(b)(6)* and an *Opposition to the Motion for Preliminary Injunction*.[120] Their motion raises issues of abstention and failure to state a claim and argues that Frampton was not subject to any threat of irreparable injury.[121] Frampton filed a reply memo,[122] as did Defendants.[123]

On August 6, 2021, the Court held a hearing on the *Motion for Preliminary Injunction*.[124] At the hearing, exhibits were introduced[125] and four witnesses were called: (1) Frampton, (2) Special Assistant Parish Attorney Deelee Morris, (3) BRPD Administrative Specialist Valerie

---

[114] *Id*. at 102–104; Doc. 41 at 10, ¶ 52.
[115] Plaintiff's Exhibit 12 at 5–6, Defendants' Answers to Interrogatories Nos. 6 and 7. *See also* Doc. 38, Transcript, at 98–100; *id*. at 102–104; Doc. 41 at 10, ¶ 52.
[116] Doc. 1.
[117] *Id*. at ¶ 62 *et seq.*
[118] *Id.* at ¶ 80.
[119] Doc. 2 at 1; *see also* Doc. 2-1 at 1.
[120] Docs.18-1 and 18-5 respectively.
[121] Doc. 18-2.
[122] Doc. 21.
[123] Doc. 25.
[124] Doc. 32; Doc. 38, Transcript at 1 *et seq.*
[125] Doc. 38, Transcript at 8.

Singleton, and (4) Assistant East Baton Rouge Parish District Attorney Courtney Myers-Minor.[126]

## IV.    STANDARDS TO BE APPLIED

### A.  Motion To Dismiss

In *Johnson v. City of Shelby*,[127] the Supreme Court explained: "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."[128]

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."[129]

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The

---

[126] Doc. 38, Transcript.
[127] 574 U.S. 10 (2014).
[128] *Id.* at 11.
[129] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.[130]

The Fifth Circuit further explained that, in deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff.[131] The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted.[132]

## B. Motion For Preliminary Injunction

Plaintiff has moved to preliminarily enjoin Defendants from proceeding with their Contempt Motion.

> To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest.[133]

"[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[134]

---

[130] *Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

[131] *Thompson v. City of Waco*, 764 F.3d at 500, 502–03 (5th Cir. 2014).

[132] *Id.* at 503.

[133] *W. Sur. Co. v. PASI of La, Inc.*, 334 F. Supp. 3d 764, 789 (M.D. La. 2018) (deGravelles, J.) (quoting *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) (citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974))). *See also June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 534–35 (M.D. La. 2016) (deGravelles, J.); *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 635 (M.D. La. 2015) (deGravelles, J.), (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

[134] *PASI of La, Inc.*, 334 F. Supp. 3d at 789–90 (citing *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (stating that it has "cautioned" this point "repeatedly") (quoting *Lake Charles Diesel, Inc. v. Gen.*

"Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the ... preliminary injunction."[135]

## C. *Younger* Abstention And Bad Faith Exception

Plaintiff sues under 42 U.S.C. § 1983 for the violation of his rights under the First and Fourteenth Amendments to the United States Constitution[136] and therefore jurisdiction is based on 28 U.S.C. § 1331. Defendants do not question this Court's jurisdiction but urge the Court to abstain based on *Younger v. Harris.*[137] As the Fifth Circuit has explained,

> Under the broad proscriptions of *Younger v. Harris* and its companion cases, a federal district court presumptively must abstain from granting either injunctive or declaratory relief when state criminal actions or certain categories of state civil proceedings are pending against the federal plaintiff at the time that federal action is commenced. This doctrine, alternately called abstention or nonintervention, is based on considerations of equity, comity, and federalism.[138]

"Under the *Younger* abstention doctrine, federal courts should generally decline to exercise jurisdiction when: '(1) the federal proceeding would interfere with an "ongoing state judicial proceeding"; (2) the state has an important interest in regulating the subject matter of the claim; and (3) the plaintiff has "an adequate opportunity in the state proceedings to raise constitutional challenges." ' "[139]

Plaintiff argues that the Juvenile Court Petition and the embedded Contempt Motion are

---

*Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Injunctive relief is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." (citing 7 Moore's Federal Practice ¶ 65.04(s) (1982); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942 at 368 (1973))).

[135] *PASI of La, Inc.*, 334 F. Supp. 3d at 790 (citing *Gonannies v. Goupair.com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2015).

[136] Doc. 1; Doc. 42 at 18, ¶ 76.

[137] 401 U.S. 37, 91 (1971).

[138] *DeSpain v. Johnston*, 731 F.2d 1171, 1175–76 (5th Cir. 1984) (citing *Younger*, 401 U.S. at 43–45).

[139] *Gates v. Strain*, 885 F.3d 874, 880 (5th Cir. 2018) (citing *Bice v. La. Pub. Def. Bd*., 677 F.3d 712, 716 (5th Cir. 2012) (in turn quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

20

not the kind of state court proceedings to which *Younger* applies.[140] However, as is discussed in more detail later, both the Supreme Court and the Fifth Circuit have held that state contempt proceedings are subject to *Younger* abstention.[141]

Plaintiff argues in the alternative that, even if *Younger* otherwise applies to the Contempt Motion, the bad faith/harassment exception to *Younger* applies and therefore the Court should deny Defendants' motion. The Fifth Circuit makes clear that the presumption in favor of *Younger* abstention is not absolute and may be overcome

> [b]y a showing of bad faith or intent to harass. When the state in a criminal proceeding acts in bad faith or with the purpose of harassing the federal plaintiff, its actions are not 'legitimate activities'. In those extraordinary cases, the balance tips in favor of the national government, and federal courts should act to protect federal interests. [*Younger*] at 47, 91 S. Ct. at 752. Equitable relief by the federal court is warranted, because the federal plaintiff faces a risk of irreparable injury that is both 'great and immediate'. *Id*.[142]

"[T]he 'bad faith' exception is narrow and should be granted parsimoniously", and Plaintiff bears the burden to establish actual proof of bad faith.[143]

In *Wilson v. Thompson*, the Court declared that

> the proper test to be applied in the context of a suit to enjoin a criminal prosecution allegedly brought in retaliation for or to deter the exercise of constitutionally protected rights is as follows: The Court should consider whether the plaintiffs have shown, first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated *at least in part* by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have

---

[140] Doc. 42 at 38–39, ¶¶ 165–168.
[141] *Juidice v. Vail*, 430 U.S. 327, 335 (1977) ("[Abstention] principles apply to a case in which the State's contempt process is involved."); *Kolwe v. Civ. & Structural Eng'rs, Inc*., 858 F. App'x 129, 132 (5th Cir. 2021).
[142] *DeSpain*, 731 F.2d at 1176–77.
[143] *Gates*, 885 F.3d at 881 (quoting *Hefner v. Alexander*, 779 F.2d 277, 280 (5th Cir. 1985).

reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.[144]

The Court later clarified the "at least in part" language of the *Wilson* test by holding that the plaintiff must show that the defendant's purpose was not merely "in part" to retaliate, but that retaliation was a "*major motivating factor and played a prominent role* in the decision to prosecute."[145]

When considering the third prong of the *Wilson* test, i.e., whether the State has met its burden to prove that it would have chosen to prosecute even in the absence of the impermissible purpose, the Court should consider:

> whether the State prosecution was undertaken with no hope of a valid conviction, see *Perez v. Ledesma*, 1971, 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701, and the significance of the alleged criminal activity. See *Duncan v. Perez*, 5 Cir., 1971, 445 F.2d 557, 560, *cert. denied*, 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254.[146]

## D. Retaliation Against The Exercise Of The Constitutional Right Of Free Speech

The Supreme Court in *Hartman v. Moore* stated the rule prohibiting retaliation against a person's exercise of the right of free speech and its rationale:

> Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' *Crawford–El v. Britton,* 523 U.S. 574, 588, n. 10, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, *id.,* at 592, 118 S. Ct. 1584; see also *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his 'constitutionally protected

---

[144] *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979) (emphasis added).
[145] *Smith v. Hightower*, 693 F.2d 359, 367 (5th Cir. 1982) (emphasis added) ("In stating that the plaintiff must prove retaliation exists before a preliminary injunction will be granted, the *Wilson* Court contemplated that the plaintiff must prove retaliation was a major motivating factor and played a prominent role in the decision to prosecute."). *See also Ramelli v. Zahn*, No. 20-1482, 2020 WL 3971279, at *7 (E.D. La. July 14, 2020).
[146] *Wilson*, 593 F.2d at 1387, n.22. *See also Gates v. Strain*, 885 F.3d 874, 881 (5th Cir. 2018) ("A prosecution is taken in bad faith if state officials proceed 'without hope of obtaining a valid conviction.' " (quoting *Perez v. Ledesma*, 401 U.S. 82, 85 (1971))); *Ramelli*, 2020 WL 3971279, at *9.

speech').[147]

The Fifth Circuit expressed similar reasoning in *Keenan v. Tejada.*

> The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities. *Colson* [*v. Grohman*]*,* 174 F.3d 498, 508 [5th Cir. 1999]. As this court explained in *Colson,* if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly. *Id.* at 509–10; *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570 (1972).[148]

As a result, even some government actions that would otherwise be lawful become prohibited if in response to protected speech. The First Amendment bars officials' actions where they "caused [the speaker] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity" and were "substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."[149]

The Court in *Keenan* set out the plaintiff's burden of proof in a First Amendment retaliation case.

> The settled law of other circuits, which we endorse, holds that to establish a First Amendment retaliation claim against an ordinary citizen, [plaintiffs] must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct. *Carroll v. Pfeffer,* 262 F.3d 847, 850 (8th Cir. 2001); *Smith v. Plati,* 258 F.3d 1167, 1176 (10th Cir. 2001); *Lucas v. Monroe County,* 203 F.3d 964, 973 (6th Cir. 2000).[150]

---

[147] *Hartman v. Moore*, 547 U.S. 250, 256 (2006).
[148] *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). *See also McLin v. Ard*, 866 F.3d 682, 696 (5th Cir. 2017).
[149] *See Keenan*, 290 F.3d at 258.
[150] *Id. See also McLin*, 866 F.3d at 696.

V.          ISSUES

The main issue in the *Motion to Dismiss* is whether the Court should abstain from exercising its jurisdiction based on the abstention doctrine announced in *Younger v. Harris*. This depends on the answer to two questions, one legal and the other factual. First, is this the kind of case to which *Younger* applies? If so, the question becomes whether the conduct of the City/Parish warrants the application of the bad faith/harassment exception to *Younger*.

On the bad faith/harassment exception, the parties do not disagree on the legal standard to be applied,[151] but they do disagree as to where the application of that standard should lead the Court. Similarly, the parties agree as to the standard for granting a motion for preliminary injunction[152] but disagree as to how that standard should be applied to the facts and law of this case.

Plaintiff posits three claims on the merits: "First Amendment Retaliation, Abuse of Process, and Violation of the Louisiana Constitution."[153] However, both the *Motion for Preliminary Injunction* and the *Motion to Dismiss* focus on the First Amendment retaliation claim.

An issue common to both Plaintiff's retaliation claim and the bad faith exception to *Younger* is whether Frampton's conduct, allegedly retaliated against, is constitutionally protected. Frampton claims that his sharing of the BRPD Video with members of the press was an exercise of free speech.[154] While Defendants do not disagree that Frampton's actions were an expression of free speech, they argue that sharing the Video without first getting permission to do so from the Juvenile Court violated Art. 412 of the Children's Code and therefore their Contempt Motion

---

[151] Doc. 42 at 40, ¶ 170; Doc. 41 at 8, ¶ 45.
[152] Doc. 42 at 18, ¶ 77; Doc. 41 at 10, ¶ 56.
[153] Doc. 1.
[154] Doc. 42 at 40, ¶ 171.

was justified and not in retaliation.[155]

Another central question which is common to both motions is, what motivated the City/Parish to bring the Contempt Motion? Was the Defendants' motivation, as Frampton urges, to retaliate against him for exercising his right of free speech and, by so doing, embarrassing the BRPD after its conduct had already been harshly criticized by a federal judge? Or was it, as Defendants maintain, an innocent effort to enforce the law in order to protect the privacy of a minor and punish Frampton for his failure to gain the needed permission of the Juvenile Court?

The *Younger* and First Amendment retaliation analyses are essentially the same.

> Where the allegation is that the state proceedings, though brought under a valid statute, were instituted in retaliation for or to deter the exercise of constitutionally protected rights, *the question of the applicability of the* Younger *exception and that of the existence of a constitutional violation merge: to prove one is to prove the other.*[156]

If Defendants acted with bad faith and retaliatory motive, the Plaintiff wins on the *Younger* abstention and First Amendment retaliation; if Defendants didn't do so, then the Court must abstain under *Younger* and never gets to Plaintiff's substantive claim.

A third issue common (but not critical)[157] to both motions is, given that no charges had been brought against F.B. at the time the Contempt Motion was filed, was there a "proceeding" or "matter" before the Juvenile Court such that Art. 412 required the Juvenile Court's permission to release the BRPD Video? Next, even if there was a "proceeding" or "matter" before the Juvenile Court, given the fact that that Frampton had legally received the BRPD Video and it was already in the public domain at the time he released it to the press, was it necessary for him to get

---

[155] Doc. 41 at 16, ¶ 86.

[156] *Wilson*, 593 F.2d at 1385, n.17 (emphasis added). *See also Torries v. Hebert*, 111 F. Supp. 2d 806, 822 (W.D. La. 2000).

[157] Defendants argue that "[t]he only issue before this Court is whether Article 412 applies in this case, where a delinquency petition has not been filed." (Doc. 44 at 6, ¶ 32). As is developed more fully in this ruling, the Court disagrees since, even if the City/Parish's interpretation of Art. 412 is correct, the Court concludes that the City/Parish filed the Contempt Motion in bad faith and to harass and retaliate against Frampton.

the Juvenile Court's permission before sharing it with other members of the public and press?

Finally, if *Younger* does not apply, has Plaintiff met his four-part burden allowing the Court to grant the preliminary injunction?

Because most of the issues and arguments are relevant to both motions, the common issues will be addressed only once.

## VI.    ARGUMENTS OF THE PARTIES

### A.  Should The Court Abstain From Deciding This Case?

#### *1. Plaintiff's Position*

Plaintiff's arguments can be summarized as follows:

a.  The Juvenile Court Petition and Contempt Motion are not the kinds of state court proceedings subject to *Younger* abstention.[158]

b.  Alternatively, even if they are, the bad faith exception to *Younger* applies because a retaliatory and vindictive motive fueled Defendants' Contempt Motion.[159] A finding of Defendants' bad faith and retaliatory motive is supported by the following arguments:

   i.  Defendants brought the Contempt Motion by way of a Juvenile Court proceeding "they knew did not exist."[160] Because no charges, petition or other Juvenile Court proceeding had been initiated against the minor, there was no "proceeding" or "matter" before the Juvenile Court and hence no need to gain its permission to release the BRPD Video.  Therefore, there is no possible sanctionable conduct

---

[158] Doc. 42 at 38–39, ¶¶ 165–169.
[159] *Id.* at 39–41, ¶¶ 169–174.
[160] *Id.* at 41, ¶ 174. *See also id.* at 4, ¶ 4; 20–25, ¶¶ 84–100.

committed by Frampton in releasing the Video;[161]

ii. Even if Defendants' interpretation of Art. 412 of the Children's Code is generally correct, Art. 412 did not apply to the BRPD Video because it was already in the public domain at the time Frampton released it;[162]

iii. Defendants' position regarding Art. 412's application is belied by their "repeatedly and flagrantly violat[ing] the privacy protections of Art. 412 in an effort to make it to the press conference on time";[163]

iv. Defendants' retaliatory motive is demonstrated by their pursuit of Frampton with a Contempt Motion when "they have never done this before to anyone else";[164]

v. Defendants' retaliatory motive is demonstrated by the "timing and nature" of their Juvenile Court Petition and Contempt Motion;[165]

vi. Defendants' retaliatory motive is demonstrated by Defendants' pursuing only Frampton for contempt when they allege others violated the same provision of the Children's Code;[166]

vii. Defendants' retaliatory motive is demonstrated by Defendants' refusing to withdraw the Contempt Motion after they learned that Frampton had obtained the BRPD Video from his client's criminal defense counsel and the Video was already public at the time

---

[161] *Id.*
[162] *Id.* at 32, ¶¶ 127–129.
[163] *Id.* at 25, subheading. *See also id.* at 24–27, ¶¶ 101–110.
[164] Doc. 42 at 28, ¶¶ 111–116.
[165] *Id.* at 29–30, ¶¶ 117–121.
[166] *Id.* at 30–32, ¶¶ 122–126.

