UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

THOMAS FRAMPTON,

       *Plaintiff*,

v.

CITY OF BATON ROUGE, *et al.*

       *Defendants*.

Case No. 21-cv-00362-JWD-SDJ

**Plaintiff's Memorandum in Support of Motion for Summary Judgment**

This case is about the City of Baton Rouge's attempt to hold Professor Frampton in contempt of court after he shared video of Baton Rouge Police Department conduct.

At the preliminary injunction phase, the Court held that Professor "Frampton was engaged in a constitutionally protected right when he issued the press release critical of BRPD and shared the BRPD Video."[1] The Court held that when the City/Parish responded with a contempt motion, it did so "with no hope or reasonable expectation of obtaining a valid conviction."[2] For that reason and others, the Court found "overwhelming evidence" that "the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light."[3]

Since that ruling, Plaintiff has obtained evidence in discovery that substantially strengthens his case, in at least three ways:

**First**, depositions and interrogatory responses have confirmed that BRPD has taken <u>no steps whatsoever</u> to change its handling of juvenile records and body-worn camera footage, even though

---

[1] R. Doc. 49 at 63.
[2] *Id.* at 84.
[3] R. Doc. 49 at 64.

1

Ms. Morris testified at the preliminary injunction hearing that such changes would be necessary to avoid repeated violations of law by BRPD. As a result, the City is either knowingly allowing its employees to engage in what it believes to be repeated violations of law without consequence, or the City does not believe its own legal theory. Either explanation strengthens Frampton's case.

**Second**, BRPD turned over an evidence log for the video footage at issue. That log shows several previously-unknown persons and agencies with whom BRPD shared the video. Each additional external person/agency that BRPD shared the video with strengthens the inference that the City was acting with retaliatory intent when it sought sanctions against Professor Frampton for the same conduct.

**Third**, BRPD confirmed that it shared *unredacted* versions of the video with a range of persons, even though it only sought permission from the juvenile court to share *redacted* footage. That fact strengthens the inference that the City was not actually seeking to protect "confidentiality" when it sought sanctions against Professor Frampton.

Each of these new items strengthens the already "overwhelming" body of evidence showing that Defendants do not actually believe or follow their own proffered legal theory about restrictions on the circulation of juvenile records. Because the evidence is now more-than-overwhelming, summary judgment on First Amendment retaliation should issue. Because Professor Frampton is not seeking damages, a grant of summary judgment will obviate the need for a trial in this matter.[4]

I. **FACTUAL BACKGROUND**

This Court's recitation of the factual background of this case can be found at R. Doc. 49 at pg. 5 *et seq.* The key elements are summarized here in brief: on January 1, 2020, Clarence Green

---

[4] Professor Frampton's complaint contains three claims: (1) First Amendment Retaliation; (2) Abuse of Process; and (3) Violation of the Louisiana Constitution. This Motion only seeks summary judgment on the First Amendment claim. Because that claim allows for the full range of Frampton's requested relief, this Court need not reach the other claims if it grants summary judgment on the First Amendment Retaliation claim.

2

and his younger brother, a juvenile hereinafter referred to as F.B., were passengers in a car in Baton Rouge. BRPD officers stopped the car.[5]

During the stop, officers frisked and strip searched both brothers[6], then drove them to their mother's apartment, where they entered the home, guns drawn, and conducted what the Court described as "an unjustified, warrantless search."[7]

After completing their warrantless search of the home, F.B. was released to the care of his mother pursuant to a BPRD "custodial agreement."[8] Under the agreement, the mother promised she would bring the child to the Juvenile Court Center if necessary for "interviews and/or hearings on notification."[9] BRPD never booked F.B. or charged him with any crime, nor was any proceeding in any court ever initiated against him thereafter.[10]

Green was arrested and then indicted by a federal grand jury.[11] In preparation for Green's prosecution, the U.S. Attorney acquired body camera footage of the stop and the warrantless search from the BRPD.[12] During discovery, the U.S. Attorney gave the footage to Green, without limitation.[13] In the lead up to trial, Green's federal public defender filed a motion to suppress and entered the footage in support of the motion.[14] The body camera footage was thereby entered into the public record.[15] It was not admitted under seal, stamped confidential, or in any way designated as not to be shared.[16]