Frampton released it to the press;[167]

viii. Defendants' retaliatory motive is demonstrated by Defendants' "fail[ure] to follow their own interpretation of the [Art. 412] – even in this case."[168]

     *a.* Younger *Does Not Apply*

Plaintiff argues that *Younger* does not apply here because the proceeding against Frampton is not yet a criminal proceeding.[169] Under Louisiana law, a "contempt proceeding assumes the quality of a criminal or quasi-criminal proceeding only after a criminal sentence is imposed."[170] Plaintiff points the Court to Defendants' earlier briefing where Defendants concede that "the City/Parish is never a party to juvenile prosecutions, and is unable to file a pleading in a prosecutorial case."[171] Thus, because the Contempt Motion is not yet a criminal action, *Younger* abstention is not triggered.[172]

Second, Plaintiff points to Defendants' briefing in the Juvenile Court where Defendants are currently arguing that that their rule to show cause is "<u>nothing like</u>" a criminal prosecution.[173] In a memo filed July 9, 2021, Defendants argue that "nowhere in the Rule to Show Cause does the City/Parish seek a specific penalty against Mr. Frampton.…"[174] Plaintiff therefore maintains that the City/Parish is taking inconsistent positions. On the one hand, the City/Parish is arguing to this Court that "the contempt request is so 'akin to a criminal prosecution' as to trigger *Younger*,

---

[167] *Id.* at 32, ¶¶ 127–131.

[168] *Id.* at 32, heading; *see also id.* at 32–33, ¶¶ 132–140.

[169] *Id.* at 38–39, ¶¶ 165–168.

[170] Doc. 42 at 38–39, ¶ 166, citing *State v. Voorhies*, 45,864 (La. App. 2d Cir. 12/15/10), 56 So. 3d 1028, citing *Swan v. Swan*, 35,393 (La. App. 2 Cir. 12/7/01), 803 So. 2d 372; *Fontana v. Fontana*, 15122 (La. App. 2 Cir. 01/17/83), 426 So. 2d 351.

[171] *Id.* at 39, ¶ 167, citing Doc. 14-1 at 12.

[172] *Id.* at 38–40, ¶ 166.

[173] *Id.* at 39, ¶ 167 (emphasis added).

[174] *Id.*, citing Doc. 24-3 at 8.

but at the same time is arguing to the Juvenile Court that their actions are <u>so mild as to not</u> <u>constitute an 'adverse action' against Frampton</u>."[175]

> *b.   Alternatively, Bad Faith Exception To* Younger *Applies*

Plaintiff argues in the alternative that, even if the Juvenile Court Petition and Contempt Motion is such that *Younger* would otherwise apply, *Younger* abstention

> is overcome by a showing of bad faith or intent to harass. When the state in a criminal proceeding acts in bad faith or with the purpose of harassing the federal plaintiff, its actions are not 'legitimate activities'. . . . Equitable relief by the federal court is warranted, because the federal plaintiff faces a risk of irreparable injury that is both 'great and immediate'."[176]

In other words, there is an "exception to *Younger* abstention [where] a state court action is brought in bad faith or for a retaliatory motive."[177] Plaintiff points the Court to the test set out in *Wilson v. Thompson*[178] and argues the first *Wilson* element is met here inasmuch as Frampton's issuance of a press release regarding police misconduct is protected First Amendment speech.[179] As to the second prong, Plaintiff contends that all he need show at this stage is that the prosecution was motivated *at least in part* by a purpose to retaliate or to deter that conduct.[180] In this connection, Plaintiff argues that the retaliatory motive is shown in at least seven different ways, summarized above and detailed below.

> *c.   Bad Faith – Defendants' Interpretation Of The Children's Code Is "Wrong On Its Face, Absurd In Its Results, And Contradicted By Their Own Witness"*[181]

---

[175] Doc. 42 at 39, ¶ 168.

[176] *Id.*, ¶ 169, citing *DeSpain*, 731 F.2d at 1176–1177; *see also Younger*, 401 U.S. at 54 (noting that holding limited to absence of "bad faith, harassment, or any other unusual circumstance").

[177] Doc. 42 at 40, ¶ 170, citing *Word of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 966 (5th Cir. 1993) (bad faith exception to *Younger* applied in a First Amendment context).

[178] *Id.* at 40, ¶ 170, quoting *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979) (emphasis added).

[179] *Id.*, ¶ 171.

[180] *Id.*, ¶ 172.

[181] *Id.*, Subheading i.

Plaintiff argues that Defendants' retaliatory motive is shown by the fact that they moved for contempt of a proceeding "that they knew did not exist."[182] In other words, the mere issuance of a custodial agreement to F.B. did not initiate a "proceeding" in the Juvenile Court against F.B. and hence, there was no need for the City/Parish, Paul, Frampton or anyone else to gain the permission of the Juvenile Court in order to release the Video.[183] "Defendants' retaliatory motive is shown because their justification relies on a theory that is wrong on its face, absurd in its results, and contradicted by their own witness."[184]

The Children's Code is explicit, argues Plaintiff, about when a juvenile delinquency proceeding begins. Children's Code Article 842 states that:

> A delinquency proceeding shall be commenced by a petition. The district attorney may file a petition without leave of court. Any person authorized by the court may file a petition if there are reasonable grounds to believe that the child is a delinquent child.[185]

Thus, according to Plaintiff, there is no juvenile court proceeding without an initiating document of some kind being filed with the juvenile court. Plaintiff points the Court to Louisiana Supreme Court jurisprudence which discusses an earlier version of the Children's Code. There, the Court explained that a delinquency

> petition setting forth the ages of the child or children, the facts which bring it or them within the purview of [the Children's Code] and so on, is the foundation of the proceeding to determine the issue of neglect or delinquency. And any proceeding conducted in its absence, as was the instant one, is null and can have no legal effect.[186]

The position of the City/Parish that an "arrest charge against a juvenile is the institution

---

[182] *Id.*, ¶ 174.
[183] Doc. 42 at 20–25, ¶¶ 84–100.
[184] *Id.* at 20.
[185] *Id.* at 21, ¶ 87.
[186] *Id.*, ¶ 88, citing *In re State in Int. of Toler*, 263 So. 2d 888, 891–92 (La. 1972) (emphasis added).

of a 'proceeding'" is "wrong and nonsensical."[187] It is wrong, maintains Plaintiff, because it is "directly contrary to Article 842 (which says a 'delinquency proceeding' is commenced by a petition, not arrest) and because that thinking has been squarely rejected by the Louisiana Supreme Court."[188]

Defendants' argument is also nonsensical, insists Plaintiff, because

> "arrest charges" <u>do not exist</u> in Louisiana law. There are *arrests,* which are the taking of one person into custody by another. And there are the *charges* which reflect the commencement of prosecution brought by the filing in court of an affidavit, information, or indictment. But there are no such things as *arrest charges*.[189]

Plaintiff maintains his position was confirmed by Defendants' own witness, the Juvenile Section Chief of the East Baton Rouge Parish Attorney's Office when she testified that "the only way that anything would get filed with the juvenile court is if the DA's office filed a petition."[190] Myers-Minor confirmed that this is true even when a minor is released pursuant to a custodial agreement. As she testified, "the custodial agreement would not be filed. The petition would be filed."[191] Thus, concludes Plaintiff, "there simply is no matter in juvenile court until a petition is filed."[192]

Myers-Minor also testified that "arrest charges" are not a concept in juvenile court. She was asked by Defendants' counsel: "So on the basis of that custodial agreement and that report, does that child have a pending charge?" She answered: "No. The charge does not – I mean, the formal charge does not come until the DA's office files the petition."[193]

---

[187] Doc. 42 at 22, ¶ 89.
[188] *Id.*, ¶ 90, citing *State v. Kimble*, 411 So. 2d 430, 433 (La. 1982) (holding that the "fact that defendant was arrested and ticketed is of no moment" in determining when a prosecution began).
[189] Doc. 42 at 22, ¶ 91 (internal citations omitted).
[190] Doc. 42 at 22–23, ¶ 92, citing Doc. 38, Transcript at 123.
[191] *Id.*, citing Doc. 38, Transcript at 125.
[192] *Id.*
[193] *Id.*, ¶ 93, citing Doc. 38, Transcript at 125–126.

Nor is Defendants' interpretation reflected anywhere in Louisiana law. The one case cited by Defendants for the proposition that Louisiana's Article 412 confidentiality might apply before a prosecution is initiated is a Nevada public records act case and, according to Plaintiff, is not on point; Plaintiff contends the Nevada statute being interpreted broadly protects all "juvenile justice information,"[194] whereas Article 412 is specifically limited to documents concerning "matters or proceedings before the juvenile court."[195]

Plaintiff argues that Defendants' interpretation "has been squarely rejected by Louisiana courts."[196] In support, Plaintiff cites *State v. Mart*, involving a video of a fight on a school bus.[197] Although the video was turned over by the school board to law enforcement agencies partially in connection with proceedings against one of the juvenile offenders depicted on the tape, the Court of Appeal held that the tape was not protected by Art. 412.[198] Because the video was generated outside of the juvenile court proceeding as a public record, "the Public Records Law mandates that the public be given access to the evidence tape."[199] Frampton argues, "[i]f sharing a video that actually <u>was</u> used in a juvenile court proceeding does not violate Article 412, then *a fortiori* Prof. Frampton's sharing of a video that was never used in juvenile court does not violate Article 412."[200]

Plaintiff argues that Defendants' interpretation would lead to absurd results such as subjecting a U.S. Attorney to sanctions and potential jail time for complying with his *Brady* obligations.[201] Similarly, Defendants' interpretation would subject a lawyer to sanctions and

---

[194] *Republican Att'ys Gen. Ass'n v. Las Vegas Metro. Dep't*, 458 P.3d 328, 334–35 (Nev. 2020).
[195] Doc. 42 at 23, ¶ 94.
[196] *Id*., ¶ 95.
[197] 697 So. 2d 1055 (La. App. 1997).
[198] *Id*. at 1058, 1060.
[199] *Id*. at 1060.
[200] Doc. 42 at 23–24, ¶ 95.
[201] *Id.* at 24, ¶ 96, citing Doc. 38, Transcript at 102–103 ("The Court: . . . When the U.S. Attorney released this to the Federal Public Defender, he violated the Children's Code. Correct? Ms. Morris: I believe so.").

potential jail time for sharing documents with her clients,[202] even though she has an ethical duty

to do so.[203] Defendants' interpretation would subject clients to sanctions and potential jail time

for sharing documents *with their own lawyer*.[204]  Plaintiff stresses,

> [t]his is not a hypothetical parade of horribles; Defendants and their counsel affirmed each of these outcomes in briefing or at the hearing. But at no point in briefing or during the hearing did Defendants attempt to harmonize their unusual interpretation of the law with the long-standing constitutional and ethical duties it would impinge upon.[205]

According to Plaintiff, the alternative argument made by the City/Parish that there is a

"dearth of case law" about when a "case or proceeding" begins in Louisiana juvenile court, such

that "there is no Louisiana case law available directly addressing this matter," and that these are

therefore "uncharted waters of state law," actually favors Plaintiff.[206] "If the law were as

uncharted as the City/Parish argues, the City/Parish could not reasonably seek to hold Prof.

Frampton in contempt for not hewing to their unusual reading of it."[207]

> ### d. Bad Faith - Even If Defendants' Interpretation Of Art. 412 Of The Children's Code Is Correct, Art. 412 Did Not Apply To The BRPD Video Because It Was Already In The Public Domain

Plaintiff contends in the alternative that, whether the Juvenile Court Petition was a valid

and necessary procedure to gain the release of the BRPD Video or a cynical pretextual vehicle to

punish Frampton for making the video public is a red herring because the video Frampton released

---

[202] *Id.*, citing Doc. 38, Transcript at 103 ("The Court: And when the Federal Public Defender released it to his client, Clarence Green, the Federal Public Defender violated the Children's Code, correct? Ms. Morris: That's my understanding, yes.").

[203] *Id.*, citing La. Rules of Pro. Conduct r. 1.16(d) ("Upon written request by the client, the lawyer shall promptly release to the client or the client's new lawyer the entire file relating to the matter.").

[204] *Id.* (emphasis added), citing Doc. 14-1 at 13 ("As Mr. Frampton was not the attorney for Mr. Green in his criminal prosecution, the release of the videos containing the juvenile arrest to Mr. Frampton was improper without a Court order from Juvenile Court.").

[205] *Id.*

[206] Doc. 42 at 25, ¶ 99.

[207] *Id.*

was already in the public domain. "If Louisiana law purported to allow such a thing – if Louisiana law truly defined as a 'juvenile court record' a video broadcast of CBS Evening News of video obtained from public records – it would gravely infringe on the First Amendment."[208]

Alternatively, Frampton stresses that this case is not about whether the City/Parish is correctly interpreting the Children's Code. It is about whether the City/Parish is engaging in First Amendment retaliation against Frampton by continuing to try to hold him in contempt of court for releasing the video.[209] "The existence (or, more accurately, non-existence) of a 'juvenile proceeding' under La. Ch. C. art. 412 [sic] thus has no bearing on the federal constitutional claims being litigated here."[210]

> e.  *Bad Faith – Defendants' Flagrant Violation Of The Privacy Protections Of Article 412 In An Effort To Make It To A Press Conference On Time*

According to Plaintiff, although Defendants claim that the "City/Parish only seeks to protect the confidentiality provisions established by law to protect a child's best interest," their actual conduct shows the opposite.[211] The evidence shows that in a rush to obtain videos in time for a 3:00 p.m. police press conference, the City/Parish entirely skipped the required procedures of the Children's Code that protect a child's confidentiality interests including (but not limited to) the requirement that service be made "on the minor and his attorney"[212] so as to "ensure the juvenile is afforded notice of the hearing and an opportunity to be heard at a contradictory hearing on the petition."[213] In this case, service was not made on Frampton until after the Juvenile Court judge had already signed the Order setting the Contempt Motion for hearing thus depriving him

---

[208] *Id.* at 20, ¶ 85.
[209] *Id.* at 24, ¶ 97.
[210] *Id*. at 20, ¶ 85.
[211] *Id.* at 25, ¶¶ 101–102.
[212] Doc. 42 at 26, ¶¶ 102–103, quoting Art. 412(E)(2)(a).
[213] *Id.*, ¶ 103, quoting Art. 412(L).

and the minor of the opportunity to be heard and object.[214]

Furthermore, the petition must "[s]tate the names of all persons that will have access to the information."[215] And finally, any records so released shall be marked "UNLAWFUL DISSEMINATION OF THIS INFORMATION IS PUNISHABLE AS A CONSTRUCTIVE CONTEMPT OF COURT PURSUANT TO LOUISIANA CHILDREN'S CODE ARTICLE 1509(E)."[216]

But in dealing with F.B. and the BRPD Video, argues Plaintiff, Defendants followed none of those steps. They sought to release the Video for a BRPD press conference rather than a "specific investigation or proceeding" and failed to list the names of all persons who would have access to the information.[217] Plaintiff again complains that Defendants did not give the juvenile or his attorney an opportunity to object.[218] Rather, the City/Parish filed the petition on the morning of May 28, 2021, obtained the judge's signature at approximately noon the same day,[219] but did not serve it upon Frampton until that afternoon.[220]

Plaintiff maintains that, by waiting until hours after the judge signed the order before serving the petition on Frampton, the City/Parish guaranteed that the juvenile would not have the required "opportunity to be heard at a contradictory hearing."[221] The City/Parish did not even *request* a contradictory hearing before asking the judge to sign the order *ex parte*, nor did the City/Parish ever serve the juvenile himself.[222]

---

[214] Doc. 42 at 26–27, ¶ 105.
[215] *Id*. at 26, ¶ 103, citing Art. 412(E)(2)(c).
[216] *Id.*, quoting Art. 412(L).
[217] *Id.* at 26, ¶ 104, citing Plaintiff's Exhibit 7, Rule to Show Cause.
[218] *Id.* at 26, ¶ 105, citing Doc. 38, Transcript at 52 ("They did not provide the juvenile any opportunity to object or be heard.").
[219] Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 4.
[220] Doc. 42 at 26, ¶ 105.
[221] *Id.* at 26–27, ¶ 106.
[222] *Id.*, citing Plaintiff's Exhibit 7, Rule to Show Cause at 3 (only listing Professor Frampton on service list); Cf. Art. 412(E)(2)(a) (requiring service on juvenile and attorney).