---

[5] Transcript of Preliminary Injunction Hearing ("Transcript") at 19:19-25. R. Doc. 49 at 5.
[6] Transcript at 20:1-2; R. Doc. 49 at 5.
[7] Transcript. at 20:03-20:6; Plaintiff's Preliminary Injunction Hearing ("PI") Exhibit 3, *USA v. Green*, R. Doc. 35 at n. 1.
[8] Transcript. at 20:13-15; R. Doc. 49 at 34.
[9] Plaintiff's PI Exhibit 2 (Custodial Agreement).
[10] Transcript at 26:9-10; R. Doc. 49 at 7, 65.
[11] *Id.* at 20:11-20; *USA v. Green,* 20-cr-00046-BAJ-SDJ (M.D. La.)
[12] *Id.* at 103:3-9; Plaintiff's PI Exhibit 13 (Receipt from Clerk of Court); R. Doc. 49 at 64.
[13] *Id.* at 102:25-103:2; R. Doc. 49 at 64.
[14] *Id.* at 20:21-22; *USA v. Green*, R. Doc. 26. R. Doc. 49 at 8, 65.
[15] *Id.* at 29:10-16; R. Doc 49, at 8, 65.
[16] *Id.* at 28:25-29:5; Transcript at 36:6-10; R. Doc. 49, at 8, 65.

During an evidentiary hearing on November 20, 2020, Officer Camallo testified under oath and gave "multiple conflicting accounts," per the Court.[17] The United States moved to dismiss the indictment.[18] Ordering Green's immediate release, the Court declared that "the state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights."[19] After that, Professor Frampton undertook to represent the Green family *pro bono* in a civil suit against the BPRD, *Green v. Camallo*, 21-cv-00001-JWD-EWD (M.D. La.)[20]

During his representation of the Green family in their civil suit, Professor Frampton received a copy of the body camera video from the federal public defender, which had received the video from the U.S. Attorney's Office, which had received the video from BPRD.[21]

By early 2021, it was apparent that the body camera footage had been shared beyond its initial custodians. On January 12, 2021, the Baton Rouge Advocate published a news article describing the footage. The reporter confirmed in writing to Professor Frampton that she independently acquired a copy of the video.[22] Professor Frampton discussed his possession of the video with the Parish Attorney's office during a March 2021 settlement conference[23] and in conversation over the telephone with District Attorney Hillar Moore.[24] At no point in either of those conversations did anyone suggest or express to Professor Frampton that the video was confidential or that sharing it would be a violation of the law.[25] Nor did any party ever state or

---

[17] R. Doc. 49 at 8.
[18] *USA v. Green*, R. Doc. 35 at n. 1.; R. Doc. 49 at 8.
[19] *USA v. Green*, R. Doc. 35 at n. 1.
[20] Transcript at 26:21-27:4; R. Doc. 49 at 9.
[21] Transcript at 41:5-11; R. Doc. 49 at 9.
[22] Plaintiff's Exhibit 5 (John Simerman and Lea Skene, *Federal judge voids gun charges, calls bad BRPD bust a 'foul' against justice system*, BATON ROUGE ADVOCATE, Jan. 12, 2021); Transcript at 30:5-9 (describing that Lea Skene confirmed in writing she had obtained the footage); Transcript at 31:12-17 (describing details in article only available in footage and not Judge Jackson's opinion); R. Doc. 49 at 65.
[23] Transcript at 35:11-14; R. Doc. 49 at 11, 65.
[24] Transcript at 39:2-6; R. Doc. 49 at 11.
[25] Transcript at 36:2-5; R. Doc. 49 at 9, 11.

4

suggest to Professor Frampton that a juvenile proceeding of any sort against F.B. was pending, or even contemplated, or had ever existed in the past.[26]

By May 14, 2021, the parties in the Green Family's civil action against the Baton Rouge Police Department reached a settlement agreement and moved to dismiss the case.[27] The settlement agreement did not include any confidentiality or non-disparagement terms.[28]

As no officers had been disciplined at that point, the Green family asked Professor Frampton to further publicize the video. Frampton issued "a press release on their behalf as the best way to try to actually get some accountability with respect to what had happened on January 1st."[29] On May 27, 2021, as a result of that press release, BRPD's treatment of the Green Family became national news.[30]

The following morning, the City of Baton Rouge and the Baton Rouge Police Department (Defendants) filed a petition in juvenile court seeking permission to release a redacted version of even more of the video.[31]