Plaintiff points the Court to the testimony of City/Parish Attorney Deelee Morris where she admitted under cross-examination why she skipped the required steps: "I believe there are certain circumstances that require an urgency. And in this case, no, I did not – I did not have the time, honestly, to notify any juvenile."[223] This position was confirmed in City/Parish's briefing where it admits that it filed the petition "in Juvenile Court in urgency to try obtain the records in time for a press conference."[224]

Plaintiff strenuously argues that "Defendants' 'for thee but not for me' approach to the mandatory confidentiality requirements of the Children's' Code makes it likely that their motivation was retaliation for Plaintiff's speech, rather than to 'protect the confidentiality provisions established by law to protect a child's best interest.'"[225]

### f.  Bad Faith - Timing, Contents, And Nature Of The Juvenile Court Petition And Contempt Motion

Citing Second and Fifth Circuit jurisprudence, Plaintiff argues that the timing and contents of government action support a finding of retaliatory motive. Specifically, a "plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."[226] Here, contends Plaintiff, the timeline of events shows retaliatory motive. "Although the videos had been in the public record for nearly six months, and

---

[223] *Id.* at 27, ¶ 107, quoting Doc. 38, Transcript at 97.

[224] *Id.*, ¶ 108, citing Doc. 14-1 at 7; Doc. 38, Transcript at 86 ("We needed to have the documents properly released for the press conference so that we could use them for public release."); Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 2 ("On May 28, 2021, I filed a Petition to Seek the Disclosure of Juvenile Records in the East Baton Rouge Juvenile Court, in an effort to obtain juvenile arrest videos for a BRPD press conference scheduled for 3 p.m. that same day.").

[225] *Id.*, ¶ 110.

[226] Doc. 42 at 29, ¶ 117, citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action . . . Here, we find that the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in [a] prior lawsuit, is sufficient to support an inference of a causal connection."); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995) ("chronology of events" can provide inference of First Amendment retaliation).

the City/Parish was aware Frampton had the Video since March of 2021, Defendants moved for contempt *the day after* the videos became a national news story."[227]

That retaliation is the true motive of Defendants is reinforced, argues Plaintiff, by the text of the petition which complains that "the City of Baton Rouge has received an [sic] substantial amount of negative correspondence from the public."[228]

> g. *Bad Faith - Retaliatory Motive Is Shown By The Fact That Defendants Have Never Done This Before To Anyone Else And Frampton Is Only Person Against Whom Sanctions Have Been Sought*

According to Plaintiff, retaliatory motive is also demonstrated by the undisputed fact that, despite public releases of the BRPD Video by others (which Defendants now claim violate the Children's Code), Frampton is the only individual who the City/Parish has ever attempted to find in contempt for the release of this Video or for the release of any other allegedly protected confidential juvenile information.[229] In discovery, Defendants admitted that they have never sought sanctions against any person the way they have against Frampton.[230]

Indeed, in answers to discovery, Defendants admit that they chose Frampton on whom to "test" their theory that this video release was sanctionable conduct.[231] When asked to identify "each instance, from 2010 to the present, that the Baton Rouge Parish Attorney's Office has moved for contempt of juvenile court for the unauthorized release of records,"[232] Defendants responded:

---

[227] *Id.* at 40, ¶ 173, comparing *Espinal*, 558 F.3d at 129 ("six months" between events "sufficient to support an inference of casual connection"). *See also* Doc. 38, Transcript at 42–43; *Id.* at 35:11–14 ("Q. So by March 2021, the City Parish Attorney's Office knew that someone had shared the video because it had been shared with you. Correct? A. Yes.").

[228] *Id.* at 29, ¶ 119, citing Plaintiff's Exhibit 7, Rule to Show Cause at ¶ 4.

[229] *Id.* at 28–29, ¶¶ 111–116.

[230] *Id.* at 28, ¶ 111, citing Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6.

[231] Doc. 42 at 28–29, ¶ 116, citing Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6.

[232] *Id.*, 28, ¶ 112.

> this is the first time that the Baton Rouge Parish Attorney's Office has encountered what appears to be an unauthorized release of juvenile investigation materials, accordingly, this is the first time that the Parish Attorney's Office has filed a rule for contempt in Juvenile Court to put the question to the test.[233]

Plaintiff insists this answer is false since, according to Frampton's uncontradicted trial testimony, "the Parish Attorney's office had been informed as early as March 2021 that someone had shared the video *with* Frampton."[234] Thus, to the extent the Video was a confidential record, Defendants were aware that it had been shared by someone without Juvenile Court blessing months before they sought sanctions against Frampton.[235]

Thus, according to Plaintiff, it is not a coincidence that Defendants chose to "test"[236] a new theory of sanctions on the person who caused BRPD misconduct to be the subject of a national news story. Plaintiff maintains that this reinforces the conclusion that retaliation was Defendants' true motivation.[237]

Plaintiff maintains that retaliatory intent is further shown by counsel for Defendants' testimony at trial that previous releases of the BRPD Video by others violated the same law Frampton is accused of having violated, but only Frampton was selected for a Contempt Motion.[238] He argues that if Defendants' interpretation of the Louisiana Children's Code were accepted, "literally hundreds of Americans engaging in protected First Amendment activity could be hauled into Louisiana court to face sanction."[239]

---

[233] *Id.*, ¶ 113.

[234] *Id.* at 28, ¶ 114, citing Doc. 38, Transcript at 35 ("Q. So by March 2021, the City Parish Attorney's Office knew that someone had shared the video because it had been shared with you. Correct? A. Yes.").

[235] *Id.* at ¶ 115.

[236] Doc. 42 at 28–29, ¶ 116, citing Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6 ("this is the first time that the Parish Attorney's Office has filed a rule for contempt in Juvenile Court to put the question to the test").

[237] *Id.* at 28–29, ¶ 116.

[238] *Id.* at 28–32, ¶¶ 111–126.

[239] *Id.* at 30, ¶ 122. Plaintiff gives as an example, a single Twitter thread containing the Video was shared by 468 individual users: https://twitter.com/billybinion/status/1408152766351089671.

Furthermore, in the context of this case, "[i]f the 'sharing' of a video that was not obtained from a juvenile court proceeding—and, indeed, was already public—could constitute 'contempt of court,' then the following individuals also face jail time for contempt:

- the Clerk of this Court (who provided a copy of the video to Plaintiff's counsel);

- unknown BRPD officials (who shared the video with the US Attorney);

- Assistant United States Attorneys Kashan Khan Pathan and Jeremy Johnson (who shared the video with the Federal Public Defender);

- The Federal Public Defender Mark Upton (who shared the video with Professor Frampton);

- Norah O'Donnell (CBS Evening News host);

- Other national news outlets; and

- Any other concerned citizens who 'shared' the video on Twitter, Facebook, Instagram, and other social media platforms."[240]

Plaintiff further highlights this point with the testimony of City/Parish Attorney Morris who stated that in her view, the U.S. Attorney, Baton Rouge Police Department, Federal Public Defender, Clarence Green, and whoever released the video to the Advocate all "violated the Children's Code," but nonetheless, she "didn't know" why the City/Parish had not pursued any of those persons for contempt.[241] This is further evidence, argues Plaintiff, of the retaliatory motive behind Defendants' Contempt Motion.

---

Another was shared by 65 users: https://twitter.com/nbcnews/status/1398392409265000454.
Another was shared by 40 users: https://twitter.com/cbsnews/status/1398977442346323970.
[240] Doc. 42 at 30–31, ¶ 123.
[241] Id. at 31, ¶¶ 124–125, citing Doc. 38, Transcript at 102–104.

h.  *Bad Faith – Failure To Withdraw Contempt Motion Once Public
   Source Was Made Known*

Plaintiff argues that, contrary to Defendants' contention that they could not have been retaliating against Frampton because they had only been "recently notified" that the "body camera footage at issue was filed in the public record of this Court,"[242] they were in fact "notified" of that fact on June 2, 2021, more than a month before the hearing.[243] Nonetheless, despite being informed that Frampton got the Video on behalf of his clients from his client's criminal defense lawyer, Defendants did not withdraw the Contempt Motion and still seek contempt sanctions.[244] Thus, regardless of what Defendants' state of mind may have been before June 2, 2021, the fact that they continue to seek contempt sanctions shows Defendants' true retaliatory motive.[245]

i.  *Bad Faith – Failure Of Defendants To Follow Their Own
   Interpretation Of The Law – Even In This Case*

Despite Defendants' argument that the "City/Parish firmly believes that all records of arrests under the jurisdiction of Juvenile Court are protected under Art. 412 and the public release of any such records require a Juvenile Court order unless an exception under Art. 412 applies,"[246] their actual conduct in this case contradicts that assertion. As described above, Defendants shared the video at issue here to the U.S. Attorney's Office without seeking a court order, which under their own theory would be contemptuous conduct.[247] In addition, Ms. Morris testified that her office regularly provides video to various entities, but without "any mechanism in place at the

---

[242] *Id.* at 32, ¶ 127, citing Doc. 14-2 at ¶ 8.
[243] *Id.*, ¶ 128, citing Doc. 2-4.
[244] *Id.*, ¶ 129, citing Doc. 38, Transcript at 128–129 (Defendants agreed to postpone, but not withdraw, Rule to Show Cause on Sanctions); Doc. 42 at 32, ¶¶ 127–131.
[245] *Id.*, ¶ 130.
[246] *Id.* at 32, ¶ 132, citing Doc. 14-1 at 8.
[247] *Id.* at 33, ¶ 133, citing Doc. 38, Transcript at 103 ("The Court: All right. And when – the fact of the matter is when the Baton Rouge Police Department released the video to the U.S. Attorney's Office without getting Juvenile Court consent, the Baton Rouge Police Department violated the Juvenile Children's Code, Correct? Ms. Morris: I believe so.").

Baton Rouge City Police Department or with the City Parish" that would prevent them from sharing video of juvenile arrests.[248]

But, according to Plaintiff, "the most astonishing example comes from this case itself, specifically, on July 20, 2021, in discovery in this case, Defendants' counsel Joe Scott's sharing a page PDF called 'Redacted Initial Report.'"[249] "The PDF included seventy-two pages of police reports, including the police reports identified Item No. 20-225 related to F.B.'s arrest."[250] He did so without requesting permission of the Juvenile Court. It was only the following day, July 21, 2021, that Defendants' counsel Deelee Morris filed a motion with the Juvenile Court to release documents including "BRPD reports in file #20-225."[251] In that petition, Ms. Morris was seeking "permission from the Juvenile Court to release those very same police reports that Mr. Scott had already shared."[252] Thus, Defendants "produced a juvenile report and **then** asked for permission to produce it after they already produced it."[253]

Plaintiff insists that the theory of law that Defendants are asking this Court to accept is so divorced from the actual law that their own attorneys could not stick to it *during the pendency of this proceeding*; Defendants' theory is so impracticable that Ms. Morris admitted that she was not "quite sure how you proceed under that [understanding of the law], you know, to be in compliance with the law, without doing a lot of legwork."[254]

Plaintiff concludes that "by seeking to sanction Prof. Frampton for what they do themselves, and do not even *try* not to do, Defendants again reinforce the inference of retaliation

---

[248] *Id*. at ¶ 134, citing Doc. 38, Transcript at 98–99.
[249] *Id*. at 33, ¶ 135, citing Plaintiff's Exhibit 15.
[250] *Id*., citing Doc. 38, Transcript at 53; Excerpt at Plaintiff's Exhibit 16.
[251] Doc. 42 at 33, ¶ 136, citing Plaintiff's Exhibit 17 at ¶ 11.
[252] *Id*., citing Doc. 38, Transcript at 54.
[253] *Id*., ¶ 137, citing Doc. 38, Transcript at 55–56 (emphasis added).
[254] *Id*. at 33–34, ¶ 138, citing Doc. 38, Transcript at 102.

. . . ."[255]

### 2. Defendants' Position

Defendants' arguments can be summarized as follows:

    *a.*  *Younger* applies to the Contempt Motion at issue.[256]

    *b.*  Plaintiff has not established that the Juvenile Court Petition or Contempt Motion contained any false or disputed factual information, and thus, "the only issue that is present is an interpretation of Art. 412 and its applicability under the facts presented."[257]

    *c.*  Defendants' interpretation of Art. 412 of the Children's Code is correct. The filing of the Juvenile Court Petition was procedurally proper since "a juvenile *arrest* on criminal charges constitutes a 'matter' and/or 'proceeding' before the Juvenile Court…[and therefore] all records related to the arrest are protected under Art. 412 [of the Children's Code]."[258]

    *d.*  The fact that the BRPD Video was in the public record at the time Frampton released it to the press does not gainsay the applicability of Art. 412 and the necessity of following its requirements.[259]

    *e.*  In the alternative, even if the Juvenile Court Petition was not the proper procedural vehicle, because there is a "dearth of case law" on the issue of when a "case or proceeding" begins, this is an additional reason why

---

[255] *Id.* at 34, ¶ 140.

[256] Doc. 41 at 8, ¶ 43, citing *Kolwe*, 858 F. App'x at 132–33.

[257] *Id.* at 9, ¶ 46; *see also* Doc. 44 at 6, ¶ 32 ("The only issue before the Court is whether Art. 412 applies in this case, where a delinquency petition has not been filed.").

[258] *Id.* at 11, ¶ 59 (emphasis added).

[259] *Id.* at 15, ¶¶ 80–84.

the Court should abstain from deciding the case.[260]

f.  The bad faith exception to *Younger* does not apply because Defendants had no motive to retaliate against Frampton; rather, the "only reason the City/Parish moved for a [Contempt Motion] was because," as alleged in the Juvenile Court Petition, " '[e]dited BRPD body camera footage of the juvenile's arrest . . . [had] been publicly released allegedly by Thomas Frampton and disseminated on media platforms without a court order in violation of Louisiana Children's Code Article 412(A).' "[261]

g.  The evidence Plaintiff uses to suggest Defendants' retaliatory motive is merely circumstantial; in fact, for each of these grounds, the evidence shows that Defendants acted reasonably, in good faith and within the bounds of law.

   i.  Defendants had legitimate, non-retaliatory reasons for filing the Petition the day after the CBS news story (and forgoing service and notice to the minor and Frampton): namely the urgent need to defuse potential political unrest.[262]

   ii.  Defendants' use of a procedure like the Juvenile Court Petition was not unprecedented, having utilized it at least once before under similar circumstances in July of 2020;[263] indeed, City/Parish Attorney Morris warned Frampton in February of

---

[260] Doc. 14-1 at 16.
[261] Doc. 44 at 2–3, ¶ 10.
[262] Doc. 41 at 2, ¶¶ 2–3.
[263] *Id.* at 6, ¶¶ 29–31.

43

2004 about "the requirements of getting a court order from [the] Juvenile Court as it pertained to the juvenile's arrest including specifically the body camera footage."[264]

iii.   While the City/Parish never attempted to sanction anyone for violating Art. 412 before Frampton, this is because Frampton was the first individual it was aware of who violated Art. 412.[265]

iv.   While others besides Frampton may have also violated Art. 412, "[t]he City/Parish is not required by law to file for contempt on any and all parties that it subsequently learned exchanged or released the video in violation of Art. 412 to establish its good faith in proceeding in this matter."[266]

v.   The fact that one acquires video of a minor from a public source (as Frampton and others did) does not absolve those persons from following the dictates of Art. 412. Therefore, there was no reason for the City/Parish to withdraw its Contempt Motion once it learned that Frampton had acquired the BRPD Video from a public source.

vi.   Defendants' own failure to follow the requirement of Art. 412 in this case was inadvertent and quickly remedied by filing a petition for its release a day later.

a.   Younger *Applies, Requiring Court To Abstain*

---

[264] *Id.* at 5, ¶ 20, citing Doc. 38, Transcript at 91–92; Defendants' Exhibit 3.
[265] *Id.* at 7, ¶ 39; Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6.
[266] Doc. 41 at 10, ¶ 52.