Explaining that, due to the publicity surrounding the video, "the City of Baton Rouge ha[d] received a substantial amount of negative correspondence from the public,"[32] Defendants also sought a "rule to show cause why attorney Thomas Frampton…should not be held in contempt pursuant to Louisiana Children's Code art. 1509 for the public release of the videos before seeking authorization with this Court under Louisiana Children's Code art 412."[33] Defendants made no effort to give notice to the mother of the juvenile in question or to his lawyer, Professor Frampton, the subject of the rule to show cause.[34]

---

[26] Transcript at 36:2-5.
[27] R. Doc. 49 at 8; *Green v. Camallo*, 21-cv-00001, R. Doc. 10 (Joint Motion to Dismiss); Transcript at 36:11-16.
[28] *Green v. Camallo*, 21-cv-00001, R. Doc. 10 (Joint Motion to Dismiss); Transcript at 36:11-16.
[29] Transcript at 36:22-37:4; R. Doc. 49 at 12.
[30] Transcript at 41:24-42:2.
[31] R. Doc. 49 at 13; Plaintiff's PI Exhibit 7 (Defendants' Petition for Rule to Show Cause), at ¶ 1.
[32] *Id.* at ¶ 4.
[33] *Id.* at ¶ 8.
[34] Plaintiff's PI Exhibit 1, (Declaration of Deelee Morris); Transcript at 43; R. Doc. 49 at 13.

At about noon on May 28, 2021, a Juvenile Court judge signed an *ex parte* order that granted Defendants permission to release more of the body camera footage and set a hearing on the Contempt Motion.[35] BRPD served Professor Frampton with the Contempt Motion right as it began its press conference.[36] No inquiry was made on behalf of the City/Parish or BRPD as to how Professor Frampton came to possess the video.[37]

On June 2, 2021, the American Civil Liberties Union of Louisiana sent a letter to Defendants, telling them that the footage was already a public record at the time Frampton shared it.[38] According to the testimony of Special Assistant Parish Attorney Deelee Morris, the Parish Attorney's office received the ACLU's letter and had no reason to doubt that the footage was already a public record, as the letter stated.[39] Nor, according to Morris, was there any reason to doubt that, as the letter said, the purportedly nonpublic video had already been obtained and reported on by the largest newspaper in the region.[40] The City-Parish declined, however, to withdraw its petition for contempt.[41]

## II. PROCEDURAL BACKGROUND, KEY HOLDINGS OF THIS COURT, AND SUMMARY OF EVIDENCE OBTAINED AFTER PRELIMINARY INJUNCTION.

Plaintiff brought this action seeking injunctive relief on June 23, 2021, in response to Defendants' filing of a motion for rule to show cause against Plaintiff in the Louisiana Juvenile Court.[42] Defendants moved to dismiss the case on July 5, 2021.[43] A hearing on Plaintiff's motion for a preliminary injunction was held on August 7, 2021.

---

[35] Plaintiff's PI Exhibit 7, Rule to Show Cause; Plaintiff's Exhibit 1, Declaration of Deelee Morris at ¶ 4; R. Doc 49 at 14.
[36] Transcript at 43.
[37] R. Doc. 49 at 11.
[38] Plaintiff's Exhibit 9. The letter noted, with a specific citation to the case record, that the "United States made the relevant footage public in November 2020," in the proceeding against Clarence Green.
[39] Transcript at 73:19-20; R. Doc. 49 at 16.
[40] Transcript at 74:6-9 ("Q. When you received this letter, did you have any reason to doubt that part of the letter was untrue? A. No.") R. Doc. 49 at 16.
[41] Transcript at 74:22-24
[42] R. Doc. 1.
[43] R. Doc. 14.

On January 7th, 2022, this Court granted Plaintiff's request for preliminary injunction, ordering Defendants to withdraw their petition for rule to show cause. In the same ruling, this Court denied the Defendants' motion to dismiss. The following are some key holdings of this Court from that order:[44]

- "Frampton was engaged in a constitutionally protected right when he issued the press release critical of BRPD and shared the BRPD Video."[45]

- "[T]he overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light."[46]

- "[W]hen all the circumstances are considered, the Court concludes that the City/Parish brought its Contempt Motion in bad faith."[47]

- "[T]he Court finds that the City/Parish pursued the Contempt Motion with no hope or reasonable expectation of obtaining a valid conviction."[48]

- Children's Code "Art. 412 clearly does not apply to the specific facts of this case."[49] That is because in the absence of a filed petition, "there is no proceeding before the Juvenile Court."[50]