Defendants first argue first that *Younger* applies to the Juvenile Court Contempt Motion.[267] The Fifth Circuit has recently reiterated the well-established principle that *Younger* applies to state contempt proceedings.[268]

### b. *Younger's Bad Faith Exception Does Not Apply*

Defendants concede that an exception to *Younger* applies if the state court proceeding was brought in bad faith or with the purpose of harassing the federal plaintiff but argues it should apply only where the state official proceeds "without hope of obtaining a valid conviction."[269] Thus, Defendants maintain that, under the Fifth Circuit test, the bad faith exception to *Younger* does not apply to the facts of this case.  Furthermore, the "bad faith" exception is narrow and should be granted parsimoniously, and Plaintiff bears the burden to establish actual proof of bad faith.[270] He hasn't met the burden under the Fifth Circuit test.

### c. *No Bad Faith – Correct, Or At Least Reasonable, Interpretation Of Children's Code*

Defendants argue strenuously that their interpretation of the Louisiana Children's Code requiring Frampton to have sought and obtained consent of the Juvenile Court before releasing the Video is the correct one.[271] Defendants insist that Plaintiff cannot establish a bad faith motive because the City/Parish has demonstrated through a reasonable legal basis that the BRPD Video was confidential under Louisiana Children's Code art. 412 and that Frampton's public release of the Video required an order from the Juvenile Court.[272] Therefore, their use of this procedure

---

[267] Doc. 41 at 8, ¶ 43, citing *Kolwe v. Civ. & Structural Eng'rs, Inc.*, 858 F. App'x 129, 132–33 (5th Cir. 2021).
[268] *Kolwe*, 858 F. App'x at 132.
[269] Doc. 41 at 8–9, ¶ 45, quoting *Okorie v. Miss. Bd. of Med. Licensure*, 739 F. App'x. 301, 302 (5th Cir. 2018); *Gates v. Strain*, 885 F.3d 874, 881 (5th Cir. 2018).
[270] *Id.*, citing *Gates*, 885 F.3d at 881.
[271] *Id.* at 11–16, ¶¶ 57–86; Doc. 44 at 4–5, ¶¶ 16–25.
[272] Doc. 41 at 9, ¶ 47.

does not suggest retaliatory motive.

Defendants argue that, at the time it filed its Contempt Motion, it had "substantive evidence concerning Frampton, [who was] the one individual who originally placed the body camera footage on a social media platform, which allowed the video to be reproduced and publicized by others."[273] Because Plaintiff has not established that the Juvenile Court Petition or Contempt Motion contained any false or disputed factual information, Defendants maintain that "the only issue that is present is an interpretation of Art. 412 and its applicability under the facts presented."[274]

Defendants concede that a petition to initiate formal charges under Art. 842 of the Children's Code was never filed against F.B.[275] But unlike Plaintiff, who argues that the confidentiality provision of Art. 412 is not applicable because there was no underlying juvenile proceeding before the Juvenile Court and that such proceeding does not begin until an Art. 842 petition has been filed with the Juvenile Court, Defendants assert that a juvenile's *arrest* on criminal charges alone constitutes a "matter" and/or "proceeding" before the Juvenile Court.[276] Thus, according to Defendants, all records related to F.B's arrest were protected under Art. 412.[277]

Louisiana Children's Code art. 412 provides in relevant part:

> A. Records and reports concerning all matters or proceedings before the juvenile court, except traffic violations, are confidential and shall not be disclosed except as expressly authorized by this Code. Any person authorized to review or receive confidential information shall preserve its confidentiality unless a court order authorizes them to share with others.

---

[273] *Id.*, ¶ 50.
[274] Doc. 41 at 9, ¶ 46.
[275] Doc. 41 at 11, ¶ 60.
[276] Doc. 41 at 11, ¶¶ 57–59.
[277] *Id.*, ¶ 59.

46

According to Defendants, "[t]he term 'proceeding' is distinguished from a 'case' in the Children's Code under article 116(11), which provides: '[a] "juvenile proceeding" or "juvenile case" is defined in the Children's Code as a "proceeding or case in which the court is exercising juvenile jurisdiction." ' "[278]

The Children's Code does not define the general term "matters" as referenced in Art. 412.[279] Defendants contend their position is supported by La. Child. Code Art. 102 which provides guidance on the interpretation of the terms and provisions of the Code. It states they "shall be liberally construed to the end that each child and parent coming within the jurisdiction of the court shall be accorded due process and that each child shall receive, preferably in his own home, the care, guidance, and control that will be conducive to his welfare."[280]

Defendants argue that La. Child. Code art. 103 supports a "universal" interpretation of the term "proceeding" when it states: "[e]xcept as otherwise specified in any Title of this Code, the provisions of the Children's Code shall be applicable in all juvenile court proceedings, and only to such proceedings."[281]

According to Defendants, a reading of La. Child. Code art. 303 in conjunction with Art 804 demonstrates that "a 'proceeding' is a term that is broader than a juvenile 'case' instituted by the filing of a petition."[282] La. Child. Code art. 303 provides that "A court exercising juvenile jurisdiction shall have exclusive original jurisdiction over: (1) Delinquency proceedings pursuant to Title VIII."[283]

La. Child. Code art. 804 provides:

---

[278] *Id*. at 12, ¶ 62.
[279] *Id*., ¶ 63.
[280] *Id*., ¶ 64.
[281] *Id*., ¶ 65.
[282] Doc. 41 at 11, ¶ 68.
[283] *Id*., ¶ 66.

(1) "Delinquent act" means an act committed by a child of ten years of age or older which if committed by an adult is designated an offense under the statutes or ordinances of this state, or of another state if the offense occurred there, or under federal law, except traffic violations.[284]

Defendants also point the Court to La. Child. Code art. 814 which provides the procedure for taking a child into custody without a court order and states:

(A) A child may be taken into custody without a court order or warrant by a peace officer or probation officer if the officer has probable cause to believe that the child has committed a delinquent act. When the officer has probable cause to believe that the child has committed a delinquent act, the officer, in lieu of taking the child into custody, may issue a verbal warning to the child.

(B) If a child is taken into custody without a court order or warrant, the officer shall have the responsibility to either:

(1) Counsel and release the child to the care of his parents upon their written promise to bring the child to court at such time as may be fixed by the court.

(2) Follow the appropriate procedures set forth in Article 815.[285]

Defendants point out that, pursuant to the BRPD custodial agreements, a juvenile arrestee is released to the custody of his parent or guardian based "upon their written promise to bring the child to court at such time as may be fixed by the court."[286]

Section (D) of Art. 814 further provides the procedure for taking a child into custody without a court order for detention and states:

The officer shall immediately execute a written statement of facts, sworn to before an officer authorized by law to administer oaths, supporting the existence of probable cause to believe either that the child committed a delinquent act or that the child has violated the terms of his probation or otherwise has violated the terms of his release. This affidavit shall be submitted to the juvenile court.

---

[284] *Id.*, ¶ 67, quoting La. Child. Code art. 804.
[285] *Id.*, at 13, ¶ 69, quoting La. Child. Code art. 814 (B) and (C).
[286] *Id*, ¶ 70, citing Plaintiff's Exhibit 2, Custodial Agreement.

> Within forty-eight hours after the child has been taken into custody,
> including legal holidays within the time computation, the court shall
> review the affidavit, and if it determines that probable cause exists,
> the child shall be held for a continued custody hearing pursuant to
> Article 819. If the court determines that probable cause does not
> exist, the child shall be released from custody[.][287]

According to Defendants, the language of Art. 814 "demonstrates that when a juvenile is arrested and taken into custody under Art. 814 without a court order, whether through a custodial agreement or request for detention, there is a matter or proceeding before the Juvenile Court, prior to the filing of a Petition by the Juvenile Court Division of the District Attorney's Office."[288]

Defendant maintains that the procedure for a juvenile's booking supports its position. When a juvenile is booked into the detention center, the arrestee is added to the Juvenile Court docket for a detention hearing. However, no records are filed at that time in the Juvenile Court.[289] Nonetheless, all juvenile arrests, whether processed through a custodial agreement, verified complaint, or processed for detention under Art. 815, are reviewed and processed in the same way by the BRPD and the Juvenile Court Division of the District Attorney's Office.[290] Although "[n]othing is filed into the record of the Juvenile Court until a Petition is filed by the Juvenile Court Division of the District Attorney's Office, regardless of whether the charge results from a custodial agreement or a custodial arrest,"[291] nonetheless, "all preliminary matters related to an arrest such as a custodial agreement, a verified complaint (i.e. juvenile warrant), or a detention hearing, all constitute parts of a proceeding before the Juvenile Court, and are handled prior to the

---

[287] *Id.*, ¶ 71, quoting La. Child. Code art. 814(D).
[288] Doc. 41 at 14, ¶ 72.
[289] *Id.*, ¶ 73, citing Doc. 38, Transcript at 123–124.
[290] *Id.*, ¶ 74, citing Doc. 38, Transcript at 119, 123, 124.
[291] *Id.*, ¶ 75.

filing of a Petition of Delinquency by the District Attorney's Office."[292]

Defendants maintain that this interpretation is supported by the Louisiana Supreme Court's Rules for District Courts and Juvenile Courts and Louisiana Family Law and Proceeding, Rule 42.3 Records and Information Sharing, which states:

> (b) Except as otherwise provided by La. Child. Code art. 412, all juvenile records are to remain confidential. Access to records not otherwise prohibited by law may be permitted for good cause shown pursuant to a motion for disclosure addressed to the judge.[293]

Defendants insist that, "[t]his Rule clearly states that all juvenile records are to remain confidential and does distinguish records related to formal juvenile court cases."[294]

Defendants argue that arrest and booking records are sent to "the Juvenile Court system via the District Attorney's office"[295] and attempt to analogize F.B.'s arrest to a detention hearing which is "a proceeding before the Juvenile Court despite the fact that no records are filed" with the Juvenile Court.[296]

Defendants distinguish the *State v. Mart*[297] case relied on by Plaintiff because it did not address the key provision here, Art. 412.[298] Finally, in the alternative, Defendants maintain that, even if the Juvenile Court Petition was not the proper procedural vehicle, because there is a "dearth of case law" on the issue of when a "case or proceeding" begins, this is an additional reason why the Court should abstain from deciding the case.[299]

---

[292] *Id.*, ¶ 76.

[293] *Id.* at 15, ¶ 78, quoting the Louisiana Supreme Court's Rules for District Courts and Juvenile Courts and Louisiana Family Law and Proceeding, Rule 42.3 Records and Information Sharing.

[294] Doc. 41 at 15, ¶ 79. The Court assumes Defendants intended to write Rule 43.2 "does *not*" distinguish records in formal juvenile court cases.

[295] Doc. 44 at 4, ¶ 17.

[296] *Id.* at 4, ¶ 20; *see also id*, ¶¶ 18–21.

[297] 697 So. 2d 1055 (La. App. 1997).

[298] Doc. 44 at 5 ¶ 25.

[299] Doc. 14-1 at 16.

>    d. *No Bad Faith - There Was No Waiver Of Art. 412's Requirements*
>       *By Minor's Consent Or Entering The BRPD Video Into The Public*
>       *Record*

Defendants dispute Plaintiff's argument that even if the confidentiality provision of Art.

412 is applicable in this case, it was waived when it was entered into the Federal Court record in

*U.S. v. Green*, 20-46-BAJ-SDJ and/or through consent of the parents and juvenile.[300] Art. 412(A)

provides specifically: "[a]ny person authorized to review or receive confidential information shall

preserve its confidentiality unless a court order authorizes them to share with others."[301] Thus,

argue Defendants, the mandatory confidentiality and enforcement provisions of Art. 412 cannot

be waived through prior record production unless ordered by the Court.[302]

Relying on an Attorney General's opinion, Defendants contend that Art 412 contains no

exception which would allow the juvenile or his/her parents or guardians to waive the

confidentiality provisions of the statute.[303] "Exceptions are listed in Art. 412. Absent a listed

exception in Art. 412, acknowledgement of a record is prohibited." La. Atty. Gen. Op. No. 03-

0026 (Jan. 30, 2003).[304] Accordingly, argue Defendants, waiver is not a valid exception to the

confidentiality requirement of Art. 412.[305]

>    e. *No Bad Faith - Timing Of Juvenile Court Petition*

According to Defendants, "the timing of the service of the Petition was based on

circumstances unrelated to the CBS News story or the beginning of the BRPD press

---

[300] Doc. 41 at 15, ¶ 80.
[301] *Id*., ¶ 81, quoting La. Child. Code art. 412(A).
[302] *Id.*
[303] *Id.* at 15, ¶ 82.
[304] *Id*., ¶ 83.
[305] *Id*., ¶ 84.

conference."[306]  Defendants insist that the timing was driven by "the urgent need to address the public's concern of the situation"[307] and Plaintiff's evidence to the contrary is "merely circumstantial."[308]

The orders releasing the limited video clips and setting the Contempt Motion for hearing were signed around 12:00 p.m. on May 28, 2021.[309] While Plaintiff suggests that Defendants' failure to serve him until the 3:00 p.m. press conference was deliberate and suggests retaliatory motive, Defendants argue that their delay was innocent. When counsel for the City/Parish returned to the office, the City/Parish's server and internet were down. Counsel emailed the pleading to Frampton once the City/Parish server came back later that afternoon.[310]

### f.  No Bad Faith – City/Parish's Prior Use Of Juvenile Court Procedure

As additional proof of their good faith, Defendants maintain that the use of a Juvenile Court Petition to obtain an arrest video was not unprecedented and so their use of it in this case did not single out Frampton.[311] According to Defendants, a similar situation occurred in July of 2020 where BRPD wanted to publicly release video footage of a juvenile's arrest to address public outcry resulting from the release of cell phone video which depicted police restraint used during a juvenile's arrest.[312] At that time, the City/Parish filed a petition similar to the Juvenile Court Petition at issue in this case in order to comply with La. Child. Code art. 412 and legally release portions of body camera footage to the public depicting an arrest of a juvenile.[313]

That petition contained the same "In re:" caption as Juvenile Court Petition at issue here

---

[306] Doc. 44 at 3, ¶ 14; id at 7, ¶ 34.
[307] Doc. 41 at 9, ¶ 49; see also Doc. 44 at 2, ¶¶ 5, 6 and 9.
[308] Doc. 41 at 9, ¶ 49; Doc. 44 at 6–7, ¶ 34.
[309] Doc. 41 at 7, ¶ 37; see also Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 4.
[310] Doc. 41 at 7, ¶ 39, citing Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶¶ 5–7.
[311] Id. at 6, ¶¶ 29–30, citing Doc. 38, Transcript at 80–81.
[312] Id.
[313] Id.

and was not filed in a specific juvenile case.[314] The order contained in the July 2020 petition was granted by the Juvenile Court on July 13, 2020.[315] Defendants maintain that, based on this prior experience, the City/Parish filed the Juvenile Court Petition in this case before the May 28, 2021 press conference, seeking an order to publicly release specified redacted clips from the body camera footage.[316] Furthermore, Defendants claim that, in the past, the City/Parish has "regularly" resisted requests for juvenile body camera footage on the basis of Children's Code Article 412.[317] Defendants also direct the Court to emails and testimony of City/Parish lawyer Deelee Morris wherein she advised Frampton of his need to comply with Article 412 in order to gain the release of the juvenile records.[318]

### g. No Bad Faith - Prior Knowledge Of City/Parish Of Frampton's Possession Of BRPD Video

Defendants do not dispute Frampton's allegation that he made City/Parish lawyers aware during the March 2021 settlement negotiations of Green's civil suit that he had possession of the BRPD Video footage. Defendants argue, however, that "there is no evidence that shows that the Litigation Division of the Parish Attorney's Office was informed (1) that Mr. Frampton was improperly in possession of a video of a juvenile arrest or (2) of his intent to publicly disclose portions of juvenile arrest."[319] They maintain that "[a]t the time the Juvenile Petition was filed, the City/Parish did not know how Mr. Frampton obtained the body camera footage."[320]

Drawing further distinction between groups of lawyers in the City/Parish attorney's office, Defendants argue "[t]here is no evidence to show that the Legal Division of the Baton

---

[314] Id., ¶ 31, citing Doc. 38, Transcript at 81–82.
[315] Doc. 41 at 7, ¶ 32, citing Doc. 38, Transcript at 81.
[316] Id., ¶ 33.
[317] Id. at 8, ¶ 41, citing Defendants' Exhibits 3 and 4.
[318] Id. at 5, ¶ 20, citing Doc. 38, Transcript at 91–92 and Defendants' Exhibit 3.
[319] Doc. 44 at 1, ¶ 2. See also Doc 41 at 3, ¶ 11.
[320] Doc. 44 at 3, ¶ 11; Doc. 41 at 10, ¶ 51.