- "[T]he Court finds under the circumstances of this case, there was no criminal activity. Frampton released a Video that was in the public domain, belonged to his clients, and he released it on the instructions and with the knowledge of his clients."[51]

After the Court issued the preliminary injunction, Plaintiff engaged in written discovery and took two depositions of BRPD employees. Defendants conducted no discovery. The following are the three key facts established in that post-injunction discovery:

---

[44] None of these specific holdings turned on the preliminary injunction standard. Accordingly, they are the law of the case at the summary judgment stage. *See Loumar, Inc. v. Smith*, 698 F.2d 759 (5th Cir. 1983) ("The law of the case doctrine is closely related to the principle of res judicata. The latter prevents collateral attack on the result of a completed lawsuit between the same parties; the former prevents collateral attacks against the court's rulings during the pendency of a lawsuit.")
[45] R. Doc. 49 at 63.
[46] *Id*. at 64.
[47] *Id*. at 74.
[48] *Id*. at 84.
[49] *Id*. at 77.
[50] *Id*. at 78.
[51] *Id*. at 84.

1. **BRPD has not changed its practices, despite Ms. Morris testimony that it must to avoid continued legal violations**.

In her preliminary injunction hearing testimony, Deelee Morris testified that under Defendant's legal theory, BRPD would have to change its practices of handling juvenile arrest records and video footage to avoid repeatedly breaking the law.[52] Post-hearing discovery confirms that such a change has not happened. BRPD representative Valerie Singleton testified at deposition that there have been no changes, or requests to change, BRPD's practices of handling juvenile arrest records.[53] BRPD representative Matt Johnson similarly testified that there have been no changes, or requests to change, BRPD's practices of handling juvenile video.[54] And BRPD confirmed that it has no documents whatsoever reflecting "any mechanism or procedure, or any discussion of any mechanism or procedure, regarding a process of seeking the permission of juvenile court to share juvenile records."[55] Thus, at least "a couple of times a week," BRPD continues to "transmit[] records of juvenile arrests outside of BRPD" without juvenile court permission.[56]

1. **BRPD shared unredacted footage.** Defendants sought juvenile court permission to share a redacted version of body-worn camera footage.[57] But discovery confirms that what they shared with a wide range of persons was *unredacted* footage.[58]

---

[52] Transcript at 101, 118-119.

[53] Ex. D at 11:1-7 ("Q. Okay. So the actual processes that the Baton Rouge Police Department uses to process records of juvenile arrests has not changed since 2020, agreed? A. No, it hasn't, except we have a new reporting system that we also have to feed into it."); at 17:23-18:2 ("Q. But at no time since this hearing has Deelee Morris or anybody else told you to treat juvenile arrest records or juvenile arrest reports any differently than you did before, agreed? A. No, never had.").

[54] Ex. E at 12:8-20 ("Q. Since August of 2021 have there been any official policy changes to the way body cam footage depicting juveniles is handled? A. No, sir. Q. Since August of 2021, have there been any informal changes to the way body cam footage depicting juveniles is handled? A. No, sir. Q. Since August of 2021, have there been any direction that body cam footage depicting juveniles needs to be separated out somehow? A. No, sir.") Mr. Johnson was specifically asked about the change that Ms. Morris testified "needs to be done." Id. at 14:3-23. Mr. Johnson confirmed that no such change was made. Id. at 14:24-15:1.

[55] Ex. A at pg. 4 (Response to RFP 13).

[56] Ex. D at 13:9-13.

[57] Plaintiff's PI Exhibit 7 at pg. 2,3.

[58] Ex. B at 3-4 (Response to Interr. 22).

8

2. **BRPD shared the footage with more people than previously known.** The City's theory is that any sharing of juvenile arrest footage without juvenile court permission is a violation punishable by contempt and jail time. At the preliminary injunction stage, this Court reviewed evidence and noted that "Defendants shared the video at issue here to the U.S. Attorney's Office without seeking a court order, which under their own theory would be contemptuous conduct."[59] Post-injunction discovery has uncovered a range of other persons BRPD shared the video with, including Kevin Allred (Bureau of Alcohol, Tobacco, Firearms, and Explosives), Kyle Kershaw (Baton Rouge Police Department Union Attorney), and James Raines (BRPD's outside counsel in a disciplinary matter).[60]

### III.  LAW AND ARGUMENT

Summary judgment is appropriate if the movant shows there is no genuine dispute about any material fact and the movant is entitled to judgment as a matter of law.[61]