Rouge Police Department had knowledge of his possession of the videos prior to May 27, 2021."[321]

### h. No Bad Faith – Why Frampton Is The Only One Against Whom Sanctions Sought

Defendants argue that Frampton is the first party against whom sanctions for violating Art. 412 have been sought because he is the first person they became aware of who committed this violation.[322]    According to Defendants, no negative inference should be drawn from the City/Parish's failure to seek contempt sanctions from others who, like Frampton, acquired the Video without a Juvenile Court order because "it is not required by law to file for contempt on any and all parties that it subsequently learned exchanged or released the video in violation of Art. 412 in order to establish its good faith."[323]

In addition, the City/Parish's failure to file a Contempt Motion against others for violations of Art. 412 does not establish bad faith because

> [the City/Parish] can reasonably rely on the Juvenile Court's capability to address these circumstances, provide judicial guidance on prior and post reproduction of confidential records stemming from Mr. Frampton's public release, and *sua sponte* set a Rule to Show Cause on other parties if deemed necessary, based on the facts presented during the Rule to Show Cause hearing against Mr. Frampton.[324]

### i. No Bad Faith – Why Defendants Fail To Withdraw Contempt Motion

Defendants justify their refusal to withdraw the Contempt Motion once they learned on or about June 2, 2021 that Frampton had released the BRPD Video "with the consent of and the

---

[321] Doc. 44 at 2, ¶ 3.
[322] Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6.
[323] Doc. 41 at 10, ¶ 52.
[324] *Id.*, ¶ 53.

behest of all the concerned members of the Green Family"[325] as follows: "the letter [from Frampton's counsel] did not contain any information that disputed Mr. Frampton's public release of the video in violation of Art. 412. Nor did the correspondence change the City/Parish's interpretation of Art. 412. Thus, the City/Parish had no basis to withdraw its petition."[326]

> ### j.   No Bad Faith - Defendants' Failure To Follow Requirements Of Art 412 In This Case

Defendants explain that because the Juvenile Court Petition was "filed under the general provision of Art. 412(A), relying on the general authority of the Court, not Art. 412(E)…there were no form, service, or hearing requirements for the portion of the petition seeking release of the videos."[327] Thus, no bad faith or retaliatory motive can be inferred and abstention under *Younger* is proper and required.[328]

## B.   Has Plaintiff Satisfied His Burden For The Issuance Of A Preliminary Injunction?

### 1. Has Plaintiff Shown A Probability Of Success On The Merits?

#### a.   Plaintiff's Position

For reasons which mirror Plaintiff's arguments on the applicability *vel non* of the bad faith exception to *Younger*, Plaintiff argues he has a high probability of success on the merits.[329]

#### b.   Defendants' Position

Defendants' position regarding likelihood of success on the merits depends largely on their arguments regarding the applicability of Art. 412 to the facts of this case.[330] These have

---

[325] Plaintiff's Exhibit 9, ACLU Letter.
[326] Doc. 44 at 3, ¶ 15.
[327] *Id.* at 2, ¶ 8.
[328] Doc. 41 at 10, ¶ 54.
[329] Doc. 42 at 20–34, ¶¶ 84–140.
[330] Doc. 41 at 11–16, ¶¶ 57–86.

already been summarized in connection with the issue of the bad faith exception to *Younger* and will not be repeated here.

### *2. Has Plaintiff Shown A Significant Threat Of Irreparable Injury?*

#### *a. Plaintiff's Position*

Regarding the threat of irreparable injury, Plaintiff argues that when an "alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."[331] Because the Contempt Motion carries a potential threat of imprisonment under Children's Code art. 1509, Frampton argues that "freedom from imprisonment—from government custody, detention, and other forms of physical restraint—'lies at the heart of the liberty that [the Due Process] Clause protects.'"[332] Plaintiff argues that this potential for imprisonment represents a substantial threat of irreparable injury.

In addition, a finding of contempt could have negative implications for Frampton's employment at the University of Virginia Law School and his license to practice law. Furthermore, because Frampton is not a resident of Louisiana, he would have to purchase a ticket and fly back to Louisiana for the Juvenile Court hearing – "an additional cost and an additional risk during a pandemic."[333]

Plaintiff argues that the threat of jail time, a fine, and the potential exposure to disease "chills Prof. Frampton's and his clients' speech pointing the Court to the Supreme Court's language that '[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions. . . .' "[334]

---

[331] Doc. 42 at 34, ¶ 142, quoting 11A Wright & Miller, Federal Practice & Procedure, § 2948.1.
[332] *Id.*, quoting *Zadvydas v. Davis*, 533 U.S. 678 (2001); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").
[333] *Id.* at 35, ¶ 144.
[334] *Id.*, ¶ 145, quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963).

56

### b. *Defendants' Position*

While Plaintiff argues he will suffer irreparable injury as result of the hearing on the Rule to Show Cause because a finding of contempt may result in sanctions including possible imprisonment, Defendants assert there is no evidence that proceeding with the hearing itself on the Rule to Show Cause will cause a substantial threat of irreparable injury.[335] As to the cost and inconvenience of traveling to Louisiana, the hearing can be conducted by Zoom to afford all non-local parties an opportunity to attend without travel.[336]

Defendants insist that Plaintiff has offered no evidence to show that the Juvenile Court judge cannot make a fair and impartial a ruling in this matter.[337] Furthermore, the hearing will not result in any penalties or punishment if the allegations in the Contempt Motion are without merit.[338] Because the hearing is closed and confidential, no publicity will result from proceeding with the hearing.[339]

According to Defendants, Plaintiff's claim that he will suffer a substantial likelihood of harm through penalties under Art. 1509 contradicts his argument that Defendants have brought the Contempt Motion in bad faith because Art. 412 does not apply.[340] "[I]f the plaintiff's interpretation of Art. 412 is correct, the penalties of Art. 1509 are substantially not likely to happen."[341] Furthermore, if found in contempt "he has the right to file a writ or suspensive appeal to the appropriate jurisdiction(s) to have a higher court review the Juvenile Court findings."[342] Accordingly, Plaintiff has failed to establish he will suffer a substantial threat of irreparable harm

---

[335] Doc. 41 at 16, ¶¶ 87–88.
[336] *Id.*, ¶ 89.
[337] *Id.*, ¶ 91.
[338] *Id.*, ¶ 92.
[339] *Id.*, ¶ 90.
[340] *Id.*, ¶ 93.
[341] Doc. 41 at 16, ¶ 94.
[342] *Id.*, ¶ 95.

if the hearing on the Rule to Show Cause is held.

### 3. Does The Threatened Injury Of The Injunction Outweigh The Harm That Will Result If The Injunction Is Granted?

#### a.  Plaintiff's Position

Plaintiff contends that, under this prong, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[343] Here, Frampton argues that he faces potential jail time, and certain financial cost if Defendants' counsel moves forward with their course of action. On the other hand, the practical burden on Defendants would be extremely slight: Ms. Morris testified that it "would be a simple task without great expense for the City Parish, if it were ordered to do so, to withdraw its petition for contempt against Professor Frampton" and "could likely be done in a one-page filing."[344]

At the August 6, 2021, hearing, Defendants offered no evidence to show they would suffer an injury were the preliminary injunction to be granted. However, in briefing, they argue that granting the preliminary injunction might set "a precedent that certain juvenile arrest records are not confidential, [and then] volumes of law enforcement and prosecutorial files will be subject to public records requests and those previously protected under Art. 412 will potentially be subject to unwanted publicity that could greatly impact their future welfare."[345]

Plaintiff contends this not a real problem, for three reasons. First, Article 412 concerns records related to juvenile court proceedings and because there have been no juvenile court proceedings in this matter, "the statute plainly does not apply."[346] Second, Plaintiff maintains he

---

[343] Doc. 42 at 35, ¶ 150, quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).
[344] *Id.* at 36, ¶¶ 151–152, citing Doc. 38, Transcript at 80, 79.
[345] *Id.*, ¶ 153, citing Doc. 14-1 at 18.
[346] *Id.*, citing Art. 412(A) ("Records and reports concerning all matters or proceedings *before* the juvenile court.") (emphasis added).

is not asking this Court to rule that all youth arrests or "custodial agreements" are subject to La. Child. Code art. 412; rather, this case is about whether Defendants are properly pursuing a contempt action against Frampton on the facts of this case.[347]

Finally, Plaintiff insists that nothing in this Court's opinion would affect whether custodial agreements become subject to Louisiana Public Records Law. Indeed, Defendants note that the "mandatory confidentiality and enforcement provisions of Art. 412 are separate and distinct from the law concerning public records."[348] Because the Louisiana Public Records Law does not rely primarily on Art. 412 to avoid inappropriate disclosure (it incorporates by reference to thirty-seven separate code articles of the Children's Code as exceptions to the Public Records Law), "Defendants' floodgates arguments are unavailing" and the balance of competing claims of injury weighs in Frampton's favor.[349]

### b. Defendants' Position

Defendant counters that "[i]mpeding the Juvenile Court from addressing potential violations of the provisions of Art. 412 will impact the procedural posture of this civil action."[350] Furthermore, "[b]oth parties are best served by having the Juvenile Court interpret the applicability of the Louisiana Children's Code based on its knowledge and experience in this specialized practice of State law."[351]

Defendants next argue that, in the absence of a decision in the Juvenile Court, it will be "difficult to determine the relevant issues and law to necessary to support or defend the plaintiff's First Amendment retaliation claim against the City/Parish defendants."[352] By failing to abstain,

---

[347] Id., ¶ 155.
[348] Doc. 42 at 37, ¶ 156, citing Doc. 14-1 at 13.
[349] Id., ¶¶ 156–157.
[350] Doc. 41 at 17, ¶ 98.
[351] Id., ¶ 99.
[352] Id., ¶ 100.

this Court would "usurp[ ] the Juvenile Court's jurisdiction" and allow and encourage forum shopping.[353]

For these reasons, Defendants argue that the potential harm of enjoining the Contempt Motion outweighs the potential harm of allowing the Juvenile Court to rule.

### 4. Will The Grant Of The Injunction Disserve The Public Interest?

#### a. Plaintiff's Position

As to the final prong of preliminary injunction analysis, whether the public interest supports the issuance of an injunction, Plaintiff argues it does because, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."[354] In this case specifically there is a strong public interest in preventing Defendants from a retaliatory course of action that would serve to chill the speech of any who seek to speak out against BRPD.[355]

Plaintiff maintains that, given Defendants' stated position that a wide range of public and private actors have committed the same violation as Frampton, permitting Defendants to proceed with the Contempt Motion would place a wide range of persons engaged in completely proper behavior at risk for arrest and imprisonment.[356] Plaintiff uses, as an example, evidence of the Clerk of this Court, simply doing his job of sharing a public, non-sealed document, shared a copy of the Video.[357] City/Parish counsel suggested at the hearing that, depending on how the Frampton matter went, Defendants might seek sanctions against a range of actors including this Court's Clerk.[358] Plaintiff urges that preventing such a scenario supports Plaintiff's position that

---

[353] Id., ¶ 101.
[354] Doc. 42 at 37, ¶ 159, quoting Simms v. District of Columbia, 872 F. Supp. 2d 90, 105 (D.C. Cir. 2012) (collecting cases).
[355] Id., ¶ 160.
[356] Id. at 37–38, ¶ 161.
[357] Id. at 38, ¶ 162, citing Doc. 38, Transcript at 49; Plaintiff's Exhibit 13, Receipt from Clerk of Court.
[358] Id., ¶ 163, quoting Doc. 38, Transcript at 104.

the public interest weighs in favor of an injunction.

### b. Defendants' Position

Not surprisingly, Defendants disagree. They argue that "[b]y setting a precedent that certain juvenile arrest records are not confidential, volumes of previously deemed confidential law enforcement and prosecutorial files will be subject to public records requests and will potentially be subject to unwanted publicity that could greatly impact a juvenile's future welfare."[359] This would allow "persons who do not have juveniles' best interests in mind to obtain arrest records" and avoid Art. 412's protection.[360]

Defendants give, by way of example, a juvenile who is "(1) legally arrested on charges, such LSA-R.S. 14:98 (operating a vehicle while intoxicated), (2) issued a custodial agreement and (3) submitted to pre-trial diversion in exchange for dismissal of charges prior to filing a Petition . . . would have no recourse to protect potentially embarrassing body camera footage from being publicized on social media platforms by classmates, bullies, etc."[361]

Defendants conclude that, "[b]ecause the confidentiality provisions of Art. 412 must be liberally construed in favor of a child's welfare, the public is best served by having the Juvenile Court interpret and uphold the applicability of the Louisiana Children's Code."[362]

## VII.  DISCUSSION

### A.  Motion To Dismiss

#### 1. Does Younger Apply To A State Contempt Proceeding?

Plaintiff argues that "*Younger* is no bar here…" because "the proceeding against Prof.

---

[359] Doc. 41 at 17–18, ¶ 103.
[360] *Id*. at 18, ¶ 104.
[361] *Id.,* ¶ 105.
[362] *Id*., ¶ 108.

Frampton is not yet a criminal proceeding."[363] The Court disagrees. First, the Contempt Motion meets the three basic requirements for *Younger* abstention: "(1) the exercise of federal jurisdiction would interfere with an ongoing state judicial proceeding; (2) the state proceeding implicates important state interests; and (3) the state proceeding affords an adequate opportunity to raise constitutional challenges."[364]

Furthermore, the Supreme Court has specifically held that state contempt proceedings are subject to the *Younger* abstention doctrine[365] and the Fifth Circuit has recently reiterated this principle.[366] The Court therefore rejects Plaintiff's argument and finds that *Younger* applies to this kind of case.

### 2. Test For Application Of Bad Faith Exception To Younger

The serious question here is not whether *Younger* abstention applies to state contempt proceedings but whether *Younger* should apply to *this* contempt proceeding? Or stated another way, does the bad faith exception to *Younger* abstention apply in this case?

As stated earlier, to establish a bad faith or retaliatory motive, Plaintiff must prove:

> first, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.[367]

[363] Doc. 42 at 38–39, ¶ 166.
[364] *Ramelli v. Zahn*, No. 20-1482, 2020 WL 3971279, at *6 (E.D. La. July 14, 2020) (citing *Bice v. La. Pub. Def. Bd.*, 677 F.3d 712, 716 (5th Cir. 2012).
[365] *Juidice v. Vail*, 430 U.S. 327, 335 (1977) ("[Abstention] principles apply to a case in which the State's contempt process is involved."); *see also Asher v. A.G. Edwards & Sons, Inc.*, 272 F. A'pp'x 357, 358 (5th Cir. 2008) ("In *Juidice v. Vail*, the Supreme Court extended the *Younger* abstention doctrine to state court contempt proceedings. 430 U.S. [at 338.]").
[366] *Kolwe*, 858 F. App'x at 132.
[367] *Wilson v. Thompson*, 593 F.2d 1375, 1387 (5th Cir. 1979).

The Fifth Circuit has clarified the phrase "in part" to mean that a defendant's desire to retaliate against or deter constitutionally protected conduct must have been a *major* motivating factor in bringing the action.[368]

Relevant to the third prong of the *Wilson* test, the State's burden to show it would have reached the decision to prosecute in the absence of the desire to retaliate, is "whether the State prosecution was undertaken with no hope of a valid conviction and the significance of the alleged criminal activity."[369]

### 3. Was Frampton Engaged In Exercising A Constitutionally Protected Right?

The first prong of the bad faith exception test is whether Frampton was engaged in a constitutionally protected right when he issued the press release critical of BRPD and shared the BRPD Video on a media platform which allegedly supported that criticism. This prong is easily met as this represents a classic example of exercising the right of free speech.[370]  Defendants do not seriously argue otherwise.