### A.  Plaintiff is Entitled to Summary Judgment on his First Amendment Retaliation Claim.

The "law is well settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions…for speaking out.[62] This protection goes so far as to require that "public officials may not…respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority."[63] A First Amendment retaliation has three elements: (1) that the plaintiff's conduct was constitutionally protected; (2) that the defendant's actions "caused [the speaker] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity;" and (3) that the defendant's actions were "substantially motivated against

---

[59] R. Doc. 49 at 40.
[60] Ex. C at 3-5 (Response to Interr. 21).
[61] Fed. R. Civ. P. 56; *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015).
[62] *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (First Amendment prohibits "adverse governmental action taken against an individual in retaliation for protected activities.)
[63] *Bd. of County Comm'rs, Waubaunsee Cty., v. Umbehr*, 518 U.S. 668 (1996) NEED TO RECHECK THIS.

9

the plaintiffs' exercise of constitutionally protected conduct.[64] For the reasons described below, Professor Frampton has satisfied each element.

### i. Professor Frampton Was Engaged in Constitutionally Protected Speech.

The general proposition that "freedom of expression upon public questions is secured by the First Amendment…[is] long settled."[65] This constitutional safeguard is fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.[66] Matters of public concern are those which can be fairly considered as relating to any matter of political, social, or other concern to the community.[67] "The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, *especially* when it concerns the operation of a police department."[68]

Here, this Court already ruled that "Frampton was engaged in a constitutionally protected right when he issued the press release critical of BRPD and shared the BRPD Video."[69] The Court noted that Professor Frampton's conduct "represents a classic example of exercising the right of free speech."[70] That holding is the law of the case. It is also correct because (1) Professor Frampton's speech was on a matter of public concern[71] and (2) Defendants have not offered any legitimate exception that would exclude Professor Frampton's speech from First Amendment protection. Specifically, this Court held that Children's Code "Art. 412 clearly does not apply to

---

[64] *See Keenan*, 290 F.3d at 258.
[65] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).
[66] *Id.*
[67] *Connick v. Myers*, 461 U.S. 138, 146 (1983); *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004).
[68] *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 (5th Cir. 1988).
[69] R. Doc. 49 at 63. It is also undisputed. As this Court noted, "Defendants do not disagree that Frampton's actions were an expression of free speech." *Id*. at 24.
[70] *Id.* at 63.
[71] *See Brawner, supra*; *see also USA v. Green*, R. Doc. 35 at n. 1 ("In the Court's view, this case is emblematic of precisely the type of 'foul' blows universally condemned by our jurisprudence.")

10

the specific facts of this case,"[72] because, in the absence of a filed petition, "there is no proceeding before the Juvenile Court."[73]

### ii. Defendants' Actions Caused Harm and Chill Free Speech.

The second element of a First Amendment retaliation claim requires the plaintiff show that defendants' actions "caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the constitutionally protected [speech]."[74] To chill an individual's speech is to deter that individual from engaging in speech, by instilling in the individual a fear of negative repercussions resulting from the speech.[75] The threat of criminal prosecution can inhibit the speaker from making *true* statements, thereby "chilling" a kind of speech that lies at the First Amendment's heart.[76]

Here, not only would BRPD's actions chill a person of ordinary firmness, they in fact chilled Professor Frampton. He immediately cancelled all of his media interviews scheduled to respond to Chief Paul's press conference, because he was trying to get criminal defense lawyers to represent him.[77] He wants to rebut Chief Paul's statements through the release of more of the video but has foregone doing so under the threat of contempt.[78] And the personal stress resulting from the threat of contempt undergone by Professor Frampton has had a serious chilling effect on him. The Professor is relatively new faculty member of the University of Virginia Law School. The City's retaliation forced Professor Frampton to have to explain to the Dean the allegations that he had invaded a juvenile's privacy rights.[79] For that reason, the Court held that it "finds credible

---

[72] R. Doc. 49 at 77.
[73] *Id.* at 78.
[74] *Slegelmilch v. Pearl River Cty. Hosp. & Nursing Home,* 655 F. App'x 235, 240 (5th Cir. 2016)
[75] *See Alexander v. U.S.*, 509 U.S. 544, 555 (1993); *Speech First, Incorporated v. Fenves*, 979 F.3d 319 330 (5th Cir. 2020).
[76] U*nited States v. Alvarez*, 567 U.S. 709, 733 (2012) (J. Breyer, concurring) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340-41 (1974)).
[77] Transcript at 56:10-21.
[78] *Id.* at 57:19-24.
[79] Transcript at 58:1-8.