### 4. Has Plaintiff Proved That A Major Motivating Factor In Filing The Contempt Motion Was To Retaliate?

The second prong of the test requires Plaintiff to establish that a "major factor" motivating the City/Parish's Contempt Motion was its desire to retaliate against Frampton for his

---

[368] *Smith v. Hightower*, 693 F.2d 359, 367 (5th Cir. 1982). ("In stating that the plaintiff must prove retaliation exists before a preliminary injunction will be granted, the *Wilson* Court contemplated that the plaintiff must prove retaliation was a major motivating factor and played a prominent role in the decision to prosecute."). *See also Ramelli*, 2020 WL 3971279, at *7.

[369] *Wilson*, 593 F.2d at 1387, n.22 (internal citations omitted). *See also Gates v. Strain*, 885 F.3d 874, 881 (5th Cir. 2018) ("A prosecution is taken in bad faith if state officials proceed 'without hope of obtaining a valid conviction.' "), quoting *Perez*, 401 U.S. at 85; *see also Ramelli*, 2020 WL 3971279, at *9.

[370] *Fitzgerald v. Peek*, 636 F.2d 943 (5th Cir. 1981) (upholding district court's injunction under bad faith exception to *Younger* which "enjoin[ed] state court prosecution allegedly brought in bad faith for purposes of harassing and punishing plaintiffs for having exercised their first amendment rights in criticizing certain public officials in DeKalb County.").

posting the press release and Video on the media platform. This, indeed, is the primary factual issue in this case and is critical to the Motion to Dismiss since it governs the applicability of the bad faith exception to *Younger*. In addition, it informs to one degree or another each of the four prongs the Court must consider in deciding the *Motion for Preliminary Injunction*.

Was the motivation and intent, as the City/Parish urges, merely an innocent effort to punish Frampton for failing to gain permission of the Juvenile Court before releasing BRPD onto his social media platform? Or was it, as Plaintiff contends, a bad faith retaliation against him for issuing a press release and Video critical of BRPD after the conduct of BRPD officers in the matter had already been harshly criticized by a federal judge? The Court finds the overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light.

Many, if not most, of the facts in this case are not contested and are set out in the section entitled Background Facts and Procedural History. The Court adopts and incorporates those facts here although some of these facts will be repeated for context. First, it is undisputed that months before the City/Parish filed the Juvenile Court Petition and Contempt Motion, BRPD itself released the Video (which included the search and arrest of F.B.) to the United States Attorney without requesting or obtaining the permission of the Juvenile Court and without placing any warnings on the Video or placing any restriction on its use or dissemination.[371] It is undisputed that there was no City/Parish or BRPD policy or procedure which required it to do either.[372]

It is undisputed that at some time before the November 20, 2020 Motion to Suppress hearing (some six months before the City/Parish filed the Juvenile Court Petition and Contempt Motion) the United States provided the BRPD Video to Green's attorney Mark Upton, the Federal

---

[371] Doc. 38, Transcript at 98–100.
[372] *Id*. at 99–100.

Public Defender, and did so without warnings or restrictions of any kind.[373] It is undisputed that at least by November 20, 2020, the BRPD Video in question was entered into evidence and the public record of Green's criminal proceeding and that it was so entered without anyone asking for permission of the Juvenile Court, without being filed under seal or being marked confidential, and without restrictions of any kind being placed on its use or further dissemination.[374]

It is undisputed that Green's criminal defense lawyer, the Federal Public Defender, with his client's permission, provided a copy of the BRPD Video to the Green family's civil attorney Frampton, without requesting permission and without restriction.[375] It is undisputed that by January 21, 2021 (some four months before the City/Parish filed the Contempt Motion), the Baton Rouge Advocate acquired a copy of the Video, probably from the Clerk of this Court again, without requesting permission of the Juvenile Court or placing restrictions.[376] An article in the Advocate which described parts of the Video was published on January 12, 2021.[377]

It is undisputed that in March of 2021, during settlement negotiations of Green's civil case, Frampton made the City/Parish attorneys aware of the fact that he possessed a copy of the Video.[378] By March 25, 2021, the City/Parish knew that Frampton did not get the Video by way of his subpoena request to the City/Parish since that request was withdrawn on that date.[379] City/Parish lawyers voiced no question or concern regarding Frampton's possession of the Video nor were they concerned enough to inquire or investigate how he obtained it.[380]

City/Parish attorney Deelee Morris claimed in her testimony before this Court that she

---

[373] *Id*. at 100.

[374] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La.), Motion to Suppress, Docs. 12, and Exhibit Log for Motion to Suppress Hearing, Doc. 26; Doc. 38, Transcript at 20.

[375] Doc. 38, Transcript at 41.

[376] Appendix 1 to this ruling.

[377] Plaintiff's Exhibit 5, Advocate article.

[378] Doc. 38, Transcript at 34–35.

[379] Defendants' Exhibit 3.

[380] Doc. 38, Transcript at 35–36.

was unaware of the November 20, 2020, Green Motion to Suppress hearing at which the Video

was made a part of the public record in that case.

> Q.    And in Clarence Green's federal criminal case, there was a
>        motion to suppress hearing, correct?
>
> A.    I can't really confirm that. I believe that is the case. But I
>        didn't have any participation in that matter, so I really don't
>        want to comment on anything that I'm fully aware of (*sic*).
>
> Q.    Are you aware that video footage of Clarence Green and the
>        juvenile FB was entered into the record of this court at that
>        hearing?
>
> A.    I have been told that, but *I have not requested any record*
>        and I've not seen any record, so I can't say for certain that
>        it's in the record or have - -
>
> Q.    So your - - I'm sorry.
>
> A.    *Or have the record*.
>
> Q.    So your office hasn't gone to check?
>
> A.    No.[381]

Ms. Morris' sworn testimony is directly contradicted by the record in *U.S. v. Green*

which shows that, on January 6, 2021, over four months before the Contempt Motion, Deelee

Morris herself requested the transcript of the Motion to Suppress hearing.[382] In those intervening

months, the City/Parish took no action against the BRPD, the Assistant U.S. Attorney or the

Assistant Federal Public Defender for making the Video public without getting Juvenile Court

permission. It was only on the morning after Frampton issued a press release critical of BRPD's

handling of the minor's arrest, supported by the BRPD Video, that the City/Parish filed its

---

[381] Doc. 38, Transcript at 64 (emphasis added). *See also* Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 8 ("I had no knowledge, until recently . . ., that the body camera footage at issue was filed in the public record of this Court.").

[382] *United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Jan. 6, 2021), Transcript Request by Deelee Morris, Doc. 38.

Contempt Motion and then, only against Frampton.

In attempting to explain why it didn't move earlier to sanction Frampton, the City/Parish argues that it "didn't know how Mr. Frampton obtained the body camera footage."[383]  But this explanation also rings hollow because, once the Video and story critical of BRPD aired, City Parish lawyers didn't bother to contact Frampton to find how he had obtained the Video before immediately (the morning after the press release) filing its motion to hold him in contempt. To accuse a lawyer of wrongful conduct sufficient to subject him to a finding of contempt of court and sanctions as serious as jail time requires the filing lawyer to have a belief "formed after reasonable inquiry" that "the pleading is not being presented for any improper purpose" and "has evidentiary support."[384]  Indeed, this is a lawyer's obligation before signing and filing any pleading.[385]  No such reasonable inquiry was made.

Had the City/Parish lawyers made reasonable inquiry before filing the Contempt Motion, they would have found that Frampton got the Video from his client via his client's criminal defense lawyer, who got it from the U.S. Attorney, who got it from BRPD. They would also have discovered that the Video had been in the hands of the Baton Rouge Advocate newspaper for months. If Morris read the transcript of the Motion to Suppress hearing that she ordered, she already knew that the Video was a public record in this Court, having been introduced and played at the hearing, and that the Video was available to anyone who requested it.

Not only was reasonable inquiry not made before filing the Contempt Motion, but, in addition, the City/Parish failed to give the minor (whose interests it claims to be protecting) or the minor's lawyer (Frampton), notice and an opportunity to be heard before asking the Juvenile

---

[383] Doc. 41 at 10, ¶ 51.
[384] La. Code Civ. Proc. art. 863 (B)(1) and (3).
[385] *Id.*

Court Judge to sign the show cause order *ex parte*. This failure occurred despite the fact that Art. 412(E)(3) of the Children's Code requires both.[386]

Defendants attempt to justify their failure to abide by the requirements of Art. 412(E) by contending the Petition was "filed under the general provision of Art. 412(A), relying on the general authority of the Court, not Art. 412(E)."[387] Thus, argue Defendants, "there were no form, service, or hearing requirements for the portion of the petition seeking release of the videos."[388] Defendants cite no authority for this proposition which flies in the face of La. Child. Code art. 102 upon which they rely.[389] Art. 102 states in pertinent part that the terms and provisions of the Code "shall be liberally construed to the end that each child and each parent coming within the jurisdiction of the court shall be accorded due process…" Assuming that the Children's Code required at this point the Juvenile Court's permission to show the Video (which the Court addresses later in this ruling), circumventing the requirement of Art. 412(E) that the parent, child (and their attorney) be given notice and an opportunity to be heard, hardly comports with due process.

Defendants attempt to justify their failure to give notice by arguing that this failure was driven "by the urgent need to address the public's concern of the situation."[390] Defendants offered no evidence to support its conclusory allegation made in the Juvenile Court Petition and in briefing that the "substantial amount of negative correspondence from the public" as a result of the broadcast led to a "potential for civil unrest."[391]

But assuming arguendo there was such an urgent need, and assuming further that the

---

[386] "In ruling on the petition [for the release of records]…[t]he court shall ensure the juvenile is afforded notice of the hearing and an opportunity to be heard at a contradictory hearing on the petition." La. Child. Code art. 412 (E)(3).
[387] Doc. 44 at 2, ¶ 8.
[388] *Id*.
[389] Doc. 41 at 12, ¶ 64.
[390] Doc. 41 at 9, ¶ 49,
[391] Plaintiff's Exhibit 7, Rule to Show Cause at ¶¶ 4–5.

Children's Code required at this point the Juvenile Court's permission to show the Video (which the Court addresses later in this ruling), there was certainly no urgency connected to the Contempt Motion.  Indeed, City/Parish attorney Morris admitted that the so-called "urgent need" to address the "negative correspondence" being received by the City/Parish had nothing to do with Frampton.[392] Yet, the City/Parish does not attempt to explain why its lawyers made no effort to find out the circumstances of Frampton's acquisition and dissemination of the Video before filing the Contempt Motion. Remarkably and tellingly, City/Parish Attorney Morris states in her affidavit that she included the Contempt Motion in the Petition, "for sake of efficiency."[393]

Defendants argue that, even had they known where and how Frampton got the Video, they would have pursued sanctions anyway. Indeed, they have continued to pursue the Contempt Motion after being advised that Frampton's acquired of the Video from the Assistant Federal Public Defender when it was already a public record and after being advised of the circumstances of its release by Frampton to the media (i.e., at the Green's family's "request and with their express blessing . . . as the best way to actually get some accountability with respect to what happened on January 1st."[394]).[395]

Defendants claim this pursuit of sanctions is motivated not by retaliation but is based on its interpretation of the Children's Code. The Defendants' position is belied, however, not only by the circumstances and timing of its filing of the Contempt Motion but by its conduct both before and after the Contempt Motion was filed. First, Defendants admit that Frampton is the only person the City/Parish has ever attempted to sanction under this provision of the Children's

---

[392] Doc. 38, Transcript at 86–88; Doc. 41 at 9, ¶ 49.
[393] Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 3.
[394] Doc. 38, Transcript at 38; *see also* Plaintiff's Exhibit 9, ACLU Letter (stating Frampton released video "at the behest of and with the consent of all concerned members of the Green Family.").
[395] Doc. 44 at 3, ¶ 15.

Code. They claim this is because "this is the first time the Parish Attorney's Office encountered what appears to be an unauthorized release of juvenile investigation materials [and] accordingly, this is the first time that the Parish Attorney's Office has filed a rule for contempt in Juvenile Court to put the question to the test."[396] But this explanation is flatly contradicted by the fact that it was the City/Parish itself, through BRPD, that released the Video in the first place and did so without seeking an order from the Juvenile Court and did not follow the requirements for marking the Video with warnings regarding dissemination.[397]

If the position the City/Parish now takes regarding Art. 412 was genuine and not an *ex post facto* attempt to justify its Contempt Motion, the Court would have expected there to be a mechanism or procedure in place at BRPD to ensure that permission from the Juvenile Court would be sought and received before releasing materials like the Video. In addition, the Court would have expected a procedure or mechanism in place to ensure that juvenile materials would be properly marked[398] before releasing the Video. There were no such mechanisms or procedures in place, although City/Parish lawyer Morris now takes the position that there should have been.[399]

If the position the City/Parish now takes regarding Art. 412 and its Contempt Motion was genuine and not merely a convenient vehicle by which to punish Frampton for releasing the negative press release and Video, the Court would have expected the City/Parish to express some concern or at least make inquiry when it learned in March of 2020 that Frampton had the Video

---

[396] Plaintiff's Exhibit 12 at 5, Defendants' Answer to Interrogatory No. 6.

[397] La. Child. Code art. 412(E)(2)(a) requires service on the juvenile and his attorney and 412(E)(3) requires that "[t]he court shall ensure the juvenile is afforded notice of the hearing and an opportunity to be heard at a contradictory hearing. . . ."

[398] La. Child. Code art. 412(L) requires that the records be marked "UNLAWFUL DISSEMINATION OF THIS INFORMATION IS PUNISHABLE AS A CONSTRUCTIVE CONTEMP OF COURT PURSUANT TO LOUISIANA CHILDREN'S CODE ARTICLE 1509(E)."

[399] Doc. 38 Trial, Transcript at 99, 101–102.

and had not obtained it through his request to the City/Parish. It did neither.

In addition, if the real motivation of the City/Parish was to protect the juvenile's privacy and enforce the Children's Code, as it alleges, the Court would have expected the City/Parish to take action against whoever at BRPD first released the Video. Yet, no action of any kind (let alone a contempt motion) has ever been taken against BRPD or its personnel for releasing the Video in a manner which the City/Parish now argues violated the Children's Code and for which they seek sanctions against Frampton. The hypocrisy of the City/Parish's position is astounding.

If the position the City/Parish now takes regarding Art. 412 was genuine and not merely a convenient way to punish Frampton for releasing the negative press release and Video, the Court would have expected the City/Parish itself to strictly apply the rules for which they are now attempting to sanction Frampton for not following. Yet, not only has Plaintiff demonstrated at least one occasion in the past where the City/Parish released a juvenile's records without marking it with the required warnings against dissemination,[400] Plaintiff also proved that, *in this case*, the City/Parish twice released F.B.'s records or Video without first getting permission of the Juvenile Court: first, when BRPD released the Video to the U.S. Attorney without markings or restrictions[401] and second, when City/Parish attorney Joseph Scott released F.B.'s records in discovery without first requesting permission of the Juvenile Court.[402] No sanctions were sought against BRPD[403] or Scott.[404]

Defendants' position at the hearing and in briefing is that not only did BRPD officials

---

[400] Plaintiff's Exhibit 18, Declaration of James W. Craig.
[401] Doc. 38, Transcript at 103.
[402] *See* Plaintiff's Exhibits 15 and 17; Doc. 38, Transcript at 108–109. Permission was retroactively sought the following day. *Id*.
[403] Doc. 38, Transcript at 102–104.
[404] Doc. 38, Transcript at 52–55. It is also noteworthy that F.B.'s records supplied in discovery without Juvenile Court permission, "were not redacted very well. You could see FB's full name in those documents. There was other identifying information." *Id*. at 53.

violate Art. 412 but so did the Clerk of the United States District Court for the Middle District of Louisiana, an Assistant United States Attorney from the Middle District, an Assistant Federal Public Defender of this District, Clarence Green and whoever gave the Video to reporters for the Baton Rouge Advocate.[405] Yet, it is only Frampton who has been accused of contempt.