11

Frampton's testimony that his free speech was in fact chilled by Defendants' actions."[80] The Court also noted that "a finding of contempt could have negative implications for Frampton's employment at the University of Virginia Law School and his license to practice law."[81] Accordingly, Defendants' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the constitutionally protected speech.

### iii. Defendants' Contempt Petition Was Substantially Motivated Against Professor Frampton's Exercise of His First Amendment Right.

The final element of a retaliation claim asks whether the Defendants' actions were substantially motivated against the Plaintiffs' exercise of constitutionally protected conduct.[82] At the preliminary injunction stage, the Court reviewed the evidence and found that "the overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light."[83] The overwhelming evidence cited by the Court included at least seventeen aspects:

- "Even though the BRPD Video included the arrest and search of the juvenile F.B., no effort was made by the BRPD or the City/Parish to request permission from the Juvenile Court before releasing the Video."[84]

- BRPD did not "BRPD mark the Video as confidential or place any restrictions on the use or dissemination of the Video" before sharing it.[85]

- "The Video was not admitted under seal or otherwise protected nor was its use restricted and it therefore became a public record of this Court."[86]

- Ms. Morris testified that she had not "requested any record" from the Clarence Green federal criminal case, but the record shows that "Deelee Morris herself requested the transcript of the Motion to Suppress hearing."[87]

---

[80] R. Doc. 49 at 87.
[81] *Id.* at 56.
[82] *See Keenan*, 290 F.3d at 258.
[83] R. Doc. 49 at 64.
[84] *Id*. at 7. *See also id*. at 64.
[85] *Id* at 7. *See also id.* at 65.
[86] *Id.* at 8. *See also id.* at 65.
[87] R Doc.49 at 66.

- At a March 2021 "at the settlement conference, no one with the City/Parish Attorney's Office raised a concern about [Frampton's] possession of the Video or suggested that he or the individual who provided it to him had violated the Children's Code."[88]

- "City/Parish attorneys did not tell Frampton he should not share it with anyone else."[89]

- The day after Frampton caused the video to become a national news story, Defendants filed a petition in Juvenile Court. "No effort was made to contact or give notice to F.B.'s mother or the Green family's lawyer."[90] The petition sought to hold Professor Frampton in contempt.

- Prior to Frampton's sharing of the video, "the BRPD Video was released to at least five persons without anyone having sought or gained permission of the Juvenile Court."[91]

- Defendants take the position that "1) the BRPD, 2) the U.S. Attorney, 3) the Federal Public Defender, 4) the Middle District Clerk of Court, and 5) Clarence Green" all violated "the same provision of the Children's Code it alleges was violated by Frampton." But the Defendants have "not pursued a contempt motion against anyone other than Frampton."[92] When asked why that is so, Ms. Morris responded "I don't know."[93]

- "[I]n a rush to obtain videos in time for a 3:00 p.m. police press conference, the City/Parish entirely skipped the required procedures of the Children's Code that protect a child's confidentiality interests."[94]

- "Defendants admitted that they have never sought sanctions against any person the way they have against Frampton."[95] Indeed, "the only one the City/Parish sought to sanction was the one who issued a press release critical of BRPD and sought that sanction on the day following the negative release."[96]

- "Defendants shared the video at issue here to the U.S. Attorney's Office without seeking a court order, which under their own theory would be contemptuous conduct."[97]

- BRPD "regularly provides video to various entities, but without 'any mechanism in place at the Baton Rouge City Police Department or with the City Parish' that would prevent them from sharing video of juvenile arrests."[98]

- "City Parish lawyers didn't bother to contact Frampton to find how he had obtained the Video before immediately (the morning after the press release) filing its motion to hold

---

[88] *Id.* at 11. *See also id*. at 65, 70-71.
[89] *Id.*
[90] *Id.* at 13.
[91] *Id.* at 14.
[92] *Id.* at 15-16. *See also id*. at 66.
[93] *Id.* at 72.
[94] *Id.* at 34. *See also id.* at 67-8.
[95] *Id.* at 37, 70.
[96] *Id.* at 73.
[97] *Id.* at 40.
[98] R. Doc. 49 at 40-41, 70.