When asked by the Court to explain why only Frampton and not the others were the subject of a contempt motion, City/Parish Attorney Morris responded as follows:

> Q.    Now, Ms. Morris, why hasn't the City Parish pursued sanctions against any of those people? You just said they violated it just like Mr. Frampton did. Why didn't they pursue the sanctions – the same sanctions they are pursuing against Mr. Frampton?
>
> A.    Well, I did reach out to the U.S. Attorney's Office to start mitigating the issue and getting it filed under seal –
>
> Q.    That's not the question I'm asking. I'm not asking about mitigation. I'm asking why you didn't pursue sanctions, like you did with Mr. Frampton, against all of those people you just told me, in your view, violated the Children's Code.
>
> A.    Well, at the time that I filed the rule to show cause, I didn't know –
>
> Q.    Ma'am, that's not the question. You know now, though, do you not?
>
> A.    Yes.
>
> Q.    So my question stands. Why haven't you pursued sanctions against the U.S. Attorney, the Federal Public Defender, the Clerk of Court, and Mr. Green?
>
> A.     I don't know. Honestly, I mean, I think that we're trying to resolve this matter, and then after that I will resolve all of that.[406]

---

[405] At the time of the hearing, it was not clear how the reporters from the Advocate obtained a copy of the Video. Since then, the Court has determined that the reporters requested, paid for and were sent a copy of the Video by this Court's Clerk. *See* Appendix 1 to this ruling.

[406] Doc. 38, Transcript at 103–104.

Morris' testimony that, even as of the time of the hearing, she "didn't know" why only Frampton was pursued for contempt although others allegedly committed identical violations of Art. 412, is further proof that the purpose of the Contempt Motion was harassment and retaliation against Frampton. Even if you credit what appears to be the witness's afterthought that the City/Parish is waiting to see what happens in this case before "resolv[ing] all of that"[407] (suggesting it may pursue the Middle District Clerk, Assistant U.S. Attorney, Assistant Federal Public Defender and others), this merely highlights the absurdity of Defendants' position and strengthens this Court's conclusion that retaliation was the true motivation and driving force of the City/Parish's Contempt Motion.[408]

In their briefing, Defendants add this additional explanation for not pursuing these other alleged wrongdoers: "The City/Parish is not required to file for contempt on any and all parties that it subsequently learned exchanged or released the video in violation of Art. 412 to establish its good faith in proceeding in this matter."[409] It is certainly true that a prosecutor generally has broad discretion regarding who to charge and for what crime.[410] But this discretion does not allow a prosecutor to bring an action against an individual as retaliation for exercising a constitutional right.[411] And in this case, of all those who the City/Parish claims violated Art 412, the Court finds it strong evidence of bad faith, harassment and retaliatory motive, that the only one the City/Parish sought to sanction was the one who issued a press release critical of BRPD and sought that sanction on the day following the negative release.

---

[407] *Id.* The Court does not credit this testimony.
[408] Although "the threat of multiple or repeated prosecutions is not necessary to establish bad faith prosecution," *Fitzgerald*, 636 F.2d at 944, it is relevant.
[409] Doc. 41 at 10, ¶ 52.
[410] *United States v. Young*, 231 F. Supp. 3d 33, 39 (M.D. La. 2017)  (deGravelles, J.) ("Whether to charge one with a crime and choosing the specific crime with which to charge a given defendant are decisions belonging to the prosecutor. It is an awesome power and grave responsibility, but it is one in which the Government is given very broad discretion.").
[411] *Fitzgerald*, 636 F.2d at 945; *Ramelli*, 2020 WL 3971279, at *10.

Defendants argue that, on at least one prior occasion in July of 2020, the City/Parish sought permission of the Juvenile Court to release juvenile documents under circumstances similar to those here.[412] Plaintiffs countered with evidence of one prior instance in which the City/Parish released juvenile documents without complying with the warnings requirement of Art. 412(E)(3).[413] This evidence, in isolation, is inconclusive on the issue of the City/Parish's motivation in filing a Contempt Motion against Frampton. However, when all the circumstances are considered, the Court concludes that the City/Parish brought its Contempt Motion in bad faith.

The Court's conclusion of bad faith is also supported by Defendants' continued pursuit of sanctions after being advised that a) the Video was already in the public domain at the time Frampton released it, b) it was in the public domain because BRPD put it there, and c) Frampton released it at the direction and with permission of his clients, the Green family, two of whom (including the minor) were the subjects of the Video. Defendants argue that the fact that it was already public is of no moment and support this argument by noting that this is not one of the listed exceptions to Art. 412's mandate.[414] No authority is given for this argument other than an Attorney General's opinion.[415]

The Court is not persuaded. First, the Court is not bound by an Attorney General opinion. Second, the Attorney General Opinion is readily distinguishable. The issue there was whether under the exceptions listed in Art. 412, a district attorney, sheriff or public school system may acknowledge possession of a juvenile's records. Here, the question is whether F.B.'s arrest records lost the protection of Art 412 (if they ever had that protection) when, through a series of releases beginning with BRPD, the records were placed in the public domain. Third, the opinion

---

[412] Doc. 44 at 6, ¶¶ 29–30, citing Doc. 38, Transcript at 80–81.
[413] Plaintiff's Exhibit 18, Declaration of James. W. Craig.
[414] Doc. 41 at 15, ¶¶ 80–84.
[415] Id., ¶ 83, citing La. Atty. Gen. Op. No. 03-0026 (Jan. 30, 2003).

suggests that a parent has the independent authority to release confidential records of the minor. Referring to 20 U.S.C. § 1232g which prohibits a school's release of a minor's records, the opinion states:

> Student records that are personally identifiable with a student are confidential to a *student and his parents* and are therefore excluded from the Public Records Act and are not subject to public inspection or release without the consent and authorization of the affected parties… [A] school may not acknowledge a juvenile discipline record *without prior consent and authorization from the affected parties.*[416]

Here, of course, Frampton released the Video with both the consent of F.B.'s mother and the entire Green family and at their direction.[417]

The City/Parish argues that Plaintiff's proof of bad faith relies only on "circumstantial evidence and conclusory allegations."[418] It is true that no eyewitness testified they overheard the City/Parish lawyers declare their intention to retaliate against Frampton or that these intentions were directly expressed in a document introduced into evidence. However, two points regarding circumstantial evidence are well known. First, circumstantial evidence is to be considered by the fact finder the same as direct evidence. Indeed, this Court routinely instructs juries that "[t]he law makes no distinction between the weights to be given either direct or circumstantial evidence."[419] Second, circumstantial evidence may be sufficient specifically to prove the intent of a party when that is an issue.[420] In many cases where a person's intent or motivation is at issue, circumstantial evidence may be the only available evidence.[421] Here, Plaintiff's allegations are not merely

---

[416] La. Atty. Gen. Op. No. 03-0026 (Jan. 30, 2003) at 1–2, 2003 WL 295600 (emphasis added). *See also* 20 U.S.C. § 1232g.
[417] Doc. 38, Transcript at 38; Plaintiff's Exhibit 9, ACLU Letter.
[418] Doc. 44 at 5, ¶ 27.
[419] Fifth Circuit Pattern Jury Charges, Criminal, (1.08) (Alternate B) (2019).
[420] *See, e.g., United States v. Ismolia*, 100 F.3d 380, 387 (5th Cir. 1996) (in proving fraud, it suffices to show facts and circumstances from which jury could reasonably infer that a defendant knew his conduct was unauthorized and illegal).
[421] *See, e.g., United States v. Willett*, 751 F.3d 335, 339 (5th Cir. 2014) ("Direct evidence of a conspiracy is unnecessary; each element [(including knowledge and intent)] may be inferred from circumstantial evidence. The

75

conclusory as charged by Defendants but are specific and supported by a wealth of evidence.

In conclusion, this evidence strongly supports Plaintiff's position that the City/Parish brought its Contempt Motion against Frampton as retaliation for issuing the press release and Video to the media.

In defending its conduct, Defendants attempt to narrow the question of its bad faith to a single legal question, arguing "[t]he only issue before the Court is whether Art 412 applies in this case, where a delinquency petition has not been filed."[422]  This is hardly the only issue since, even if Defendants interpretation or Art. 412 is correct and the City/Parish pursued its Contempt Motion through a valid statute, the bad faith exception to *Younger* still applies as long as a "major motivating factor" in Defendants' filing the Contempt Motion was to retaliate against Frampton for exercising his right of free speech.

> Where the allegation is that the state proceedings, *though brought under a valid statute*, were instituted in retaliation for or to deter the exercise of constitutionally protected rights, the question of the applicability of the *Younger* exception and that of the existence of a constitutional violation merge: to prove one is to prove the other. [423]

It is true that Plaintiff alleges the City/Parish moved for contempt of a proceeding "they knew did not exist". But this allegation is only one of a number of acts and omissions of Defendants which Frampton argues support his claim of retaliation, some of which have been previously discussed. Therefore, whether Art. 412 applies to the facts of this case is relevant but by no means dispositive of the bad faith issue.

---

conspirators may have a silent and informal agreement. Indeed, the voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances." (cleaned up)).

[422] Doc. 44 at 6, ¶ 32. *See also* Doc. 41 at 9, ¶ 46 where Defendants argue that the Contempt Motion "did not contain any false or disputed factual information, thus the only issue that is present is an interpretation of Art. 412 and its applicability under the facts presented."

[423] *Wilson,* 593 F.2d at 1385, n.17 (emphasis added); *see also Perez v. Ledesma*, 401 U.S. 82, 118 n.11 (1971) (Brennan, J., concurring) ("Bad-faith harassment can, of course, take many forms, including arrests and prosecutions under valid statutes where there is no reasonable hope of a valid conviction"); *Torries*, 111 F. Supp. 2d at 822.

### 5. Is Art. 412 Applicable To The Facts Of This Case?

There are two separate but related issues here. First, does Art. 412(A) apply at all when the juvenile has been given a custodial agreement (i.e., has been arrested) but no petition for delinquency has been filed, i.e., no formal charges have been brought against the minor? Second, even if the answer to the first question is yes, does Art. 412 apply to the specific facts in this case, i.e., where BRPD released the Video to the U.S. Attorney without any restriction, where Frampton acquired the Video from his client's criminal defense lawyer legally and properly, and where Frampton posted the video after it had already become public and with the permission and at the behest his clients, including the minor's mother and guardian, and all of this occurred when no petition or charges had been filed against the minor?

The Court is doubtful that Art. 412(A) applies, as Defendants suggest, in all cases following a minor's arrest, even when no petition has been filed against the minor. But the Court need not resolve this issue since Art. 412 clearly does not apply to the specific facts of this case.

Neither side has directed the Court to controlling Louisiana Supreme Court or even appellate court precedent answering the precise question before the Court.

> When the absence of a controlling high court decision requires us to make an "Erie guess" about Louisiana law, we consider many of the same sources we use when guessing the law of other jurisdictions: decisions and reasoning of the state's courts; general rules of the jurisdiction, such as those governing statutory interpretation; and secondary sources like treatises. *Id*. at 488–89. But Louisiana's "civilian methodology" means the pecking order of those sources is different than it is for a common law state. *Boyett v. Redland Ins. Co*., 741 F.3d 604, 607 (5th Cir. 2014). Louisiana's "Constitution, codes, and statutes" are of paramount importance to its judges. *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003). The doctrine of stare decisis, a creature of common law, is alien to the civilian system. *Boyett*, 741 F.3d at 607. Unlike stare decisis, which can flow from one decision, in the civil system

numerous court decisions must agree on a legal issue to establish jurisprudence constante (French for constant jurisprudence). And even when that consensus exists in the caselaw, it remains only persuasive authority for the Erie guess; "we are not strictly bound" by the decisions of Louisiana's intermediate courts. *Am. Int'l Specialty Lines*, 352 F.3d at 261 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)); see generally Alvin B. Rubin, *Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad*, 48 LA. L. REV. 1369 (1988).[424]

Art. 412(A) states:

A. Records and reports concerning all *matters or proceedings before the juvenile court*, except traffic violations, are confidential and shall not be disclosed except as expressly authorized by this Code. Any person authorized to review or receive confidential information shall preserve its confidentiality unless a court order authorizes them to share with others.[425]

The quoted language was added in a 2003 amendment to Art. 412.  Comments to the added language states "Paragraph A establishes the general principle that records and other case specific information in juvenile court proceedings are confidential and are not to be disclosed to any individual, agency or to the public unless expressly authorized by this Code."[426]  While the term "proceedings" is used, the word "matters" is not.

Although the word "proceeding" is not defined, its meaning is made explicit in Art. 842, which states, "A delinquency proceeding shall be commenced by a petition. The district attorney may file a petition without leave of court. Any person authorized by the court may file a petition if there are reasonable grounds to believe that the child is a delinquent child."[427] Thus, until a petition has been filed, there is no proceeding before the Juvenile Court. The language of Art. 842 is clear and unambiguous. "When a law is clear and unambiguous, it shall be applied as

---

[424] *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co*., 917 F.3d 847, 850–51 (5th Cir. 2019).
[425] La. Child. Code art. 412(A) (emphasis added).
[426] La. Child. Code art. 412, cmt. a (2003).
[427] La. Child. Code art. 842.

written."[428]

Like the term "proceeding", the term "matter" is not defined. However, the 2003 Comments quoted above draw no distinction between proceedings and matters, referring only to "proceedings". In addition, in order for Article 412(A) to apply, the "matter" or "proceeding" must be "*before* the juvenile court"[429] and there is nothing "before" the Court until a petition is filed. According to Defendants' own witness, Courtney Myers-Minor, Chief of the Juvenile Section of the East Baton Rouge District Attorney's Office, the custodial agreement is merely an arrest[430] and does not constitute a charge.

> Q.    [by Mr. Scott]: "So on the basis of that custodial agreement and the report, does the child have a pending charge?
>
> A.    No. The charge does not – I mean, the formal charge does not come until the DA's office files the petition. It's considered an arrest. It's essentially an arrest."[431] ***
>
> Q.    And the petition you're talking about there, that's your charging instrument in Juvenile Court?
>
> A.    Yes. It's the same as a bill of information. We just call it a petition."[432]

Myers-Minor testified that, while the custodial agreement and arrest report are sent to the DA for review, "…the only way that anything would get filed with the Juvenile Court is if the DA's office filed a petition."[433] She agreed that "[n]othing is filed with the Juvenile Court until the DA's office decides to file a petition initiating criminal charges against the minor."

At the time Frampton received and shared the BRPD Video, no petition had been filed

---

[428] *Jorge-Chavelas v. Louisiana Farm Bureau Cas. Ins. Co.*, 917 F.3d at 852 (cleaned up).
[429] La. Child. Code art. 412(A) (emphasis added)
[430] Doc. 38, Transcript at 123.
[431] *Id*. at 125–26.
[432] *Id*. at 124.
[433] *Id*. at 123.

by the DA against F.B., there were no pending charges against him, and nothing had been filed with the Juvenile Court, including the Custodial Agreement, arrest report or BRPD Video. F.B. had not had a detention hearing and was not in detention.

Defendants maintain, however, that an arrest, not a petition, "constitutes a 'matter' and/or 'proceeding' before the Juvenile Court [and] thus all records related to the arrest are protected under Art. 412."[434]  The Court disagrees. Clearly an arrest is not a "proceeding" nor does it initiate a proceeding since Art. 842 is explicit that "[a] delinquency proceeding shall be commenced by a petition."  Neither Plaintiff nor Defendants offered any Louisiana Supreme Court or Court of Appeal decisions directly on point but, under the clear language of the Children's Code and under Louisiana's adult criminal procedure, an arrest does not initiate a criminal prosecution. Thus, as supported by the testimony of the Juvenile Section Chief of the East Baton Rouge District Attorney's office, at the time Frampton received and distributed the BRPD Video, there was neither a proceeding nor a matter *before* the Juvenile Court.