him in contempt." This constituted a failure to conduct the reasonable inquiry required by La. Code Civ. Proc. art. 863.[99]

- Defendants continued to pursue sanctions against Frampton even after being advised the video "was already a public record" and approved by the Green family.[100]

- Plaintiff "proved that, *in this case*, the City/Parish twice released F.B.'s records or Video without first getting permission of the Juvenile Court: first, when BRPD released the Video to the U.S. Attorney without markings or restrictions and second, when City/Parish attorney Joseph Scott released F.B.'s records in discovery without first requesting permission of the Juvenile Court. No sanctions were sought against BRPD or Scott.[101]

- Because of all of the above, the Court found that "City/Parish pursued the Contempt Motion with no hope or reasonable expectation of obtaining a valid conviction."[102]

Since that time, the evidence of retaliation has grown stronger. Specifically, this Court noted that if "the position the City/Parish now takes regarding Art. 412 was genuine and not an *ex post facto* attempt to justify its Contempt Motion, the Court would have expected there to be a mechanism or procedure in place at BRPD to ensure that permission from the Juvenile Court would be sought and received before releasing materials like the Video."[103] The Court observed, however, that as of August 2021, there "were no such mechanisms or procedures in place, although City/Parish lawyer Morris now takes the position that there should have been."[104]

Post-injunction discovery confirms that even now, nearly a year after Morris' testimony, there still is no mechanism or procedure in place to avoid what Defendants say is law-breaking behavior. In written discovery and deposition testimony, BRPD and its representatives have confirmed that no steps whatsoever have been taken to change their practices of handling juvenile records or video footage.[105] So either Defendants are subjecting their employees to repeated risk of sanctions and jailtime – or (more plausibly) they do not actually believe their own legal theory.

---

[99] *Id.* at 67.
[100] *Id.* at 69, 74.
[101] *Id.* at 71.
[102] *Id.* at 84.
[103] *Id*. at 70.
[104] *Id.*
[105] Ex. D (Dep. of Valerie Singleton); Ex. D (Dep. of Matt Johnson); Ex. A (RFP Response).

Furthermore, post-injunction discovery has uncovered a range of additional persons BRPD shared the video with, including Kevin Allred (Bureau of Alcohol, Tobacco, Firearms, and Explosives), Kyle Kershaw (Baton Rouge Police Department Union Attorney), and James Raines (BRPD's outside counsel in a disciplinary matter).[106] All of these persons received an unredacted version of the video,[107] even though BRPD only sought permission to share a redacted version.[108] This further strengthens the inference that Defendants' legal theory is an *ex post facto* attempt to justify its Contempt Motion, rather than a genuine belief.

## IV. CONCLUSION

At the preliminary injunction stage, this Court found "overwhelming" evidence of a First Amendment violation. Subsequent discovery has strengthened that body of evidence. And Defendants' post-preliminary injunction conduct (taking no steps to change their practices, despite saying that such changes would be needed to avoid repeated lawbreaking) corroborates the Court's conclusion. Accordingly, summary judgment on Plaintiff's First Amendment claim and a permanent injunction should issue. If the parties cannot amicably resolve the issue of attorneys fees, Plaintiff will then submit a fee petition to the Court.[109]

---

[106] Ex. B and C (Response to Interrogatories.).
[107] Ex. B.
[108] Plaintiff's PI Exhibit 7.
[109] The Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, authorizes the District Court to award the prevailing party "a reasonable attorney's fee," which may be recovered from officials sued under Section 1983. *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc*., 446 U.S. 719, 737 (1980). A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

Respectfully submitted,

*/s/ William Most*
**William Most (La. Bar. No. 36914)**
Most & Associates
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
T: (504) 509-5023
williammost@gmail.com

**Katie M. Schwartzmann (La Bar No. 30295)**
Tulane First Amendment Law Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
kschwartzmann@tulane.edu
o: (504) 862-8813

**Dayton Dunbar**
Tulane First Amendment Law Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
ddunbar@tulane.edu

**Denver Nicks**
Tulane First Amendment Law Clinic
6329 Freret Street, Suite 130
New Orleans, La 70118
dnicks@tulane.edu

**Jane C. Hogan (La. Bar. No. 35172)**
Hogan Attorneys
310 North Cherry Street
Hammond, La 70401
Ph : (985) 542-7730
Fax : (985) 542-7756
jane@hoganattorneys.com

*Attorneys for Plaintiff*