Defendants argue that their position is bolstered by La. Child. Code Art. 102 which requires the Code to be "liberally construed to the end that each child and parent coming within the jurisdiction of the court shall be accorded due process and that each child shall receive, preferably in his own home, the care, guidance and control that will be conducive to his welfare."[435]

The Court fails to see how Art. 102 supports Defendants' position. First, it assumes that the Juvenile Court had jurisdiction at the operative time, which is a question here. But more importantly, the article endorses a policy of ensuring due process for the child and parent. Here, Frampton had acquired the Video legally and ethically and then released the Video with the

---

[434] Doc. 41 at 11, ¶ 59.
[435] *Id.* at 12, ¶ 64, quoting La. Child. Code Art. 102.

permission and "at [the] request" of the mother and guardian of F.B., the minor who was the subject of the Video.[436] Attempting to hold the attorney in contempt under these circumstances (including setting the show cause hearing without prior notice to the child, parent, or lawyer and doing so *ex parte*) hardly seems consistent with due process for the parent, child, or lawyer.

Defendants attempt to liken the situation here to a juvenile who has been presented for a detention hearing and yet, that juvenile's records are not sent to the Juvenile Court.[437] But these two situations are hardly comparable since in the latter, unlike the former, the juvenile is physically before the Juvenile Court.

While Defendants point the Court to Art. 814(D), this article does not support Defendants' position since it seems to envision a child in the physical custody of the Juvenile Court.[438] Such was not the case here. In any event, there is no indication that Art. 814(D) was implicated in this case since there is no evidence in this case that the arresting officers executed and filed an affidavit of probable cause with the Juvenile Court justifying maintaining custody, which is required by this article.

The Court agrees with Plaintiffs that endorsing the Defendants' interpretation of Art. 412(A) could lead to absurd consequences: namely, the kind of situation the Court now has before it. On the other hand, the dire consequences predicted by Defendants should the Court agree with Plaintiff (i.e. that the juvenile's arrest records would be stripped of all privacy protections) is based on a false premise, namely that Art. 412(A) is the only basis for the protection of a juvenile's arrest and related records. As is discussed in more detail elsewhere in this ruling, this

---

[436] Doc. 38, Transcript at 38. *See also* Plaintiff's Exhibit 9, ACLU Letter.
[437] Doc. 44 at 4, ¶¶ 18–21.
[438] La. Child. Code art. 814(D) ("if [the juvenile court] determines that probable cause exists, the child will be held for a continued custody hearing pursuant to Article 819. If the court determines that that probable cause does not exist, the child will be released from custody.").

is not the case.

If, as Defendants maintain, the Video was subject to Art. 412 protection immediately following F.B's arrest, it is no small matter (and no small irony) that BRPD, the part of the City/Parish which now complains so loudly about the Video's public release, was the entity that released the Video in the first place and did so (if its interpretation is correct) while violating Art. 412(A) and, in addition, violating Art. 412(L) which states: "Juvenile records or information from juvenile records disclosed pursuant to this Article shall be marked "UNLAWFUL DISSEMINATION OF THIS INFORMATION IS PUNISHABLE AS A CONSTRUCTIVE CONTEMPT OF COURT PURSUANT TO LOUISIANA CHILDREN'S CODE ARTICLE 1509(E)".

At the time BRPD released the Video and F.B.'s arrest records to the U.S. Attorney, no one, including the City/Parish or BRPD, requested permission of the Juvenile Court before doing so. The released records were not marked as required by Art. 412(L). Indeed, according to City/Parish, BRPD attorney Deelee Morris, there was no mechanism, procedure or policy that required BRPD to get Juvenile Court permission before releasing, without restrictions of any kind, F.B.'s Video (although Morris claims now there should have been such a procedure). Nor, apparently, was there any procedure to ensure that the minor's records were marked in compliance with Art. 412(L). There is no evidence in the record to suggest that action was taken against those within the BRPD who released the Video or that efforts have been made to prevent it from happening again.

Certainly, one reasonable inference to draw from this evidence (and one which this Court draws) is that the City/Parish's present position that Art. 412(A) is triggered by arrest rather than the filing of a petition is one which was taken after the fact in an effort to justify and defend its

actions in retaliating against Frampton for his release of the Video. This inference is supported by other evidence in the record which the Court has previously addressed.

But, regardless of which interpretation of Art. 412 is correct, it is clear that whatever protection Art 412(A) may have given these records initially, that protection was gone by the time Frampton released the Video on the media platform and at the time Defendants filed their Contempt Motion. At these times, the Video had been made public. Frampton acquired the Video legally and ethically and released the Video with the permission and "at [the] request" of the mother and guardian of F.B., the minor who was the subject of the Video.[439]

In sum, it is clear that, regardless of whether Art. 412(A) applied to the BRPD Video immediately after the arrest, it did not apply at the time Frampton released the Video and the City/Parish filed the Contempt Motion. Furthermore, even if it did apply at the time Frampton released the Video, this does not change this Court's conclusion that a major motivating factor of the City/Parish in filing its Contempt Motion was to retaliate against Frampton's exercise of free speech.

### 6. Have Defendants Met Their Burden To Show The City/Parish Would Have Brought The Contempt Motion In The Absence Of Frampton's Constitutionally Protected Right?

Because Plaintiff has met his burden regarding the first two prongs of the test for bad faith, the burden shifts to Defendants to prove they "would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered."[440] Relevant factors for the Court to consider include "whether the State prosecution was undertaken with no hope of a valid conviction . . . and the significance of the alleged criminal activity."[441]

---

[439] Doc. 38, Transcript at 38. *See also* Plaintiff's Exhibit 9, ACLU Letter.
[440] *Wilson*, 593 F.2d at 1387.
[441] *Id.* at 1387, n.22 (internal citations omitted).

The record is replete with evidence supporting the Court's conclusion that the City/Parish would not have pursued this matter in the absence of its bad faith motive to retaliate. Although, according to Defendants' current position, others violated Art. 412 both before and after Frampton supposedly did, only Frampton has been pursued with the Contempt Motion. Indeed, he is the only person ever pursued for such a violation. Although the City/Parish was aware of Frampton's possession of the Video in March of 2020, it failed to pursue a Contempt Motion at that time or even investigate how he came to be in possession of the Video. It was only immediately after Frampton issued the unfavorable press release and Video that the City/Parish filed its Contempt Motion.

In addition, for the reasons the Court has expressed in detail earlier in this ruling, the Court finds that the City/Parish pursued the Contempt Motion with no hope or reasonable expectation of obtaining a valid conviction. Finally, in measuring "the significance of [Frampton's] alleged criminal activity", the Court finds under the circumstances of this case, there was no criminal activity. Frampton released a Video that was in the public domain, belonged to his clients, and he released it on the instructions and with the knowledge of his clients.

### 7. Conclusion

In considering all the evidence and the totality of the circumstances, Plaintiff has clearly met his burden to show Defendants' bad faith in bringing the Contempt Motion against him. Defendants have failed to show it would have pursued this Motion in the absence of its impermissible purpose.

### B. Has Plaintiff Satisfied His Burden For The Issuance Of The Preliminary Injunction?

#### 1. Test

As stated earlier in this ruling, the requirements for the issuance of a preliminary

84

injunction are well known.

> To obtain a preliminary injunction, the plaintiff must show 1) that there is a substantial likelihood that it will succeed on the merits, 2) that there is a substantial threat that it will suffer irreparable injury if the district court does not grant the injunction, 3) that the threatened injury to the plaintiff outweighs the threatened injury to the defendant, and 4) that granting the preliminary injunction will not disserve the public interest. [442]

The Court is mindful that the Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements."[443]

### 2. Has Plaintiff Shown A Probability Of Success On The Merits?

Plaintiff's burden to establish his retaliation claim is the essentially same as that for demonstrating the applicability of the bad faith exception to *Younger*, i.e. he must prove that the Contempt Motion was filed against him in bad faith, for the purpose of harassment or to retaliate against him for exercising his constitutional right of free speech.[444] For the reasons set out in detail above, the Court finds that Plaintiff has met his burden.

There is an element of Plaintiff's burden in his retaliation claim which is not present in his burden for proving the applicability of the bad faith exception to *Younger*. Plaintiff must show that "the defendants' actions caused [plaintiff] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity."[445] This element "requires some

---

[442] *PASI of La, Inc.*, 334 F. Supp. 3d at 789, quoting *Sierra Club, Lone Star Chapter*, 992 F.2d at 551, citing *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974))). *See also June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d at 534–35; *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d at 635 (citing *Byrum*, 566 F.3d at 445).

[443] *Lake Charles Diesel, Inc.*, 328 F.3d at 196, quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985). *See also Bluefield Water Ass'n, Inc.*, 577 F.3d at 253.

[444] *Wilson*, 593 F.2d at 1385, n.17; *see also Torries*, 111 F. Supp. 2d at 822.

[445] *Keenan*, 290 F.3d at 258; *see also McLin*, 866 F.3d 696.

showing that the plaintiff's exercise of free speech has been curtailed."[446]

"A required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the government officials altogether in order to have a claim for retaliation." [*Keenan*] at 260. "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." [*Keenan*] at 259 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). In *Keenan*, the court found that the plaintiffs demonstrated curtailment when they asserted that they "backed off from direct involvement in helping expose unlawful practices in the constable's office," even though at least one plaintiff continued to investigate and file complaints about such practices. [*Keenan*] at 260 (internal quotations omitted).[447]

As is discussed in more detail in the next section, the Court finds that Plaintiff has met his burden to show that the Contempt Motion filed by the City/Parish caused Frampton to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the activity which gave rise to the motion.

### 3. Has Plaintiff Shown A Substantial Threat of Irreparable Harm?

The Fifth Circuit has made clear that, "when a significant chilling effect on free speech is created by a bad faith prosecution, the prosecution will thus as a matter of law cause irreparable injury regardless of its outcome, and the federal courts cannot abstain from issuing an injunction."[448]

---

[446] *Id.* at 259, citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir. 1992); *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989)). *See also McLin*, 866 F.3d at 696–97.

[447] *McLin*, 866 F.3d at 697. *See also Giese v. Jackson*, No. 19-81, 2020 WL 3493078, at *6 (S.D. Tex. May 27, 2020), *report and recommendation adopted*, No. 3:19-81, 2020 WL 3490219 (S.D. Tex. June 26, 2020).

[448] *Wilson v. Thompson*, 593 F.2d 1375, 1383 (5th Cir. 1979). *See also Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 180 (5th Cir. 2009) ("[T]he loss of First Amendment freedoms, for even minimal periods time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)); *Fitzgerald*, 636 F.2d at 944 ("A showing of bad faith or harassment is equivalent to a showing of irreparable injury under *Younger*, and irreparable injury independent of the bad faith prosecution need not be established.") (citation omitted); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 16-66, 2016 WL 3766121, at *44 (N.D. Tex. June 27, 2016) ("The chilling of speech protected by the First Amendment is in and of itself an irreparable injury.") (citations omitted); *Torries*, 111 F. Supp. 2d at 822–23; 11A Wright and Miller, Federal Practice and Procedure, § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved, such as the right to free speech…most courts hold that no further showing of irreparable injury is necessary.").

The Court in *Wilson* explained the rationale for this rule.

> With respect to the interest of the State, it by definition does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights. Perhaps the most important comity rationale of *Younger* deference – that of respect for the State's legitimate pursuit of its substantive interests, is therefore inapplicable.[449]

Here, the Court finds credible Frampton's testimony that his free speech was in fact chilled by Defendants' actions.

> Q.    So, Professor Frampton, . . . has this threat of contempt altered your behavior, your speech, anything else in any way?
>
> A.    Absolutely. In at least three ways. First, and most immediately, I had several media interviews lined up immediately after the May 28 press conference to respond to Chief Paul's remarks. . . . I immediately cancelled all of them as soon as I got the notice I was facing contempt, because I was frantically trying to get criminal defense lawyers to represent me. So I didn't speak to the press when I would have liked to and when it was in the news.
>
> Second, . . . I would very much have liked to share more of the video that was still in my possession, the Clarence Green's copy of the video. But obviously, under threat of a contempt sanction, we have not shared any more of the video that would rebut the public remarks of Chief Paul. So, I haven't talked to  - - cancelled the press interviews. I haven't shared additional interviews.
>
> And then finally, it's just been like a huge personal stress. I'm relatively new on the faculty at UVA Law School. I had to explain to my Dean what was going on and that I hoped it wouldn't affect my teaching in the fall. . . .[450]

In conclusion, the Court finds that Frampton has shown a substantial threat of irreparable harm.

---

[449] *Wilson*, 593 F.2d at 1383 (citations omitted).
[450] Doc. 38, Transcript, at 56–58.

### 4. Does The Threatened Injury To Plaintiff Outweigh The Threatened Injury To Defendants?

The threatened harm to Frampton is substantial since, if found in contempt (rightly or wrongly), he would face significant sanctions including possible time in jail. While Defendants make vague and unsubstantiated arguments about the parties being "best served" by allowing the Juvenile Court to decide the contempt motion,[451] Defendants point to no harm that they would suffer by being required to dismiss the Contempt Motion.[452] Indeed, as Plaintiff points out,[453] City/Parish Attorney Morris admitted it "would be a simple task without great expense for the City Parish, if it were ordered to do so, to withdraw its petition for contempt against Professor Frampton" and could likely be done in a one-page filing.[454] Plaintiff has satisfied this element.

### 5. Will The Granting Of The Preliminary Injunction Disserve The Public Interest?

Granting the preliminary injunction will not disserve the public interest since "[i]njunctions protecting First Amendment freedoms are always in the public interest."[455] In addition, if Defendants are to be believed and they are seriously considering filing similar Contempt Motions against an Assistant U.S. Attorney, an Assistant Federal Public Defender, this Court's Clerk, and others, the public interest will clearly be served by preventing such unfounded litigation.

While Defendants argue that granting this preliminary injunction would allow "persons who do not have juveniles' best interests in mind to obtain arrest records" by avoiding Art. 412's protection, the Court disagrees. First, this Court has found it unnecessary to decide in this ruling

---

[451] Doc. 41 at 17, ¶ 99.
[452] *Id.*, ¶¶ 98–102.
[453] Doc. 42 at 36, ¶¶ 151–152.
[454] Doc. 38, Transcript at 79–80.
[455] *Ramelli*, 2020 WL 3971279, at *10, quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir 212), quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

whether Art. 412(A) is inapplicable in all cases where a petition has not yet been filed against a juvenile. As explained elsewhere in this ruling, the Court's preliminary injunction applies to the specific (and unusual) facts of this case.

But even if the Children's Code, properly interpreted, limits Article 412(A)'s reach to cases where the petition initiating formal charges against a juvenile has been filed (and the Court believes this is the proper interpretation), the Court finds Defendants' predictions regarding the ramifications of such an interpretation are inaccurate and overblown. In this regard, the Court agrees with Plaintiff when he argues "[b]ecause the Louisiana Public Records Law does not rely primarily on Art. 412 to avoid inappropriate disclosure - it incorporates by reference *thirty-seven* separate code articles of the Children's Code as exceptions to the Public Records Law . . . Defendants' floodgates arguments are unavailing."[456]

In addition, as pointed out by Ms. Morris in response to Frampton's public records request, records subject to La. R.S. § 44:3 (protecting "[r]ecords pertaining to pending criminal litigation or any criminal litigation which can be reasonably anticipated, until such litigation has been finally adjudicated or otherwise settled") are "not…subject to disclosure through a public records request."[457]

Finally, even if Defendants' dire predictions regarding the effect of this Court's ruling were correct, changing the law to conform to Defendants' interpretation in order to correct what Defendants see as a danger to juveniles' records is a matter for the Louisiana Legislature and not this court.

Plaintiff has satisfied this final element of the test for granting a preliminary injunction.

---

[456] Doc. 42 at 37, ¶ 156, citing La. R.S. § 44:4.1(39).
[457] Defendants' Exhibit 3.

## VIII.   CONCLUSION

For the foregoing reasons, Defendants' *Motion to Dismiss under Fed.R.Civ.P. 12(b)(1) and 12(b)(6)* (Doc. 18) is **DENIED**. Plaintiff's *Motion for Preliminary Injunction* (Doc. 2) is **GRANTED,** and defendant City of Baton Rouge/Parish of East Baton Rouge is ordered to withdraw its rule to show cause why Thomas Frampton should be held in contempt of the Juvenile Court.

Signed in Baton Rouge, Louisiana, on <u>January 7, 2022</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

# APPENDIX 1



